ACCEPTED
03-15-00280-CV
6142048
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 3:53:59 PM
JEFFREY D. KYLE
CLERK

# No. 03-15-00280-CV

_____

In the Third Court of Appeals
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

7/20/2015 3:53:59 PM

JEFFREY D. KYLE
Clerk

_____

**Michael J. DeLitta,**

*Appellant,*

v.

**Nancy Schaefer,**

*Appellee.*

_____

## BRIEF OF APPELLEE

_____

Donald R. Taylor
  State Bar No. 19688800
  dtaylor@taylordunham.com
Stacey Reese (Of Counsel)
  State Bar No. 24056188
  stacey@reeselawpractice.com
TAYLOR DUNHAM & RODRIGUEZ LLP
301 Congress Avenue, Suite 1050
Austin, Texas 78701
(512) 473-2257
(512) 478-4409 (fax)

Lisa Bowlin Hobbs
  State Bar No. 24026905
  Lisa@KuhnHobbs.com
Kurt Kuhn
  State Bar No. 24002433
  Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, Suite 310
Austin, Texas 78731
(512) 476-6003
(512) 476-6002 (fax)

Howard F. Carter, Jr.,
  State Bar No. 03916500
  sam@scarterlawfirm.com
HOWARD F. CARTER, JR., P.C.
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
(972) 455-2001
(972) 455-2015 (fax)

COUNSEL FOR APPELLEE

July 20, 2015

## IDENTITY OF PARTIES AND COUNSEL

In addition to the parties and counsel listed by Appellant in his brief, pursuant to TRAP 38.1, Appellee lists the following:

**Trial Counsel for Appellant:** Timothy J. Herman[1]
State Bar No. 09513700
HOWRY BREEN & HERMAN LLP
1900 Pearl Street
Austin, Texas 78705
(512) 474-7300
(512) 474-8557 (fax)

---

[1] Mr. Herman appeared at the hearing on the temporary injunction and remains trial counsel for DeLitta. Yet he did not appear as counsel in this interlocutory appeal.

Identity of Parties and Counsel...................................................................... ii

Table of Contents...................................................................................... iii

Index of Authorities.................................................................................... v

Statement of the Case ............................................................................... vii

Statement Regarding Oral Argument......................................................... viii

Issues Presented......................................................................................... ix

Statement of Facts....................................................................................... 1

    A.    In this business dispute over the ownership of Axiom, Schaefer asserts claims against her co-owner DeLitta for breach of fiduciary duty for DeLitta's repeated and ongoing self-dealing and usurpation of corporate assets. ................................................... 1

    B.    Schaefer has already successfully sought temporary relief enjoining DeLitta's malfeasance, enforcing those prohibitions, and placing the company in a partial receivership.......................................... 2

    C.    Axiom is a medical consulting company that provides injury management and medical advice concerning work-related accidents. ..................................................................................... 3

    D.    DeLitta, Axiom's "Medical Director," is not a medical doctor................ 3

    E.    Yet DeLitta unabashedly portrays himself, professionally and personally, as "Dr. DeLitta."........................................................ 4

    F.    DeLitta's fake persona is effective: clients and employees believe he is a medical doctor. ................................................................ 7

    G.    DeLitta justifies the title because he obtained a "Ph.D." in psychology from a diploma mill. .................................................. 8

    H.    The trial court correctly determined that use of the title "Dr. DeLitta" is highly misleading when used by a "medical director" of a company in a medical-related industry and that enjoining DeLitta from doing so was necessary to protect Axiom's corporate assets pending final resolution of this lawsuit....................................... 8

Standard of Review ................................................................................................ 10

Summary of Argument ........................................................................................... 11

Argument................................................................................................................. 11

I.     DeLitta misleads the Court by suggesting Schaefer asserts a statutory cause of action under the Occupation Code......................................................................... 11

     A.     The trial court's injunction is based on Schaefer's probable right to recover on her breach of fiduciary claims—a claim DeLitta does not even challenge. .................................................................................... 12

     B.     Violations of the Occupations and Penal Codes are the conduct enjoined, not the cause of action asserted, and prohibiting that misconduct is necessary to preserve the status quo of Axiom as a reputable entity free from civil and criminal liability. ............................... 13

     C.     There is ample evidence to support the trial court's determination that DeLitta was fraudulently holding himself out as a medical doctor. .................................................................................................... 16

II.     The trial court did not abuse its discretion in determining that DeLitta's fraudulent conduct threatened Axiom with imminent harm.............................. 19

Conclusion............................................................................................................... 23

Certificate of Compliance...................................................................................... 25

Certificate of Service ............................................................................................. 25

# INDEX OF AUTHORITIES

**Cases**

*Butnaru v. Ford Moter Co.*,
   84 S.W.3d 198 (Tex. 2002) ................................................................10, 19, 23

*Canteen Corp. v. Republic of Tex. Props., Inc.*,
   773 S.W.2d 398 (Tex. App.—Dallas 1989, no writ) ............................................ 11

*City of Houston v. Mem'l Bend Util. Co.*,
   331 S.W.2d 418 (Tex. Civ. App.—Houston 1960, writ ref'd n.r.e.) ................... 20

*Davis v. Huey*,
   571 S.W.2d 859 (Tex.1978) ................................................................10, 23

*Downer v. Aquamarine Operators, Inc.*,
   701 S.W.2d 238 (Tex. 1985) ..................................................................... 10

*Ebony Lake Healthcare Ctr. v. Texas Dep't of Human Servs.*,
   62 S.W.3d 867 (Tex. App.—Austin 2001, no pet.) ................................................ 22

*ERI Consulting Eng'rs, Inc. v. Swinnea*,
   318 S.W.3d 867 (Tex. 2010) ..................................................................... 23

*Featherstone v. Indep. Serv. Stations Ass'n*,
   10 S.W.2d 124 (Tex. App.—Dallas 1928, writ denied) ......................................... 13

*Franklin Sav. Ass'n v. Reese*,
   756 S.W.2d 14 (Tex. App.—Austin 1988, no writ) .............................................. 12

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*,
   281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) .............................. 19

*Jenkins v. Transdel Corp.*,
   No. 03-04-00033-CV, 2004 WL 1404364 (Tex. App.—Austin June 24,
   2004, no pet.) ............................................................................... 18

*Jim Rutherford Inv., Inc. v. Terramar Beach Cmty. Ass'n*,
   25 S.W.3d 845 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) .............. 20

*Keightley v. Republic Ins. Co.*,
   946 S.W.2d 124 (Tex. App.—Austin 1997, no writ) ........................................... 23

*Operation Rescue Nat'l v. Planned Parenthood of Houston*,
   937 S.W.2d 60 (Tex. App.—Houston [14th Dist.] 1996, writ denied) .............. 22

*Pydia, Inc. v. State*,
 212 S.W.3d 513 (Tex. App.—Austin 2006, no pet.)................................................ 10

*R & R Res. Corp. v. Echelon Oil & Gas, L.L.C.*,
 No. 03-05-00479-CV, 2006 WL 66458 (Tex. App.—Austin Jan. 10,
 2006, no pet.) ......................................................................................................... 22

*Rattikin Title Co. v. Grievance Committee*,
 272 S.W.2d 948 (Tex. Civ. App.—Fort Worth 1954, no writ)............................. 20

*T&R Assocs., Inc. v. City of Amarillo*,
 601 S.W.2d 178 (Tex. Civ. App.—Amarillo 1980, no writ)................................. 21

*T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*,
 965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).................. 11

*Universal Health Servs. v. Thompson*,
 24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.)................................................ 13

**Statutes**

TEX. OCC. CODE §101.201 ............................................................................................. 14

TEX. OCC. CODE §204.201 ............................................................................................... 4

TEX. OCC. CODE §204.202 ............................................................................................... 4

TEX. OCC. CODE §204.204 ............................................................................................... 4

TEX. OCC. CODE §204.302 ........................................................................................ 4, 14

TEX. PENAL CODE §32.52 .............................................................................................. 15

## STATEMENT OF THE CASE

*Nature of the Case:*   The underlying suit is a business dispute between business partners Michael DeLitta and Nancy Schaefer over the ownership and management of Axiom Medical Consulting, LLC ("Axiom"). On December 12, 2014, Appellee filed a Verified Application for Temporary Injunction seeking to prohibit Appellant from representing himself as a medical doctor.[2]

*Trial Court:*   The Honorable Orlinda Naranjo, 201st District Court, Travis County, Texas.

*Trial Court Disposition:*   After an evidentiary hearing, Judge Naranjo entered a Temporary Injunction Order,[3] which was amended by agreement (and without substantive change) on April 29, 2015.[4]

---

[2] CR323–59.
[3] CR624–31.
[4] CR632–38.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant has waived his right to oral argument in this appeal. Appellee agrees that oral argument is not necessary for the Court to fully understand and properly resolve this interlocutory appeal.

**ISSUES PRESENTED**

1.     In a business dispute about the ownership and mismanagement of a medical consulting company, does a trial court abuse its discretion by enjoining the CEO from misleading others into falsely believing he is a medical doctor to prevent harm to the company's reputation and to protect the company from potential civil and criminal liability?

**A.     In this business dispute over the ownership of Axiom, Schaefer asserts claims against her co-owner DeLitta for breach of fiduciary duty for DeLitta's repeated and ongoing self-dealing and usurpation of corporate assets.**

This is a business dispute over the ownership and management of Axiom Medical Consulting, LLC.[5]  DeLitta and Schaefer partnered to form the company in 1999.[6]  Over a decade later, the relationship between the two owners deteriorated and, in September 2013, DeLitta started taking drastic measures to unilaterally push Schaefer out of the company and undermine her goodwill within the company.[7]

Schaefer sued.[8]  Schaefer claims, among other things, that DeLitta breached oral and written contracts, committed fraud, and breached his fiduciary duties to her and to the company.[9]  Her fiduciary claims include allegations that Delitta is depriving her of her 50% ownership in Axiom and her rights as a member and manager of Axiom, and that DeLitta is engaging in self-dealing to the detriment of Axiom, including unilaterally refusing to implement the resolutions of the Board and misusing corporate assets for his personal benefit.[10]  Schaefer also asserts a claim for negligent misrepresentation because DeLitta provided false information for the guidance of others.[11]

---

[5] CR125–27.
[6] CR400.
[7] CR403–04.
[8] CR3.
[9] CR409–17.
[10] CR413–14.
[11] CR414.

1

**B.** **Schaefer has already successfully sought temporary relief enjoining DeLitta's malfeasance, enforcing those prohibitions, and placing the company in a partial receivership.**

Upon filing suit, Schaefer immediately sought and received a temporary restraining order enjoining DeLitta from interfering with her access to and position in the company.[12] Eventually, the parties entered into an Agreed Temporary Injunction. The Agreed Injunction prohibited the parties from undertaking certain acts, similar to the TRO, and also obligated the parties to file a joint motion for appointment of a provisional member to break deadlock between Schaefer and DeLitta.[13]

Unfortunately, the Court is intimately familiar with this litigation from this point. This is the *fifth* appeal that DeLitta has filed. Four of those appeals were attempted interlocutory appeals.[14] One was a mandamus proceeding.[15] None have been successful.[16] And, in addition to this appeal, one other remains pending before the Court.[17]

DeLitta's intentional, willful, and repeated self-dealing and violations of the injunction—which harm both Schaefer and Axiom—have gotten so bad that the trial

---

[12] CR405.

[13] *Id.*

[14] *See* No. 03-15-00280-CV (this appeal); No. 03-14-000425-CV (appeal of order appointing receiver); No. 03-14-00426-CV (appeal of an order enforcing the terms of agreed temporary injunction); No. 03-15-00085-CV (appeal of order refusing to dissolve agreed temporary injunction).

[15] No. 03-14-00423-CV (original proceeding seeking to declare agreed temporary injunction void).

[16] No. 03-14-00423-CV (original proceeding seeking to declare injunction void, denied on July 11, 2014); No. 03-14-00426-CV (appeal of an order enforcing the terms of the injunction dismissed for lack of jurisdiction on November 6, 2014); No. 03-14-000425-CV (appeal of order appointing a receiver over Axiom dismissed for failure to prosecute on October 17, 2014).

[17] No. 03-15-00085-CV (appeal of order refusing to dissolve agreed temporary injunction).

court was forced to appoint a receiver over Axiom's finances and books and to disqualify DeLitta's attorneys from jointly representing Axiom and DeLitta to adequately protect Axiom's interests.[18]  The case is set for trial on October 26, 2015.[19]

## C.  Axiom is a medical consulting company that provides injury management and medical advice concerning work-related accidents.

Axiom is a medical consulting company.[20]  The company provides injury management for work-related and personal injuries for oil and gas companies.[21]  Axiom advertises that it "employs Doctors, Physician Assistants, Registered Nurses, and a specially trained support staff to provide a full suite of medical management services, ranging from work-related injury case management to a multitude of customizable exam programs."[22]  It allows employees and employers "immediate access to [a] medical professional 24/7 for [employment-related] injuries."[23]

## D.  DeLitta, Axiom's "Medical Director," is not a medical doctor.

DeLitta serves as both CEO and "Medical Director" of Axiom.  DeLitta, however, is not a medical doctor.  He is a physician's assistant.  As a condition to his licensure, DeLitta must be continuously supervised by a supervising physician and is

---

[18] CR410.
[19] CR635.
[20] 2RR56.
[21] CR400.
[22] CR324.
[23] 3RRPX2.

3

prohibited from providing any medical services unless his supervising physician delegates services for him to perform.[24]

A physician's assistant is expressly prohibited from "falsely represent[ing] that the person is a physician" or from acting "in a unprofessional or dishonorable manner that is likely to deceive, defraud, or injure the public."[25] These prohibitions are stated in a section entitled "Conduct Related to Fraud or Misrepresentation."[26]

**E.  Yet DeLitta unabashedly portrays himself, professionally and personally, as "Dr. DeLitta."**

Despite these statutory prohibitions against a physician's assistant misleading others into believing he is a medical doctor, until recently, Axiom's marketing materials stated that it "is a privately owned company established in 1999 by its CEO Dr. Michael J. DeLitta" and whose "mission" is "to transform Occupational Medicine."[27]



---

[24] TEX. OCC. CODE §§204.201, 204.202, 204.204.
[25] *Id.* §204.302(3), (4).
[26] *Id.*
[27] 3RRPX3.
[28] 3RRPX2.

4

DeLitta maintains business cards that incorporate caduceus, the modern symbol of medicine, and refer to "Dr. Michael J. DeLitta."



DeLitta has opened a credit card account as "Michael J. DeLitta MD."



---

[29] 3RRPX5.
[30] 3RRPX1.

5

DeLitta has posed as a "doctor" for so long that he has become self-delusional. His vanity license plates say it all:



These plates are undoubtedly shorthand for "Occupational Doctor,"[32] as the court found,[33] since DeLitta has worked in the occupational medicine field for multiple decades. He maintains a similar email address: occdoc66@hotmail.com.[34]

---

[31] 3RRPX7.
[32] 2RR50, 56.
[33] CR625.
[34] 2RR56, 58, 59-60 (occupational medicine field); 2RR50 (email).

**F.    DeLitta's fake persona is effective:  clients and employees believe he is a medical doctor.**

These public representations by DeLitta have left the impression to those in his work environment that DeLitta is a medical doctor.  Schaefer alerted DeLitta of the false impression he was creating as early as 2010.[35]  Since then, several former Axiom employees have also sounded warnings about DeLitta's misleading conduct.  Ashley Santoro, a registered nurse who was employed by Axiom for over two years, expressed concern about the issue in her resignation letter:

> I am also concerned over the fact we also are told to lie to our clients about Dr. Mike DeLitta.  Although, he has a doctorate degree - it is not in medicine.  He is not a medical physician but a Physician's Assistant.  I was told to never tell this to our clients and we are always to say "Dr. DeLitta" when speaking about him to keep up the image.  Axiom does not want anyone to know he is not a medical physician as he solicits himself to our clients as.[36]

Former Axiom employee Shane Enochs, also a registered nurse, offered similar testimony at the hearing on the temporary injunction.  He testified that DeLitta used the title "Doctor" both orally and in writing in connection with his employment with Axiom.[37]  Staff members regularly introduced him, both in staff meetings and in presentations to clients, as "Dr. Michael DeLitta."[38]  He never corrected or clarified that his title as "doctor" referenced a psychology degree and not a medical degree.[39]  Mr.

---

[35] 3RRDX21.
[36] CR351–52.
[37] 2RR29.
[38] 2RR29.
[39] 2RR30, 34.

7

Enochs was convinced, based on his observations of how people reacted to DeLitta, that using the title "doctor" was misleading people into falsely believing DeLitta was a medical doctor.[40] Even Enochs was misled. He testified that he himself thought DeLitta was a medical physician his first year at Axiom.[41]

## G. DeLitta justifies the title because he obtained a "Ph.D." in psychology from a diploma mill.

Although he is not a medical doctor, DeLitta does have a "Ph.D." from Newport University, a web-based "education institution."[42] Now defunct, "Newport University was not accredited by any higher education accreditation organization by the United State Department of Education or the Council for Higher Education Accreditation."[43] The Texas Higher Education Coordinating Board lists Newport University as an institution that issues "fraudulent or substandard degrees."[44]

## H. The trial court correctly determined that use of the title "Dr. DeLitta" is highly misleading when used by a "medical director" of a company in a medical-related industry and that enjoining DeLitta from doing so was necessary to protect Axiom's corporate assets pending final resolution of this lawsuit.

Deeply concerned that DeLitta was holding himself out as a medical doctor and misleading others as to his qualifications, Schaefer filed a verified application for a

---

[40] 2RR30.
[41] 2RR34.
[42] 3RRDX1.
[43] 3RRDX1. Newport University appears on numerous lists of institutions known informally as "diploma mills." CR347–48.
[44] CR349–50. DeLitta tried to convince the trial court that the "Newport University" listed here is not the same institution that issued his "Ph.D.," but this Court must view the evidence most favorably in support of the judgment.

8

temporary injunction on December 12, 2014.[45]  The application was heard on April 15, 2015.[46]  The Honorable Orlinda Naranjo presided over the evidentiary hearing.[47]

On April 22, 2015, the trial court signed a temporary injunction enjoining DeLitta from using the title "Doctor," "Dr.," or M.D. in any context and removing any reference to the term Dr. or M.D. from Axiom marketing materials.[48]  The trial court emphasized that "[b]ecause Axiom is a medical consulting company and provides medical advice, there is a substantial likelihood that DeLitta's use of the 'Dr.' title could mislead others into believing that he is a medical doctor."[49]  As to harm, the trial court found that DeLitta's fraudulent conduct "is causing immediate and irreparable harm to Axiom's reputation and may subject Axiom to civil and criminal liability thereby diminishing its value and causing damages that are not quantifiable."[50]  This harm, the trial court found, harms Axiom's reputation, not only with its customers and employees but also within the medical industry, and makes Axiom a party to false advertising and complicit in DeLitta's wrongful conduct."[51]

The temporary injunction was later amended, by agreement, to correct the trial date.[52]  This appeal followed.[53]

---

[45] CR323–59.
[46] 2RR1.
[47] *Id.*
[48] CR624–28.
[49] CR625.
[50] CR625.
[51] CR626.
[52] CR632.
[53] CR642–45.

9

## STANDARD OF REVIEW

Whether to grant or deny an injunction is within a trial court's discretion. *Butnaru v. Ford Moter Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The test for abuse of discretion is not whether, in the reviewing court's opinion, the trial court's action was appropriate. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). Instead, the reviewing court must determine whether the trial court acted without reference to any guiding rules and principles, or in an arbitrary or unreasonable manner. *Id.* That a trial judge decided the matter in a different manner than an appellate judge would does not demonstrate an abuse of discretion. *Id.*

An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). An appellate court must view the evidence in the manner most favorable to the trial court's decision, indulging every reasonable inference in its favor. *Pydia, Inc. v. State*, 212 S.W.3d 513, 516–17 (Tex. App.—Austin 2006, no pet.). The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Butnaru*, 84 S.W.3d at 211.

To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* at 204. A probable right of success on the merits is shown by alleging a cause of action and introducing evidence that tends to sustain it. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23–24 (Tex. App.—Houston [1st Dist.] 1998, pet.

10

dism'd). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ).

## SUMMARY OF ARGUMENT

DeLitta is not a medical doctor, but he uses the title "doctor" in a way that leads the employees and customers of his medical consulting company to falsely believe that he is. Materials that market the company's occupational medical services refer to him as "Dr. Michael J. DeLitta." So do his business cards. He opened a credit card as "Michael J. DeLitta, MD" and even owns a car with "OCC DOC" vanity plates.

DeLitta's conduct is not just misleading; it is against the law. The trial court was reasonable to conclude that DeLitta's fraudulent conduct is causing irreparable harm to the Axiom Companies' reputation and subjecting Axiom to civil and criminal liability, thereby diminishing the companies' value and thus Schaefer's financial interest.

## ARGUMENT

**I.      DeLitta misleads the Court by suggesting Schaefer asserts a statutory cause of action under the Occupation Code.**

The entire premise of DeLitta's appeal is a conjured issue with no basis in this record. All but two pages of DeLitta's argument is spent attempting to convince the Court that Schaefer has "no standing" to seek an injunction because "no private civil cause of action exists" under the Occupations and Penal Code provisions that the trial

11

court found DeLitta was violating.[54]  As such, he argues, Schaefer cannot show two necessary elements for obtaining an injunction:  (1) a cause of action against the defendant, and (2) a probable right to the relief sought.[55]

## A. The trial court's injunction is based on Schaefer's probable right to recover on her breach of fiduciary claims—a claim DeLitta does not even challenge.

Schaefer did not (and need not) plead and prove a statutory "cause of action" under the Occupations and Penal Codes.  The cause of action on which Schaefer will probably obtain relief is her claims that DeLitta breached his fiduciary duties to Axiom, committed fraud, and provided false information for the guidance of others.  This is the wrongful conduct that forms the basis of the trial court's injunction. *Franklin Sav. Ass'n v. Reese*, 756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no writ) (temporary injunction applicant need only establish probable recovery on one cause of action).

Importantly, DeLitta never challenged the assertion that Schafer will probably recover on these claims.  On appeal, too, his brief is silent as to these causes of action.

DeLitta was forced to conjure up a cause of action because Schaefer so easily met her burden to show viable claims against him.  In fact, Schaefer has already successfully sought temporary relief enjoining DeLitta's malfeasance, enforcing those prohibitions, and placing the company in a partial receivership.[56]  The trial court was

---

[54] Appellant's Br. at 17.

[55] Appellant's Br at 16–18 (Section 1, no cause of action under Occupations Code), 18–21 (Section 2, no probable recovery under Occupations and Penal Codes).

[56] *See supra* at 2 (Statement of Facts, Section B).

reasonable to conclude that Schaefer met her burden of showing a viable cause of action for breach of fiduciary duty. *See Universal Health Servs. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.) (applicant need not prove that she will ultimately prevail in the litigation, only that she has a cause of action for which relief may be granted). And a civil court maintains jurisdiction to enjoin a statutory offense incident to a proper injunction. *See, e.g.*, *Featherstone v. Indep. Serv. Stations Ass'n*, 10 S.W.2d 124 (Tex. App.—Dallas 1928, writ denied).

## B. Violations of the Occupations and Penal Codes are the conduct enjoined, not the cause of action asserted, and prohibiting that misconduct is necessary to preserve the status quo of Axiom as a reputable entity free from civil and criminal liability.

Although the injunction was not based on a statutory cause of action, the Occupations Code and Penal Code did play a role in the trial court's decision to enter the injunction. Texas law does prohibit an individual from holding himself out as a medical doctor. As a PA, DeLitta also faces regulatory action, including forfeiture of his license. If DeLitta's conduct continued, Axiom faced civil penalties and third-party liability. At the time the injunction was sought, Axiom had not been cited or sued for DeLitta's egregious conduct. Thus, the injunction preserved the status quo by ensuring that Axiom would remain free from civil and criminal liability for DeLitta's misconduct.

DeLitta's conduct threatened both him and Axiom of civil penalties. DeLitta is a Texas-licensed physician's assistant ("PA"). As such, he is governed by the Texas Physician Assistant Board and Chapter 204 of the Texas Occupations Code. His license

13

imposes a specific obligation for him to avoid confusion over this training. A PA that

commits any of the following acts can face civil and criminal liability:

- falsely represents that the person is a physician;

- acts in an unprofessional or dishonorable manner that is likely to deceive, defraud, or

- injure the public; -unlawfully advertises in a false, misleading, or deceptive manner, as described by Section 101.201.

TEX. OCC. CODE §§204.302(3), 302(4), and 302(8) ("Conduct Related to Fraud or

Misrepresentation").

The Occupations Code also prohibits false, misleading, or deceptive advertising

by certain professionals, including PAs:

(a) A person may not use advertising that is false, misleading, deceptive, or not readily subject to verification.

(b) False, misleading, or deceptive advertising or advertising not readily subject to verification includes advertising that:

(1) makes a material misrepresentation of fact or omits a fact necessary to make the statement as a whole not materially misleading;

(5) causes confusion or misunderstanding as to the credentials, education, or licensing of a health care professional;

or

(9) represents in the use of a professional name a title or professional identification that is expressly or commonly reserved to or used by another profession or professional.

TEX. OCC. CODE §101.201.

14

Finally, Texas makes it a crime for DeLitta to use his claimed Ph.D. (i.e., to refer to himself as a "doctor") to promote a business or to obtain employment, compensation or other benefit in employment or in the practice of a trade. TEX. PENAL CODE §32.52.

These statutes were clearly designed to prevent the type of confusion that DeLitta is causing by calling himself a "doctor" (based on a phony Ph.D. in psychology) while he is engaged in a medical consulting business where he allegedly supervises nurses. But, more to the point, DeLitta's flagrant violations of these statutes has serious potential consequences to Axiom. The consequences range from revocation of DeLitta's physician's assistant license to civil penalties, enforcement actions by the Texas Attorney General, and remedies under Chapter 17 of the Texas Deceptive Trade Practices Act. Given DeLitta's role as CEO and co-founder of Axiom, his conduct makes the company itself a party to false advertising and complicit in DeLitta's crime.

Enjoining DeLitta from continuing to violate these provisions was necessary to maintain the status quo and to protect the rights and interests of Schaefer in the business and the property of the Axiom Companies. The injunction prevents any dissipation or diminution of the business and the property of the Axiom Companies, which is the very heart of this lawsuit. It also protects the devastation to Axiom's reputation should the industry learn that the company's CEO and Medical Director was investigated, fined, or stripped of his PA license for fraud and false advertising.

**C.** **There is ample evidence to support the trial court's determination that DeLitta was fraudulently holding himself out as a medical doctor.**

DeLitta also implies that the trial court erred in finding that his conduct does not violate the Occupations and Penal Code provisions.[57] The trial court was not required to do so. In fact, the injunction does not even reference those statutes. And rightly so. Even if there was no statutory prohibition against an individual holding himself out to be a medical doctor when he is not one, a trial court would be reasonable in enjoining that misconduct as fraudulent and misleading and likely to subject a company to reputational harm and third-party liability. The fact that the Legislature has expressly labeled this misconduct as fraudulent and misleading simply amplifies the impropriety of DeLitta's actions.

And the evidence is overwhelming that DeLitta is misleading others into believing he is a medical doctor when he is not. The first sentence of the company's online brochure refers to DeLitta as "*Dr.* Michael J. DeLitta." The brochure does not include the initials "Ph.D." DeLitta maintains business cards as "*Dr.* Michael J. DeLitta." Again, the cards do not include the initials "Ph.D." But they do incorporate caduceus, the modern symbol of medicine.

Several former Axiom employees have sounded warnings about DeLitta's misleading conduct. Ashley Santoro, a registered nurse who was employed by Axiom for over two years, cited DeLitta's fraudulent conduct in a scathing resignation letter:

---

[57] Appellant's Br. at 17–18.

16

I am also concerned over the tact we also are told to lie to our clients about Dr. Mike DeLitta. Although, he has a doctorate degree - it is not in medicine. He is not a medical physician but a Physician's Assistant. I was told to never tell this to our clients and we are always to say "Dr. DeLitta" when speaking about him to keep up the image. Axiom does not want anyone to know he [isl not a medical physician as he solicits himself to our clients as.[58]

Former Axiom employee Shane Enochs, who is also a registered nurse, testified before the trial court that he witnessed similar conduct from DeLitta. He testified that DeLitta used the title "Doctor" both orally and in writing in connection with his employment with Axiom.[59] Staff members regularly introduced him, both in staff meetings and in presentations to clients, as "Dr. Michael DeLitta."[60] He never corrected or clarified that his title as "doctor" referenced a psychology degree and not a medical degree.[61] Mr. Enochs was convinced, based on his observations of how people reacted to DeLitta, that using the title "doctor" was misleading people into falsely believing DeLitta was a medical doctor.[62] Enochs himself was misled. He testified that he worked at Axiom for over a year before he learned that DeLitta was not a medical physician.[63] Enochs' testimony supports Schaefer's belief that Axiom's employees and customers are unaware that DeLitta is not a medical doctor.[64]

---

[58] CR351–52.
[59] 2RR29.
[60] 2RR29.
[61] 2RR30, 34.
[62] 2RR30.
[63] 2RR34.
[64] 2RR86.

17

DeLitta has convinced himself that because he does not use the initials "M.D." that he is not holding himself out as a medical doctor.[65] But the record evidence shows DeLitta opened a credit card account as "Michael J. DeLitta MD." He claims now that this is a "personal" credit card, not a business card, issued by "mistake."[66] But the trial court was reasonable to dismiss this attempt to explain away damning evidence as not credible and to infer from these credit card records that DeLitta intended to falsely portray himself as a medical doctor. DeLitta's "OCC DOC" vanity license plates make this inference all the more reasonable.

In any event, DeLitta's technical distinction between a Ph.D. and M.D. might be more persuasive if DeLitta worked in a non-medical field. But DeLitta is the CEO and "Medical Director" of medical consulting company that provides injury management for work-related injuries in the oilfield. The company provides direct access to medical professionals. In this context, it was reasonable for the trial court to determine that DeLitta's use of the title "Dr." could mislead others into believing that he is a medical doctor.[67] *Jenkins v. Transdel Corp.*, No. 03-04-00033-CV, 2004 WL 1404364, at *5 (Tex. App.—Austin June 24, 2004, no pet.) (restraints must be viewed in broader context of the parties' dispute). Because there is some evidence to support that finding, the trial

---

[65] Appellant's Br. at 19 (arguing that none of the misleading marketing materials "state that DeLitta is a medical doctor or M.D.").

[66] Appellant's Br. at 21.

[67] CR633 (injunction concluding that "[b]ecause Axiom is a medical consulting company and provides medical advice, there is a substantial likelihood that DeLitta's use of the "Dr." title could mislead others into believing that he is a medical doctor.").

18

court did not abuse its discretion in making this factual determination. *Butnaru*, 84 S.W.3d at 211.

## II. The trial court did not abuse its discretion in determining that DeLitta's fraudulent conduct threatened Axiom with imminent harm.

DeLitta also challenges the trial court's determination that DeLitta must be enjoined from falsely representing himself as a medical doctor to protect the Axiom Companies from imminent harm. Importantly, DeLitta does not dispute the fact that harm to an entity's business reputation and goodwill is the type of harm that cannot be easily measured and thus is "irreparable" at law. *See, e.g., Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.,* 281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied). He asserts only that the threat to the Axiom Companies was nothing more than "fear and apprehension of injury" that is too "speculative" to support a temporary injunction.[68]

The threat to Schaefer's interest in the Axiom Companies is more than just "fear and apprehension of injury." DeLitta himself testified that this kind of misconduct poses a real threat to a company like Axiom:

> Q.     Okay. And by the way, you would agree that if the company is— and this is a hypothetical—if it's using false or misleading designations and they are doing something false or misleading or against the law, that that can harm the company, correct?
>
> A.     Let me see if I understand your question. If the company is doing something that's illegal, would it harm the company?
>
> Q.     Yes.

---

[68] Appellant's Br. at 22–23.

A.    *Of course, it would.*[69]

Yet DeLitta defiantly testified that he will not stop his fraudulent conduct:

Q.    Are you willing to just agree that you will not use the Doctor designation in front of your name anymore?

A.    No, I won't agree with that.[70]

A trial court must be given broad discretion to find imminent harm sufficient when the evidence shows the party to be enjoined intends to do an act that is illegal and fraudulent. *Cf. Jim Rutherford Inv., Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845, 849 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (explaining that a movant seeking a temporary injunction to enforce a restrictive covenant need only prove that the defendant intends to do an act that would breach the restrictive covenant). In fact, Texas courts have held that a trial court has a *duty* to enjoin illegal conduct. *City of Houston v. Mem'l Bend Util. Co.*, 331 S.W.2d 418, 422 (Tex. Civ. App.—Houston 1960, writ ref'd n.r.e.) (emphasizing that where "a party is violating the substantive law, it becomes the duty of the court to enjoin the violation. In such case there is no discretion to be exercised."); *Rattikin Title Co. v. Grievance Committee*, 272 S.W.2d 948, 955 (Tex. Civ. App.—Fort Worth 1954, no writ) ("[W]hen it is determined that the law is being violated it is the province and the duty of the court to restrain it . . ., for no man may

---

[69] 2RR77 (emphasis added).
[70] 2RR78.

20

engage in actions in violation of the statutory law."); *T&R Assocs., Inc. v. City of Amarillo*, 601 S.W.2d 178, 180 (Tex. Civ. App.—Amarillo 1980, no writ) (holding that if the law is being violated, it is the duty of the court to restrain it, and a temporary injunction is an appropriate remedy).

In any event, the trial court was presented with evidence of imminent harm. Already, DeLitta's flagrantly misleading conduct has harmed the Axiom Companies. The record evidence shows that a nurse resigned, in part, because DeLitta misleads others into believing he is a medical physician as a means of soliciting clients.[71] Moreover, former employee Enochs' testimony painted a picture of DeLitta who flagrantly violated licensing rules and regulations.[72] He testified that DeLitta encouraged him to violate the law by using his medical nursing training in states where he was not licensed.[73] Enochs was terminated for refusing to violate the law in this way.[74]

The trial court was reasonable to conclude that this evidence suggests a course of conduct that supports the likelihood of injury. "In making its determination of imminent harm, the trial court may determine that, when violations are shown up to or near the date of trial, the defendant has engaged in a course of conduct and the court may assume that it will continue, absent clear proof to the contrary." *See Operation Rescue*

---

[71] CR351–52.
[72] 2RR31 (testifying that DeLitta encouraged Enochs to practice nursing in states where he was not licensed).
[73] 2RR31.
[74] 2RR36.

21

*Nat'l v. Planned Parenthood of Houston*, 937 S.W.2d 60, 77 (Tex. App.—Houston [14th Dist.] 1996, writ denied). "The probability of the continuation of the prohibited practices is not subject to direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or promise to cease the activity." *Id.* Moreover, a trial court may allow less stringent proof of harm when a party offers strong evidence of her probable right to relief. *See Ebony Lake Healthcare Ctr. v. Texas Dep't of Human Servs.*, 62 S.W.3d 867, 874 (Tex. App.—Austin 2001, no pet.) ("In weighing these two elements, we apply a 'sliding scale' under which clear evidence establishing one of the elements will result in a less stringent requirement of proof of the other element.").

DeLitta's fraudulent conduct goes to the very core of Axiom's reputation, competence and standing in the occupational medical field. The seriousness of these former employees' allegations (criminal and illegal conduct) evidence an immediate threat to the Axiom Companies and its reputation within the medical community. The trial court did not abuse its discretion in ordering it stopped. *See R & R Res. Corp. v. Echelon Oil & Gas, L.L.C.*, No. 03-05-00479-CV, 2006 WL 66458, at *7 (Tex. App.—Austin Jan. 10, 2006, no pet.) (evidence of exposure to liability supported trial court finding of harm).

Nor did the trial court abuse its discretion in rejecting DeLitta's argument that Schaefer's alleged delay in seeking an injunction is evidence that there is no threat of

injury.[75] Nurse Santoro's scathing resignation letter, which was important evidence supporting Schaefer's petition for injunction, was dated June 2014[76]—a mere six months before this injunction was sought—and not immediately produced.[77] The trial court could weigh this evidence against DeLitta's accusations of delay to decide that the injunction was timely sought and the harm imminent. It is not this Court's role to reweigh the evidence presented below. *Davis*, 571 S.W.2d at 862. As long as some evidence supports the trial court's decision, the Court must affirm. *Butnaru*, 84 S.W.3d at 211.

## CONCLUSION

For these reasons, Appellee asks that the Court to affirm the trial court's order. Appellee seeks any other relief to which she may be entitled.

---

[75] Appellant's Br. at 22. DeLitta suggests, in a single line with no authority, that Schaefer waived her right to seek injunctive relief. *Id.* at 23 ("The delay . . . shows acquiescence and works as a waiver."). But DeLitta never raised this equitable defense below. *See Keightley v. Republic Ins. Co.*, 946 S.W.2d 124, 126 (Tex. App.—Austin 1997, no writ) (waiver must be raised in trial court). And, in any event, this Court should reject the argument as not properly briefed. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (party waives points not adequately briefed).
[76] CR351.
[77] 2RR91.

23

Dated: July 20, 2015                          Respectfully submitted,

                                              /s/Lisa Bowlin Hobbs

Donald R. Taylor                              Lisa Bowlin Hobbs
  State Bar No. 19688800                        State Bar No. 24026905
  dtaylor@taylordunham.com                      Lisa@KuhnHobbs.com
Stacey Reese (Of Counsel)                     Kurt Kuhn
  State Bar No. 24056188                        State Bar No. 24002433
  stacey@reeselawpractice.com                   Kurt@KuhnHobbs.com
TAYLOR DUNHAM & RODRIGUEZ LLP                  KUHN HOBBS PLLC
301 Congress Avenue, Suite 1050               3307 Northland Drive, Suite 310
Austin, Texas 78701                           Austin, Texas 78731
(512) 473-2257                                (512) 476-6003
(512) 478-4409 (fax)                          (512) 476-6002 (fax)


                                              Howard F. Carter, Jr.,
                                                State Bar No. 03916500
                                                sam@scarterlawfirm.com
                                              HOWARD F. CARTER, JR., P.C.
                                              5600 Tennyson Parkway, Suite 160
                                              Plano, Texas 75024
                                              (972) 455-2001
                                              (972) 455-2015 (fax)

COUNSEL FOR APPELLEE

24

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this brief contains 5,181 words. This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Lisa Bowlin Hobbs

Lisa Bowlin Hobbs

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2015, I served a copy of this Brief of Appellee on counsel of record electronically, in accordance with the Court's rules on electronic filing, as listed below:

Douglas R. Drucker                                                            *via e-Service*
Kirby D. Hopkins
DRUCKER | HOPKINS LLP
21 Watery Avenue, Suite 300
The Woodlands, TX 77380
*Counsel for Appellant Michael J. DeLitta*

Eric J. Taube                                                                 *via e-Service*
HOHMANN, TAUBE & SUMMERS LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
*Counsel for the Axiom entities and Receiver/Provisional Member Jeff Compton*

/s/ Lisa Bowlin Hobbs

Lisa Bowlin Hobbs

84 S.W.3d 198
Supreme Court of Texas.

Hanan BUTNARU and Gil Butnaru, Petitioners,

v.

FORD MOTOR COMPANY, Respondent.

No. 00–0513. | Argued Feb. 14, 2001. | Decided June 27, 2002.

Potential buyers of automobile dealership filed action asserting claims against dealership, its shareholder, and another potential buyer for breach of purchase and sale agreements and claims against manufacturer for tortious interference. The 63rd Judicial District Court, Val Verde County, George M. Thurmond, J., granted temporary injunction to prevent manufacturer from exercising right of first refusal to buy dealership. Manufacturer appealed. The Court of Appeals, 18 S.W.3d 762, dismissed appeal in part, dissolved temporary injunction, and remanded case. Potential buyers filed petition for review. The Supreme Court, James A. Baker, J., held that: (1) amended provision of Motor Vehicle Commission Code granting Motor Vehicle Board exclusive, original jurisdiction to regulate aspects of distribution, sale, and leasing of motor vehicles as governed by Code constitutionally applied retroactively; (2) potential buyers' tortious interference and declaratory judgment claims fell outside purview of Board's exclusive jurisdiction, but Board had primary jurisdiction over claims; and (3) trial court did not abuse its discretion in issuing a temporary injunction.

Reversed and remanded.

West Headnotes (21)

**[1]    Injunction** 👈 Preservation of status quo

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits.

144 Cases that cite this headnote

**[2]    Injunction** 👈 Extraordinary or unusual nature of remedy

A temporary injunction is an extraordinary remedy and does not issue as a matter of right.

40 Cases that cite this headnote

**[3]    Injunction** 👈 Issues, proof, and variance

To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

265 Cases that cite this headnote

**[4]    Injunction** 👈 Irreparable injury

**Injunction** 👈 Adequacy of remedy at law

**Injunction** 🔑 Recovery of damages

An injury is irreparable, for purposes of a temporary injunction, if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

123 Cases that cite this headnote

**[5]** **Injunction** 🔑 Discretionary Nature of Remedy

Whether to grant or deny a temporary injunction is within the trial court's sound discretion.

91 Cases that cite this headnote

**[6]** **Appeal and Error** 🔑 Injunction

A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion.

50 Cases that cite this headnote

**[7]** **Appeal and Error** 🔑 Abuse of discretion

A reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion.

42 Cases that cite this headnote

**[8]** **Antitrust and Trade Regulation** 🔑 Retroactive operation

**Statutes** 🔑 Administrative agencies and proceedings

**Statutes** 🔑 Trade or business

Amended provision of Motor Vehicle Commission Code granting Motor Vehicle Board exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by Code constitutionally applied retroactively in action brought by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer; amended provision was jurisdictional statute that did not alter parties' rights or obligations or remove any available remedies, and parties did not have vested right in choosing what tribunal would initially resolve all issues and claims governed by Code. Vernon's Ann.Texas Civ.St. art. 4413(36), § 3.01(a).

4 Cases that cite this headnote

**[9]** **Antitrust and Trade Regulation** 🔑 Exclusive and Concurrent Remedies or Laws

**Antitrust and Trade Regulation** 🔑 Exhaustion

Although amended provision of Motor Vehicle Commission Code granted Motor Vehicle Board exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by Code, tortious interference and declaratory judgment claims asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer were not governed by Code and, thus, fell outside the purview of the Board's exclusive jurisdiction, such that potential buyers did not have to exhaust any administrative remedies before raising claims in trial court. Vernon's Ann.Texas Civ.St. art. 4413(36), § 3.01(a).

5 Cases that cite this headnote

**[10]    Torts** 🔑 Contracts in general

To establish their tortious interference claim, potential buyers of automobile dealership had to show: (1) a contract for sale of dealership existed between them and dealership, its sole shareholder, and property owners; (2) dealership willfully and intentionally interfered with that contract; (3) the interference proximately caused potential buyers damage; and (4) buyers suffered actual damage or loss.

50 Cases that cite this headnote

**[11]    Torts** 🔑 Defense, justification or privilege in general

Defendant could defeat liability for tortious interference claim by proving the affirmative defense that its conduct was privileged or justified, so long as that conduct was not illegal or tortious.

13 Cases that cite this headnote

**[12]    Antitrust and Trade Regulation** 🔑 Judicial remedies prior to or pending administrative proceedings

Motor Vehicle Board had primary jurisdiction over tortious interference and declaratory judgment claims asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer, which claims raised Motor Vehicle Commission Code construction issue that was within Board's special competence and expertise; thus, trial court should abate lawsuit and suspend finally adjudicating tortious interference and declaratory judgment claims until Board had a reasonable opportunity to act on the matter. Vernon's Ann.Texas Civ.St. art. 4413(36), § 5.01B(d).

16 Cases that cite this headnote

**[13]    Constitutional Law** 🔑 Abrogation, modification, or recognition of remedies

State Constitution's open courts provision prohibits the Legislature from abrogating well-established, common-law claims unless the reason for doing so outweighs a litigant's constitutional right of redress. Vernon's Ann.Texas Const. Art. 1, § 13.

4 Cases that cite this headnote

**[14]    Antitrust and Trade Regulation** 🔑 Exclusive and Concurrent Remedies or Laws

Motor Vehicle Commission Code did not abrogate any previously existing common-law rights and, thus, trial court had immediate jurisdiction to adjudicate common-law claims for breach of the purchase and sale agreements asserted by potential buyers of automobile dealership against dealership, its shareholder, and another potential buyer. Vernon's Ann.Texas Civ.St. art. 4413(36).

Cases that cite this headnote

**[15]    Antitrust and Trade Regulation** 🔑 Particular cases

Reliance by potential buyers of automobile dealership on general equitable principles did not relieve buyers of their burden to show an inadequate legal remedy, in seeking temporary injunction against manufacturer's exercising its right of first refusal to purchase dealership on the same terms and conditions as proposed buyers.

7 Cases that cite this headnote

**[16]    Antitrust and Trade Regulation**  👈 Particular cases

Evidence that potential buyers of automobile dealership would lose not only their right to purchase real property, in addition to the dealership, if manufacturer exercised its right of first refusal was sufficient to establish that potential buyers had a probable right to recovery and that injunctive relief was necessary to preserve the status quo.

31 Cases that cite this headnote

**[17]    Injunction**  👈 Contracts

**Injunction**  👈 Breaches in general

Generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available.

25 Cases that cite this headnote

**[18]    Appeal and Error**  👈 Injunction

Under an abuse of discretion standard for reviewing an injunction, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles.

91 Cases that cite this headnote

**[19]    Appeal and Error**  👈 Substituting reviewing court's judgment

The court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion.

8 Cases that cite this headnote

**[20]    Appeal and Error**  👈 Reasonably supported findings

A trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision.

157 Cases that cite this headnote

**[21]    Equity**  👈 Property and rights therein in general

A trial court may grant equitable relief when a dispute involves real property.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*200**  Jonathan Scott Miles, Andrew L. Kerr, Holland & Knight LLP, San Antonio, Byron W. Hodge, Lowry Foster & Hodge, Del Rio, Larry G. Berkman, Jenkens & Gilchrist, San Antonio, for Petitioner.

Paul S. Francis, Jon David Ivey, Baker & Hostetler, Alfred V. Sumpter, Oritz & Sumpter, Del Rio, for Respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

On December 6, 2001, we granted Ford's motion for rehearing. We withdraw our opinion dated July 7, 2001, and substitute the following in its place.

In this case, we determine whether the Texas Motor Vehicle Board has exclusive jurisdiction over a prospective car dealership transferees' claims that raise an issue about how to construe the Texas Motor Vehicle Commission Code. [1] We conclude the Board has exclusive jurisdiction to resolve only those claims and issues the Code governs. Moreover, we conclude that this exclusive jurisdiction does not extend to the prospective transferees' claims here, and thus, they do not have to exhaust administrative remedies before bringing their claims in the trial court. Instead, because of the Board's special expertise in interpreting the Code, the trial court should abate the prospective transferees' tortious interference and declaratory judgment claims so the Board may exercise its primary jurisdiction to **\*201** determine the Code construction issue raised with those claims. We further conclude that the trial court did not abuse its discretion by entering a temporary injunction. Accordingly, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

Martin Graf is the sole shareholder of Graf Ford, Lincoln, Mercury, Inc., a dealership in Del Rio, Texas. The dealership's agreement with Ford provides that if Graf Ford proposes to transfer the dealership, Ford shall have a right of first refusal to purchase the dealership on the same terms and conditions that the proposed buyer agreed to, "regardless of whether the proposed buyer is qualified to be a dealer." A Ford representative testified that this provision's purpose, and the purpose of similar provisions in other standard Ford dealership agreements, is "to be able to put into business dealers who [Ford feels] are qualified whenever [Ford has] the opportunity."

In 1999, Hanan and Gil Butnaru contracted with Graf to buy the Graf dealership. They also contracted separately to buy the real property upon which the dealership was located. Graf and J.M. Barton owned the property and executed that contract. Graf told the Butnarus about Ford's right of first refusal. Additionally, both agreements were "expressly conditioned upon approval by Ford of Hanan Butnaru as a[sic] authorized sales and service dealer" and warranted that neither agreement conflicted with any prior agreement to which Graf or Barton were parties.

In September 1999, Graf told Ford that he intended to sell the dealership to the Butnarus. The Butnarus then filed a Prospective Dealer Application with Ford, seeking approval as an authorized dealer. A month later, Ford informed Graf that it intended to exercise its right of first refusal and offered to pay the Butnarus' reasonable expenses incurred in negotiating the purchase and sale agreements. On the same day, Ford assigned its right of first refusal to an existing Ford dealer. Ford and Graf agreed that Ford would indemnify Graf against damages arising from Ford's exercising its right of first refusal and that Graf would cooperate with Ford in defending any action challenging the right.

Anticipating their breaching the purchase and sale agreements, the Butnarus sued Graf, Graf Ford, and Barton for breach of those agreements. The Butnarus also sued Ford for tortiously interfering with the agreements. They alleged Ford tortiously interfered because Ford's right of first refusal violates a Code provision that prohibits a manufacturer from denying or preventing a dealership transfer to a qualified applicant. *See* TEX.REV.CIV. STAT. art. 4413(36), §§ 5.01B(c), 5.02(b)(8). Thus, the Butnarus sought a declaration that Ford's right of first refusal was unenforceable and a declaration about the parties' rights and obligations under the agreements. Finally, the Butnarus requested a temporary injunction to prevent Ford or its assignees from exercising its right of first refusal during the suit. Ford opposed this request and filed a plea to the jurisdiction. Ford argued that the Board has exclusive jurisdiction to determine whether a manufacturer has violated the Code's provisions. The trial court denied Ford's plea and granted the injunction.

Ford sought interlocutory review of the trial court's temporary injunction. *See* 18 S.W.3d at 762. The court of appeals first noted that the Legislature did not confer any rights on prospective transferees under **\*202** the Code to seek relief for the Code violation the Butnarus allege. Then, the court of appeals held that the trial court did not have jurisdiction over the Butnarus' claims, "to the extent their claims are based on violations of the [Code]," because the Code grants the Board exclusive jurisdiction over alleged Code violations. 18 S.W.3d at 767. The court also held that the Code does not violate the Texas Constitution's open courts provision, which prohibits the Legislature from unreasonably abrogating well-established common-law claims. The court explained that the Code merely confers new statutory rights on motor vehicle dealers and leaves "all others in the same position they previously occupied." 18 S.W.3d at 768. Therefore, the court concluded that "the Butnarus can sue Ford ... for tortious interference with contract, breach of contract, and declaratory relief. They simply cannot base those causes of action on [Code] violations...." 18 S.W.3d at 768. The court of appeals then remanded the claims not based on Code violations and, holding that the Butnarus did not establish an inadequate legal remedy, dissolved the trial court's temporary injunction. 18 S.W.3d at 769–70.

The Butnarus petitioned this Court to review the court of appeals' opinion. Typically, jurisdiction over an order granting or denying a temporary injunction is final in the courts of appeals. *See* TEX. GOV'T CODE § 22.225(b)(4). However, because the court of appeals' decision here conflicts with another court of appeals' decision, this Court has jurisdiction. *See* TEX. GOV'T CODE § 22.225(c). Specifically, the court of appeals' holding that the Code does not violate the Texas Constitution's open courts provision conflicts with *David McDavid Nissan, Inc. v. Subaru, Inc.,* 10 S.W.3d 56, 68 (Tex.App.-Dallas 1999), *affirmed in part, reversed in part, and remanded on rehearing,* 84 S.W.3d 212 (Tex.2002). In *David McDavid Nissan,* the court of appeals held that the Code abrogated the plaintiff's common-law claims without reasonably substituting another remedy and thus contravened the open courts provision. 10 S.W.3d at 67–68. We granted the Butnarus' petition, as well as the petition in *David McDavid Nissan,* to resolve this conflict.

At the time the trial courts and courts of appeals here and in *David McDavid Nissan* determined whether the Board had exclusive jurisdiction, section 3.01 of the Code provided:

> (a) The board has the general and original power and jurisdiction to regulate all aspects of the distribution, sale, and leasing of motor vehicles and to do all things, whether specifically designated in this Act or implied herein, or necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction. In addition to the other duties placed on the board by this Act, the board shall enforce and administer the terms of Chapter 503, Transportation Code.

> (b) Unless otherwise specifically provided by Texas law not in conflict with the terms of this Act, all aspects of the distribution and sale of motor vehicles shall be governed exclusively by the provisions of this Act.

TEX.REV.CIV. STAT. art. 4413(36), § 3.01 (Vernon Supp.1998), *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313.

In our original opinions in this case and in *David McDavid Nissan,* we concluded that this provision granted the Board primary —not exclusive—jurisdiction over Code issues and claims. Moreover, we concluded that section 3.01(b) does not grant the Board exclusive jurisdiction because, **\*203** by its plain language, that subsection only establishes that the Code governs this area of law and trumps other laws if they conflict with the Code.

However, only weeks before we issued our opinions, the Legislature amended section 3.01(a) to provide:

> (a) The board has the *exclusive, original jurisdiction* to regulate *those aspects* of the distribution, sale, and leasing of motor vehicles *as governed by this Act* and to do all things, whether specifically designated in this Act or implied herein, or necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction.

TEX.REV.CIV. STAT. art. 4413(36), § 3.01(a) (emphasis added). The Legislature made this amendment "effective immediately" after receiving the necessary votes, which occurred on May 18, 2001. *See* Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313, 317. The Legislature's amendment did not change section 3.01(b).

Today, we determine (1) whether section 3.01 's current or former version applies, (2) whether the applicable provision grants the Board exclusive jurisdiction and how this affects the trial court's jurisdiction here, and (3) whether the trial court abused its discretion by issuing a temporary injunction.

## II. APPLICABLE LAW

### A. DAVID MCDAVID NISSAN, INC.

#### 1. Retroactive application of Section 3.01

Today, in *David McDavid Nissan,* we held that section 3.01 's current version constitutionally retroactively applied to the pending claims a licensed motor vehicle dealer had raised against a manufacturer. *David McDavid Nissan,* 84 S.W.3d at 218. We explained that this jurisdictional provision is procedural and remedial and did not affect a vested right. *David McDavid Nissan,* 84 S.W.3d at 219 (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 273, 114 S.Ct. 1483 (1994); *Baker Hughes, Inc. v. Keco, R & D, Inc.,* 12 S.W.3d 1, 4 (Tex.1999); *City of Tyler v. Likes,* 962 S.W.2d 489, 502 (Tex.1997); *Ex parte Abell,* 613 S.W.2d 255, 260 (Tex.1981); *McCain v. Yost,* 155 Tex. 174, 284 S.W.2d 898, 900 (1955); *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 560 (1916); *Blonstein v. Blonstein,* 831 S.W.2d 468, 472 (Tex.App.-Houston [14th Dist.] 1992, writ denied); *Southwestern Bell Tel. Co. v. City of Kountze,* 543 S.W.2d 871, 874–75 (Tex.Civ.App.-Beaumont 1976, no writ)).

#### 2. Exclusive Versus Primary Jurisdiction

Furthermore, in *David McDavid Nissan,* we explained the significant differences between the primary and exclusive jurisdiction doctrines. *David McDavid Nissan,* 84 S.W.3d at 218. We held that, unlike its former version, section 3.01(a) 's current version expressly confers exclusive jurisdiction on the Board to initially determine issues or claims that the Code governs. *David McDavid Nissan,* 84 S.W.3d at 218. We based our decision on the provision's plain language, and the Legislature's intent when it amended the provision to include the express exclusive jurisdiction language. *David McDavid Nissan,* 84 S.W.3d at 218. (citing *Cash Am. Int'l Inc. v. Bennett,* 35 S.W.3d 12, 15 (Tex.2000); *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 447 (Tex.1996); SENATE COMM. ON STATE AFFAIRS, BILL ANALYSIS, Tex. H.B. 1665, 77th Leg., R.S. (2001)).

#### *204 3. Open Courts Challenge

In *David McDavid Nissan,* we also concluded that, as applied to the motor vehicle dealer in that case, the Code did not violate the Texas Constitution's open courts provision. *David McDavid Nissan,* 84 S.W.3d at 227; *see also* TEX. CONST. art. 1, § 13. We explained that the Board's exclusive jurisdiction over issues and claims the Code governs—all matters derived from the Code and not the common law—did not abrogate any of the motor vehicle dealer's common-law rights. *David McDavid Nissan,* 84 S.W.3d at 227 (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 448 (Tex.1993)).

### B. TEMPORARY INJUNCTIONS

**[1]** **[2]** **[3]** **[4]** A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993); *Electronic Data Sys. Corp. v. Powell,* 508 S.W.2d 137, 139 (Tex.Civ.App.-Dallas 1974, no writ). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling,* 863 S.W.2d at 57. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Walling,* 863 S.W.2d at 57; *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex.1968). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.,* 773 S.W.2d 398, 401 (Tex.App.-Dallas 1989, no writ).

**[5]** **[6]** **[7]** Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling,* 863 S.W.2d at 58; *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Walling,* 863 S.W.2d at 58; *Walker,* 679 S.W.2d at 485. The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. of Appeals,* 700 S.W.2d 916, 918 (Tex.1985); *Davis v. Huey,* 571 S.W.2d 859, 861–62 (Tex.1978).

### III. ANALYSIS

### A. WHETHER AMENDED SECTION 3.01 RETROACTIVELY APPLIES

**[8]** In *David McDavid Nissan,* we concluded that section 3.01(a), a jurisdictional provision, is a procedural and remedial statute that applied retroactively because it did not affect a vested right in that case. *See David McDavid Nissan,* 84 S.W.3d at 219 (citing *Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483; *Likes,* 962 S.W.2d at 502; *Abell,* 613 S.W.2d at 260; *Phil H. Pierce Co. v. Watkins,* 114 Tex. 153, 263 S.W. 905, 907 (1924); *Middleton,* 185 S.W. at 560; *Blonstein,* 831 S.W.2d at 472; *City of Kountze,* 543 S.W.2d at 874–75). However, section 3.01(a) still may not constitutionally retroactively apply in this case if it affects a vested right. *See Baker Hughes,* 12 S.W.3d at 4; *Middleton,* 185 S.W. at 560.

The Butnarus do not allege that section 3.01(a) affects any vested right. Instead, they contend that the Legislature did not expressly make the amendment to section 3.01(a) retroactive, and therefore, we should apply the Code Construction Act to conclude section 3.01(a) 's current version does not retroactively apply. *See* TEX. GOV'T CODE §§ 311.022 ("A statute is presumed **\*205** to be prospective in its operation unless expressly made retrospective."), 311.031 ("[T]he ... amendment ... of a statute does not affect ... the prior operation of the statute or any prior action taken under it.").

But the Butnarus misplace their reliance on the Code Construction Act. That statute applies only to "each code enacted by the 60th or subsequent legislature as part of the state's continuing statutory revision program." TEX. GOV'T CODE § 311.002. When the Legislature recodifies a statute under Texas's continuing statutory revision program, the statute will indicate this. *See, e.g.,* TEX. LOCAL GOV'T CODE § 1.001 ("This code is enacted as a part of the state's continuing statutory revision program...."). And, though we refer to the Motor Vehicle Code as "the Code," nothing in the Code's language or legislative history shows that it is part of our State's "continuing statutory revision program." TEX. GOV'T CODE § 311.002; *Robbins Chevrolet Co. v. Motor Vehicle Bd.,* 989 S.W.2d 865, 867 (Tex.App.-Austin 1999, pet. denied); *see also Knight v. Int'l Harvester Credit Corp.,* 627 S.W.2d 382, 385 (Tex.1982).

Section 3.01(a) is a jurisdictional statute that, in this case, does not alter the parties' rights or obligations or remove any remedies already available. *See David McDavid Nissan,* 84 S.W.3d at 222; *Likes,* 962 S.W.2d at 502. This provision merely determines the tribunal that must initially resolve all issues and claims the Code governs. *See Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483; *David McDavid Nissan,* 84 S.W.3d at 222; *City of Kountze,* 543 S.W.2d at 874–75. The parties do not have a vested right in choosing what tribunal will do this. *See Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483; *David McDavid Nissan,* 84 S.W.3d at 222;

1898454; *Middleton,* 185 S.W. at 559; *City of Kountze,* 543 S.W.2d at 874–75. Accordingly, we conclude that amended section 3.01(a) constitutionally applies retroactively in this case.

### B. APPLYING SECTION 3.01'S CURRENT VERSION TO THE BUTNARUS' CLAIMS

 **[9]**    Ford contends that section 3.01 's current version grants the Board exclusive jurisdiction, and thus, the Board has the sole authority to make the initial determination about the alleged Code violation here. The Butnarus, on the other hand, argue that section 3.01 does not oust the trial court's jurisdiction because the Board does not have authority to award damages for their well-established common-law claims. Therefore, the Butnarus assert that the Board only has *primary* jurisdiction to decide whether Ford's right of first refusal violates the Code.

The Butnarus' pleadings currently reflect four claims, the first two of which are based on Ford's allegedly violating the Code. First, the Butnarus seek a judicial declaration that Ford's right of first refusal violates the Code. Second, the Butnarus allege that Ford tortiously interfered with the purchase and sale agreements by attempting to exercise its allegedly invalid right of first refusal. Third, the Butnarus seek a declaration about the parties' rights and obligations under the purchase and sale agreements. Fourth, the Butnarus claim that Graf and Barton have breached or are about to breach the purchase and sale agreements by permitting Ford to exercise its right of first refusal rather than requiring Ford to determine the Butnarus' eligibility under the Code for the dealership transfer.

The court of appeals, after analyzing section 3.01 's former version, concluded that the Board has exclusive jurisdiction;  **\*206** however, it held that the Butnarus do not have standing as prospective car dealership transferees to seek relief from the Board for the Code violation they allege. The court of appeals further determined that the Butnarus' lack of standing to obtain relief from the Board did not give them a right to seek damages for the alleged Code violation in the trial court. 18 S.W.3d at 767–68. Accordingly, the court of appeals held that the Butnarus could maintain their breach of contract and tortious interference claims; however, the Butnarus could not "base those causes of action on [Code] violations." 18 S.W.3d at 768.

As discussed above, we disagree that section 3.01 's former version granted the Board exclusive jurisdiction. But we conclude that section 3.01(a) 's current version, which applies here, grants the Board exclusive jurisdiction over issues and claims the Code governs. Thus, we must determine if the Butnarus' claims fall within the Board's exclusive jurisdiction.

Because motor vehicle distribution and sales affects our State's economy and citizens' welfare, the Code's primary purpose is "to insure a sound system of distributing and selling motor vehicles through licensing and regulating manufacturers ... and dealers of those vehicles." *See* TEX.REV.CIV. STAT. art. 4413(36), § 1.02. To accomplish this, the Code strictly regulates conduct by or between franchise dealers and manufacturers. *See* TEX.REV.CIV. STAT. art. 4413(36), §§ 4.01–.07, 5.01–.05. For example, the Code establishes how a dealer must request a transfer, assignment, or sale of its franchise agreement. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B. Under that process, the Code also determines the circumstances under which a manufacturer may withhold its consent to the dealer's request. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c).

Specifically, to transfer a dealership the dealer must file a written application with the manufacturer to transfer the dealership. The application must identify the prospective transferee and any pertinent agreements about the proposed transfer. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(a)(1)-(4). The manufacturer must timely advise the dealer in writing if the prospective transferee is qualified or if the transferee is not acceptable. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(b). The Code prohibits a manufacturer from "unreasonably" withholding its consent to a dealer's transfer application if the prospective transferee is "of good moral character" and otherwise meets the manufacturer's predetermined, written standards, if any, about a transferee's business experience and financial qualifications. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c). Further, the Code makes it unlawful for a manufacturer to "fail to give effect to or attempt to prevent any sale or transfer" of a dealership "except as provided by Section 5.01B." TEX.REV.CIV. STAT. art. 4413(36), § 5.02(b)(8).

Additionally, the Code provides a dealer a remedy if the manufacturer "unreasonably" denies a dealer's application to transfer its franchise ownership. The Code's definition of "dealer" includes licensed dealers but not prospective transferees. *See* TEX.REV.CIV. STAT. art. 4413(36), § 1.03(7). The dealer may file a protest with the Board. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(d). The issue would be whether the prospective transferee is qualified, and the manufacturer must prove the prospective transferee's inadequacy. TEX.REV.CIV. STAT. art. 4413(36), §§ 5.01B(d)-(e). If the Board determines the prospective transferee is qualified, the Board shall enter an order reflecting this, and the manufacturer must accept the transfer. TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(e).

**\*207** **[10]** **[11]** Here, the court of appeals' analysis presumes that the Butnarus' trial court claims simply seek monetary damages based on their allegation that Ford's exercising its right of first refusal and denying the dealership transfer violated section 5.01B. But the Butnarus' trial court claims involve something different. The Butnarus seek relief for Ford's alleged tortious interference, and this claim, in turn, raises a Code construction issue. To establish their tortious interference claim, the Butnarus must show: (1) a contract exists between Graf, Graf Ford, Barton and the Butnarus; (2) Ford willfully and intentionally interfered with that contract; (3) the interference proximately caused the Butnarus damage; and (4) the Butnarus suffered actual damage or loss. *See Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996); *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995). But Ford may defeat liability by proving the affirmative defense that its conduct was privileged or justified —so long as that conduct was not illegal or tortious. *See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.,* 29 S.W.3d 74, 80 (Tex.2000); *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997); *Texas Beef Cattle,* 921 S.W.2d at 210. It is the Butnarus' position that Ford does not have a justification defense, because rights of first refusal contravene certain Code provisions and, accordingly, are void and unenforceable. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(c) (prohibiting a manufacturer from unreasonably denying a dealership transfer); TEX.REV.CIV. STAT. art. 4413(36), § 1.04 (making an agreement to waive the Code's terms void and unenforceable). The Butnarus also request that the trial court enter a declaratory judgment that rights of first refusal violate the Code.

We conclude that the Butnarus' tortious interference and declaratory judgment claims fall outside the purview of the Board's exclusive jurisdiction. In *David McDavid Nissan,* we held that the Board's exclusive jurisdiction under section 3.01(a) required the dealer in that case to exhaust its administrative remedies to obtain a final Board finding to support its Code-based DTPA, bad faith, and oral contract claims. *David McDavid Nissan,* 84 S.W.3d at 226. In concluding that the Board's exclusive jurisdiction applied to the dealer's Code-based DTPA and bad-faith claims, we explained that the Code provides a hybrid claims-resolution process by which a dealer or manufacturer may seek damages for certain Code violations. *David McDavid Nissan,* 84 S.W.3d at 226 (discussing TEX.REV.CIV. STAT. art. 4413(36), §§ 6.06(a), (e)). Based on this process, we held that the dealer had to exhaust its administrative remedies under the Code to obtain supporting Board findings before a trial court could finally adjudicate the dealer's damages request for its Code-based claims. *See David McDavid Nissan,* 84 S.W.3d at 227. Additionally, in requiring the dealer to obtain a Board finding before pursuing its oral contract claims, we relied on a Code provision mandating that a dealer obtain the Board's approval and a license before operating a franchise in a certain area. *See David McDavid Nissan,* 84 S.W.3d at 227 (discussing TEX.REV.CIV. STAT. art. 4413(36), §§ 4.02(c), 4.06(a)-(e)).

Here, however, no Code provision extends the Board's exclusive jurisdiction to resolving the Butnarus' tortious interference and declaratory judgment claims so that they must exhaust any administrative remedies before seeking judicial relief. In fact, the Code's failing to establish any procedure through which the Board may resolve a prospective transferee's claim that a manufacturer unlawfully refused to **\*208** accept a dealer's transfer request—coupled with the Board's inability to award monetary damages—demonstrate the contrary. Thus, this case is analogous to *Cash America,* in which we held that the plaintiff did not have to exhaust administrative remedies under the Pawnshop Act because "nothing in the statutory scheme indicate[d] that the Legislature intended to replace a pledgor's common-law remedies with the like-kind replacement remedy" available under the statute. *Cash Am.,* 35 S.W.3d at 18. Similarly, because the Code does not indicate the Legislature's intent to replace the prospective transferees' remedies here, the Butnarus do not have to exhaust any administrative remedies before suing Ford for tortious interference or declaratory relief.

 **[12]**  But our inquiry does not end here. Though the Legislature did not confer exclusive jurisdiction on the Board to resolve the Butnarus' claims, we still must decide whether the Board has primary jurisdiction to resolve the Code construction issue that those claims raise. *See, e.g, Cash Am.,* 35 S.W.3d at 18 (recognizing that, though an agency does not have exclusive jurisdiction, the policies underlying the primary jurisdiction doctrine may require the agency to initially decide an issue). In *David McDavid Nissan,* we explained that the primary jurisdiction doctrine requires trial courts to allow an administrative agency to initially decide an issue when: (1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations. *David McDavid Nissan,* 84 S.W.3d at 221 (citing *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Cash Am.,* 35 S.W.3d at 18; *Foree v. Crown Cent. Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968); *Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411, 413 (1961); *Kavanaugh v. Underwriters Life Ins. Co.,* 231 S.W.2d 753, 755 (Tex.Civ.App.-Waco 1950, writ ref'd); Travis, Comment, *Primary Jurisdiction: A General Theory and Its Application to the Securities Exchange Act,* 63 CAL. L.REV. 926, 927 (1975)). We noted that, when the primary jurisdiction doctrine requires a trial court to defer to an agency to make an initial determination, the court should abate the lawsuit and suspend finally adjudicating the claim until the agency has an opportunity to act on the matter. *David McDavid Nissan,* 84 S.W.3d at 221 (citing *Central Power & Light Co. v. Public Util. Comm'n,* 17 S.W.3d 780, 787 (Tex.App.-Austin 2000, pet. denied); *Roberts Express, Inc. v. Expert Transp., Inc.,* 842 S.W.2d 766, 771 (Tex.App.-Dallas 1992, no writ)).

We conclude that the primary jurisdiction doctrine applies in this case. The Butnarus' tortious interference and declaratory judgment claims raise a Code construction issue that is within the Board's special competence and expertise. *See Cash Am.,* 35 S.W.3d at 18. As discussed above, the Legislature has specifically authorized the Board to resolve disputes between a manufacturer and dealer when the dealer alleges that the manufacturer violated section 5.01B by unreasonably withholding consent to transfer a dealership. *See* TEX.REV.CIV. STAT. art. 4413(36), § 5.01B(d). The Board's expertise in construing section 5.01B in these disputes, and the State's interest in a uniform interpretation of the Code, requires the trial court to abate the lawsuit and suspend finally adjudicating the tortious interference and declaratory judgment claims until the Board has a reasonable opportunity to  **\*209**  act on the matter. *See David McDavid Nissan,* 84 S.W.3d at 228; *Central Power & Light,* 17 S.W.3d at 787; *Roberts Express,* 842 S.W.2d at 771. Accordingly, the trial court should abate the claims pending the Board having an opportunity to exercise its primary jurisdiction to determine, at least in the first instance, whether a right of first refusal violates the Code. In sum, we hold that section 3.01(a) confers exclusive jurisdiction on the Board but only over issues and claims the Code governs. Here, the Code does not govern the Butnarus'—as prospective transferees—tortious interference and declaratory judgment claims. Consequently, the Butnarus do not have to exhaust any administrative remedies before raising these claims in the trial court. However, because these claims raise a Code construction issue, the primary jurisdiction doctrine requires the trial court to abate the claims pending the Board having a reasonable opportunity to determine whether a right of first refusal violates the Code.

### C. OPEN COURTS CHALLENGE

 **[13]**  The Butnarus contend that if the Board has exclusive jurisdiction over all Code issues and claims, this violates our Constitution's open courts provision. TEX. CONST. art. 1, § 13. This provision prohibits the Legislature from abrogating well-established, common-law claims unless the reason for doing so outweighs a litigant's constitutional right of redress. *See Texas Ass'n of Bus.,* 852 S.W.2d at 448.

 **[14]**  But we have already concluded that the Board's exclusive jurisdiction does not extend to the claims in this case. Accordingly, the Code does not abrogate any previously existing common-law rights here. The trial court has immediate jurisdiction to adjudicate the Butnaru's common-law claims for breach of the purchase and sale agreements. And, after deferring to the Board so it has an opportunity to decide the Code construction issue, the trial court may finally adjudicate the tortious interference and related declaratory judgment claim.

## D. TEMPORARY INJUNCTION

The trial court temporarily enjoined Ford or its assignees from exercising its right of first refusal during the suit. The court of appeals dissolved the temporary injunction, agreeing with Ford's contention that the Butnarus did not establish an inadequate legal remedy. 18 S.W.3d at 769. In so concluding, the court of appeals noted that generally a court will not enforce contracts by injunction because a suit for damages is deemed to be an adequate remedy. 18 S.W.3d at 769. The Butnarus respond twofold. First, they argue that they were not required to show an inadequate legal remedy because an alleged statutory violation relieves a movant of that burden. *See Furr v. Hall,* 553 S.W.2d 666, 672 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.). They assert that courts have a duty to enjoin statutory violations. *See Priest v. Texas Animal Health Comm'n,* 780 S.W.2d 874, 876 (Tex.App.-Dallas 1989, no writ). Second, the Butnarus argue that they have otherwise established the temporary-injunction elements. On the inadequate legal remedy element, they argue that Ford's exercising its right of first refusal would deprive them of the opportunity to purchase two unique assets: real property and the dealership located on the property. *See, e.g., Home Sav. of Am. v. Van Cleave Dev. Co.,* 737 S.W.2d 58, 59 (Tex.App.-San Antonio 1987, no writ) (noting that "each and every piece of real estate is unique" and that "is certainly an element to be considered in deciding whether there [will be] irreparable damages").

### *210  1. Statutory Violation

 [15]    The Butnarus' misplace their reliance on *Furr. See Furr,* 553 S.W.2d at 672. *Furr* does not generally propose that an alleged statutory violation relieves the plaintiff's burden to show an inadequate legal remedy. Rather, the party seeking injunctive relief in *Furr* relied on a specific statute giving the right to an injunction, and the court of appeals concluded that the statutory right relieved the party from proving an inadequate legal remedy. *Furr,* 553 S.W.2d at 672. The court relied on *Republic Insurance Co. v. O'Donnell Motor Co.,* which explains:

> The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law. This limitation, however, has no application where the right to relief is predicated on a statutory ground other than on the general principles of equity.

289 S.W. 1064, 1066 (Tex.Civ.App.-Dallas 1926, no writ).

Here, the Butnarus rely on general equitable principles, not a statutory injunctive-relief right, to enjoin Ford's conduct. Thus, *Furr* does not apply. And the Butnarus had to establish in the trial court, in addition to the other temporary-injunction elements, an inadequate legal remedy.

### 2. Temporary Injunction Elements

 [16]    In the trial court, the Butnarus alleged that Ford's exercising its right of first refusal would tortiously interfere with the Butnarus' contract to purchase the real property and the contract to purchase the dealership. They further contended that their right to purchase the real property and dealership would be lost if Ford exercised its right of first refusal, and, therefore, injunctive relief was necessary to preserve the status quo.

At the temporary injunction hearing, the Butnarus presented the following evidence: (1) their agreement with Graf and Barton to purchase the real property, (2) their agreement with Graf and Graf Ford to purchase the dealership, (3) Graf Ford's agreement with Ford containing the right of first refusal that allegedly violates the Code, (4) the Code provisions that allegedly prohibit Ford's right of first refusal provision, and (5) the Butnarus' dealership application to Ford detailing their business experience and financial qualifications. Additionally, Hanan Butnaru testified about his agreements with Graf, Graf Ford, and Barton to purchase dealership and the real property in Del Rio. He stated that in planning to establish a dealership, he was only looking

within a 100 mile radius of San Antonio, which includes Del Rio. He also explained, and the agreements entered in evidence showed, that the Butnarus agreed to pay $1.2 million for the real property and only $500,000 for the dealership.

Based on the Butnarus' allegations and this evidence, the trial court granted the temporary injunction. The trial court stated in the order that the Butnarus would be irreparably harmed if Ford exercises its right of first refusal "in that the issues and rights sought to be adjudicated will become moot and [the Butnarus] will have lost the opportunity to purchase the Dealership and the Real Property."

The court of appeals, however, dissolved the temporary injunction after concluding that the Butnarus did not establish an inadequate legal remedy:

> The Butnarus are not interested in the real property for its own resources or aesthetics. Their interest in the property results solely from the fact that the dealership is located on it. Thus, their true complaint relates to their inability to purchase the dealership. The uniqueness **\*211** of the real property is therefore irrelevant to the adequacy of their legal remedy.

18 S.W.3d at 769. The court of appeals' holding is predicated upon its assumptions that the real property is neither unique nor pertinent to this dispute and that the Butnarus are only interested in purchasing the dealership.

 **[17]** **[18]** **[19]** **[20]** We agree with the court of appeals that, generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available. *Canteen Corp.,* 773 S.W.2d at 401; *Chevron U.S.A., Inc. v. Stoker,* 666 S.W.2d 379, 382 (Tex.App.-Eastland 1984, writ dism'd). But under an abuse of discretion standard, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Beaumont Bank v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Davis,* 571 S.W.2d at 861–62. Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion. *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992); *Beaumont Bank,* 806 S.W.2d at 226. The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Davis,* 571 S.W.2d at 862.

 **[21]** The evidence shows this is a case involving two contracts: a contract to purchase land and a contract to purchase a business. There is some evidence that the Butnarus desired valuable land located at this specific Del Rio location. Thus, the evidence before the trial court supports its conclusion that this dispute is about the right to purchase real property worth at least $1.2 million and not just the dealership itself. *See Home Sav.,* 737 S.W.2d at 59 (upholding temporary injunction in dispute involving land worth $1.5 million). And a trial court may grant equitable relief when a dispute involves real property. *See Bennett v. Copeland,* 149 Tex. 474, 235 S.W.2d 605, 609 (1951); *E.I. DuPont de Nemours & Co. v. Zale Corp.,* 462 S.W.2d 355, 359–60 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.); *Burnett v. Mitchell,* 158 S.W. 800, 801–02 (Tex.Civ.App.-Fort Worth 1913, writ ref'd). Thus, the trial court's conclusion that the Butnarus do not have an adequate legal remedy was not arbitrary and unreasonable and was not made without reference to guiding rules and principles. And, because the trial court's determination was not an abuse of discretion, the court of appeals should not have substituted its judgment for that of the trial court. *Beaumont Bank,* 806 S.W.2d at 226.

Ford contends that the court of appeals could have also determined that the Butnarus did not establish a probable right to recovery. We disagree. The trial court could reasonably conclude, based on the Butnarus' allegations and the evidence previously discussed, that the Butnarus had a probable right to recovery. *See Sun Oil,* 424 S.W.2d at 218 (stating that the temporary injunction applicant is not required to establish that it will prevail on final trial and need only plead a cause of action and show a probable right to the relief sought). Because this conclusion was not "so arbitrary as to exceed the bounds of reasonable discretion," *CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ), the trial court did not abuse its discretion in finding a probable right to recovery.

Accordingly, we conclude that there is evidence to support the trial court's decision to issue the temporary injunction. *See Davis, 571 S.W.2d at 862.* Thus, the **\*212** trial court did not abuse its discretion, and we reverse the court of appeals' order dissolving the temporary injunction.

## IV. CONCLUSION

Section 3.01(a) grants the Board exclusive jurisdiction but only over the issues and claims the Code governs. Because the Code does not govern, or expressly authorize the Board to resolve, the Butnarus' tortious interference and declaratory judgment claims, these prospective transferees need not exhaust any administrative remedies before the trial court has jurisdiction over these claims. However, under the primary jurisdiction doctrine, the trial court should abate these claims to the extent that may be necessary to allow the Board a reasonable opportunity to resolve the Code construction issue they raise. Finally, the trial court did not abuse its discretion in granting the temporary injunction. Thus, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings consistent with this opinion on rehearing.

**All Citations**

84 S.W.3d 198, 45 Tex. Sup. Ct. J. 916

Footnotes

1      Unless otherwise indicated, "the Code" refers to the Texas Motor Vehicle Commission Code, and "the Board" refers to the Motor Vehicle Board. *See* TEX.REV.CIV. STAT. art. 4413(36).

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

773 S.W.2d 398
Court of Appeals of Texas,
Dallas.

CANTEEN CORPORATION, d/b/a Gulliver's, Appellant,

v.

REPUBLIC OF TEXAS PROPERTIES, INC., Appellee.

No. 05–88–01397–CV.    |    June 8, 1989.

Landlord sued tenant for breach of commercial lease. The 298th Judicial District Court, Dallas County, James Fry, J., rendered judgment in favor of landlord which enjoined tenant from maintaining a vending machine operation and ordered tenant to reopen and operate restaurant similar to other restaurants operated by tenant in the area. The Court of Appeals, Burnett, J., held that: (1) vending machines were not a "restaurant" and therefore installation of the machines was a breach of the lease; (2) order requiring tenant to open and operate a restaurant on premises was improper; and (3) injunction was proper as far as enjoining tenant's vending machine operation.

Affirmed in part and reversed in part.

West Headnotes (6)

**[1]    Contracts**  ⟜ Intention of Parties

**Contracts**  ⟜ Written contracts in general

Primary concern of the courts is to give effect to the intentions of the parties as expressed in the instruments; in the face of unambiguous provisions, the court must give effect to the contract as written.

1 Cases that cite this headnote

**[2]    Landlord and Tenant**  ⟜ Restrictions in lease

Vending machines were not a "restaurant" as contemplated by the parties and therefore tenant's installation of open access, unstaffed vending machine operation breached lease under which tenant warranted that premises would be used and occupied only for the purpose of restaurant use.

Cases that cite this headnote

**[3]    Specific Performance**  ⟜ Defenses or Objections to Relief

Court will generally not decree a party to perform a continuous series of acts which extend through a long period of time and require constant supervision by the court; parties are left to their remedies at law unless the interest of the public is involved.

6 Cases that cite this headnote

**[4]    Specific Performance**  ⟜ Performance of Contract in General

Order requiring tenant which breached commercial lease requiring that leased premises be used and occupied only for restaurant use to open and operate a restaurant in the style of other restaurants operated by tenant in the area was

improper in that present performance was not possible and operation of a delicatessen restaurant was not a matter of public interest which justified deviation from general rule against ordering ongoing activities.

2 Cases that cite this headnote

**[5]** **Injunction** 🔑 Contracts

Contractual rights are generally not enforced by writs of injunction since inadequate remedy at law and irreparable injury are rarely shown when a suit for damages for breach of contract is available.

34 Cases that cite this headnote

**[6]** **Injunction** 🔑 Business, commercial, or industrial uses

Injunction was proper insofar as it enjoined tenant from operating vending machines where landlord demonstrated an inability to compute damages for tenant's breach of commercial lease requiring that premises would be used and occupied only for purposes of restaurant use; evidence showed that other tenants complained about vending machines installed by tenant, that some prospective tenants did not lease building space due to fact that there was no restaurant and that there was no way to prove how many prospective tenants had not approached landlord about leasing due to lack of restaurant.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*399** Larry F. Amerine, Susan Johnson Foster, Dallas, for appellant.

Michael E. Mears, Dallas, for appellee.

Before McCLUNG, ROWE and BURNETT, JJ.

**Opinion**

BURNETT, Justice.

Canteen Corporation, doing business as Gulliver's, appeals an adverse judgment rendered in favor of Republic of Texas Properties, Inc. which 1) enjoined Canteen from maintaining a vending machine operation and 2) ordered Canteen to reopen and operate Gulliver's restaurant in accordance with the lease agreement between Canteen and Republic. In three points of error, Canteen asserts that 1) the temporary injunctive relief is void ab initio 2) the finding that Canteen breached the lease was in error and 3) the mandatory injunction was granted in error. Although we disagree with points of error one and two, we agree with Canteen's third point of error and for the reasons discussed herein, affirm the judgment of the trial court as to the prohibitory portion of the injunction and reform the judgment to eliminate the portion which decrees specific performance.

In February, 1985, Canteen, as lessee, and Republic as lessor, entered into a commercial lease agreement for the lease of space in RepublicBank Plano Tower. The lease agreement provided in part that "lessee warrants and represents to lessor that the leased premises shall be used and occupied only for the purpose of a restaurant." Approximately three years later, Canteen ceased to operate Gulliver's as a delicatessen style restaurant and installed vending machines. These machines served hot and cold beverages and food.

The trial court found that Canteen's vending machine operation did not constitute the operation of the restaurant and, therefore, was a violation of the lease agreement. The trial court rendered judgment in favor of Republic and granted Republic's request for injunctive relief. Specifically, the trial court enjoined Canteen from maintaining a vending machine operation in the leased premises and ordered **\*400** Canteen to reopen a restaurant in accordance with the lease agreement and in accordance with the Gulliver's concept as utilized by Canteen at other locations in the Dallas area.

In its first point of error, Canteen maintains that the temporary injunctive relief granted by the trial court is void ab initio. A review of the record reveals that although Republic requested a temporary injunction in its original petition, the injunction which issued was not a temporary injunction. Instead, it was a permanent injunction entered after a trial before the court. Thus, the defects urged by Canteen such as lack of a bond, failure to set a trial date, and failure to state a reason for the temporary injunction are not fatal to the injunction which was granted by the trial court. Canteen's first point of error is overruled.

In its second point of error, Canteen asserts that the trial court erroneously found that the installation of the vending machines did not constitute the operation of a restaurant and, thus, was a breach of the lease agreement. In paragraph 5, the lease provides as follows:

> Lessee warrants and represents to lessor that the leased premises shall be used and occupied only for the purpose of restaurant use ...

The lease at paragraph 5(b) continues:

> Lessee shall not at any time leave the leased premises vacant, but shall in good faith continuously throughout the term of this lease conduct and carry on in the entire leased premises the type of business for which the leased premises are leased. Lessee shall operate its business in an efficient, high class and reputable manner so as to produce the maximum amount of sales from the leased premises, and shall, except during reasonable periods for repairing, cleaning and decorating, keep the leased premises open to the public for business with adequate personnel in attendance on all days and during all hours established by lessor from time to time as store hours for the building, and during any other hours when the building is generally open to the public for business ...

The lease at paragraph 5(c) continues:

> Lessee understands that normal operating hours for this building are expected to be Monday through Friday, 7:30 a.m. to 6:30 p.m.; Saturday, 8:00 a.m. to 1:00 p.m. ...

The lease at paragraph 5(e) continues:

> Lessee shall not ... do anything which would tend to injure the reputation of the premises.

Finally, the lease at paragraph 5(f) provides:

> Exclusivity clause: Canteen Corporation shall have the exclusive right to provide manual food service in the building with exception of a white tablecloth restaurant on the premises. Lessee reserves the first right of refusal to install and maintain public vending machines at a location to be agreed upon in the future.

 **[1]**    Under general contract principles, the primary concern of the courts is to give effect to the intentions of the parties as expressed in the instruments. *Ideal Lease Service, Inc. v. Amoco Production Co.,* 662 S.W.2d 951, 952–53 (Tex.1984). In the face of unambiguous provisions, the court must give effect to the contract as written. *Id.; Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 728 (Tex.1981).

 **[2]**    It is clear from a reading of the contract that the restaurant contemplated by the parties was not an open access, unstaffed vending machine operation as was installed by Canteen. In fact, paragraph 5(f) refers to vending machines as a separate type

of operation than that contemplated by the parties. Thus, the trial judge properly found that the vending machines were not a restaurant and that the installation of the machines was a breach of the lease. Canteen's second point of error is overruled.

 [3]     Canteen maintains, in its third point of error, that the trial court improperly granted the mandatory injunction. the injunction of the trial court consists of two parts: (1) a portion which prohibits Canteen from operating the vending machines  **\*401**  in the lease space; and (2) a portion which orders Canteen to operate a restaurant in the leased premises in accordance with the Gulliver's concept. It is well established that a court of equity will only order specific performance when present performance is possible. A court will generally not decree a party to perform a continuous series of acts which extend through a long period of time and require constant supervision by the court. *Texas & Pacific Ry. Co. v. City of Marshall,* 136 U.S. 385, 390–91, 10 S.Ct. 846, 847, 34 L.Ed. 385 (1890); *American Housing Resources, Inc. v. Slaughter,* 597 S.W.2d 13, 15 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.); *United Coin Meter Co., Inc. v. Johnson–Campbell Lumber Co.,* 493 S.W.2d 882, 888 (Tex.Civ.App.1973); 81 C.J.S. *Specific Performance* § 75 (1977). Instead, the parties are left to their remedies at law unless the interest of the public is involved. *Beckham v. Munger Oil & Cotton Co.,* 185 S.W. 991, 992 (Tex.Civ.App.—Dallas 1916, no writ); *See Nueces Valley Townsite Co. v. San Antonio, Uvalde & Gulf R.R. Co.,* 67 S.W.2d 215, 220–221 (Tex.1933).

 [4]     In the instant case, the trial court ordered Canteen to open and operate a restaurant in the style of the Gulliver's restaurants operated in the Dallas area. This is not capable of present performance. Neither is the operation of a delicatessen restaurant a matter of public interest which justifies deviation from the general rule against ordering ongoing activities. The portion of the injunction which orders the operation of a Gulliver's is improper. Accordingly, we sustain Canteen's third point of error.

 [5]     Generally, contractual rights are not enforced by writs of injunction, since inadequate remedy at law and irreparable injury are rarely shown when a suit for damages for breach of contract is available. *Chevron U.S.A., Inc. v. Stoker,* 666 S.W.2d 379, 382 (Tex.App.—Eastland 1984, writ dism'd w.o.j.). "Irreparable injury" is stated to be "an injury of such nature that the injured party cannot be adequately compensated therefore in damages, or that the damages which result therefrom cannot be measured by any certain pecuniary standard." *Id.; see Minexa Arizona, Inc. v. Staubach,* 667 S.W.2d 563, 567 (Tex.App.—Dallas 1984, no writ).

 [6]     In the instant case, Republic presented evidence that tenants were complaining about the vending machines and that some prospective tenants did not lease space in the building in part because there was no restaurant. Additionally, Republic demonstrated that there was no way to prove how many prospective tenants had not approached Republic about leasing and had not leased in the building because there was no restaurant. Thus, Republic demonstrated an inability to compute damages. The injunction is proper as far as enjoining Canteen's vending machine operation.

However, the injunction also commands Canteen to reopen and operate a Gulliver's-type restaurant in the nature of a decree of specific performance. "Whether a court will grant an injunction the effect of which is to compel the specific performance of a contract, depends, of course, upon the same principles as govern a decree of specific performance." *Beckham v. Munger Oil & Cotton Co.,* 185 S.W. 991, 992 (Tex.Civ.App.—Dallas 1916, no writ).

The judgment of the trial court is AFFIRMED in part and REVERSED in part.

**All Citations**

773 S.W.2d 398

---

**End of Document**                                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

331 S.W.2d 418
Court of Civil Appeals of Texas, Houston.

CITY OF HOUSTON, Appellant,

v.

MEMORIAL BEND UTILITY COMPANY, Appellee.

No. 13555.     |     Jan. 21, 1960.

Suit for injunction. The District Court, Harris County, John, Snell, Jr., J., refused to grant injunction, and plaintiff appealed. The Court of Civil Appeals, Bell, C. J., held that city was entitled to temporary injunction restraining private water and sewer utility from charging more than the rates which had been fixed in ordinance which adopted rates requested by city and which had not been contested by utility as fixing confiscatory rates until two years after ordinance became effective.

Reversed and rendered.

West Headnotes (11)

**[1]**     **Constitutional Law** 🔑 Water, sewer, and irrigation

**Municipal Corporations** 🔑 Sewer rates

**Water Law** 🔑 Notice

**Water Law** 🔑 Hearing, in general

Where private water and sewer utility requested city to pass ordinance approving utility's rates and city passed ordinance having that effect, the utility was not denied procedural due process because it was given no notice or hearing in connection with such ordinance, and after the elapse of more than two years without the utility having contested the ordinance on ground that rates established therein were confiscatory the utility could not change its rates without approval of city council.

Cases that cite this headnote

**[2]**     **Public Utilities** 🔑 Nature and extent in general

Until such time as a regulatory body assumes to exercise its authority to fix rates which a utility may charge, the utility may fix its own rates, provided they are reasonable.

5 Cases that cite this headnote

**[3]**     **Constitutional Law** 🔑 Charges and prices in general

In case the regulatory body proposes to fix the rates to be charged by the utility, due process of law requires that the utility be given notice and be given a hearing, unless utility in some manner consents to fixing of particular rates which regulatory body in fact fixes, and if there is such consent no notice of the passage of the order need be given and no hearing need be accorded the utility.

3 Cases that cite this headnote

**[4]** **Municipal Corporations** 🔑 Sewer rates

**Water Law** 🔑 Revision, Increase, or Reductions of Charges

Where an ordinance is passed fixing the rates which a private utility may charge for water and sanitary sewer service, the utility cannot promulgate new rates until the existing rates are set aside and the only way the rates can be changed is through a hearing before the city council and the courts cannot intervene until the utility first exhausts its remedy before the city council.

Cases that cite this headnote

**[5]** **Municipal Corporations** 🔑 Charges and prices

If city council denies the utility a hearing and seeks to enforce a rate-fixing ordinance which the utility contends operates to confiscate its property, the court can intervene to determine whether there is in fact confiscation.

Cases that cite this headnote

**[6]** **Municipal Corporations** 🔑 Sewer rates

**Water Law** 🔑 Methodologies; establishment of rate base

A nonrecurring revenue of private utility furnishing water and sanitary sewer service cannot be considered in fixing a rate operative in the future.

Cases that cite this headnote

**[7]** **Municipal Corporations** 🔑 Judicial proceedings

**Water Law** 🔑 Injunction

In suit by city to enjoin private water and sewer utility from charging rates in excess of those fixed by ordinance, wherein the utility contended that it had been operating at a loss, the court could consider that if revenue from tap charges was included as income the utility would show a profit, even though such nonrecurring income could not be considered in fixing a rate operative in the future.

Cases that cite this headnote

**[8]** **Appeal and Error** 🔑 Injunction

The inquiry of the Court of Civil Appeals in a temporary injunction proceeding is whether the trial court has abused its discretion.

2 Cases that cite this headnote

**[9]** **Injunction** 🔑 Injunctions to enforce laws and regulations in general

Where the facts conclusively show that a party is violating the substantive law it becomes duty of court to enjoin the violation and in such case there is no discretion to be exercised.

5 Cases that cite this headnote

**[10]** **Injunction** 🔑 Preservation of status quo

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

It is the office of a temporary injunction to preserve the "status quo", meaning the last actual, peaceful, noncontested status of the parties to the controversy, which preceded the suit.

1 Cases that cite this headnote

**[11]** **Municipal Corporations** 🔑 Sewer rates

**Water Law** 🔑 Injunction

City was entitled to temporary injunction restraining private water and sewer utility from charging more than the rates which had been fixed in ordinance which adopted rates requested by city and which had not been contested by utility as fixing confiscatory rates until two years after ordinance became effective.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*420** R. H. Burks, City Atty., John Gano, Senior Asst. City Atty., Charles F. Weaver, Asst. City Atty., Houston, for appellant.

Dow & Dow, Melvin A. Dow, Houston (Howard W. Edmunds, Houston, of counsel), for appellee.

**Opinion**

BELL, Chief Justice.

The appellee is a private utility furnishing water and sanitary sewer service to residents of a defined area in the City of Houston. Prior to December 31, 1956, the territory served was outside the limits of the City. As a result of annexation, a part of the area served by appellee bcame a part of the City of Houston. At the time of annexation appellee was charging rates for services rendered by it according to a rate schedule promulgated by it. These rates it continued to charge until it raised its rates effective July 1, 1959.

On January 2, 1957, the City Council of the City of Houston passed general ordinances Nos. 57–1 and 57–3, by which it, without notice to appellee, fixed the rates that might be charged by a utility situated as was appellee for water and sanitary sewer service. The rates so fixed were less than the rates prescribed by appellee's schedule of rates. The record here reflects that on February 18, 1957, appellee furnished the City information as to the value of its properties, the appraisal being made by Freese, Nichols and Turner, the report being dated February 15, 1957. Also it furnished a statement of its income and expenses for the fiscal year ending November 30, 1956. The furnishing of these statements was in an effort to comply with the above ordinances. At the same time appellee for various reasons protested the passage of the ordinances and questioned their validity and the rates fixed thereby. The petition to the City Council contains this prayer:

'Wherefore, premises considered, petitioner prays that the City Council of the City of Houston *pass an ordinance approving the rates and charges made by the petitioner in the operation of its utilities and in the furnishing of other public services* (emphasis ours) or in the alternative that said City Council conduct a public hearing concerning rates and charges made by the petitioner and at such hearing that said petitioner be given an opportunity to introduce evidence with reference thereto *and further, that the rates and charges made by petitioner be not changed* until the City of Houston has taken final action after such hearing.' (Emphasis ours.)

On May 1, 1957, the City Council passed ordinance No. 57–531 by which it provided that a private utility operating without a franchise could charge no greater rate for its service than was being charged by it on December 31, 1956. The effect of the ordinance was to fix the maximum rate that could be charged, such maximum rate being that being charged by the utility on

December 31, 1956. Appellee had no notice of the passage of the ordinance before its passage. On the same day ordinances Nos. 57–1 and 57–3 were repealed.

The facts here show that the rates being charged by appellee on May 1, 1957 were the same as those being charged by them on December 31, 1956.

Nothing was done by appellee until June 3, 1959. It continued to charge the rates it had voluntarily adopted and which it, by its petition of February 18, 1957, expressly asked the City Council to adopt and which the City Council did effectively adopt by ordinance No. 57–531. On June 3, appellee wrote the City Council contending it had on February 18, 1957 asked for a rate hearing and stating the rates in force were not compensatory and stating it did not intend to continue to operate under the existing rates. **\*421** They requested a rate hearing. Mr. Puig, the Company president, stated appellee had several times from early 1957 orally requested a rate hearing. Just what kind of a rate hearing he does not state, nor are the times of the requests stated. On June 9, 1959, the City Council set a rate hearing for July 23, 1959.

Appellee, without approval of the City Council, promulgated an increase in rates to be charged by it effective July 1, 1959, and is now charging such rates.

Appellant filed this suit to enjoin appellee from charging rates in excess of those fixed by ordinance No. 57–531. The trial court refused to grant the injunction.

 [1]    Appellee contends the ordinance is as to it invalid because it was given no notice or hearing in connection with the ordinance fixing its rates and it was thus denied procedural due process. Too, it contends the rates established are not compensatory, but operate to confiscate its property. Further, it says the ordinance recites facts which are contrary to the established fact, that is, that since Decembr 31, 1956, there has been no increase in prices and expenses, whereas certainly there has been a very substantial increase in taxes. Appellee says that in any event under all circumstances the trial court did not abuse its discretion in refusing to grant the injunction.

 [2]    [3]    We have reached the conclusion that ordinance No. 57–531 was as to appellee valid and effective to fix the maximum rates which appellee could charge for its services. We take it to be established law that until such time as a regulatory body assumes to exercise its authority to fix rates which a utility may charge, that the utility may fix its own rates, provided they are reasonable. 73 C.J.S. Public Utilities §§ 14 and 15, p. 1009. Such rates would be binding until such time as the regulatory body assumes to exercise its authority. United Gas Corp. v. Shepherd Laundries, 144 Tex. 164, 189 S.W.2d 485. As we held on January 14, 1960, in the case of the City of Houston v. Willow Bend Utilities, Inc., Tex.Civ.App., 331 S.W.2d 333, in case the regulatory body proposes to fix the rates to be charged by the utility due process of law requires that the utility be given notice and be given a hearing, unless the utility in some manner consents to the fixing of the particular rates which the regulatory body in fact fixes. We think there can be no question that if the utility consents to an order by the regulatory body fixing particular rates, no notice of the passage of the order need be given and no hearing need be accorded the utility. In such case the rate is that of the utility and the regulatory body. It would be a rate fixed by the regulatory body with the consent of the utility.

In this case, on February 18, 1957, appellee expressly requested the City Council of the City of Houston to pass an ordinance approving the rates and charges being made by appellee. There was an alternative prayer for a rate hearing, but it was for a hearing to examine the rates appellee was charging and in this connection it was expressly asked that the rates appellee was charging *be not changed until after a hearing*. On May 1, 1957, with the enactment of Ordinance No. 57–531, the City Council did just what appellee had expressly requested. It adopted the rates the appellee was charging. After the request by appellee that an ordinance approving these rates be passed, appellee was entitled to no notice that the Council would be as appellee had requested.

 [4]    [5]    When the ordinance was passed, the rate fixed became the rate promulgated by law and it could not be changed except in a manner provided by law. The utility could not itself promulgate new rates until the existing rates fixed by law be set aside. The only way the rates could be changed would be through a hearing before the City Council. The courts could not intervene until appellee first exhausted its remedy before the City Council. San Antonio Transit Company v. City of San Antonio, Tex.Civ.App., 323 S.W.2d 272, no writ hist. Of **\*422** course, if the Council should deny a hearing and seek to continue to

enforce an ordinance that appellee contends operates to confiscate its property, the courts would intervene to determine whether there was in fact confiscation. Oklahoma Operating Company v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596. In the case before us, a hearing was set to commence July 23, 1959. There has been no denial of a hearing. We do not mean to say that even though appellee consented to the adoption of a rate that it would be estopped to assert the rate was confiscatory in a suit filed within the time prescribed by law after the passage of the ordinance adopting the rates. We merely hold procedural due process has not been denied and that the ordinance not having been contested in court for over two years after it became effective on the ground that the rates established were noncompensatory, appellee cannot change its rates except with the approval of the City Council. San Antonio Transit Co. v. City of San Antonio, supra. Of course, even should the City Council not expressly deny a hearing but should delay or prolong the hearing so its action would be tantamount to a denial of a hearing, the courts could intervene upon proper proceedings being instituted. We have no such situation here.

 [6]    [7]    Appellee contends continued enforcement of the rates would confiscate its property. What we have said above we think should adequately dispose of such contention. However, without going into the matter extensively, it should suffice to say that the proof shows that if revenue from tap charges is included as income, then for the years ending November, 1958, and May 31, 1959, appellee would show a profit. Appellee argues that since tap charges are nonrecurring, the revenue derived from this service may not be considered in determining profit. It is true that nonrecurring revenue may not be considered in fixing a rate operative in the future. However, it seems to us but reasonable to consider such in a situation such as we have here where appellee is contending it should not be enjoined from raising rates fixed by ordinance because it has been operating at a loss. Certainly it has been income for the period meterial to our inquiry. In determining what the future rate should be you have an entirely different problem.

 [8]    [9]    We are not unaware that the inquiry of this court in a temporary injunction proceeding is whether trial court has abused its discretion. ==However, we understand the law to be that where the facts conclusively show a party is violating the substantive law it becomes the duty of the court to enjoin the violation. In such case there is no discretion to be exercised.== It must correctly apply the law to positively established fact. General Drivers, Warehousemen & Helpers, Local 745, et al. v. Dallas County Construction Employers Ass'n, Tex.Civ.App., 246 S.W.2d 677, writ ref., n. r. e.; Southland Life Ins. Co. v. Egan, 126 Tex. 160, 86 S.W.2d 722.

 [10]    [11]    Too, it is the office of a temporary injunction to preserve the status quo. The status quo to be preserved is the last actual, peaceful, noncontested status of the parties to the controversy, which preceded the suit and which should be preserved until a final determination of the matters in controversy. Transport Company of Texas v. Robertson Transports, Inc., 152 Tex. 551, 261 S.W.2d 549. The last actual, peaceful and noncontested status of the parties to this suit was the status created by ordinance No. 57–531 adopting rates voluntarily used by appellee which appellee requested the Council to adopt, and the ordinance adopting them was not contested as fixing confiscatory rates until two years after it became effective.

The judgment of the trial court is reversed and judgment is here rendered enjoining appellee, pending a trial on the merits, from charging its customers rates in excess of those being charged by it on May 1, 1957.

**All Citations**

331 S.W.2d 418, 32 P.U.R.3d 522

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

571 S.W.2d 859
Supreme Court of Texas.

Tom H. DAVIS et ux., Petitioners,

v.

Robert M. HUEY et al., Respondents.

No. B-7182.    |    Oct. 4, 1978.    |    Rehearing Denied Nov. 1, 1978.

Action was brought for injunction to arrest construction of dwelling in residential subdivision in claimed violation of covenants and restrictions imposed upon all lots. The 201st District Court, Travis County, Herman Jones, J., denied temporary injunction and plaintiffs appealed. The Court of Civil Appeals, 556 S.W.2d 860, reversed and remanded with instructions, and defendants filed writ of error. The Supreme Court, Johnson, J., held that: (1) the Court of Civil Appeals far exceeded proper scope of appellate review of temporary injunction and improperly granted premature review of entire case on its merits, and thus denied defendants their right to trial by jury; (2) the trial court did not abuse its discretion in denying the temporary injunction; (3) issue of necessity of bond in injunction pendente lite issued by Court of Civil Appeals to protect its jurisdiction was rendered moot by expiration of the injunction pendente lite upon filing of application for writ of error to the Supreme Court, and (4) defendants timely filed application for writ of error invoking jurisdiction of the Supreme Court.

Judgment of the Court of Civil Appeals reversed; judgment of the trial court affirmed.

West Headnotes (10)

**[1]**    **Appeal and Error** ⛝ Extent of Review Dependent on Nature of Decision Appealed from

**Appeal and Error** ⛝ Injunction

**Appeal and Error** ⛝ Refusing injunction

Appeal of order granting or denying temporary injunction is appeal from interlocutory order; accordingly, merits of underlying case are not presented for appellate review; appellate review of such an order is strictly limited to determination of whether there has been clear abuse of discretion by trial court in granting or denying the interlocutory order. Vernon's Ann.Civ.St. art. 4662.

164 Cases that cite this headnote

**[2]**    **Appeal and Error** ⛝ Nature and Grounds of Decision of Intermediate Court

Where Court of Civil Appeals' opinion contained no indication that it confined its appellate consideration to review for abuse of discretion, but instead gave full consideration to merits of underlying lawsuit, and where the order which the Court of Civil Appeals directed the trial court to enter upon remand fully granted the relief sought by plaintiffs, the Court of Civil Appeals far exceeded proper scope of appellate review of temporary injunction and improperly granted premature review of entire case on its merits, and thus denied enjoined defendants their right to trial by jury.

101 Cases that cite this headnote

**[3]**    **Appeal and Error** ⛝ Interlocutory Orders and Proceedings

The Supreme Court will not assume that evidence taken at preliminary hearing will be same as evidence developed at full trial on the merits.

11 Cases that cite this headnote

**[4]** **Appeal and Error** 🔑 Injunction

**Injunction** 🔑 Preservation of status quo

At hearing upon request for temporary injunction, only question before trial court is whether applicant is entitled to preservation of status quo of subject matter of the suit pending trial on merits; on appeal the reviewing court is limited in its consideration as to whether the trial court abused its discretion in making the foregoing determination.

215 Cases that cite this headnote

**[5]** **Appeal and Error** 🔑 Abuse of discretion

The appellate court may not substitute its judgment for that of the trial court; an abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence.

236 Cases that cite this headnote

**[6]** **Appeal and Error** 🔑 Matters Appearing Otherwise Than by Record

Letter from trial judge to attorneys in case setting forth basis for his judgment denying temporary injunction, which was submitted to Supreme Court as attachment to the parties' briefs, was not properly made part of appellate record and would not be considered on appeal as finding of fact or conclusion of law on appeal.

9 Cases that cite this headnote

**[7]** **Appeal and Error** 🔑 Necessity of finding facts

Where no findings of fact or conclusions of law were filed in connection with denial of temporary injunction, trial court judgment must be upheld on any legal theory supported by the record.

107 Cases that cite this headnote

**[8]** **Injunction** 🔑 Real property in general

In action by owners of property adjacent to property on which they sought to enjoin building of home, some basis existed upon which the trial court could have properly held that the owners seeking the injunction were not entitled to temporary injunction pending final hearing, and thus trial court did not abuse its discretion in denying the temporary injunction.

39 Cases that cite this headnote

**[9]** **Appeal and Error** 🔑 Scope of Inquiry in General

Where the Supreme Court acquired exclusive jurisdiction of action for injunctive relief upon filing of application for writ of error, the order of the Court of Civil Appeals granting the injunction pendente lite without requiring bond expired, and thus the issue of necessity of bond in injunction pendente lite issued by Court of Civil Appeals to protect its jurisdiction was rendered moot.

3 Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 Order for Appeal or Writ of Error

Where first motion by owners of property, who were enjoined by Court of Civil Appeals' injunction pendente lite from building home on their property primarily sought setting of bond, and they subsequently filed motion for rehearing, and where enjoined owners filed writ of error in Supreme Court within 30-day statutory period following second motion, but not within 30 days of first motion, the first did not preclude enjoined owners' subsequent filing of timely motion for rehearing, and thus they timely filed application for writ of error invoking jurisdiction of the Supreme Court. Rules of Civil Procedure, rules 4, 468.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*860** Graves, Dougherty, Hearon, Moody & Garwood, John T. Anderson and Robert J. Hearon, Jr., Byrd, Davis & Eisenberg, Tom H. Davis, Austin, for petitioners.

Eskew, Brady, Womack & Muir, Doren R. Eskew, David L. Tisinger, Austin, for respondents.

**Opinion**

JOHNSON, Justice.

The primary issue presented by this case is the proper scope and standard of review by the court of civil appeals of a trial court's denial of a temporary injunction.

The respondents, Robert M. Huey and wife, Mary Paige Huey, filed suit to permanently enjoin the petitioners, Tom and Hattie Davis, from building upon their lot until their plans therefor had been approved by the developer. The Hueys further sought an immediate temporary restraining order and, after a hearing, a temporary injunction similarly restraining the Davises. After a hearing the trial court denied the temporary injunction and the Hueys appealed the denial of the temporary injunction. The court of civil appeals reversed the trial court judgment and rendered judgment that the cause be remanded to the district court, with instructions to enter judgment enjoining the Davises from continuing with construction until the plans had been approved by the developer. 556 S.W.2d 860. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

Petitioners Tom and Hattie Davis purchased a lot in Northwest Hills, a subdivision of Austin, Texas, noted for its view of the surrounding hills. The Davis lot abuts on its west side a lot owned by respondents Robert and Mary Paige Huey. A house was already constructed on the Huey lot at the time of the Davis purchase. The Davis lot, as are all other lots in the subdivision, is subject to certain restrictive covenants in its deed, including restrictions 7 and 8, as follows:
"7. Set-Back, Front Line, Side Line and Rear Line

"No structure shall be located or erected on any lot nearer to the front plot line than twenty-five (25) feet, nor nearer than five (5) feet to any side plot line except that the total combined setback from both sides shall in no event be less **\*861** than fifteen (15) feet, nor nearer than fifteen (15) feet to the rear plot line.

"8. Architectural Control and Building Plans

"For the purpose of insuring the development of the subdivision as a residential area of high standards, the Developers . . . reserve the right to regulate and control the buildings or structures or other improvements placed on each lot. No building, wall or other structure shall be placed upon such lot until the plan therefor and the plot plan have been approved in writing by the Developers. Refusal of approval of plans and specifications by the Developers . . . may be based on any ground, including purely

aesthetic grounds, which in the sole and uncontrolled discretion of the Developers . . . shall seem sufficient. No alterations in the exterior appearance of any building or structure shall be made without like approval. . . . " [1]

The Davises proposed to build a house on their lot to be situated twenty-five feet from the rear plot line. This placement of the house on the lot will clearly comply with restriction 7. However, the developer, respondent Austin Corporation, acting through respondent David Barrow, refused to approve the Davises' plans because the proposed placement of the house on the lot would bar the side view from the Hueys' existing house. In its refusal of the plans the developer purports to exercise its general authority under restriction 8 to refuse approval of a plan "on any ground, including purely aesthetic grounds, which in the sole and uncontrolled discretion" of the developer shall seem sufficient.

The Hueys filed the instant lawsuit to permanently enjoin the Davises from building any structure upon their lot until the plans therefor had been approved in writing by the developer. The Hueys' petition included a prayer that an immediate temporary restraining order be granted and that after a hearing a temporary injunction be entered, both similarly restraining the Davises. The trial court granted an immediate and Ex parte temporary restraining order. After a hearing the trial court entered an order dissolving the temporary restraining order and denying the temporary injunction. No findings of fact or conclusions of law were requested or filed.

The Hueys appealed the denial of the temporary injunction. The court of civil appeals reversed the trial court judgment and rendered judgment "that the cause be remanded to the district court, with instructions to enter judgment enjoining Appellees Davis and wife from continuing with construction until the house and plot plans have been approved by the developer." In reaching this result the court of civil appeals opinion concluded that the covenants in question were valid. The opinion discussed at length the authorities in Texas and other jurisdictions which uphold restrictive covenants implementing a general scheme of development for the common benefit of all lot owners by providing for approval of building plans by the developer. The court of civil appeals further examined the issue of the standard governing the developer's conduct in exercising its plan approval authority and concluded that the developer's conduct is improper only if it is arbitrary or in bad faith.

## THE TEMPORARY INJUNCTION REVIEW

 [1]    The Davises contend that the court of civil appeals far exceeded the proper scope of appellate review of a temporary injunction and improperly granted premature review of the entire case on its merits. We must agree. The appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order, which is expressly authorized by Article 4662, Texas Revised Civil Statutes Annotated. Accordingly, the merits of the underlying case are not presented for appellate review. Appellate review of an order **\*862**  granting or denying a temporary injunction is strictly limited to determination of whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory order. State v. Southwestern Bell Tel. Co., 526 S.W.2d 526 (Tex.1975); City of Spring Valley v. Southwestern Bell Tel. Co., 484 S.W.2d 579 (Tex.1972); State v. Cook United, Inc., 469 S.W.2d 709 (Tex.1971); Texas Foundries v. International Moulders & F. Wkrs., 151 Tex. 239, 248 S.W.2d 460 (1952).

The court of civil appeals opinion contains no indication that it confined its appellate consideration to review for abuse of discretion. To the contrary, it appears that the court of civil appeals gave full consideration to the merits of the underlying lawsuit. The opinion itself characterizes the case as an appeal from an order denying an injunction. The opinion makes no reference to the interlocutory nature of the injunction or to the abuse of discretion standard. Further, the order which the court of civil appeals directed the trial court to enter upon remand fully grants the relief sought by the Hueys in their lawsuit: injunction of the construction until the Davises' plans are approved by the developer.

 [2]    [3]    The Hueys argue that the court of civil appeals opinion was clearly limited to review of the temporary injunction because that was the only issue raised before that court. However, a reading of the court of civil appeals opinion and order will not support this contention. The effect of premature review of the merits accomplished by the court of civil appeals here is to deny the Davises their right to trial by jury. This court will not assume that the evidence taken at a preliminary hearing will be

the same as the evidence developed at a full trial on the merits. Houston Belt & T. Ry. Co. v. Texas & New Orleans R. Co., 155 Tex. 407, 289 S.W.2d 217 (1956); Transport Co. of Texas v. Robertson Transports, 152 Tex. 551, 261 S.W.2d 549 (1953).

 [4]   [5]   [6]   [7]   At a hearing upon the request for a temporary injunction the only question before the trial court is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits. Houston Belt & T. Ry. Co. v. Texas & New Orleans R. Co., supra. On appeal the reviewing court is limited in its consideration as to whether the trial court abused its discretion in making the foregoing determination. The appellate court may not substitute its judgment for that of the trial court. Texas Foundries v. International Moulders & F. Wkrs., supra. An abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence. Zmotony v. Phillips, 529 S.W.2d 760 (Tex.1975). Here, as no findings of fact or conclusions of law were filed, [2] the trial court judgment must be upheld on any legal theory supported by the record. Seaman v. Seaman, 425 S.W.2d 339 (Tex.1968).

 [8]   The Davises assert that there are at least three legal theories which will support the trial court's implied holding that the Hueys showed no probable right to recover. First, the trial court might have concluded that the developer had no power to modify the fifteen-foot setback requirement of deed restriction 7 under the holding of Johnson v. Dick, 281 S.W.2d 171 (Tex.Civ.App. San Antonio 1955, no writ). Second, the trial court could have found as a fact that the developer's action in refusing approval was not reasonable under the circumstances. Third, the trial court could have found as fact that "views" were not a part of the general scheme of development of the subdivision and not a proper basis for the exercise of the developer's authority under restriction 8.

The Davises further contend that there are under the evidence at least three theories upon which the trial court could have concluded that the Hueys failed to show irreparable injury. First, there was testimony **\*863** by Mr. Huey that the reduced value of his property could be compensated by money damages. Second, there was testimony that the Hueys could extend their deck ten feet to preserve their view. Third, because the construction of the Davis house was in such early stages, the Hueys would suffer little injury in the time period between the temporary injunction hearing and the final hearing on the merits. Without intruding upon the merits of the underlying cause of action, it may be concluded that at least some basis exists upon which the trial court could have properly held that the Hueys were not entitled to a temporary injunction pending the final hearing. Accordingly, we hold that the trial court did not abuse its discretion in denying the temporary injunction.

### THE BOND QUESTION

 [9]   In addition to ordering the case remanded to the trial court with instructions to issue an injunction against construction until the plans were approved, on October 5, 1977 the court of civil appeals also entered its own injunction pendente lite for the stated purpose of protecting its jurisdiction, ordering the Davises to cease all construction work on the dwelling and not to resume work so long as the cause remained within its jurisdiction. 556 S.W.2d 860 at 865. This injunction pendente lite was not conditioned upon the posting of a bond by the Hueys to protect the Davises against loss for delay of construction should the Davises eventually prevail. On October 6, 1977 the Davises filed a "Motion to Set Aside Order or, in the Alternative, to Set Bond" wherein the Davises complained of the court of civil appeals' failure to set bond on its own injunction. The motion was overruled on the day it was filed.

The Davises maintain that the court of civil appeals' failure to condition its injunction pendente lite upon a bond is error. In support of this argument the Davises rely upon the recent decisions of two courts of civil appeals requiring a bond upon the issuance of injunctions to preserve their jurisdiction. Riverdrive Mall, Inc. v. Larwin Mortgage Investors, 515 S.W.2d 2 (Tex.Civ.App. San Antonio 1974, writ ref'd n. r. e.); Pendleton Green Associates v. Anchor Savings Bank, 520 S.W.2d 579 (Tex.Civ.App. Corpus Christi 1975, no writ).

The Davises also concede that the issue may be moot. The jurisdiction of the court of civil appeals terminated and the supreme court acquired exclusive jurisdiction of the case when the application for writ of error was filed. Ammex Warehouse Company v. Archer, 381 S.W.2d 478 (Tex.1964); Johnson v. Sovereign Camp, W. O. W., 125 Tex. 329, 83 S.W.2d 605 (1935). Therefore,

by its terms the order of the court of civil appeals has expired. Petitioners and all respondents agree that the issue is rendered moot by the expiration of the injunction pendente lite. It would appear that this court can grant no relief from an injunction pendente lite which is no longer in existence. Therefore, we decline to comment upon the necessity of a bond in an injunction pendente lite issued by a court of civil appeals to protect its jurisdiction.

### THE MOTION TO DISMISS

 **[10]**    The Hueys have also filed in this court a motion to dismiss for want of jurisdiction the Davises' application for writ of error on the grounds that it was not timely filed. An application for writ of error must be filed with the clerk of the court of civil appeals within thirty days after the overruling of the motion for rehearing in the court of civil appeals. Tex.R.Civ.P. 468. The Davis application was filed with the clerk of the court of civil appeals on November 14, 1977. The Hueys argue that the Davises' "Motion to Set Aside Order or, in the Alternative, to Set Bond," filed and overruled on October 6, 1977, must be considered to operate as the Davises' only motion for rehearing in the court of civil appeals. If the Hueys were correct in this assertion, the thirty-day time period expired on November 5, 1977, which was a Saturday, and the application was due to be filed by the following Monday, November 7, 1977. Tex.R.Civ.P. 4. However, the Davises also timely filed a motion for rehearing **\*864** in the court of civil appeals on October 20, 1977. The motion for rehearing was overruled November 2, 1977. It is clear from a reading of the Davises' October 6 motion that its major thrust was to seek the setting of a bond in connection with the court of civil appeals injunction pendente lite. The October 6 motion will not be considered a motion for rehearing, nor will its filing preclude the Davises' filing of a timely motion for rehearing on October 20. Therefore, the Davis application for writ of error filed on November 14, 1977 was timely filed and the jurisdiction of this court properly invoked.

The judgment of the court of civil appeals is reversed and the judgment of the trial court is affirmed.

**All Citations**

571 S.W.2d 859

Footnotes

1      Restriction 8 in its entirety provides for approval by the developer or by an architectural committee. References to the architectural committee are deleted as no committee had been formed at the time in question.

2      A letter from Judge Jones to the attorneys in the case setting forth a basis for his judgment has been submitted as an attachment to the parties' briefs. The letter, however, is not properly made a part of the appellate record and it will not be considered as findings of fact or conclusions of law.

**End of Document**                                                                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

701 S.W.2d 238
Supreme Court of Texas.

Ida E. DOWNER, Petitioner,

v.

AQUAMARINE OPERATORS, INC., Respondent.

No. C–4141. | Dec. 4, 1985. | Rehearing Denied Jan. 15, 1986.

Wife of deceased seaman brought action for damages against shipowner. Trial court struck shipowner's answer as discovery abuse sanction and signed interlocutory default judgment as to liability. Jury trial on issue of damages was had in the 334th District Court, Harris County, Ken Harrison, J. Shipowner appealed. The Court of Appeals, 689 S.W.2d 472, reversed judgment of trial court. Wife appealed. The Supreme Court, Wallace, J., held that: (1) trial court had authority under rule regarding failure of party to appear at oral deposition to strike answer of shipowner; (2) trial court correctly imposed discovery sanction of striking shipowner's answer; and (3) trial court correctly refused to admit evidence of contributory negligence.

Judgment of Court of Appeals reversed and judgment of trial court affirmed.

West Headnotes (8)

[1]     **Pretrial Procedure**  ⚼  Corporate officers, agents, and employees

President of company which was party to action was a "party" within meaning of Rule 215a(c) regarding failure of party to appear at oral deposition, where president testified he was in complete charge of all operations of the company. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

27 Cases that cite this headnote

[2]     **Pretrial Procedure**  ⚼  Amendment or modification

Trial court's plenary jurisdiction gives it not only authority but responsibility to review any pretrial order upon proper motion, and in doing so, it is presumed that court is familiar with entire record of case up to and including motion to be considered.

8 Cases that cite this headnote

[3]     **Pretrial Procedure**  ⚼  Striking pleadings

**Pretrial Procedure**  ⚼  Dismissal or default judgment

In refusing to grant new trial and reinstate party's answer which had been struck at prior hearing on Motion for Sanctions as discovery sanction, trial court could consider evidence introduced subsequent to original sanctions hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

35 Cases that cite this headnote

[4]     **Appeal and Error**  ⚼  Abuse of discretion

Test for whether trial court abused its discretion is whether court acted without reference to any guiding rules and principles, i.e., whether the act was arbitrary or unreasonable, and mere fact that trial judge may decide matter within

his discretionary authority in different manner than appellate judge in similar circumstance does not demonstrate that an abuse of discretion has occurred.

3460 Cases that cite this headnote

**[5]** **Pretrial Procedure** Striking pleadings

**Pretrial Procedure** Dismissal or default judgment

Trial court correctly imposed discovery sanction of striking defendant's answer and signing interlocutory default judgment as to liability under Rule 215a(c)(Repealed) regarding failure of party to appear at oral deposition, where shipowner voluntarily sent crew to sea rather than producing them for depositions as agreed on two occasions, attorney for wife of deceased seaman stated shipowner's attorney waited until one hour past deposition time to advise wife's attorney that wife's attorney would have to fly to another city to take depositions on following day, and shipowner failed to produce president of shipowner and immediate supervisor of captain for deposition and did not explain this failure. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

17 Cases that cite this headnote

**[6]** **Appeal and Error** Sustaining challenge or excusing juror

Alleged error of trial court in refusing to strike a juror for cause did not result in harm, where challenged juror was a spare.

1 Cases that cite this headnote

**[7]** **Damages** Scope of issues and questions considered

Trial court correctly refused to admit evidence of contributory negligence in trial to determine damages, where defendant's answer had been struck and default judgment rendered as to liability and defendant had no pleading to support contributory negligence.

14 Cases that cite this headnote

**[8]** **Appeal and Error** Amount of recovery or extent of relief

Alleged error of trial court in awarding prejudgment interest was not presented to trial court and was thus waived on appeal.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*239** John O'Quinn, Frank M. Staggs, Jr., O'Quinn & Hagans, Houston, for petitioner.

Terry P. Ayre and Thomas A. Brown, Brown, Sims, Wise & White, Houston, for respondent.

**Opinion**

WALLACE, Justice.

This is an appeal from a judgment for damages in a suit brought under the Jones Act and under admiralty law. The trial dealt only with damages because the trial court struck the defendant's answer as a discovery abuse sanction and signed an interlocutory default judgment as to liability. The court of appeals reversed the trial court judgment, holding that the action of **\*240** that court was an error of law and an abuse of discretion. 689 S.W.2d 472. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

The issues before us are whether TEX.R.CIV.P. 215a(c), as it existed prior to the amendment effective August 1, 1984, authorized the trial court to strike defendant's answer, and, if so, whether the exercise of that authority constituted an abuse of discretion.

Edward P. Downer was a seaman aboard the vessel Four Point IV. He drowned while attempting to free a line that had fouled the vessel's propeller. Ida E. Downer, his widow, brought this action against Aquamarine Operators, Inc., the owner and operator of the vessel. The case was filed in the 151st District Court of Harris County. Both Downer and Aquamarine are residents of Harris County, Texas.

Downer filed Notice of Intent to Take the Depositions of All Members of The Crew on June 1. The notice identified each crew member, including the captain, Chester P. Dalfrey, by name only. Downer also requested depositions of the immediate supervisor of Chester Dalfrey and the custodian of Edward Downer's personnel file. On June 1, Aquamarine notified Downer that the crew was at sea and would not appear. Aquamarine at that time agreed to produce the requested persons on June 22. On June 21, Aquamarine again notified Downer that the crew was at sea and would not appear. It agreed to produce them on July 5.

Downer filed written Notice of Intent to Take Depositions of the same individuals for July 5. On that date, the requested deponents did not appear, whereupon Downer filed a Motion for Sanctions. A hearing on the Motion for Sanctions was set for August 22. Aquamarine made no appearance at the hearing; the trial court granted the Motion for Sanctions and signed an Order Striking Aquamarine's Answer.

Downer filed a Motion for Interlocutory Default Judgment to which Aquamarine responded. The response contained Aquamarine's reasons for not producing the requested individuals for depositions and its failure to appear at the sanctions hearing.

The reason offered for the first two occasions was that work for the FOUR POINT IV was scarce and, when work was available, it was necessary to send the vessel and crew to sea rather than produce them for depositions. On the third occasion, the vessel was in port at New Iberia, Louisiana, but Coast Guard regulations required a skeleton crew to be kept aboard at all times. Aquamarine's attorney stated that he notified Downer's attorney on July 1 of the necessity to take the depositions in New Iberia. Downer's attorney stated that he first learned that the individuals would not appear as noticed when Aquamarine's attorney called him an hour after the depositions were scheduled to commence. Both agreed that Aquamarine requested that the depositions be taken in New Iberia on July 6. However, Downer's attorney stated that he could not do so because he was preferentially set for trial in Houston starting at 9:00 a.m. on July 6.

The reason given by Aquamarine for not appearing at the sanctions hearing was that Hurricane Alicia had struck La Porte, the residence of Mr. Ayres, Aquamarine's lead counsel, four days previously. Mr. Ayres was involved in cleaning up after the hurricane and mitigating the damages to his home. Also, he had a hearing set in federal court in Beaumont on the following day and was directing all of his available attention to that matter.

To his Motion to Reconsider the Sanctions, Mr. Ayres attached an affidavit from his secretary, which stated that she had called the clerk of the court on July 7, and had advised her that Mr. Ayres had to make a docket call in Angleton on August 22. She understood the clerk to say that the sanctions hearing would be reset for September 6. In response to this motion, Downer's attorney advised the court by letter of his version of the circumstances leading up to the non-appearance on July 5, and the time when he was first advised **\*241** that the named individuals would not appear. Attached to this letter to the court was

a copy of a letter dated July 28, written by Mr. Bales, an associate of Mr. Ayres, which confirmed that the sanctions hearing was set for August 22.

With the above information before it, the trial court overruled Aquamarine's Motion to Reconsider the Sanctions and to reinstate its answer. The court signed an order granting an interlocutory default judgment as to liability. Aquamarine filed a Motion to Set Aside the Default Judgment. The motion contained practically the same information as the Motion to Reconsider Sanctions set out above. The trial court considered this motion and overruled it. On April 16, 1984, the case was preferentially set for trial for June 4, and the trial court refused to consider Aquamarine's Second Motion to Set Aside the Interlocutory Default Judgment and Reinstate Defendant's Pleadings.

A jury trial was had in a different court, the 334th District, on the issue of damages. At the trial, Chester Dalfrey testified that he was captain of the FOUR POINT IV and as such he was in complete charge of the vessel with authority over all of its operations. Mr. Clark Ivans testified that he was president of Aquamarine at all times pertinent to this case, and that as such, he was the immediate supervisor of Chester Dalfrey.

 **[1]**    We now address the issue of whether the trial court had authority under Rule 215a(c) to strike Aquamarine's answer. That rule stated in pertinent part:

> If a party or an officer or managing agent of a party, except for good cause shown, fails to appear before the officer who is to take his oral deposition ... the court in which the action is pending on motion and notice may strike out all or any part of the pleading of that party or dismiss the action or proceeding or any part thereof....

As noted above, Ivans testified that as president of Aquamarine he was in complete charge of all operations of the company. Thus he was a party as contemplated by Rule 215a(c).

 **[2]**    **[3]**    The next question is whether the trial court, in refusing to grant a new trial and reinstate Aquamarine's answer, could consider the evidence introduced subsequent to the original sanctions hearing. Aquamarine contends that the trial court, in imposing sanctions, could consider only the evidence before it at the time of the sanctions hearing, and not any evidence subsequently produced. A trial court's plenary jurisdiction gives it not only the authority but the responsibility to review any pre-trial order upon proper motion. In doing so, it is presumed that the court is familiar with the entire record of the case up to and including the motion to be considered. The plenary jurisdiction of the trial court in this case continued through the final judgment and overruling of Aquamarine's motion for new trial. When considering the motion for new trial, the court had before it the reasons advanced by Aquamarine for not appearing for depositions or the sanctions hearing; Downer's response to Aquamarine's motions; and the evidence produced at the trial on damages. Thus, the court of appeals erred in holding that the trial court did not have authority under Rule 215a(c) to strike Aquamarine's answer.

We now turn to the court of appeals holding that the trial court abused its discretion in striking Aquamarine's answer. The court of appeals concluded its review of the abuse of discretion issue by stating: "The facts of the case simply do not, in our opinion, show this to be an appropriate case to impose the ultimate sanctions of striking the pleadings and entering default judgment." We interpret that statement to mean that the court of appeals disagreed with the decision of the two trial judges who reviewed the matter.

 **[4]**    The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and **\*242** principles. *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.—1939, opinion adopted). Another way of stating the test is whether the act was arbitrary or unreasonable. *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984); *Landry v. Travelers Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does

not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (Tex.1959).

To determine the trial judge's guiding rules and principles in imposing sanctions for discovery abuse, we must look to the Texas Rules of Civil Procedure as promulgated and amended by this Court as well as the decisions of appellate courts of this State and of the United States. The Texas Rules of Civil Procedure pertaining to discovery and sanctions for noncompliance have been amended several times, culminating in Rule 215a as it existed at the time of this case, and now embodied in Rule 215. The use of sanctions by trial courts to prevent discovery abuse has developed steadily over the past several years. These changes reflect the continuing pattern both to broaden the discovery process and to encourage sanctions for failure to comply.

The United States Supreme Court in *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) approved the use of sanctions not only to assure compliance with the discovery process but also to deter those who might be tempted to abuse discovery in the absence of a deterrent.

This court and various courts of appeals have also followed this progression. *See, e.g., Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985), (Kilgarlin, J., concurring) (unnamed witness not permitted to testify); *Jarrett v. Warhola,* 695 S.W.2d 8 (Tex.App. —Houston [14th Dist.] 1985, writ ref'd), (plaintiff's cause of action dismissed); *City of Houston v. Arney,* 680 S.W.2d 867 (Tex.App.—Houston [1st Dist.] 1984, no writ) (defendant's answer struck for failure to answer interrogatories); *Southern Pacific Transportation v. Evans,* 590 S.W.2d 515 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (defendant's answer struck and interlocutory default judgment rendered as to liability), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980).

In various speeches and law review articles, different members of this court have encouraged trial judges to use sanctions to the degree necessary to assure compliance with discovery procedures and deter abuse of the process. Barrow and Henderson, *1984 Amendments to the Texas Rules of Civil Procedure Affecting Discovery,* 15 ST. MARY'S L.J. 713 (1984) (presented to the Texas College of the Judiciary Nov. 29, 1984); Kilgarlin and Jackson, *Sanctions for Discovery Abuse Under New Rule 215,* 15 ST. MARY'S L.J. 767 (1984); Pope and McConnico, *Practicing Law With the 1981 Texas Rules,* 32 BAYLOR L.REV. 457 (1981); Spears, *The Rules of Civil Procedure: 1981 Changes In Pretrial Discovery,* 12 ST. MARY'S L.J. 633 (1981).

The trial court in this case was free to examine the factors before it to determine whether to levy sanctions. Among these were the following: (1) whether voluntarily sending the crew to sea rather than producing them for depositions as agreed on two occasions was in conscious disregard of this court's rules; (2) whether the contradictory statements of both attorneys indicated that Aquamarine's attorney did in fact wait until one hour past the scheduled time for depositions on July 5, to advise Downer's attorney that he would have to fly to New Iberia and take depositions on the following day; (3) whether Aquamarine's attorney consciously disregarded the sanctions hearing in preference to his personal needs and the federal court case set the following day; (4) whether the information contained in the secretary's affidavit as to the date of the sanctions hearing conflicted with the letter from an attorney **\*243** in that law firm confirming that the hearing was set on August 22; and (5) the unexplained failure of Aquamarine to produce for depositions on any of the occasions in question Clark Ivans, the immediate supervisor of Chester Dalfrey and the president of Aquamarine.

[5] The record contains no indication that the trial court was capricious, arbitrary, or unreasonable. Thus, the court of appeals erred in holding that the trial court abused its discretion.

In determining whether to reverse and render this cause or to remand it to the court of appeals, we must look to the four points of error raised by Aquamarine before the court of appeals but not addressed by that court. If those points raise questions of law, as opposed to questions of fact, they can be addressed by this court.

The first point was that Downer's First Amended Original Petition was insufficient to support the judgment. The contention is that the facts supporting the cause of action were not pleaded. TEX.R.CIV.P. 47 requires that a petition contain a short statement

of the cause of action sufficient to give fair notice of the claim involved. Our rules do not require pleadings to contain evidence or factual detail. That point is overruled.

 **[6]**    The second point was that the trial court improperly refused to strike a juror for cause. After the court had ruled on challenges for cause, there were 26 names left on the jury list. Each party was given six jury strikes, so, after making those strikes, 14 names remained on the list. The challenged juror was Number 14 and was thus a spare. There was no harm in refusing to dismiss him for cause.

 **[7]**    The third point was that the trial court improperly refused to admit evidence of Downer's contributory negligence. Contributory negligence is an affirmative defense which must be pleaded. Aquamarine's answer had been struck and default judgment rendered as to liability. Thus, defendant had no pleading to support contributory negligence, so the court did not err in refusing to admit the requested evidence.

 **[8]**    Aquamarine's remaining point before the court of appeals was that the trial court erred in awarding prejudgment interest in a Jones Act case tried to a jury. This point was not presented to the trial court and was thus waived.

Aquamarine's points of error presented to the court of appeals but not considered by that court concerned questions of law over which we have jurisdiction. There is no merit to these points so it is not necessary for this cause to be remanded to the court of appeals.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

**All Citations**

701 S.W.2d 238

---

**End of Document**                                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

62 S.W.3d 867
Court of Appeals of Texas,
Austin.

EBONY LAKE HEALTHCARE CENTER, Appellant,

v.

TEXAS DEPARTMENT OF HUMAN SERVICES and Attorney General for the State of Texas, Appellees.

No. 03–01–00184–CV.　　|　　Nov. 29, 2001.

Health care facility brought declaratory judgment actions, seeking determination that documents sought by family members of patient at facility were subject to privilege, and seeking temporary injunction to prevent release of documents. The District Court, Lowry, J., granted temporary injunction in part, but order failed to include date for trial on merits, and failed to set bond amount. The Department of Human Services and the attorney general moved to dissolve temporary injunction. The Judicial District Court, Travis County, Darlene Byrne, J., declared first temporary injunction order void, and denied temporary injunction, and facility filed interlocutory appeal. The Court of Appeals, Bea Ann Smith, J., held that: (1) initial order granting temporary injunction was void; (2) facility established probable right to recovery on declaratory judgment action; and (3) facility's disclosure of allegedly privileged peer review committee reports would result in irreparable harm.

Sustained in part, reversed in part, and remanded.

West Headnotes (14)

**[1]**　　**Injunction** 🔑 Necessity and waiver in general

Before a trial court issues a temporary injunction, the applicant must execute a bond to the adverse party and file the bond with the court clerk; temporary injunction orders filed without bond are void. Vernon's Ann.Texas Rules Civ.Proc., Rule 684.

2 Cases that cite this headnote

**[2]**　　**Injunction** 🔑 Form and requisites

The requirement that order for temporary injunction must include an order setting cause for trial on merits is mandatory, and an order that does not comply is fatally defective and void. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**[3]**　　**Declaratory Judgment** 🔑 Injunction

Order granting temporary injunction in favor of health care facility to prevent release of certain records to patient's family members was void, where order failed to set bond, and failed to include date for trial on merits. Vernon's Ann.Texas Rules Civ.Proc., Rules 683, 684.

3 Cases that cite this headnote

**[4]**　　**Appeal and Error** 🔑 Extent of Review Dependent on Nature of Decision Appealed from

In an appeal from an order denying a request for a temporary injunction, the Court of Appeals' review is confined to the validity of the order denying the injunctive relief.

1 Cases that cite this headnote

**[5]** **Appeal and Error** Injunction

**Appeal and Error** Refusing injunction

**Injunction** Discretionary Nature of Remedy

The decision to grant or deny a temporary injunction lies within the sound discretion of the trial court; the Court of Appeals will not disturb that decision absent a clear abuse of discretion.

Cases that cite this headnote

**[6]** **Appeal and Error** Extent of Review Dependent on Nature of Decision Appealed from

**Appeal and Error** Injunction

In reviewing order denying temporary injunction, the Court of Appeals may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit; rather, it views the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion.

Cases that cite this headnote

**[7]** **Injunction** Entitlement to Relief

**Injunction** Likelihood of success on merits

**Injunction** Injury, Hardship, Harm, or Effect

In a temporary injunction hearing, the trial court assesses whether the applicant has shown a probable right to recovery and a probable injury in the interim.

Cases that cite this headnote

**[8]** **Injunction** Likelihood of success on merits

To establish a probable right to recovery, as necessary for temporary injunction, an applicant need not prove that it will ultimately prevail in the litigation; rather, the applicant must show it has a cause of action for which it may be granted relief.

Cases that cite this headnote

**[9]** **Records** Judicial enforcement in general

Whether information is subject to disclosure under the Public Information Act and whether an exception applies are legal questions of statutory construction. V.T.C.A., Government Code §§ 552.001–552.353.

Cases that cite this headnote

**[10]** **Courts** Abuse of discretion in general

A trial court abuses its discretion when it misapplies the law to the facts.

Cases that cite this headnote

**[11]    Declaratory Judgment** ⚿ Injunction

Health care facility established probable right to recovery on declaratory judgment action to protect documents generated by facility's peer review committee which were sought by family members of patient, under Public Information Act, based on facility's assertion of a peer review privilege, as necessary for issuance of temporary injunction; although documents were on pre-printed forms developed by the state Department of Human Services, reports attached to those forms contained details about accidents at facility, and indicated that actions of medical staff were reviewed. V.T.C.A., Government Code § 552.001 to 552.353.

3 Cases that cite this headnote

**[12]    Injunction** ⚿ Irreparable injury

**Injunction** ⚿ Adequacy of remedy at law

**Injunction** ⚿ Recovery of damages

A party proves irreparable harm, as required for issuance of temporary injunction, by showing an injury for which there can be no real legal measure of damages or none that can be ascertained with a sufficient degree of certainty.

Cases that cite this headnote

**[13]    Declaratory Judgment** ⚿ Injunction

Health care facility's disclosure of allegedly privileged peer review committee reports would result in irreparable harm, for purposes of issuance of temporary injunction; disclosure of reports prior to trial on merits would result in noncompensable injury, if trial court later determined that reports were privileged.

2 Cases that cite this headnote

**[14]    Injunction** ⚿ Balancing or weighing factors; sliding scale

Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory to obtain temporary injunction; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury.

1 Cases that cite this headnote

## Attorneys and Law Firms

**\*869** John Cornyn, Howard G. Baldwin, Jr., Jeffrey S. Boyd, Toni Hunter, Bryan Gantt, Austin, for Appellee Texas Dept. of Human Services.

Howard G. Baldwin, Jr., Jeffrey S. Boyd, Don Walker, Courtney Duperier Newton, Office of Atty. Gen., Austin, for Appellee John Cornyn, Atty. Gen. of Texas.

Gail N. Friend, Alicia K. Dowdy, Friend & Associates, L.L.P., Houston, for Appellant Ebony Lake Healthcare Center.

Before Justices KIDD, B.A. SMITH and PURYEAR.

**Opinion**

BEA ANN SMITH, Justice.

Appellee Texas Department of Human Services (the Department) received a request for release of certain documents regarding appellant Ebony Lake Healthcare Center (Ebony Lake), pursuant to the Public Information Act. *See* Tex. Gov't Code Ann. §§ 552.001–552.353 (West 1994 & Supp.2001). Ebony Lake informed the Department that it considered some of the documents privileged. Accordingly, the Department requested an attorney general's opinion. The Attorney General found that the documents in question were not privileged and ordered the documents released. Ebony Lake subsequently sought a declaratory judgment, asking the trial court to declare the documents subject to a confidentiality privilege; in conjunction with the suit, Ebony Lake also sought a temporary injunction. The trial court denied the temporary injunction, and Ebony Lake brings this interlocutory appeal from that ruling. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014 (West Supp.2001). We will reverse the trial court's order denying the temporary injunction and remand the cause to the trial court.

## BACKGROUND

On February 23, 2000, an attorney representing family members of an Ebony Lake resident sent an open records request to the Department, seeking among other items all incident reports sent by Ebony Lake to the Department. On April 6, Ebony Lake informed the Department that it considered some of the documents privileged from disclosure. Based on this information, the Department requested an attorney general's opinion concerning the confidentiality of the documents. The Attorney General determined that the documents were not subject to the asserted privileges and should be disclosed.

Ebony Lake then filed a declaratory judgment suit, seeking a judicial determination that the documents were subject to the asserted privileges. In conjunction with the suit, Ebony Lake sought a temporary restraining order to prevent the release of the documents. On August 20, 2000, visiting Judge Pete Lowry granted the temporary restraining order and set the matter for a temporary injunction hearing. Following the hearing, Judge Lowry granted the temporary injunction in part. [1] The order signed by the trial court, **\*870** however, failed to include a date for a trial on the merits and failed to set a bond.

On January 9, 2001, the Department and the Attorney General filed a joint motion to dissolve Judge Lowry's order, claiming that it was void *ab initio* because it failed to set a trial date or a bond. Judge Darlene Byrne considered the motion and agreed that the order was void.

Thereafter, the trial court granted a second temporary restraining order and held a second temporary injunction hearing. At the hearing, the parties and the trial court agreed to adopt all evidence and exhibits from the first temporary injunction hearing, and the trial court heard legal arguments. Following the hearing, the trial court denied the application for temporary injunction. Ebony Lake requested findings of fact and conclusions of law, which the trial court declined to file. Ebony Lake now appeals the trial court's denial of its application for temporary injunction and the trial court's ruling that the initial temporary injunction order was void.

## DISCUSSION

Judge Lowry entered an order granting Ebony Lake's application for temporary injunction in part on August 28, 2000. More than four months later, the Department and the Attorney General filed a joint motion to dissolve the temporary injunction, arguing that the order was void on its face because it failed to include a date for a trial on the merits and failed to set a bond amount. The trial court agreed and declared the order void. By its second issue, Ebony Lake claims the trial court erred in declaring the first temporary injunction order void.

 **[1]** Rule 684 of the Texas Rules of Civil Procedure provides: "In the order granting any ... temporary injunction, the court shall fix the amount of security to be given by the applicant." Tex.R. Civ. P. 684. This rule has been strictly construed. Before a trial court issues a temporary injunction, the applicant must execute a bond to the adverse party and file the bond with the court clerk. *Chambers v. Rosenberg,* 916 S.W.2d 633, 634 (Tex.App.—Austin 1996, writ denied). Orders filed without a bond are void. *Id.*

 **[2]** Similarly, Rule 683 provides: "Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought." Tex.R. Civ. P. 683. The requirements of Rule 683 are mandatory, and an order that does not comply with the rule is fatally defective and void. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986); *University Interscholastic League v. Torres,* 616 S.W.2d 355, 357–58 (Tex.App.—San Antonio 1981, no writ).

Finally, both the supreme court and this Court have held that "a judgment which discloses its invalidity on its face is a nullity and may be disregarded anywhere at any time." *Chambers,* 916 S.W.2d at 635; *accord Fulton v. Finch,* 162 Tex. 351, 346 S.W.2d 823, 827 (1961). The trial court correctly applied this rule in declaring the initial temporary injunction order void. We overrule Ebony Lake's second issue.

 **[3]** **[4]** **[5]** **[6]** Having determined that the initial order granting Ebony Lake's application for a temporary injunction was void, we next consider whether the trial court erred in denying Ebony Lake's second request for a temporary injunction. In an appeal from an order denying a request for a temporary injunction, our review is confined to the validity of the order denying the injunctive relief. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993); **\*871** *Universal Health Servs. v. Thompson,* 24 S.W.3d 570, 576 (Tex.App.—Austin 2000, no pet.). The decision to grant or deny the temporary injunction lies within the sound discretion of the trial court; we will not disturb that decision absent a clear abuse of discretion. *Thompson,* 24 S.W.3d at 576. This Court may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit. *Id.* Rather, we view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Id.*

 **[7]** **[8]** In a temporary injunction hearing, the trial court assesses whether the applicant has shown a probable right to recovery and a probable injury in the interim. *Id.* To establish a probable right to recovery, an applicant need not prove that it will ultimately prevail in the litigation; rather, the applicant must show it has a cause of action for which it may be granted relief. *Id.* Probable right to recovery includes the element of wrongful conduct. *Id.* At this preliminary stage, the applicant need not prove that the information subject to the Public Information Act is privileged. *See Center for Econ. Justice v. American Ins. Ass'n,* 39 S.W.3d 337, 343 (Tex.App.—Austin 2001, no pet.). The applicant need only demonstrate that it is entitled to protection and the status quo should be maintained until a trial on the merits commences.

Ebony Lake claims it established a probable right to recovery because it has a claim based on the Public Information Act. *See* Tex. Gov't Code Ann. §§ 552.001–.353. Ebony Lake further argues that it established a likelihood of success on the merits by presenting competent, uncontroverted evidence that the reports at issue were created by a medical peer review committee and are therefore confidential.

The Texas Public Information Act governs access to governmental information. Tex. Gov't Code Ann. §§ 552.001–.353. At the heart of the Act is the principle that the public is entitled to all information "collected, assembled, or maintained by a governmental body." *Holmes v. Morales,* 924 S.W.2d 920, 922 (Tex.1996); *accord* Tex. Gov't Code Ann. § 552.002(a)(1) (West Supp.2001). However, the Act provides that information is excepted from public disclosure if it is considered confidential by either constitutional or statutory law or by judicial decision. Tex. Gov't Code Ann. § 552.101 (West 1994).

 **[9]** **[10]** Whether information is subject to disclosure under the Public Information Act and whether an exception applies are legal questions of statutory construction. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 357 (Tex.2000); *Center for*

*Econ. Justice,* 39 S.W.3d at 347. A trial court abuses its discretion when it misapplies the law to the facts. *Center for Econ. Justice,* 39 S.W.3d at 347.

Ebony Lake claims on appeal that the information sought is made confidential by the medical peer review committee privilege ("peer review privilege"). Tex. Occ.Code Ann. § 160.007 (West 2001). The Medical Practice Act provides: "[E]ach proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." Tex. Occ.Code Ann. § 160.007(a). Medical peer review committee is defined as

> a committee of a health care entity, the governing board of a health care entity, or the medical staff of a health care entity, that operates under written bylaws approved by the policy-making body or the governing board of the health care entity and is authorized to evaluate the quality of medical and **\*872** health care services or the competence of physicians.

*Id.* § 151.002(a)(8) (West 2001). The Act defines medial peer review as "the evaluation of medical and health care services, including evaluation of the qualifications of professional health care practitioners and of patient care provided by those practitioners." *Id.* § 151.002(a)(7).

In determining whether Ebony Lake established the elements necessary for temporary injunctive relief, the trial court considered whether Ebony Lake had a probable right to prevail on its claim of privilege. In support of its claim to a privilege, Ebony Lake presented the documents at issue for *in camera* inspection and produced its quality assurance committee policy, along with testimony from the facility administrator, Del Waggoner. The documents themselves detail three different accidents involving residents at the facility. They include witnesses' observations of the incidents, along with any subsequent action taken by the facility, including any actions directed toward its employees as a result of the incidents. Finally, the reports include diagnoses of the residents following their transport to the hospital.

Waggoner testified that the incident reports were "processed" by the quality assurance committee and handled through the committee process. Waggoner also testified that at least one of the documents was created following an investigation performed by an "expression" of the quality assurance committee. He added that this investigation would have been conducted even if the committee had elected not to file any incident report with the Department. On cross-examination, Waggoner conceded that one of the reports would not have been filed with the Department if a complaint had not been lodged against the facility.

In response, appellees maintain that because Ebony Lake was required by law to file its reports with the Department, *see* Health & Safety Code Ann. § 242.122 (West 2001), the reports constitute business records, which are public information. *See In re Pack,* 996 S.W.2d 4, 7 (Tex.App.—Fort Worth 1999, orig. proceeding.). In addition, appellees argue that Ebony Lake cannot satisfy the strict requirements mandated by *Jordan v. Court of Appeals for the Fourth Supreme Judicial District,* 701 S.W.2d 644 (Tex.1985), in order to assert a privilege. We will first address the applicability of *Jordan* to the facts of this case.

According to appellees, *Jordan* mandates that in order for a party to successfully assert a privilege, the party must establish that the documents at issue were (1) created with committee impetus and purpose, and (2) not "gratuitously submitted to a committee." *Id.* at 648. *Jordan* addressed the predecessor to section 161.032 of the Health and Safety Code, or the medical committee privilege.[2] The **\*873** statutory definition of "medical committee" is broad in scope and encompasses a medical peer review committee. *Memorial Hosp.—The Woodlands v. McCown,* 927 S.W.2d 1, 8 (Tex.1996); *Irving Healthcare Sys. v. Brooks,* 927 S.W.2d 12, 20 (Tex.1996). In considering the scope of the privilege provided by that section, the supreme court narrowly construed its applicability and held: "[T]his privilege extends to documents that have been prepared by or at the direction of the committee for committee purposes. Documents which are gratuitously submitted to a committee or which have been created without committee impetus and purpose are not protected." *Jordan,* 701 S.W.2d at 648.

Later, in *Irving* and *McCown,* the supreme court considered the scope of the predecessor to the peer review privilege, now codified in the Occupations Code, and its applicability to communications regarding the qualifications of a physician. Both *Irving* and *McCown* addressed a narrow set of facts in which the supreme court was asked to determine whether documents

generated by a medical peer review committee in its initial credentialing process are subject to the peer review privilege. The court broadly applied the peer review privilege and held that "even a 'gratuitous' communication to a peer review committee about the qualifications of a physician or the quality of health care provided by that physician is within the scope of section 5.06 [now section 160.006 of the Occupations Code]." *Irving,* 927 S.W.2d at 19; *accord McCown,* 927 S.W.2d at 5.

 **[11]**     In this case, Ebony Lake relies on only the peer review privilege. This privilege is associated with one discreet and specific type of medical committee—that which performs peer reviews. Although the peer review committee is encompassed by the more broadly defined "medical committee," the supreme court has held that the more specific sub-category of a medical peer review committee enjoys broad application of the peer review privilege. Accordingly, we consider only whether Ebony Lake has shown a probable right to recovery based on its assertion of a peer review privilege. Although the documents at issue were on pre-printed forms developed by the Department, reports were appended to those forms. The reports indicate the time and location of the occurrences, the nature of the occurrences, post-occurrence treatment, witnesses to the occurrences, and descriptions of the incidents. The documents also indicate that the actions of some of the facility's medical staff were investigated or reviewed. Moreover, Waggoner testified that the reports were processed by the quality assurance committee, and Ebony Lake produced a copy of the policy under which the committee operates. Appellees presented no controverting evidence. Based on this evidence, we conclude that Ebony Lake has satisfied its burden for purposes of a temporary injunction. *Cf. In re Osteopathic Med. Ctr.,* 16 S.W.3d 881 (Tex.App.—Fort Worth 2000, orig. proceeding) (holding trial court abused its discretion in ordering production of report documenting occurrence at facility, patient's condition before occurrence, diagnosis of condition after occurrence, and care and treatment received until transport to hospital); *In re WHMC,* 996 S.W.2d 409 (Tex.App.—Houston [14th Dist.] 1999, orig. proceeding) (holding trial court abused its discretion in ordering medical facility to produce documents even though witness averred that documents were generated for committee purpose of improving quality of patient care).

 **[12]**    **[13]**     Ebony Lake has also demonstrated a showing of probable harm in the interim. A party proves irreparable harm  **\*874**  by showing an injury for which there can be no real legal measure of damages or none that can be ascertained with a sufficient degree of certainty. *Thompson,* 24 S.W.3d at 577. Ebony Lake argues that disclosure of the reports prior to the trial on the merits would result in a noncompensable injury. We agree. It would be a hollow victory if, following a trial on the merits, the trial court were to determine that the reports were indeed privileged, but the reports had already been disclosed.

Relying on *In re Pack,* appellees counter that because Ebony Lake was required by law to disclose the reports to the Department, they have failed to demonstrate any injury. *Pack* was a mandamus action, in which the second court of appeals was called upon to decide whether nursing home investigation reports prepared by the Texas Department of Human Services, along with a nursing home's responsive plans of correction, and the testimony of the Department's surveyors regarding their investigations, were excluded from discovery under the peer review privilege. 996 S.W.2d at 5. The nursing home argued that the records were prepared from confidential information collected from the nursing home's peer review committee, and that the Department was an agent of this committee when it prepared its reports. However, in that proceeding the nursing home did not segregate those documents that it claimed included confidential information for *in camera* inspection, as it was required to do. The court concluded that because the Department and the nursing home were required by law to make the documents at issue public, the documents were discoverable. *In re Pack,* 996 S.W.2d at 7. The court further held, "The mere fact that the Nursing Home's peer review committee may have reviewed the TDHS documents does not make them privileged." *Id.*

 **[14]**     In this case, the nursing home did segregate the questionable documents for *in camera* inspection. Furthermore, the documents were not created by the Department, as was the case in *Pack,* but were created by the quality assurance committee. We need not decide at this juncture whether *In re Pack* applies to the facts of this case and renders the reports at issue subject to disclosure. The facts before us, however, are sufficiently distinguishable to establish a bona fide issue that should be addressed at a trial on the merits. And because Ebony Lake has shown clear evidence of irreparable injury, its certainty of victory need not be as stringently examined. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 72 S.W.3d 23, ——, No. 3–01–114–CV, slip op. at 11, 2001 WL 838883 (Tex.App.—Austin July 26, 2001, no pet. h.) (quoting *Developments in the Law—Injunctions,* 78 Harv. L.Rev. 994, 1056 (1965)). As this Court has acknowledged, "Clear evidence of irreparable injury should result in a less

stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury." *Id.* In this case, the sliding scale measures in Ebony Lake's favor. Ebony Lake's first issue is sustained.

### CONCLUSION

We hold that the initial August 20 temporary injunction order was fatally defective and therefore void; accordingly, we overrule Ebony Lake's second issue. We conclude, however, that Ebony Lake established a probable right to recovery and a probable injury in the interim and thus satisfied the prerequisites for a temporary injunction. We therefore sustain its first issue and reverse the trial court's order denying the application for a temporary injunction, and remand the cause to the trial court for issuance of a temporary **\*875** injunction or for further proceedings consistent with our opinion.

### All Citations

62 S.W.3d 867

Footnotes

1    Judge Lowry signed three orders, which are not readily reconcilable. One order purports to deny the temporary injunction in part, one grants it in part, and one is simply titled Order on Temporary Injunction. The thrust of the orders, however, appears to be that the Department is enjoined from releasing the documents that were submitted to the court for *in camera* inspection. The temporary injunction is denied as to any other documents that may not have been submitted. The order is further stayed until all appeals or mandamuses are exhausted. For purposes of our discussion, we refer only to the order granting the temporary injunction and prohibiting the Department from releasing the documents submitted to the trial court for *in camera* inspection.

2    That statute provided:

   The records and proceedings of any hospital committee, medical organization committee or extended care facility committee established under the state or federal law or regulations or under the by-laws, rules or regulations of such organization or institution shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records and shall not be available for court subpoena; provided, however, that nothing herein shall apply to records made or maintained in the regular course of business by a hospital or extended care facility....

   *Jordan v. Court of Appeals for the Fourth Supreme Judicial District,* 701 S.W.2d 644, 646 (Tex.1985) (quoting Tex.Rev.Civ. Stat. Ann. art. 4447d, § 3 (West 1976)).

---

                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

318 S.W.3d 867
Supreme Court of Texas.

ERI CONSULTING ENGINEERS, INC. and Larry G. Snodgrass, Petitioners,

v.

J. Mark SWINNEA, Brady Environmental, Inc., and Malmeba Company, Ltd., Respondents.

No. 07–1042. | Argued Dec. 17, 2009. | Decided May 7, 2010. | Rehearing Denied Oct. 1, 2010.

**Synopsis**

**Background:** Employer and its shareholder brought action against former employee, his company, and employer's landlord to recover for fraud, breach of contract, breach of fiduciary duty, and conspiracy in connection with buyout agreement involving employee's sale of stock back to employer without disclosing formation of business and shareholder's transfer of his partnership interest in landlord. Defendants filed counterclaim for breach of contract and conspiracy, and landlord alleged anticipatory breach of lease agreement. Following a bench trial, the 114th Judicial District Court, Smith County, Cynthia S. Kent, J., entered judgment in favor of plaintiffs, awarding them actual damages of $1,020,700, and ordered defendant to pay plaintiff $1,000,000 in exemplary damages. Defendants appealed. The Court of Appeals, Sam Griffith, J., 236 S.W.3d 825, affirmed in part, and reversed and rendered in part. Plaintiffs petitioned for review which was granted.

**Holdings:** The Supreme Court, Green, J., held that:

[1] contractual consideration received by fiduciary were recoverable in equity;

[2] testimony was properly admitted under collateral agreement exception to parol evidence rule;

[3] lost profit damage award of $300,000 was not supported by substantial evidence; and

[4] former employee's company was not jointly liable as a conspirator.

Affirmed in part and reversed in part.

West Headnotes (25)

[1] **Fraud** 👈 Elements of compensation

**Principal and Agent** 👈 Nature of agent's obligation

Where willful actions which are breaches of fiduciary duty also amount to fraudulent inducement, contractual consideration received by fiduciary is recoverable in equity, regardless of whether actual damages are proven, subject to certain limits; agency principles, that forfeiture of compensation discourages agent from taking personal advantage of his position of trust in every situation, no matter the circumstances, whether principal may be injured or not, and that forfeiture removes any incentive for agent to stray based on possibility that principal will be unharmed, apply where fiduciary takes advantage of his position of trust to induce principal to enter into contract. Restatement (Second) of Agency § 469.

2 Cases that cite this headnote

**[2]**    **Fraud**   Elements of compensation

Courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty; for instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal.

16 Cases that cite this headnote

**[3]**    **Fraud**   Fiduciary or confidential relations

Even if a fiduciary does not obtain a benefit from a third party by violating his duty, he may be required to forfeit the right to compensation for his work.

5 Cases that cite this headnote

**[4]**    **Fraud**   Elements of compensation

Although forfeiture of contractual consideration may have a punitive effect like forfeiture of compensation, it may nevertheless be necessary to protect fiduciary relationships; fiduciary who breaches his duty should not be insulated from forfeiture if the party whom he fraudulently induced into contract is ignorant about the fraud, or fails to suffer harm, and innocent party should not be put into a difficult choice regarding termination of the contract upon discovering the breach of duty.

3 Cases that cite this headnote

**[5]**    **Equity**   Grounds of jurisdiction in general

Where equitable remedies exist, remedy of forfeiture must fit the circumstances presented.

5 Cases that cite this headnote

**[6]**    **Principal and Agent**   Nature of agent's obligation

Factors which are relevant to whether plaintiff is entitled to equitable forfeiture include gravity and timing of the breach of duty, level of intent or fault, whether principal received any benefit from fiduciary despite breach, centrality of the breach to the scope of fiduciary relationship, any threatened or actual harm to the principal, and adequacy of other remedies, including any punitive damages award; above all, the remedy must fit the circumstances and work to serve the ultimate goal of protecting relationships of trust. Restatement (Third) of the Law Governing Lawyers § 49; Restatement (Second) of Trusts § 243 comment.

2 Cases that cite this headnote

**[7]**    **Evidence**   Distinct consideration

Testimony of former employee of company conceding that lease agreement was consideration for buyout agreement as a whole was properly admitted under collateral agreement exception to parol evidence rule; if the parties agreed that lease obligation was to be additional consideration for buyout, then such an agreement was consistent collateral agreement. Restatement (First) of Contracts § 240 comment.

1 Cases that cite this headnote

**[8]** **Evidence**  Contracts in General

**Evidence**  Prior and Contemporaneous Collateral Agreements

General rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence; an exception exists for consistent collateral agreements.

4 Cases that cite this headnote

**[9]** **Evidence**  Prior and Contemporaneous Collateral Agreements

Parol evidence rule does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof.

4 Cases that cite this headnote

**[10]** **Evidence**  Prior and Contemporaneous Collateral Agreements

Collateral agreement between parties concerning the relationship of several distinct obligations between them falls within exception to parol evidence for collateral agreements.

2 Cases that cite this headnote

**[11]** **Conspiracy**  Damages

**Damages**  Particular cases

**Fraud**  Amount awarded

Lost profit damages award of $300,000 was not supported by substantial evidence in action by former employer and its shareholder against former employee for fraud, breach of contract, breach of fiduciary duty, and conspiracy, although shareholder's uncontradicted testimony indicated that company's net profit margin from account which former employee caused company to lose was 25-30%, company averaged $19,833 in monthly revenue from account, and method of comparing revenue from before and after loss of account was legally adequate; owner presented evidence of estimated lost revenue over the 33–month period of $595,337, 30% of which was $178,601.

1 Cases that cite this headnote

**[12]** **Damages**  Loss of profits

Recovery for lost profits does not require that the loss be susceptible of exact calculation, but injured party must do more than show that they suffered some lost profits; amount of the loss must be shown by competent evidence with reasonable certainty.

24 Cases that cite this headnote

**[13]** **Damages**  Loss of profits

What is reasonably certain evidence of lost profits is a fact-intensive determination; as a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.

28 Cases that cite this headnote

**[14]     Damages** 🗝 Loss of profits

Although supporting documentation for lost profits may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

11 Cases that cite this headnote

**[15]     Damages** 🗝 Loss of profits

Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation.

3 Cases that cite this headnote

**[16]     Damages** 🗝 Loss of Profits

Discrepancy between two reasonably certain lost profit amounts does not defeat recovery of such damages.

3 Cases that cite this headnote

**[17]     Conspiracy** 🗝 Damages

**Damages** 🗝 Loss of profits and expenses incurred

**Fraud** 🗝 Measure in General

Former employee did not meet his burden to provide at least some evidence that former employer's otherwise complete lost profit damages calculation was actually inadequate because of a necessary credit or additional expense, in former employer's action against him for fraud, breach of contract, breach of fiduciary duty, and conspiracy in connection with buyout agreement, although customer gave former employer ultimatum to chose between it and another customer because of former employee; nothing indicated that former employer could not work with both customers, thus, profits from former employer's work with one customer were not required to be offset against lost profits caused by ultimatum.

1 Cases that cite this headnote

**[18]     Damages** 🗝 Loss of profits and expenses incurred

**Damages** 🗝 Necessity of proof as to damages in general

Plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses.

3 Cases that cite this headnote

**[19]     Damages** 🗝 Loss of profits

Defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credit; were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing.

8 Cases that cite this headnote

**[20]    Damages** 👈 Loss of profits and expenses incurred

For purposes of calculating lost profit damages, it is not necessarily the case that a company will incur increased expense or overhead, especially where a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources.

1 Cases that cite this headnote

**[21]    Labor and Employment** 👈 Weight and sufficiency

Former employee's testimony that his involvement with one customer could harm employer's relationship with its customer, and that a severance of former employer's relationship with its customer would negatively affect former employer's revenues, was legally sufficient to establish a straight-forward link between former employee's breach of fiduciary duty and the loss of profits to former employer.

Cases that cite this headnote

**[22]    Conspiracy** 👈 Damages

Company formed by former employee and his wife was not jointly liable as a conspirator for punitive damages and forfeiture of contractual consideration for former employee's fraud, breach of contract, or breach of fiduciary duty; there was no evidence that any of the damages awarded by the trial court occurred as the proximate result of any involvement by company, and no meeting of the minds between former employee and company could have occurred involving the actions causing former employer lost profits because company did not exist when employee committed breach, having been formed approximately six-months after employee's departure.

1 Cases that cite this headnote

**[23]    Conspiracy** 👈 Nature and Elements in General
**Conspiracy** 👈 Object

Actionable civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means.

2 Cases that cite this headnote

**[24]    Conspiracy** 👈 Object

One of the elements of conspiracy is a meeting of the minds on the object or course of action; another is actual damages as the proximate result of the conspiracy.

3 Cases that cite this headnote

**[25]    Equity** 👈 Grounds of jurisdiction in general

Equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships but, the remedy of forfeiture must fit the circumstances presented.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*870** Sarah B. Duncan, Elissa Gail Underwood, Mike A. Hatchell, Susan A. Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, TX, Deborah J. Race, Ireland Carroll & Kelley, P.C., Roger W. Anderson, Gillen & Anderson, Tyler, TX, for Petitioners.

Gregory D. Smith, S. Justin Lindley, Ramey & Flock, P.C., Tyler, TX, Sheral Kniffin Maloy, El Paso, TX, for Respondents.

**Opinion**

Justice GREEN delivered the opinion of the Court.

The principal question in this case is whether consideration received for the sale of a business interest is subject to equitable forfeiture as a remedy for breach of fiduciary duty. We hold that when a partner in a business breached his fiduciary duty by fraudulently inducing another partner to buy out his interest, the consideration received by the breaching party for his interest in the business is subject to forfeiture as a remedy for the breach, in addition to other damages that result from the tortious conduct. Here, the trial court ordered equitable forfeiture, but the court of appeals reversed, concluding that forfeiture was not an available remedy. We reverse the court of appeals' judgment in part and remand the case to that court for further proceedings consistent with this opinion.

## I. Facts

Larry G. Snodgrass and J. Mark Swinnea owned equal interests in two business entities, ERI Consulting Engineers, Inc., and Malmeba Company, Ltd., which they operated together for approximately ten years. ERI is a small consulting company that manages asbestos abatement projects for contractors. It leased office space from Malmeba, a partnership that owned the building.

Snodgrass and ERI purchased Swinnea's interest in ERI in 2001. ERI paid Swinnea $497,500 to redeem Swinnea's ERI stock, and Snodgrass transferred his half-interest in Malmeba to Swinnea. ERI agreed to employ Swinnea for six years, and Swinnea agreed not to compete with ERI. At the same time, ERI agreed to continue leasing from Malmeba for six **\*871** years. [1]

Unknown to Snodgrass, the wives of Swinnea and Chris Power, an ERI employee, had created a new company called Air Quality Associates a month before Swinnea and Snodgrass executed the buyout agreement. Air Quality Associates was created to perform mold abatement, but later engaged in asbestos abatement as a contractor even though neither wife had experience in the asbestos abatement field. Swinnea did not disclose the existence of Air Quality Associates to Snodgrass during the ERI buyout negotiations. In fact, because Swinnea believed Snodgrass would "run [ERI] into the ground," Swinnea told Power to "[b]e patient because we can buy this company back 50 cents on the dollar." The trial court found that "Swinnea's placement of his wife, Dawn Swinnea, and Tracy Power as principals of Air Quality Associates, Inc. was deceptive, a sham and constituted fraud."

After the buyout, Swinnea's revenue production as an ERI employee dropped 30%–50%. Snodgrass testified that although Swinnea's supervisory responsibilities were to cease under their agreement, Swinnea's revenue production was to remain the same, if not increase. Soon thereafter, Snodgrass learned about Swinnea's relationship with Air Quality Associates from one of ERI's asbestos contractors, Merico, with which Air Quality Associates was competing. Because of the personal relationship between the individuals involved with ERI and Air Quality Associates, Merico told Snodgrass that Merico would no longer work with ERI if ERI were to accept bids from Air Quality Associates on asbestos abatement projects. ERI had been accepting bids from Air Quality Associates without Snodgrass knowing of Swinnea's or Power's relationship with Air Quality Associates.

Power and his wife later bought out the Swinneas' interest in Air Quality Associates. ERI subsequently worked with Air Quality Associates, while its work with Merico declined. Meanwhile, Swinnea and his wife formed a new company, Brady

Environmental. The Swinneas told Snodgrass that Brady Environmental was going to clean homes and air ducts. However, Brady Environmental began performing asbestos abatement using the Resilient Floor Covering Institute method. Evidence suggests that ERI's clients' use of this method impacted ERI's business because RFCI does not require a consultant like ERI. Although he was employed by ERI, Swinnea encouraged ERI's clients to use RFCI instead, contrary to ERI's interest and policy. After the relationship between Swinnea and ERI deteriorated, Snodgrass ultimately fired Swinnea, releasing him from his non-compete obligations. Swinnea obtained a license to perform asbestos consulting work the next day and began working for Brady Environmental as a consultant. Snodgrass moved ERI out of Malmeba's building and pursued this lawsuit with ERI against Swinnea, Malmeba, and Brady Environmental.

After a bench trial, the trial court found for Snodgrass and ERI on their claims for statutory fraud in a real estate and stock transaction, common law fraud, breach of the non-compete clause in the contract, as well as for breach of fiduciary duty. It rendered judgment awarding ERI and Snodgrass combined damages of $1,020,700, and $1 million in exemplary **\*872** damages. The non-exemplary damages awarded by the trial court consisted of both equitable forfeiture and actual damages: forfeiture of $437,500, a portion of the $497,500 paid to Swinnea by ERI; forfeiture of $150,000, the value of Snodgrass's one-half interest in Malmeba transferred to Swinnea; forfeiture of $133,200, constituting the sum of the lease payments from ERI to Malmeba after the buyout; and $300,000 as ERI's lost profits from its business relationship with Merico. The trial court found that a civil conspiracy existed between Swinnea and Brady Environmental, and held Brady Environmental jointly and severally liable with Swinnea for the damages.

The court of appeals reversed and rendered judgment in favor of Swinnea because it found the evidence "legally insufficient to support the damage awards." 236 S.W.3d 825, 832 (Tex.App.-Tyler 2007). In particular, the court of appeals found that ERI failed to prove any actual damages. *Id.* at 841. It found that the equitable remedy of forfeiture was unavailable because there was no fee paid to Swinnea to be forfeited. *Id.* It concluded further that ERI failed to prove that Swinnea obtained any ill-gotten gains subject to disgorgement. *Id.* It determined that the lease payments were not recoverable because the evidence that the lease payments were intended as consideration for the buyout was "incompetent parol evidence." *Id.* at 835. Finally, the court of appeals concluded that there was no basis for joint liability as to Brady Environmental because there was no evidence of a conspiracy between Swinnea and Brady Environmental. *Id.* at 841–42.

Swinnea does not dispute his liability for fraud, breach of contract, or breach of fiduciary duty. Rather, he disputes the damages the trial court awarded. He asserts that the forfeiture award is unsupported by law. He also asserts that the lost profits award is unsupported by legally sufficient evidence. Brady Environmental primarily disputes whether it can be jointly liable for any of the particular damages awarded by the trial court regardless of whether it later conspired in certain wrongful acts.

## II. Equitable Forfeiture

 **[1]**    The primary question we must address is whether forfeiture of contractual consideration is available as a remedy against Swinnea. We have previously upheld equitable remedies for breach of fiduciary duty. *E.g., Burrow v. Arce,* 997 S.W.2d 229, 237–45 (Tex.1999) (upholding remedy of forfeiture upon attorney's breach of fiduciary duty). In *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* we stated the principle behind such remedies:

It is beside the point for [Defendant] to say that [Plaintiff] suffered no damages because it received full value for what it has paid and agreed to pay.... It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

138 Tex. 565, 160 S.W.2d 509, 514 (1942) (quoting *United States v. Carter,* 217 U.S. 286, 306, 30 S.Ct. 515, 54 L.Ed. 769 (1910)). We later reiterated that a fiduciary may be punished for breaching his duty: "The main purpose of forfeiture is not

to compensate an injured principal.... Rather,  **\*873**  the central purpose ... is to protect relationships of trust by discouraging agents' disloyalty." *Burrow,* 997 S.W.2d at 238.

 **[2]**    **[3]**    Accordingly, courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty. For instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal. *See, e.g., Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex.2002) (stating the rule that courts may disgorge any profit where "an agent diverted an opportunity from the principal or engaged in competition with the principal, [and] the agent or an entity controlled by the agent profited or benefitted in some way"). Similarly, even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work. *See, e.g., Burrow,* 997 S.W.2d at 237 ("[A] person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust."). The difficulty comes in categorizing the damages awarded in this case. Here, the damages awarded by the trial court were not ill-gotten profits from an outside opportunity or external competition, or compensation for work done by the fiduciary. Rather, the trial court returned a significant part of the contractual consideration paid by ERI and Snodgrass to Swinnea as part of the buyout agreement. The situation arises because here the contracting party, Swinnea, was a fiduciary, such that we must consider whether under the circumstances an equitable remedy may cross the line from actual damages for breach of contract or fraud (redressing specific harm) to further, equitable return of contractual consideration.

The trial court found Swinnea liable for fraudulent inducement as to the buyout agreement, and Swinnea does not challenge this liability. The trial court also found that Swinnea owed fiduciary duties both to ERI and to Snodgrass. It follows that Swinnea's actions in fraudulently inducing the buyout agreement contracts were willful breaches of his fiduciary duty. We hold that where willful actions constituting breach of fiduciary duty also amount to fraudulent inducement, the contractual consideration received by the fiduciary is recoverable in equity regardless of whether actual damages are proven, subject to certain limiting principles set out below.

The situation in this case is akin in many respects to the fee forfeiture scenario between a principal and agent, which we discussed at length in *Burrow,* 997 S.W.2d at 237–45. In that case, former clients sued their attorneys alleging breach of fiduciary duty arising from settlement negotiations in a previous lawsuit. *Id.* at 232–33. We held that "a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." *Id.* at 240. We repeated that "the central purpose of the remedy is to protect relationships of trust from an agent's disloyalty or other misconduct." *Id.* That policy applies equally to the relationship of trust at issue here and the duties Swinnea owed to ERI and Snodgrass. We cited section 469 of the *Restatement (Second) of Agency,* which states that if "conduct [that is a breach of his duty of loyalty] constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." *Id.* at 237. We also stated:

> [T]he possibility of forfeiture of compensation discourages an agent from taking  **\*874**  personal advantage of his position of trust in every situation no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence or amount of damages.

*Id.* at 238. The same principles apply to circumstances where a fiduciary takes advantage of his position of trust to induce a principal to enter into a contract. The remedy of forfeiture is necessary to prevent such abuses of trust, regardless of proof of actual damages.

 **[4]**    Although forfeiture of contractual consideration may "have a punitive effect" like forfeiture of compensation, *id.* at 240, it may nevertheless be necessary to protect fiduciary relationships. As we said in the attorney-client context:

> An attorney who has clearly and seriously breached his fiduciary duty to his client should not be insulated from fee forfeiture by his client's ignorance of the matter. Nor should an attorney who has

> deliberately engaged in professional misconduct be allowed to put his client to the choice of terminating the relationship and risking that the outcome of the litigation may be adversely affected, or continuing the relationship despite the misconduct.

*Id.* at 244. The same reasoning applies here: a fiduciary who breaches his duty should not be insulated from forfeiture if the party whom he fraudulently induced into contract is ignorant about the fraud, or fails to suffer harm. Likewise, the innocent party should not be put into a difficult choice regarding termination of the contract upon discovering the breach of duty.

 **[5]**     **[6]**     Where equitable remedies exist, however, "the remedy of forfeiture must fit the circumstances presented." *Id.* at 241. In *Burrow,* we listed several factors for consideration when fashioning a particular equitable forfeiture remedy in the context of attorney-client relationships:

> "[T]he gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." These factors are to be considered in determining whether a violation is clear and serious, whether forfeiture of any fee should be required, and if so, what amount. The list is not exclusive. The several factors embrace broad considerations which must be weighed together and not mechanically applied. For example, the "wilfulness" factor requires consideration of the attorney's culpability generally; it does not simply limit forfeiture to situations in which the attorney's breach of duty was intentional. The adequacy-of-other-remedies factor does not preclude forfeiture when a client can be fully compensated by damages. Even though the main purpose of the remedy is not to compensate the client, if other remedies do not afford the client full compensation for his damages, forfeiture may be considered for that purpose.

*Id.* at 243–44 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 (Proposed Final Draft No. 1, 1996)). We also cited comment c to section 243 of the *Restatement (Second) of Trusts:*

> It is within the discretion of the court whether the trustee who has committed a breach of trust shall receive full compensation or whether his compensation shall be reduced or denied. In the exercise of the court's discretion the following factors are considered: (1) whether  **\*875**  the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust.

*Id.* at 243. Several of these factors are also relevant in this context. The gravity and timing of the breach of duty, the level of intent or fault, whether the principal received any benefit from the fiduciary despite the breach, the centrality of the breach to the scope of the fiduciary relationship, and any threatened or actual harm to the principal are relevant. Likewise, the adequacy of other remedies—including any punitive damages award—is also relevant. Above all, the remedy must fit the circumstances and work to serve the ultimate goal of protecting relationships of trust.

There is no indication the trial court followed these principles in fashioning its award. Accordingly, we direct the court of appeals to remand the case to the trial court for consideration of these factors upon resolution of the issues remaining for the court of appeals. [2]

### III. Evidence of Contractual Consideration

 **[7]**     We next consider whether the trial court properly admitted undisputed testimony offered to show that the lease agreement was intended to be consideration for the buyout agreement, and thus subject to potential forfeiture under our analysis above. The court of appeals concluded that such testimony was "incompetent parol evidence." 236 S.W.3d at 835. We disagree.

 **[8]** **[9]** **[10]** The general rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence. *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008) (per curiam). However, an exception exists for consistent collateral agreements. As we stated over half a century ago in *Hubacek v. Ennis State Bank,* the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." 159 Tex. 166, 317 S.W.2d 30, 32 (1958); *accord Haden,* 266 S.W.3d at 451 ("Under the exception, parol evidence can be used to demonstrate a prior or contemporaneous agreement that is both collateral to and consistent with a binding agreement, and that does not vary or contradict the agreement's express or implied terms or obligations."). A collateral agreement between parties concerning the relationship of several distinct obligations between them falls within the exception. *See, e.g., Hubacek,* 317 S.W.2d at 34 ("A and B in an integrated contract respectively promise to sell and to buy Blackacre for $3,000.00. A contemporaneous oral agreement between them that the price shall be paid partly by discharge of a judgment which B has against A is operative." (quoting with approval RESTATEMENT (FIRST) OF CONTRACTS section 240 cmt. d (1939))). Here, if the parties agreed that the lease obligation was to be additional **\*876** consideration for the buyout, then such an agreement was a consistent collateral agreement. Nothing in such an agreement would contradict the written contracts. *See id.* at 32 ("If ... the parol evidence rule precludes enforcement of the oral agreement, it is because the agreement varies or contradicts the terms or obligations of the [written contracts]."). Accordingly, Swinnea's testimony conceding this fact was properly admitted under this long-standing exception to the parol evidence rule. The fact that the lease agreement was consideration for the buyout agreement as a whole is thus established by legally sufficient evidence.

Therefore, as contractual consideration, the lease payments from ERI to Malmeba are subject to forfeiture for Swinnea's breach of fiduciary duty. The trial court should consider whether to include them in fashioning an appropriate equitable forfeiture.

## IV. Lost Profit Damages

 **[11]** We turn next to the question of actual damages. Here, where the only actual damages that the trial court awarded were lost profit damages, the issue is whether ERI provided legally sufficient evidence of those lost profits. [3]

 **[12]** **[13]** **[14]** The rule concerning adequate evidence of lost profit damages is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (citations omitted).

The trial court awarded $300,000 in lost profits "constituting the loss of income from [ERI's and Snodgrass's] business relationship with Merico." Our legal sufficiency analysis thus reviews whether competent evidence establishes this amount with reasonable certainty. *See id.*

 **[15]** Snodgrass testified that based on information from his in-house accountant, ERI's net profit margin on revenue from Merico was approximately 25%–30%. [4] As a long-time co-owner and then sole owner of ERI—a small, profitable company —Snodgrass was competent to testify as to ERI's estimated profit margin on the Merico account. *Cf. Bowen v. Robinson,* 227 S.W.3d 86, 97 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) ("Competent evidence of lost profits relating to property can be proved by the testimony of an expert or the owner of the property."). Swinnea directs us to no evidence contradicting **\*877** this

testimony concerning ERI's profit margin. [5] ERI also introduced evidence—including dozens of detailed invoices—indicating that from January 2000 through August 2001 (20 months), ERI averaged $19,833.10 in revenue per month from Merico. Later, from September 2001 through May 2004 (33 months), average revenue dropped to $1,792.59 per month. [6] Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994) ("It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought." (quoting *Sw. Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938))). Thus, ERI's method for proving its lost profits in a reasonably certain amount—establishing its lost revenue with comparative evidence from a recent time period, and establishing its profit margin on that revenue by competent testimony of its owner— was legally adequate under *Holt Atherton.*

However, ERI's method does not support a calculation yielding the amount of damages awarded by the trial court. Even assuming a 30% profit margin on the work from Merico, Snodgrass's maximum profit margin estimate, the damages award would be only $178,601.05 for the 33–month period at issue when ERI's profits from Merico declined. [7] ERI's evidence thus fails to meet the minimum requirements for legal sufficiency that we set out in *Holt Atherton* regarding reasonable certainty as to the amount awarded by the trial court—here, $300,000. Up to this point, the court of appeals reached the same conclusions that we have. *See* 236 S.W.3d at 838–39 (reciting the same evidence and reaching the same conclusion regarding whether such evidence is legally sufficient to prove $300,000 of lost profit damages with reasonable certainty).

 [16]    Still, while the evidence does not prove $300,000 in lost profits, ERI's evidence is legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty. In this situation, such a discrepancy between two reasonably certain amounts will not defeat recovery by ERI. *See Sw. Battery,* 115 S.W.2d at 1099 ("[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."); *Tex. Instruments,* 877 S.W.2d at 279 (explaining that *Southwest Battery* and subsequent cases required reasonable certainty as to the amount of lost profit damages); *cf.*    **\*878**  *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 109 (Tex.2009) (remanding to the court of appeals where there was some evidence of damages, but not enough to support the full amount awarded by the trial court). ERI proved lost profit damages; its entitlement to recover them survives the trial court's error in awarding too much. Accordingly, the appropriate remedy is to remand the case to the court of appeals to consider the possibility for remittitur on lost profit damages. *See* TEX.R.APP. P. 46.3, 46.5 (providing procedures for remittitur by courts of appeals).

 [17]    Swinnea argues that ERI's lost profits calculation is inadequate because it fails to apply certain credits or deduct certain expenses. First, Swinnea asserts that because ERI's lost profits were on the Merico account, which were in turn lost because of Swinnea's involvement with Air Quality Associates, we must offset any amount that ERI gained by doing business with Air Quality Associates. That is, where the two accounts were mutually exclusive, loss from one must be offset by gain from the other. This argument is unpersuasive in part because the exclusivity arose out of Merico's ultimatum to ERI about Air Quality Associates—"us or them"—not because it was otherwise impossible for ERI to pursue both business relationships simultaneously. The evidence shows that Merico came to give ERI its ultimatum because of Swinnea. Merico did not object to ERI's work with Air Quality Associates—a competitor of Merico's in asbestos abatement—until it discovered that Swinnea and Power were involved with Air Quality Associates. Nothing suggests that ERI could not have profited from working both with Air Quality Associates (apart from Swinnea) and Merico. [8] Accordingly, because nothing indicates that ERI could not work with both companies, any profits from ERI's work with Air Quality Associates need not be offset against the lost profits from Merico caused by Swinnea's position with Air Quality Associates.

 [18]    [19]    Even assuming that Swinnea is correct that profits from Air Quality Associates must be credited against the lost profits figure, he can point to no evidence to support his assertion that ERI profited from work with Air Quality Associates as a substitute for Merico. The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses. *See Holt Atherton,* 835 S.W.2d at 85 ("Recovery of lost profits

must be predicated on one complete calculation."). However, the defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credits. *Cf. Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.1980) ("The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion."). Were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing. That subtle distinction is crucial here because Swinnea directs us to nothing in the record proving that ERI profited—in any amount—from working with Air Quality Associates as a substitute for Merico in **\*879** asbestos abatement; and we can find none. [9] Rather, he simply asserts that ERI does not dispute that it developed a mutually successful relationship with Air Quality Associates. The only evidence in the record indicates that ERI continued to show an overall profit despite the decline in revenue from Merico, and that ERI worked with Air Quality Associates. No evidence shows whether any *profits* from working with Air Quality Associates contributed to ERI's overall profits, as a substitute for Merico or otherwise. [10]

[20] Swinnea also contests that overhead costs and other unspecified expenses were not included in ERI's evidence or calculation. However, it is not necessarily the case that a company will incur increased expense or overhead, especially where—as evidence here suggests—a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources. *See Tex. Instruments,* 877 S.W.2d at 279 ("[P]re-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost." (quoting *Sw. Battery,* 115 S.W.2d at 1099)). This is not a manufacturing scenario, where production costs necessarily exist. Rather, ERI was a consulting company, which wrote plans and specifications, solicited bids for projects, and completed surveys. Evidence suggests that ERI would have been able to perform all of this service work using its existing employees. Power, for instance, testified that he "put in whatever hours it takes to get jobs done." Swinnea himself had begun contributing much less work to ERI, despite having been one of its most productive workers before. Had Swinnea continued to contribute at his prior level, that productivity would only have helped ERI complete additional projects. Furthermore, after Snodgrass fired Swinnea, ERI began to work with Merico again, while still working with Air Quality Associates, without expansion to ERI's staff. Accordingly, Swinnea has not met his burden to provide at least some evidence that ERI's otherwise complete lost profit damages calculation was actually inadequate because of a necessary credit or additional expense.

[21] Swinnea also challenges causation as to ERI's lost profit damages. However, evidence showed that at the end of October 2001, upon concluding a series of conversations about Swinnea's involvement with Air Quality Associates, Merico specifically indicated that it would no longer be working with ERI because of Swinnea's involvement. [11] Swinnea himself testified **\*880** that his involvement with Air Quality Associates could harm the Merico relationship, and that a severance of ERI's relationship with Merico would negatively affect ERI's revenues. This evidence is legally sufficient to establish a straightforward link between Swinnea's breach of duty and the loss of profits to ERI.

In sum, legally sufficient evidence does not exist to prove the trial court's lost profit damages award under the minimum requirements of *Holt Atherton.* However, this insufficiency does not extend to reasonable certainty as to *any* amount. Rather, competent evidence exists to establish *some* reasonably certain amount of lost profits—just not the particular amount awarded by the trial court. Unlike a situation where no evidence establishes any amount of lost profit damages with reasonable certainty, the situation here requires a potential reduction, not a take—nothing judgment against the plaintiff. Therefore, we reverse the court of appeals' judgment that ERI recover no lost profit damages and remand the case to that court for further proceedings. Should the court of appeals fail to arrive at a disposition concerning remittitur, it may remand for a new trial on lost profit damages, as we might have if the evidence did not seem conducive to remittitur. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 51 (Tex.1998) ("[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages, we reverse the judgment of the court of appeals and remand the cause for a new trial.").

Two additional collateral issues remain: punitive damages and factual sufficiency. The trial court found clear and convincing evidence establishing that Swinnea willfully, maliciously, and intentionally caused injury to ERI and Snodgrass in committing fraud. Accordingly, exemplary damages may be recoverable. *See TEX. CIV. PRAC. & REM.CODE § 41.003* (providing that

exemplary damages are recoverable if clear and convincing evidence shows harm from fraud or malice). Thus, upon resolution of the actual damages (lost profits) question, it is now proper for the courts below to consider any remaining issues concerning the trial court's initial award of $1 million in punitive damages, which Swinnea has continued to contest.

As for factual sufficiency of the lost profits award, however, we observe that there may be a question of whether Swinnea adequately briefed the issue to the court of appeals. The Texas Rules of Appellate Procedure require adequate briefing. *See* TEX.R.APP. P. 38.1(i) ("The [Appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *accord Redmon v. Griffith,* 202 S.W.3d 225, 241 (Tex.App.-Tyler 2006, pet. denied) ("In their brief, the [cross-appellants] have not presented much in the way of cogent argument, nor have they cited to any authority in support of their sole issue.... We hold that the [cross-appellants] have waived their sole issue by their failure to adequately brief it."); *Murchison v. State,* 93 S.W.3d 239, 254 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (holding that factual sufficiency point concerning criminal trial was waived because "appellants' argument, record citations, and authorities do not address" the point); *Smith v. Tilton,* 3 S.W.3d 77, 84 (Tex.App.-Dallas 1999, no pet.) ("Points of error asserted on appeal but not briefed are waived."). On remand, the court of appeals should consider whether Swinnea **\*881** adequately raised a factual sufficiency challenge.

### V. Liability for Conspiracy

 **[22]**    Having found that legally sufficient evidence established lost profit damages in some amount, and that Swinnea may also be liable for punitive damages as well as forfeiture of contractual consideration, we must next address whether Brady Environmental may be jointly liable for these damages as a conspirator.

 **[23]**    **[24]**    An actionable civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996). One of the elements of conspiracy is a meeting of the minds on the object or course of action. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Another element is actual damages as the proximate result of the conspiracy. *Id.*

In its live pleading at trial, ERI asserted that Brady Environmental conspired in Swinnea's ongoing fraudulent misrepresentations as well as Swinnea's ongoing breach of fiduciary duty, which among other things damaged existing ERI client relationships. The trial court found that Swinnea's wrongful conduct "continued after the buy-out, including but not limited to his formation of Brady Environmental, Inc." It also found that Brady Environmental "participated in and knowingly accepted the benefits of ... Swinnea's wrongful conduct," and that Brady Environmental "had actual awareness of the wrongful conduct."

Even assuming those findings are true, there is no evidence that any of the damages awarded by the trial court occurred as the proximate result of any involvement by Brady Environmental. Moreover, no meeting of the minds between Swinnea and Brady Environmental could have occurred involving the actions causing ERI actual harm—lost profits—because Brady Environmental did not yet exist, having been formed approximately six months after Swinnea left Air Quality Associates. Accordingly, Brady Environmental cannot be jointly and severally liable for any lost profit damages discussed above, or any potential punitive damages that follow from them.

 **[25]**    Furthermore, while Brady Environmental may have participated in the abuse of trust in Swinnea's ongoing breaches of fiduciary duty and Swinnea's ongoing fraudulent misrepresentations, Brady Environmental had no part in inducing the buyout agreement. As discussed above, the forfeiture of contractual consideration is available as an equitable remedy against a fiduciary who fraudulently induces the contract, regardless of actual harm. Contractual consideration is subject to forfeiture because it was fraudulently bargained for by a fiduciary. Certainly the rule allowing such equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships. *See Kinzbach,* 160 S.W.2d at 514 ("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."). Yet, "the remedy of forfeiture

must fit the circumstances presented." *Burrow,* 997 S.W.2d at 241. The trial court's award included no equitable remedy tied to conduct in which Brady Environmental participated. Rather, the only equitable award—forfeiture of contractual consideration —arose from a transaction that occurred approximately a year before Brady Environmental existed. Under the circumstances of this particular case, we believe that even if Brady Environmental **\*882** conspired in later breaches of fiduciary duty or fraud, Brady Environmental is not subject to liability for any particular equitable forfeiture amount from the return of contractual consideration given in the specific transaction at issue. Accordingly, we affirm the court of appeals' judgment that ERI take nothing on its conspiracy claim against Brady Environmental.

## VI. Conclusion

We hold that when a fiduciary fraudulently induced a contract, such a breach of fiduciary duty may give rise to equitable forfeiture of contractual consideration. We therefore reverse the portion of the court of appeals' judgment that ERI take nothing in equity. Because trial courts are required to consider certain factors when fashioning a forfeiture remedy, which we have set out, we direct the court of appeals to remand the case to the trial court, in turn, for review of its forfeiture award in light of these principles. Additionally, we conclude that the court of appeals erred in excluding evidence that certain lease payments were contractual consideration subject to forfeiture because testimony proving this fact was properly admitted under the consistent collateral agreement exception to the parol evidence rule.

We also hold that while legally sufficient evidence does not exist to prove the lost profits awarded by the trial court, legally sufficient evidence does exist to prove some reasonably certain amount of lost profits. We therefore also reverse the portion of the court of appeals' judgment that ERI take nothing on its claims for lost profit damages and punitive damages and remand the case to the court of appeals to consider a remittitur, as well as any other remaining issues, before remanding the case to the trial court.

Finally, we affirm the portion of the court of appeals' judgment that ERI and Snodgrass take nothing on their civil conspiracy claims against Brady Environmental because the actual damages awarded by the trial court were not caused by Brady Environmental's wrongful conduct, and the equitable forfeiture awarded by the trial court arose from a transaction too remote from Brady Environmental's involvement to support liability in equity.

## All Citations

318 S.W.3d 867, 53 Tex. Sup. Ct. J. 683

Footnotes

1    The parties dispute whether the lease agreement was intended to be consideration for the buyout. None of the documents in the buyout agreement expressly addressed this, but Snodgrass testified that he and Swinnea had agreed to the lease as part of the comprehensive buyout.

2    As we discuss below, certain issues that remain as a result of our holdings in this case are properly before the court of appeals on remand, precluding us from remanding the case directly to the trial court.

3    We need not distinguish here between ERI's causes of action—common-law and statutory fraud, breach of contract, and breach of fiduciary duty—because ERI's lost profit damages are recoverable for any one of those claims. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184–85 (Tex.1998) (per curiam) (observing that lost profits are recoverable both as tort and contract damages, subject to the rule precluding double recovery for a single injury).

4    Swinnea did not raise a hearsay objection at trial.

5    We note that Swinnea's counsel stated on cross-examination of Snodgrass that "if we looked at [ERI's] financials, we could pretty well figure [the profit margin on the Merico account] out." Indeed, Swinnea had the opportunity to attempt to negate Snodgrass's testimony on profit margin with conclusive contrary evidence, if such evidence existed. Yet, Swinnea directs us to no such evidence from which we could determine whether Snodgrass's estimate was mistaken.

6    ERI points us to testimony from another ERI employee that its revenue from Merico was $300,000–$400,000 per year, but the accounting statements introduced by ERI as a trial exhibit conclusively establish otherwise. *See City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005) ("[Fact-finders] are not free to believe testimony that is conclusively negated by undisputed facts.")

7    At trial, ERI put on evidence that its estimated lost revenue over the 33–month period was $595,336.83. Thirty percent of this figure is $178,601.05.

8    Swinnea elsewhere points out to us that Air Quality Associates was also doing profitable mold treatment work, while Merico focused on asbestos removal. This suggests that ERI might have had separate consulting opportunities with Air Quality Associates that were unavailable from Merico, meaning it could have consistently worked with both without overlap, as ERI also performed mold assessments. Indeed, ERI began to work with both Merico and Air Quality Associates some time after the period in question.

9    Swinnea asserts in his brief that where "ERI chose the relationship with AQA [instead of Merico, such] conduct of itself is evidence of ERI's belief that the AQA relationship was the more profitable one." At most, this suggests that ERI might have believed that the Air Quality Associates relationship *would be* the more profitable one, which says nothing about whether it was actually profitable. Swinnea also asserts in his brief that "the AQA relationship was demonstrably ... lucrative to ERI, as the corporate financial records proved." But Swinnea does not direct us to any such financial records in the record. Further, having reviewed hundreds of ERI's invoices (the majority of which were issued to Merico), as well as other financial records introduced as evidence, we could not find a single piece of evidence in the record proving any profit to ERI from Air Quality Associates.

10    Indeed, we are left to wonder further whether any such alleged profits were in turn for asbestos projects that Merico might have worked on rather than for mold projects.

11    We reiterate that Swinnea does not contest liability. The trial court entered specific findings of fact and conclusions of law concerning the impropriety of Swinnea's involvement with Air Quality Associates. Thus, Swinnea's liability extends to any damage caused by his involvement with Air Quality Associates.

---

**End of Document**                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

10 S.W.2d 124
Court of Civil Appeals of Texas, Dallas.

FEATHERSTONE
v.
INDEPENDENT SERVICE STATION ASS'N OF TEXAS ET AL.

No. 10338.  |  July 28, 1928.  |  Rehearing Denied Oct. 13, 1928.

Appeal from District Court, Dallas County; Joel R. Bond, Judge.

Action by M. B. Featherstone against the Independent Service Station Association of Texas and others. Judgment for defendants, and plaintiff appeals. Affirmed in part, and in part reversed and rendered.

West Headnotes (8)

**[1]** **Antitrust and Trade Regulation** 👈 Gifts, premiums, trading stamps, contests, and lotteries

Distribution for every dollar's worth of merchandise, of ticket entitling holder to chance to win automobile at drawing, involves "lottery," as regards question of unfair competition. Vernon's Ann.St.Const. art. 3, § 47; Vernon's Ann.P.C. art 654.

2 Cases that cite this headnote

**[2]** **Gaming and Lotteries** 👈 Lotteries and raffles

Gratuitous distribution of tickets, entitling holders to chances on automobile at drawing, does not violate lottery law. Const. art. 3, § 47 (Vernon's Ann.St.); Vernon's Ann.P.C. art. 654.

4 Cases that cite this headnote

**[3]** **Gaming and Lotteries** 👈 Lotteries and raffles

Advertising scheme by which dealers distributed tickets representing chances on automobile held unlawful as "lottery," in competitor's injunction suit, though tickets were not necessarily given to customers and were not based upon any required purchase. Const. art. 3, § 47 (Vernon's Ann.St.); Vernon's Ann.P.C. art. 654.

21 Cases that cite this headnote

**[4]** **Injunction** 👈 Commission of crime in general

Equity has no jurisdiction to enjoin criminal acts or omissions, in absence of statute.

2 Cases that cite this headnote

**[5]** **Injunction** 👈 Injunctions to enforce laws and regulations in general

Equity, in exercise of jurisdiction to protect civil or property rights, may enjoin commission of statutory offense.

11 Cases that cite this headnote

**[6]**    **Antitrust and Trade Regulation**  Protection and regulation in general

**Antitrust and Trade Regulation**  In general;  what is unfair competition

Equity will interfere to protect business rights from unlawful and unreasonable injury from competitor.

4 Cases that cite this headnote

**[7]**    **Antitrust and Trade Regulation**  In general;  what is unfair competition

Competitor may use all means available to procure business from plaintiff's customers, provided means are lawful and do not violate plaintiff's legal rights.

6 Cases that cite this headnote

**[8]**    **Antitrust and Trade Regulation**  Injunction

Dealer in oil and gasoline held entitled to enjoin association of competing dealers from distributing tickets to their customers and prospective customers giving chances on automobile. Vernon's Ann.Civ.St. art. 4642; Vernon's Ann.St.Const. art. 3, § 47; Vernon's Ann.P.C. art. 654.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*124**  Hughes & Monroe, of Dallas, for appellant.

Callaway & Reed, of Dallas, for appellees.

**Opinion**

LOONEY, J.

M. B. Featherstone, who operates a general garage business in the city of Dallas, and deals in oils and gasoline, brought **\*125**  this suit against the Independent Service Station Association of Texas, a corporation, the Independent Service Station Association of Dallas, an unincorporated association, and C. M. Proctor, R. E. Tomlinson, and E. L. Haskins, individuals, who are engaged in the same line of business as that pursued by plaintiff, to enjoin an alleged lottery scheme employed by the defendants to attract business and trade from plaintiff to the injury of his property and property rights involved in said competing business.

The case, by agreement, was withdrawn from the jury and submitted to the trial judge, whose findings of fact and conclusions of law are, in substance, that, the defendants, other than the defendant corporation, had, for eight or nine months prior to the institution of the suit, operated, and caused to be operated in Dallas county, a scheme by which automobiles, as prizes, were distributed by chance in substantially the following manner: That is to say, the Independent Service Station Association of Dallas, a voluntary association of retail dealers, including the individuals, defendants herein, through its officers and committees, sold tickets to the members of the association for a money consideration used to purchase automobiles that constituted the prizes at the drawings. That the retail dealers composing this association, including the individual defendants, advertised to the general public that purchasers of merchandise and service from them would receive a ticket for each dollar spent, entitling the holder to a chance to win an automobile. That, when a ticket was issued, a stub, containing a number corresponding to that on the ticket, was

retained, and, at the end of stated periods, these stubs were placed in a receptacle and a drawing therefrom was had by chance, and the holder of the ticket corresponding in number to that on the stub drawn won the prize and received the automobile.

The court found: That the defendants were operating this scheme at the time the temporary injunction was issued in this cause, and that they threatened to continue its operation. That they changed the mode of operations to this extent, they not only gave out tickets to customers who bought merchandise, but in some instances to individuals who were not purchasers. That defendants had distributed many prizes in this manner, and had advertised a drawing for a Chrysler car to take place May 23, 1928. That the admitted purpose of such scheme was to attract trade from competitors who did not participate in the scheme and to build up their own business.

The court found: That plaintiff was a competitor of the defendants in the sale of oil, gasoline, and in the general garage business, and that members of said association had opened up places of business immediately surrounding that of plaintiff, at which they displayed advertisements to the effect that customers would receive chances on automobiles by patronizing their places. That various prospective customers of plaintiff left his place without making purchases, on discovering that he did not distribute tickets for the automobile drawing, and that, since and during the operation of the scheme, plaintiff's business declined, he lost money, whilst the defendants' business increased and they made money as the result of the scheme.

The court concluded that the facts showed the existence of a lottery in violation of the penal statutes of the state; that every element of the offense existed--that is, a prize to be distributed, by chance, to the holder of a ticket, who acquired the same on a consideration.

Paragraphs 3 and 4 of the court's legal conclusions are as follows:
"(3) I find that the plaintiff has no property rights involved in the crime committed by the defendants and each of them, and loss of trade and patronage by the plaintiff, caused by the defendants, does not constitute injury to property rights. In this connection, I find that general business, commonly known as 'trade,' coming from the general public in the form of patronage, is entitled to go into whatever channel it deems fit, and, although said scheme and device directly injures the plaintiff financially in the operation of his business, that same does not constitute such unfair competition that plaintiff has a legal cause to complain by asking an injunction.

"(4) I further find that the plaintiff, M. B. Featherstone, is not entitled to equitable relief in the form of a permanent injunction for the reason hereinabove stated, to wit, that his property rights are not affected as the term 'property right' is construed by this court, and that the plaintiff has an adequate remedy at law, to wit, protection by the criminal courts, and that the plaintiff's adequate remedy would be to file a criminal complaint against the defendants herein in the event he desires to do so."

In harmony with the court's legal conclusions, judgment was rendered denying plaintiff the relief sought, from which this appeal is prosecuted.

Plaintiff's contention in effect is this, that his property and property rights (that is, his business and the right to operate the same without unlawful interference, invasion, or injury) were violated by the lottery scheme conducted by defendants, and therefore he was entitled to the injunctive relief sought, notwithstanding the fact that the lottery constituted a violation of the Penal Code of the state.

Lottery as an offense was unknown to the common law, and only within recent times the scheme was not only tolerated, but employed as a convenient method of raising revenue for governmental, religious, charitable, and educational purposes. Experience, however, demonstrated that the practice was demoralizing in arousing and cultivating the **\*126** gambling instinct dormant in all human nature, was widespread, casting a baneful influence over entire communities, reaching persons of all ages and classes, entering every fireside, preying especially upon the meager means and earnings of the poor, attracting especially the simple and ignorant, and leading at last to idleness, mendicancy, moral profligacy and debauchery. In view of its malign and demoralizing influence, the lottery has been outlawed in probably every state in the Union, and all propaganda, with reference to such enterprises, has been banished from the mails and interstate commerce, by acts of Congress.

The people of this state were so intent on outlawing the lottery, they refused to commit the subject to the discretion of the Legislature, but commanded, in section 47, art. 3, of the Constitution that:

> "The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this state, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other states."

In obedience to this mandate of the people, the Legislature enacted the following penal statute (article 654, Penal Code):

> "If any person shall establish a lottery or dispose of any estate, real or personal, by lottery, he shall be fined not less than one hundred nor more than one thousand dollars; or if any person shall sell, offer for sale or keep for sale any ticket or part ticket in any lottery, he shall be fined not less than ten nor more than fifty dollars."

It will be observed that the lottery prohibited by this statute is not defined, but the courts of the country are in general accord in regard to the definition and constituent elements of the offense.

A satisfactory definition is given in State v. Lipkin, 169 N. C. 265, 271, 84 S. E. 340, 342, L. R. A. 1915F, 1018, 1022, Ann. Cas. 1917D, 137, as follows:

> "A lottery, for all practical purposes, may be defined as any scheme for the distribution of prizes, by lot or chance, by one, on paying money or giving any other thing of value to another, obtains a token, which entitles him to receive a larger or smaller value or nothing, as some formula of chance may determine."

 [1]    The findings of the trial court in the case under consideration and the undisputed facts fill up to the fullest measure the above definition. They are to the effect that the Independent Service Station Association of Dallas sold to its members, including the individual defendants, tickets in batches of 1,000 that were distributed by the dealers to their customers, one ticket, for every dollar's worth of merchandise purchased, that entitled the holder to a chance to win an automobile at a drawing to be held; thus is revealed all the essential elements of a lottery--that is, the prize, the chance distribution of same, and the consideration passing from the holder of the ticket.

Appellees, however, do not seriously contend that the scheme above outlined was not a lottery within the meaning of the statute, but by appropriate cross-assignments of error challenge the correctness of the findings of the trial court, to the effect that defendants were operating under a lottery scheme at the time the restraining order was issued. Their contention is that the undisputed facts show that this scheme had been abandoned prior to the institution of the suit, and that the scheme, under which they were then operating, was a perfectly legal and permissible procedure.

They insist that, under the plan as changed, instead of giving to customers a ticket for each one dollar's worth of merchandise purchased, defendants and other members of the association, for the purpose of advertising their business as independent oil and gas dealers, and to promote good will among customers, gave tickets that entitled the holder to a chance to draw an automobile, that these tickets were given indiscriminately, to whomsoever they pleased, to customers and noncustomers as well; hence this new scheme was lacking in one of the essential elements necessary to constitute a lottery, to wit, the consideration.

 [2]    [3]    We readily agree to the correctness of the proposition that, if tickets given by defendants and other members of the association were gifts, unsupported by a consideration moving from the ticket holder, were in fact gratuities pure and simple, the lottery statute was not violated, for the evident reason that a person is at liberty to give away his property, by chance, at a drawing to ticket holders, or in any other manner, without violating the law. But is the case at bar of that nature? We do not think so for the following reasons: The change wrought as testified to by defendants was not a change in the scheme itself, but merely in the procedure or method of executing the same. Instead of giving a ticket to a customer for every dollar's worth of

merchandise purchased, they gave tickets to whomsoever they pleased-- customers and noncustomers as well. On this point, C. M. Proctor, one of the defendants, testified:

> "The purpose of this scheme is to draw business; to get all the business we can; to draw business from our competitors. We have now changed our plan of operation. It was not because we were enjoined by the court. We did not change our plan because of any court action. We do not intend to give any more automobiles away under that plan. Our plan now is to give tickets to our various customers; to issue tickets to whomsoever we see fit; if they come in to get water or gas; if we want to give them to our patrons, and others. We threatened at this time to give a car away on May **\*127** 24 (1928) by giving chances to customers. * * * These tickets are to be given patrons and customers. Yes; we are going to give them to our customers. * * * I take the tickets under the present plan, and, when the customers come in to buy merchandise, I give them a ticket. I do not give every one a ticket. We give to those whom we see fit. We give them whether they buy or not. One of the purposes is to advertise, and we give the tickets out as an advertisement. Under this new plan we have a drawing, and the winning number gets the prize. That is the plan we will attempt to use."

Mr. R. E. Tomlinson, one of the defendants, after testifying that he and Messrs. Proctor and Haskins (also defendants) constituted the committee that acted for the Independent Service Station Association in handling the matter of purchasing automobiles, etc., said:

> "Our intention is to enforce this new plan (the new plan of procedure); to make the men live up to it just like they have to live up to the by-laws and constitution of the association. * * * The purpose of our entire scheme is to draw business. It is an advertising proposition to take away business from others. That is the whole proposition, like any other advertising, to get business. It has worked very satisfactorily. * * * I haven't changed my mind that the purpose of advertising is getting good will for the independents, and that a man would buy for the purpose of getting a chance. We have abandoned the other plan we had. Now we have a new plan; we have a prize. The men buying the prize are members of the Independent Service Station Association of Dallas. They sell tickets to the members of this association for money. They buy these chance tickets from the committee for money, and the money goes into the general fund to buy the prize, the car. The purpose of the scheme is to promote good will, but when the dealer pays for the tickets, buys them, one of the purposes of it is to give the tickets away to the fellow that comes into the station. That is one of the purposes. Then, when these dealers that buy these tickets give them away, they are all put in a receptacle, and there is a drawing, and the ticket that is drawn gets the automobile. They draw seven tickets. That is the scheme we intend to follow."

This testimony fails to show any material change in the scheme as originally operated, but reveals a change simply in the plan of its operation. While dealers, under the new plan, distributed tickets to noncustomers as well as to customers, it seems that the scheme was to distribute tickets, in the main to customers, as the evidence discloses that only a few, negligible in number, were given to persons other than customers. That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. Patronage thus induced was the consideration that passed from the ticket holder for the chance received, in that the price paid, whatever it was, the amount being immaterial, constituted the aggregate price for the merchandise or service and the ticket that represented a chance to win the prize; in other words, for one undivided price both were purchased, the merchandise, or service, and ticket, the ticket being as much bought as though priced separately. State v. Danz, 140 Wash. 546, 250 P. 37, and annotations 48 A. L. R. 1109, 1122. We are of the opinion, therefore, that the court did not err in concluding that the facts constituted a lottery within the meaning of the law.

The court, however, denied plaintiff relief, on the idea that his property rights, as that term was construed by the court, were not affected, and further that he had an adequate remedy, in that, he could institute criminal prosecutions against defendants.

 [4]    When and under what circumstances will a court of equity exercise authority to prevent the commission of crimes? The general rule is that, except as conferred by statute, courts of equity have no criminal jurisdiction, and acts or omissions will not be enjoined merely on the ground that they constitute violations of penal statutes.

 [5]    Notwithstanding this is the general rule, it is also well settled that, when necessary to protect civil or property rights, equity will interfere, and the fact that the commission of a statutory offense must be enjoined, as an incident to the giving of proper relief, will not deprive the court of its jurisdiction in this respect.

An apt statement of the law on this point was made by Judge Neill in State v. Patterson, 14 Tex. Civ. App. 465, 469, 37 S. W. 478, 479, as follows:

> "It is only when property or civil rights are involved and an irreparable injury to such rights is threatened or is about to be committed, for which no adequate remedy exists at law, that courts of equity will interfere by injunction for the purpose of protecting such rights. The injury threatened to such rights may, if committed, constitute a crime, and subject its perpetrator to punishment under the criminal law; yet, as his punishment would furnish him whose property or civil rights have been irreparably injured by the acts constituting the offense no compensation for such injury, courts of equity will interfere to prevent such an injury, notwithstanding the commission would constitute a criminal offense, not because it would be a crime, but because the injury to such rights would be irreparable. It cannot be said that such interference by a court of equity is an invasion of the domain of the criminal law, for no crime has been committed where equity interposes its arm for the protection of property or civil rights. In extending such protection, it may prevent a crime; but, as no one has a right to commit crime, no one should be heard to complain that he is restrained from its commission, when such restraint has been exercised in the jurisdiction of a court for the purpose of preventing him from  **\*128**  irreparably injuring another in his property or civil rights."

This doctrine was approved by the Supreme Court of the United States in Re Debs, 158 U. S. 593, 15 S. Ct. 900, 39 L. Ed. 1106. Also see 32 C. J. p. 277, § 440.

We do not agree with the trial judge in his legal conclusion to the effect that plaintiff has no property rights involved in the offense committed by defendants.

 [6]     [7]    We are of the opinion that plaintiff's business and his right to conduct the same constitute property that a court of equity will protect from unlawful interference or injury. The correctness of this proposition has been announced so often and by so many courts that it ought not now to be considered an open question. While it is true a dealer has no such interest in the future trade, that is, in possible customers, as would justify an appeal to a court of equity, to restrain a competitor from doing what is perfectly legal, to advertise and attract customers to his own business, although such conduct may result in a corresponding loss to one engaged in a similar business, yet a competitor may ask for the restraint of acts and conduct prohibited by law, that unreasonably interfere with, divert patrons from, and injure his business. The correct rule on this subject was announced by Judge James, in Robison v. Texas Pine Land Association (Tex. Civ. App.) 40 S. W. 843, 844, in the following language:

> "According to plaintiff's allegations, competition in trade existed between plaintiff and defendant, and it was legitimate for defendant to appropriate to itself all the customers it could command, even to the extent of driving plaintiff out of business, provided the means used for that purpose did not contravene any law, or violate a definite legal right of the plaintiff."

To the same effect, see Pierce v. Society, etc., 268 U. S. 510, 45 S. Ct. 571, 574, 69 L. Ed. 1070, 39 A. L. R. 468.

The correctness of the proposition that one may confidently appeal to a court of equity for protection against an unlawful interference with and injury to his business was affirmed in the following cases: Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 127, 66 L. Ed. 254, 27 A. L. R. 375; Allgeyer v. Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 835; Webb v. Cooks', etc., Union (Tex. Civ. App.) 205 S. W. 468; Cooks' Union v. Papageorge (Tex. Civ. App.) 230 S. W. 1086; Hawks v. Yancey (Tex. Civ. App.) 265 S. W. 233, 238, 239; Glover v. Malloska, 238 Mich. 216, 213 N. W. 107, 52 A. L. R. 77.

In the case of Glover v. Malloska, supra, certain dealers sought to enjoin a competitor from executing a lottery scheme very similar to the one under consideration. Responding to the contention there made, that plaintiffs had no property rights involved that a court of equity would protect, the court said:

"Have plaintiffs property rights of a pecuniary nature here involved? It would astound the business world to hold that an established business is barren of property rights of a pecuniary nature. Merchants, and others engaged in business, feel that they have property rights therein, and we must hold that an injury to such rights, through criminal acts, is an injury to property rights of a pecuniary nature.

"No one should be permitted to employ criminal means in trade rivalry. The law proscribes a lottery, and those injured thereby in their rights of property are not required to suffer successive inflictions of pecuniary injury until a criminal prosecution is launched. Courts do not depart from the rule that equity may not interfere, except to protect property rights of a pecuniary nature, in enjoining criminal acts exercised by one dealer to enhance his sales to the calculated pecuniary injury of a lawabiding competitor. Defendant Malloska adopted the lottery scheme for profit, admits its employment increased his sales, and plaintiffs established the fact that such increase was directly traceable to their loss of customers."

 **[8]**    That plaintiff's business, in the case at bar, was interfered with and injured, as a direct result of the operation of the lottery scheme conducted by defendants, is shown by the undisputed facts and the unchallenged findings of the trial court.

Article 4642 (4643) (2989), R. S. 1925, authorizes the issuance of injunctions:

> "(1) Where the applicant is entitled to the relief demanded and such relief or any part thereof requires the restraint of some act prejudicial to him."

If we are correct in the conclusions announced above, plaintiff was and is entitled to have his business protected from unfair competition produced by the unlawful means employed by his competitors, and it seems that the only adequate remedy, appropriate and suited to the conditions with which we are dealing, is the restraint of the prejudicial acts of which plaintiff complains.

Plaintiff cannot successfully combat this competition except on the plane where the contest for business has been pitched, and this he cannot attempt, without himself becoming a violator of the law. The lottery scheme had been in operation eight or nine months at the time this suit was instituted, a number of drawings had taken place and prizes distributed thereunder, and, so far as the record discloses, without any effort having been put forth for its suppression. The Independent Service Station Association of Dallas at that time had 86 members, operating 108 oil stations scattered over Dallas county, most of them located in the city of Dallas. In these circumstances, to invite plaintiff to seek relief from this unlawful competition by the institution of criminal prosecutions against the large number of individuals who are aiding and abetting the lottery, to assume the burdens and suffer the loss of time that attention to the prosecutions   **\*129**   would require, is to invite him to attempt the accomplishment of an Herculean, if not impossible, task. If this is plaintiff's only relief from the conditions in which his business is enmeshed, the statute, promising relief from prejudicial acts, is delusive, in holding out the word of promise to the ear only to disappoint the hope. The remedy, to be adequate, must be applied at the source of the evil, the association, the head and front of the offending, as well as the individual members sued, must be enjoined from further operations under the lottery scheme.

We find no evidence that connects the Independent Service Station Association of Texas, the corporation, with any participation in the operation of the lottery; hence the judgment below will be affirmed as to that defendant, but, as to each and all of the other defendants, the judgment below is reversed, and judgment here rendered for plaintiff granting the relief sought.

Affirmed in part; reversed and rendered in part.

**All Citations**

10 S.W.2d 124

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

756 S.W.2d 14
Court of Appeals of Texas,
Austin.

FRANKLIN SAVINGS ASSOCIATION, Appellant,

v.

Louis G. REESE, III, et al., Appellees.

No. 3–87–259–CV.    |    June 29, 1988.    |    Rehearing Overruled in Part/Granted in Part June 29, 1988.

Mortgagors brought application for temporary injunction to prevent foreclosure of their property by savings and loan. The 200th Judicial District Court, Travis County, Juan Gallardo, J., granted temporary injunction and set injunction bond at $10,000. Savings and loan appealed. The Court of Appeals, Carroll, J., on rehearing held that: (1) issuance of temporary injunction to prevent foreclosure of property on basis that mortgagor had probable right of recovery was proper, and (2) setting of injunction bond at $10,000 was improper since $10,000 did not adequately protect savings and loan.

Affirmed in part, and reversed and remanded in part.

West Headnotes (5)

[1]    **Injunction** 🔑 Likelihood of success on merits

In hearing on application for temporary injunction, only question for trial court is whether applicant is entitled to preservation of status quo pending trial on merits, and applicant need only demonstrate probable injury and probable right of recovery and does not have to establish that he will finally prevail on merits.

7 Cases that cite this headnote

[2]    **Appeal and Error** 🔑 Injunction

**Injunction** 🔑 Discretionary Nature of Remedy

Where pleadings and evidence present case of probable injury and probable right of recovery, trial court is clothed with broad discretion in determining whether to issue temporary injunction, and its order will be reversed only on showing of clear abuse of discretion.

1 Cases that cite this headnote

[3]    **Appeal and Error** 🔑 Injunction

Standard of review of grant of temporary injunction is whether trial court abused its discretion, which occurs when decision of trial court was arbitrary or unreasonable, in finding that there was probable injury and probable right of recovery.

4 Cases that cite this headnote

[4]    **Mortgages** 🔑 Restraining foreclosure in general

Issuance of temporary injunction to prevent foreclosure of property on basis that mortgagor had probable right of recovery was proper; evidence in record, if believed, established at least one of mortgagor's causes of action.

Cases that cite this headnote

**[5]**  **Mortgages**  Restraining foreclosure in general

Setting of injunction bond at $10,000 was improper in action where court granted temporary injunction to prevent foreclosure of property by savings and loan; $10,000 did not adequately protect savings and loan since property at issue was valued at between $25 million and $50 million, debt to savings and loan was some $34 million, and unpaid interest on debt had been accruing at rate of about $300,000 each month.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*14**  H. Robert Powell, Hughes & Luce, Austin, for appellant.

**\*15**  William M. Ravkind, Dallas, for appellees.

Before POWERS, SMITH [*] and CARROLL, JJ.

### ON MOTION FOR REHEARING

CARROLL, Justice.

The May 11, 1988 opinion and judgment of this Court are withdrawn and the following substituted therefor.

The district court granted the appellees' application for a temporary injunction to prevent the foreclosure of their property by appellant. We will affirm the judgment of the district court granting the temporary injunction, but will remand the cause to that court to set an adequate bond.

### BACKGROUND

Appellant Franklin Savings is a state savings and loan association. Appellant owned a large tract of real property in Travis County known as Jourdan Crossing. Appellee Louis G. Reese, III, is an experienced and sophisticated real estate investor and developer, and is the principal owner of appellee Louis G. Reese, Inc., a Texas corporation. In this opinion we will refer both to Reese individually and to his corporation jointly as "appellee."

The parties agree that in the fall of 1985, appellant contracted to sell appellee the Jourdan Crossing property for some $45,000,000. While the parties agree on very little else, it is clear that the transaction ultimately closed.

Appellee paid $10 million (borrowed from another savings and loan) as a down payment and executed a note to appellant for over $34 million. The market fell, development of the project stalled and appellee was unable to meet his obligations under the $34 million note. Appellant attempted to foreclose its deed of trust against the property, and appellee filed suit seeking both temporary and permanent injunctive relief along with actual and exemplary damages and a declaratory judgment. Appellee based its suit on claimed causes of action involving usury, breach of contract, real estate and common-law fraud, and conspiracy, as well as violations of the Federal Savings and Loan Tying Act and Savings and Loan Act.

The district court granted a temporary restraining order without notice and after three days of testimony granted the temporary injunction and set the injunction bond at $10,000.

## DISCUSSION

**[1]** **[2]** In a hearing on an application for *temporary* injunction, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending a trial on the merits. The applicant need only demonstrate a probable injury and a probable right of recovery; he does not have to establish that he will finally prevail on the merits. *Transport Co. of Texas, et al. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549 (1953). Where the pleadings and evidence present a case of probable injury and probable right of recovery, the trial court is clothed with broad discretion in determining whether to issue a temporary injunction and its order will be reversed only on a showing of a clear abuse of discretion. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978).

**[3]** This is not an appeal of the cause on the merits, and we are not to be understood as holding that appellee will ultimately prevail on *any* of the alleged causes of action. To the contrary, our standard of review of a grant of a temporary injunction is whether the trial court abused its discretion in finding that there was a probable injury and a probable right of recovery. An abuse of discretion occurs when the decision of the trial court was arbitrary or unreasonable. *Landry v. Traveler's Insurance Co.,* 458 S.W.2d 649 (Tex.1970). Since it is obvious that appellee would probably **\*16** be injured if the property were foreclosed and sold, the only question here is whether the trial court erred in determining there was a probable right of recovery.

**[4]** The parties have not yet had the opportunity to present all their evidence on appellee's allegations. Until then, the probable right to recover is determinable only by what now appears in the record. And what now appears in the record is evidence that, while hotly disputed, *if believed* establishes at least one of appellee's causes of action. Point of error one is overruled.

Appellant's second point of error challenges the trial court's setting of bond for the temporary injunction at $10,000. Texas R.Civ.P. 684 (Supp.1988) provides that in the order granting any temporary injunction, the court shall fix the amount of security to be given by the applicant. The rule then provides that the bond is to be conditioned "... that the applicant will abide the decision ... in the cause, and that *he will pay all sums of money and costs that may be adjudged against him if the ... temporary injunction [is] dissolved* ..." (emphasis added). The rule also provides that the discretion of the trial court in fixing the amount of the bond is subject to review. Neither Rule 684 nor the case law gives us much guidance in evaluating the sufficiency of the bond here, but several courts have required bond amounts that, in relation to the value at stake in the action below, are proportionately far greater than the bond set in this case. *See, e.g., Westside Airways, Inc. v. JR Aircraft Corp.,* 694 S.W.2d 100 (Tex.App.1985, no writ); *Lee v. Howard Broadcasting Corp.,* 305 S.W.2d 629 (Tex.Civ.App.1957, writ dism'd).

**[5]** We do not believe that $10,000 adequately protects appellant in this case. The property at issue is valued at between $25 million and $50 million. The debt to appellant is some $34 million, and the unpaid interest on the debt has been accruing at the rate of about $300,000 each month; thus, the potential loss of *interest alone* over the life of the injunction (which took effect December 1, 1987) already exceeds $2 million. Furthermore, should appellant eventually prevail on the merits, it might sustain other losses resulting from its inability to develop the property during the term of the injunction. We think the trial court abused its discretion in failing to set bond at an amount adequate to protect appellant, and accordingly sustain the second point of error.

## CONCLUSION

We affirm the district court's order granting the temporary injunction, but remand the cause to that court with instructions to determine what amount of security (which in any event should greatly exceed $10,000) will adequately protect appellant, and to set bond accordingly under Tex.R.Civ.P. 684.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART ON MOTION FOR REHEARING.

POWERS, J., not participating.

**All Citations**

756 S.W.2d 14

Footnotes

\*        Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex.Gov't Code § 73.012 (Supp.1988).

---

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

281 S.W.3d 215
Court of Appeals of Texas,
Fort Worth.

FREQUENT FLYER DEPOT, INC., George Pirkle, and Robert Pirkle, Appellants,

v.

AMERICAN AIRLINES, INC., Appellee.

No. 2–08–386–CV.　|　Feb. 26, 2009.

**Synopsis**

**Background:** Airline brought tortious interference with contract, tortious interference with prospective relations, breach of contract, misappropriation and fraud action against broker of frequent flyer miles and rewards. Broker counterclaimed. The 67th District Court, Tarrant County, Donald J. Cosby, J., granted airline a temporary injunction, and broker filed interlocutory appeal.

**Holdings:** The Court of Appeals, Terrie Livingston, J., held that:

[1] airlines state law claims against broker were not preempted by the Airline Deregulation Act of 1978;

[2] temporary injunction preserved the status quo pending trial;

[3] airline's agreements with members of its frequent flyer program, which prohibited members from selling and buying rewards, did not fail for lack of mutuality;

[4] trial court did not abuse its discretion by denying broker's motions to continue hearing on the temporary injunction;

[5] evidence was sufficient to establish that airline would suffer irreparable injury if a temporary injunction was not issued;

[6] evidence was sufficient to establish that airline did not have an adequate remedy in damages, as required in order for airline to obtain a temporary injunction; and

[7] laches did not bar airline from seeking a temporary injunction.

Affirmed.

West Headnotes (35)

**[1]　Injunction**　🔑　Grounds in general; multiple factors

To be entitled to a temporary injunction, the applicant must plead a cause of action, and show both a probable right to recover on that cause of action, and a probable, imminent and irreparable injury in the interim.

9 Cases that cite this headnote

**[2]    Injunction**  👈 Likelihood of success on merits

A probable right of recovery, for purposes of a temporary injunction, is shown by alleging a cause of action and presenting evidence tending to sustain it.

4 Cases that cite this headnote

**[3]    Injunction**  👈 Irreparable injury

**Injunction**  👈 Adequacy of remedy at law

**Injunction**  👈 Recovery of damages

An injury is irreparable, for purposes of a temporary injunction, if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard.

8 Cases that cite this headnote

**[4]    Appeal and Error**  👈 Review of order granting, refusing, or dissolving injunction

In an appeal from an order granting or denying a temporary injunction, the scope of review is restricted to the validity of the order granting or denying relief.

3 Cases that cite this headnote

**[5]    Appeal and Error**  👈 Injunction

**Appeal and Error**  👈 Refusing injunction

**Injunction**  👈 Discretionary Nature of Remedy

Whether to grant or deny a request for a temporary injunction is within the trial court's discretion, and the Court of Appeals will not reverse its decision absent an abuse of discretion.

2 Cases that cite this headnote

**[6]    Appeal and Error**  👈 Injunction

When reviewing a decision to grant or deny a temporary injunction, the Court of Appeals must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion.

2 Cases that cite this headnote

**[7]    Appeal and Error**  👈 Injunction

**Appeal and Error**  👈 Refusing injunction

**Injunction**  👈 Discretionary Nature of Remedy

A trial court does not abuse its discretion in granting or denying a temporary injunction if it bases its decision on conflicting evidence and at least some evidence in the record reasonably supports the trial court's decision.

6 Cases that cite this headnote

**[8]    Appeal and Error**  👈 Necessity of finding facts

**Appeal and Error** 👈 Scope and theory of case

When findings of fact are not requested or separately filed in regard to a decision granting or denying a temporary injunction, the Court of Appeals must uphold the trial court's order on any legal theory supported by the record.

1 Cases that cite this headnote

**[9]**     **Brokers** 👈 Actions by or against principals or brokers

**States** 👈 Particular cases, preemption or supersession

**Torts** 👈 Preemption

Airline's state law tortious interference with contract, tortious interference with prospective relations, misappropriation, and fraud claims, asserted against broker of frequent flyer miles and rewards issued by airline under its frequent flyer program, were not preempted by the Airline Deregulation Act of 1978, as the airline's invocation of the benefits and protections of state law to protect its own agreements did not have the same impermissible regulatory effect upon prices, routes, or services that Congress was concerned with when it enacted the preemption provision of the Act, and the Act was intended to pre-empt only those state actions having a regulatory effect upon the airlines rather than to preclude airlines from seeking the benefits and protections of state law to enforce their self-imposed standards, regulations and contracts. 49 U.S.C.A. § 41713(b)(1).

1 Cases that cite this headnote

**[10]**     **Injunction** 👈 Preservation of status quo

The purpose of a temporary injunction is to preserve the status quo until a trial on the merits.

Cases that cite this headnote

**[11]**     **Injunction** 👈 Preservation of status quo

For purposes of a temporary injunction, the "status quo" is the last, actual, peaceable, noncontested status which preceded the pending controversy.

1 Cases that cite this headnote

**[12]**     **Injunction** 👈 Airports and aviation

**Injunction** 👈 Interference with contractual or business relations

Temporary injunction, prohibiting broker from purchasing, bartering, soliciting and selling frequent flyer rewards issued by airline under its frequent flyer program, preserved the status quo, as required for the injunction to issue pending trial in airline's tortious interference, misappropriation and fraud action against broker; though broker traded airline's frequent flyer miles for several years before airline brought the action, airline had been freezing the accounts of frequent flyer members when it discovered they had improperly sold their rewards, and, if broker's activities were in violation of airline's agreements with the members of airline's frequent flyer program as airline alleged, the last peaceable, noncontested status was for broker to refrain from trading in the frequent flyer reward points.

Cases that cite this headnote

**[13]**     **Contracts** 👈 Bilateral contracts

A "bilateral contract" is one in which there are mutual promises between two parties to the contract, each being both a promisor and a promisee.

2 Cases that cite this headnote

**[14]**     **Contracts** 🔑 Mutuality of Obligation

         **Contracts** 🔑 Necessity in general

A bilateral contract must be based upon a valid consideration, in other words, mutuality of obligation.

1 Cases that cite this headnote

**[15]**     **Contracts** 🔑 Nature and Elements

Consideration may consist of either benefits or detriments to the contracting parties; it may consist of some right, interest, profit, or benefit that accrues to one party, or alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party.

3 Cases that cite this headnote

**[16]**     **Contracts** 🔑 Presumptions and burden of proof

The existence of a written contract presumes consideration for its execution.

3 Cases that cite this headnote

**[17]**     **Contracts** 🔑 Mutuality of Obligation

A contract that lacks mutuality of obligation is illusory and void and thus unenforceable.

Cases that cite this headnote

**[18]**     **Contracts** 🔑 Mutuality of Obligation

A promise is illusory, for purposes of determining whether a contract lacks mutuality of obligation, when it fails to bind the promisor who retains the option of discontinuing performance without notice.

4 Cases that cite this headnote

**[19]**     **Contracts** 🔑 Mutuality of Obligation

Mutuality in each clause of a contract is not required when consideration is given for the contract as a whole.

1 Cases that cite this headnote

**[20]**     **Contracts** 🔑 Mutuality of Obligation

The test for mutuality, required for a binding contract, is applied and determined when enforcement is sought, not when the promises are made.

1 Cases that cite this headnote

**[21]**     **Contracts** 🔑 Mutuality of Obligation

Even if an illusory promise renders a contract unilateral, consideration can still be established by part performance by the promisee.

5 Cases that cite this headnote

[22] **Brokers** 👉 Purchases, Sales, and Conveyances

**Brokers** 👉 Misrepresentation or fraud of broker

**Carriers** 👉 Fares, charges, and tickets in general

**Torts** 👉 Contracts in general

Airline's agreements with members of its frequent flyer program, which prohibited members from buying and selling reward points, did not fail for lack of mutuality, as required in order for airline to assert tortious interference with contract, tortious interference with prospective relations, misappropriation and fraud claims against broker who purchased, bartered, solicited and sold frequent flyer rewards issued by airline; though airline reserved the right to change the terms of the program at any time with or without notice, airline's subsequent performance under the agreements by issuing tickets in exchange for reward points established consideration even if consideration was illusory when it entered into the agreements, and it was nonsensical for broker to argue that the agreements were not enforceable when its entire business depended on airline issuing tickets in exchange for reward points.

2 Cases that cite this headnote

[23] **Pretrial Procedure** 👉 Affidavits and evidence

Trial court did not abuse its discretion by denying broker's motions to continue hearing on airline's motion for a temporary injunction, in airline's tortious interference with contract, tortious interference with prospective relations, misappropriation, and fraud action against broker which purchased, bartered, and sold rewards that airline issued to members of airline's frequent flyer program, where broker failed to support the motions for a continuance with the required written affidavit. Vernon's Ann.Texas Rules Civ.Proc., Rule 251.

Cases that cite this headnote

[24] **Injunction** 👉 Injury to or restraint of trade or business in general

If necessary to protect a proven legal right, a temporary injunction may issue even if it has the effect of restraining competition, so long as it is narrowly tailored to preserve the status quo.

Cases that cite this headnote

[25] **Injunction** 👉 Irreparable injury

**Injunction** 👉 Recovery of damages

A party proves irreparable injury for temporary injunction purposes by proving that damages would not adequately compensate the party or cannot be measured by any certain pecuniary standard.

5 Cases that cite this headnote

[26] **Injunction** 👉 Unclear, unlikely, doubtful or speculative injury

An injunction is not proper when the claimed injury is merely speculative; fear and apprehension of injury are not sufficient to support a temporary injunction.

3 Cases that cite this headnote

**[27]** **Injunction** 🔑 Airports and aviation

**Injunction** 🔑 Interference with contractual or business relations

Evidence was sufficient to establish at hearing on temporary injunction that airline would suffer irreparable injury if a temporary injunction were not issued prohibiting broker from soliciting, bartering, purchasing and selling reward points from members of airline's frequent flyer program, pending trial in airline's tortious interference, misappropriation and fraud action against broker; airline's agreement with members of the program stated that members would not sell or purchase reward points, manager of airline's frequent flyer program testified that airline was reluctant to challenge members' veracity when booking travel because it would damage airline's goodwill and disrupt its business, and there was evidence that when a third party purchased reward points from broker the third party often would displace a customer who would pay cash for a ticket.

2 Cases that cite this headnote

**[28]** **Injunction** 🔑 Irreparable injury

Disruption to a business can be irreparable harm, and support the issuance of a temporary injunction.

3 Cases that cite this headnote

**[29]** **Injunction** 🔑 Airports and aviation

**Injunction** 🔑 Interference with contractual or business relations

Evidence was sufficient to establish at hearing on temporary injunction that airline did not have an adequate remedy in damages, as required in order for airline to obtain a temporary injunction prohibiting broker from soliciting, bartering, purchasing and selling reward points from members of airline's frequent flyer program, pending trial in airline's tortious interference, misappropriation and fraud action against broker; airline's agreement with members of the program stated that members would not sell or purchase reward points, manager of airline's frequent flyer program testified that airline was reluctant to challenge members' veracity when booking travel because it would damage airline's goodwill and disrupt its business, and damages from loss of goodwill and disruption of business were types of injuries to which a dollar value was not easily assigned.

1 Cases that cite this headnote

**[30]** **Injunction** 🔑 Adequacy of remedy at law

An adequate remedy, for purposes of a temporary injunction, is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.

1 Cases that cite this headnote

**[31]** **Injunction** 🔑 Recovery of damages

Damages are an inadequate remedy, for purposes of a temporary injunction, if they are difficult to calculate.

Cases that cite this headnote

**[32]** **Injunction** 🔑 Recovery of damages

A remedy is not adequate, for purposes of a temporary injunction, simply because some of the proven damages are calculable.

Cases that cite this headnote

**[33]** **Equity** 🔑 Prejudice from Delay in General

A party asserting the defense of laches must show both an unreasonable delay by the other party in asserting its rights and harm resulting to it because of the delay.

2 Cases that cite this headnote

**[34]** **Injunction** 🔑 Laches

Laches did not bar airline from seeking a temporary injunction prohibiting broker from soliciting, bartering, purchasing and selling reward points from members of airline's frequent flyer program, pending trial in airline's tortious interference, misappropriation and fraud action against broker; airline's agreement with members of the program stated that members would not sell or purchase reward points, though airline had contacted broker six years earlier when broker started its business regarding broker's use of Internet domain names there was no evidence that airline knew at that time that broker was bartering reward points, and broker concealed its dealings from the airline and instructed people who purchased reward points to lie to the airline and claim that the reward points they were using were gifts.

Cases that cite this headnote

**[35]** **Equity** 🔑 He Who Comes Into Equity Must Come with Clean Hands

Unclean hands did not bar airline from seeking a temporary injunction prohibiting broker from soliciting, bartering, purchasing and selling reward points from members of airline's frequent flyer program, pending trial in airline's tortious interference, misappropriation and fraud action against broker; airline's agreement with members of the program stated that members would not sell or purchase reward points, and even though broker claimed that airline had unclean hands because airline's refusal to allow trading in its reward points violated antitrust laws, an otherwise proper injunction was not rendered improper because it had a preclusive effect on competition.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*219** Bennett, Weston & LaJone, P.C., J. Michael Weston, Dallas, for Appellants.

Kelly Hart & Hallman, LLP, Dee J. Kelly, Jr., Fort Worth, Yetter, Warden & Coleman, L.L.P., R. Paul Yetter, Ann Rotman, Houston, for Appellee.

Panel LIVINGSTON, DAUPHINOT, and McCOY, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

This is an accelerated interlocutory appeal from the imposition of a temporary injunction prohibiting appellants Frequent Flyer Depot, Inc. and its officers and owners, George and Robert Pirkle, from engaging in the brokering, purchase, sale, bartering,

and solicitation of American Airlines AAdvantage® rewards points. Appellants challenge the injunction on seven grounds: the underlying suit is pre-empted by federal law; the injunction does not preserve the status quo; there is no enforceable contract between American and its AAdvantage® members prohibiting members from selling their rewards points to third parties; the hearing on the temporary injunction should have been continued for appellants to obtain discovery on their antitrust-related counterclaims; American failed to show an imminent injury; American has an adequate remedy; and principles of equity bar the imposition of an injunction. Because we conclude that there is no reversible error on any of these grounds, we affirm.

## *220 Background

Frequent Flyer admittedly brokers the purchase and sale of airline frequent flyer miles and awards, including AAdvantage® rewards points issued by American to its AAdvantage® members. The Pirkles are officers and owners of Frequent Flyer. American sued appellants and other similar brokers and their principals, contending that the brokering, purchase, bartering, and sale of AAdvantage® rewards is improper. Among its claims against appellants are claims for tortious interference with contract, tortious interference with prospective relations, misappropriation, and fraud. American also asserted a breach of contract claim against Robert Pirkle. After filing suit, American sought and obtained a temporary injunction prohibiting appellants from buying, selling, bartering, or soliciting AAdvantage® rewards during pendency of the suit.

## Standard of Review

 [1]    [2]    [3]    To be entitled to a temporary injunction, the applicant must plead a cause of action and further show both a probable right to recover on that cause of action and a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002); *Argyle ISD ex rel. Bd. of Trustees v. Wolf,* 234 S.W.3d 229, 236 (Tex.App.-Fort Worth 2007, no pet.); *Fox v. Tropical Warehouses, Inc.,* 121 S.W.3d 853, 857 (Tex.App.-Fort Worth 2003, no pet.). A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Wolf,* 234 S.W.3d at 236; *Fox,* 121 S.W.3d at 857. An injury is irreparable if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204; *Wolf,* 234 S.W.3d at 236; *Fox,* 121 S.W.3d at 857.

 [4]    [5]    [6]    [7]    [8]    In an appeal from an order granting or denying a temporary injunction, the scope of review is restricted to the validity of the order granting or denying relief. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993); *Wolf,* 234 S.W.3d at 237; *Fox,* 121 S.W.3d at 857. Whether to grant or deny a request for a temporary injunction is within the trial court's discretion, and we will not reverse its decision absent an abuse of discretion. *Butnaru,* 84 S.W.3d at 204; *Wolf,* 234 S.W.3d at 237; *Fox,* 121 S.W.3d at 857. Accordingly, when reviewing such a decision, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion. *Wolf,* 234 S.W.3d at 237; *Fox,* 121 S.W.3d at 857. A trial court does not abuse its discretion if it bases its decision on conflicting evidence and at least some evidence in the record reasonably supports the trial court's decision. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *Wolf,* 234 S.W.3d at 237; *Fox,* 121 S.W.3d at 857. When findings of fact are not requested or separately filed, as in this case, we must uphold the trial court's order on any legal theory supported by the record. *Mabrey v. SandStream, Inc.,* 124 S.W.3d 302, 309 (Tex.App.-Fort Worth 2003, no pet.).

## Pre-emption Claim

Appellants first contend that American's noncontract claims against them are pre-empted by the Airline Deregulation Act of 1978(ADA), which provides, in part, that "[e]xcept as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service *221 of an air carrier that may provide air transportation under this subpart." 49 U.S.C.A. § 41713(b)(1) (West 2007). The United States Supreme Court has held that threatened enforcement by state attorneys

general of "fare advertising guidelines" was pre-empted by the ADA. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 391, 112 S.Ct. 2031, 2041, 119 L.Ed.2d 157 (1992). The Court has also held that claims brought by AAdvantage® members against American in state court alleging violations of Illinois's Consumer Fraud Act were pre-empted by section 41713(b)(1). *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 226, 115 S.Ct. 817, 823–24, 130 L.Ed.2d 715 (1995).

 **[9]**    Appellants allege that this suit likewise involves an attempt to regulate prices, routes, or services that is pre-empted by the Act. American counters that any suit brought against it attempting to apply standards to its AAdvantage® program would be pre-empted as an attempt to place state regulations upon prices, routes, or services but that any attempt by it to enforce via state law its own standards as to prices, routes, or services, including frequent flyer mile credits, is not pre-empted as impermissible state regulation. We agree with American.

In *Morales,* the Court considered the effect the advertising restrictions would have on airlines' fares, holding that the restrictions would curtail the airlines' ability to communicate their fares to customers. *Morales,* 504 U.S. at 389, 112 S.Ct. at 2039–40. But it also held that " '[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* at 391, 112 S.Ct. at 2040.

The Court further distinguished contract actions in *Wolens,* holding that the Act does not shelter airlines from suits "seeking recovery solely for the airlines' alleged breach of its own self-imposed undertakings." *Wolens,* 513 U.S. at 228, 115 S.Ct. at 824. Although concluding that the Act pre-empted AAdvantage® members' Illinois Consumer Fraud Act claims because mileage credits are akin to "rates," the Court nevertheless held that as to contracts affecting such mileage credits, "[m]arket efficiency requires effective means to enforce private agreements." *Id.* at 230, 115 S.Ct. at 824.

After *Morales* and *Wolens,* courts have held that certain personal injury causes of actions against airlines are not pre-empted by the Act. *See, e.g., Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 340 (5th Cir.1995); *Continental Airlines v. Kiefer,* 920 S.W.2d 274, 283 (Tex.1996). In explaining its decision in *Kiefer,* the Texas supreme court noted that, "as *Wolens* explains at some length, claims are not [pre-empted] if they do not involve the enforcement of policy-laden state law that too closely approaches a regulatory effect on airlines." *Kiefer,* 920 S.W.2d at 283.

Here, although American has brought mostly tort claims, those claims attempt to protect the vitality of its self-imposed obligations: those arising from the AAdvantage® program. American's invoking the benefits and protections of state law to protect its own agreements does not have the same impermissible regulatory effect upon prices, routes, or services that Congress was concerned with in enacting section 41713(b)(1). The Act was intended to pre-empt only those state actions having a regulatory effect upon the airlines rather than to preclude airlines from seeking the benefits and protections of state law to enforce their self-imposed standards, regulations, and contracts. *See id.* ("[T]he purpose of ADA preemption is not to absolve airlines from all liability under state law, but to prohibit state regulation of air carriers, direct or indirect. Congress' concern **\*222** was 'that the States would not undo federal deregulation with regulation of their own.' "); *see also Hodges,* 44 F.3d at 337 ("Following deregulation, the CAB's [the former Civil Aeronautics Board's] statements implementing the ADA strongly support the view that the ADA was concerned solely with economic deregulation, not with displacing state tort law."). Indeed, denying American access to state courts for such purposes would seem to have such an impermissible regulatory effect.

Appellants contend that it is unfair to allow the airlines unfettered access to the state courts to enforce their own standards related to frequent flyer programs while denying access to the state courts to the states themselves and other parties attempting to impose standards on the airlines under state law. But the fairness of this application is not for us to decide; we must abide by Congress's intentions when determining whether a suit is pre-empted by the Act. *See Morales,* 504 U.S. at 383, 112 S.Ct. at 2036 (noting that in determining whether a suit is pre-empted under the Act, the question is one of statutory intent, and we must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose").

We conclude and hold that American's suit against appellants is not pre-empted by section 41713 of the Act. We overrule appellants' first issue.

## Status Quo

In their second issue, appellants contend that the injunction fails to preserve the status quo. According to appellants, they have been operating their business since 2002; they allege that American has known about their activities since that time, or at least since the beginning of the lawsuit. Appellants claim that because American knowingly allowed their activities to continue for some time, the last peaceable uncontested status is to allow appellants to continue their business.

 [10]    [11]    The purpose of a temporary injunction is to preserve the status quo until a trial on the merits. *Butnaru,* 84 S.W.3d at 204; *Wolf,* 234 S.W.3d at 237; *Fox,* 121 S.W.3d at 857. "Status quo is defined as 'the last, actual, peaceable, noncontested status which preceded the pending controversy.' " *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 577 (Tex.App.-Austin 2000, no pet.) (quoting *Transp. Co. v. Robertson Transps., Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553–54 (1953)); *see Wolf,* 234 S.W.3d at 237.

George Pirkle testified at the temporary injunction hearing that an attorney for American called him "several times" in 2002 about domain names connected to Frequent Flyer's website, frequentflyerdepot.com. The attorney told George that those domain names constituted trademark infringement and that American wanted them back. George told the attorney that the domain names were connected to frequentflyerdepot.com, and he agreed to give them to American. Although George testified that the attorney did not tell him to stop operating frequentflyerdepot.com, he also admitted that he could not recall whether they had talked about Frequent Flyer's brokerage business. He also said that the lawyer never told him that American would permit Frequent Flyer to sell AAdvantage® miles.

Since 2005, American has stopped travel on tickets sold by Frequent Flyer by freezing the accounts of AAdvantage® members who American discovers have improperly sold their rewards points to a third party. But George Pirkle admitted that American successfully discovers and  **\*223**  stops travel on Frequent Flyer's transactions only between about three and four to ten percent of the time. American's representative testified that these "policing" efforts are disruptive, causing operational difficulties for American and diverting resources away from legitimate ticketing.

When American deposed George Pirkle as the designated representative of Frequent Flyer, [1] he admitted that Frequent Flyer "brokers" AAdvantage® rewards points; in other words, Frequent Flyer buys rewards points from AAdvantage® members and sells those points to third parties. He agreed that American had asked Frequent Flyer to stop doing so "earlier this year [2008]," and he confirmed that Frequent Flyer had refused. American sought the temporary injunction hearing shortly after taking appellants' depositions.

 [12]    If, as American claims, appellants' activities are in violation of its agreements with AAdvantage® members, [2] the last peaceable, noncontested status is for appellants to refrain from selling AAdvantage® rewards points. There is no evidence that American knew of Frequent Flyer's brokering activities in 2002 when its attorney contacted George Pirkle about the domain names; as George himself testified, he bought around 136 domain names when he started. Likewise, there is no evidence that American knew in 2005 and later that the AAdvantage® accounts it was freezing for the improper sale of rewards points were sold through Frequent Flyer in particular. [3] Even so, it is a reasonable inference that American could not have known the full extent of Frequent Flyer's activities, considering George's testimony that Frequent Flyer transactions were "caught" only between three to ten percent of the time.

American moved for a temporary injunction when it learned the full extent of Frequent Flyer's activities and Frequent Flyer refused to discontinue those activities even in the face of American's suit. American should not be denied its ability to obtain

injunctive relief to which it is otherwise entitled simply because it took some time for it to discover Frequent Flyer's admittedly concealed activity. *See Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 428–29 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (holding that complete preservation of status quo in case involving improper use of trade secrets to operate competing chemical sales company was that new company would not be able to sell any of the disputed chemicals). We hold that the trial court's injunction properly preserves the status quo pending resolution of the suit. Accordingly, we overrule appellants' second issue.

### Enforceability of Agreement Between American and AAdvantage® Members

Appellants contend in their third issue that there is no evidence that American has a binding contract with its AAdvantage® members such that appellants' actions in buying and selling, and inducing AAdvantage® members to buy and sell, AAdvantage® rewards points are improper as alleged by American in its tort claims.

**\*224** To become an AAdvantage® member, a person must agree to American's online User Agreement, which contains the following provision: "At no time may AAdvantage® mileage credit or award tickets be purchased, sold or bartered. Any such mileage or tickets are void if transferred for cash or other consideration." The User Agreement also contains other provisions allowing American to change the terms of the AAdvantage® program, upon which appellants base their claim that the User Agreement lacks mutuality and is, therefore, unenforceable. Specifically, the User Agreement states that American may,

> in its discretion, change the AAdvantage® program rules, regulations, travel awards, and special offers at any time with or without notice.... American Airlines may make one or more of [certain enumerated] changes at any time even though such changes may affect your ability to use the mileage credit or awards that you have already accumulated. American Airlines reserves the right to end the AAdvantage® program with six months notice. [4]

According to appellants, this clause shows a fatal lack of mutuality, rendering the entire agreement unenforceable.

**[13]** **[14]** **[15]** **[16]** A bilateral contract is one in which there are mutual promises between two parties to the contract, each being both a promisor and a promisee. *Hutchings v. Slemons,* 141 Tex. 448, 174 S.W.2d 487, 489 (1943); *The Colony, Tex. v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 725 (Tex.App.-Fort Worth, pet. filed). A bilateral contract must be based upon a valid consideration, in other words, mutuality of obligation. *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 409 (Tex.1997); *The Colony,* 272 S.W.3d at 725. Consideration may consist of either benefits or detriments to the contracting parties; it may consist of some right, interest, profit, or benefit that accrues to one party, or alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party. *The Colony,* 272 S.W.3d at 725; *In re C & H News Co.,* 133 S.W.3d 642, 647 (Tex.App.-Corpus Christi 2003, orig. proceeding). The existence of a written contract presumes consideration for its execution. *The Colony,* 272 S.W.3d at 725; *Doncaster v. Hernaiz,* 161 S.W.3d 594, 603 (Tex.App.-San Antonio 2005, no pet.).

**[17]** **[18]** **[19]** A contract that lacks mutuality of obligation is illusory and void and thus unenforceable. *The Colony,* 272 S.W.3d at 725; *Tex. S. Univ. v. State St. Bank & Trust Co.,* 212 S.W.3d 893, 914 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). A promise is illusory when it fails to bind the promisor who retains the option of discontinuing performance without notice. *Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642, 645 (Tex.1994); *The Colony,* 272 S.W.3d at 725; *Rogers v. Alexander,* 244 S.W.3d 370, 382 (Tex.App.-Dallas 2007, no pet.). But mutuality in each clause of a contract is not required when consideration is given for the contract as a whole. *Howell v. Murray Mortgage Co.,* 890 S.W.2d 78, 87 (Tex.App.-Amarillo 1994, writ denied).

**[20]** **[21]** The test for mutuality is applied and determined when enforcement is sought, not when the promises are made. *Hutchings,* 174 S.W.2d at 489; *Cherokee Commc'ns, Inc. v. Skinny's, Inc.,* 893 S.W.2d 313, 316 (Tex.App.-Eastland 1994, writ denied). Accordingly, even if an illusory **\*225** promise renders a contract unilateral, consideration can still be established by part performance by the promisee. *Hutchings,* 174 S.W.2d at 489; *Cherokee Commc'ns,* 893 S.W.2d at 316; *cf. Alex Sheshunoff*

*Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 650–51 (Tex.2006) (distinguishing general rule as to covenants not to compete, which, by statute, must be enforceable when entered into).

 **[22]**　Here, the clause pointed to by appellants allows American to terminate the program upon notice and allows American to change the terms of the program with or without notice. However, that does not mean American is without obligation to its members under the User Agreements. In consideration for AAdvantage® members' purchasing paid travel on American and its partner airlines, and purchasing other services from specified providers, American agrees to provide rewards points to those customers. It is nonsensical for appellants to argue that no enforceable agreement exists when their entire business depends on the enforceability of that agreement. In other words, if American has no obligation to issue a ticket in exchange for rewards points when an AAdvantage® member fully complies with the User Agreement, appellants are ill-positioned to complain about the trial court's enjoining their activities, which depend on American's complying with its obligation even when a ticket is obtained in violation of the applicable User Agreement. Appellants cannot have it both ways.

Additionally, as appellants point out in their brief, American's misappropriation claim "as alleged requires a showing that [appellants] 'wrongfully[ ]obtained award tickets.' " The key word here is "obtained," in the past tense. It is undisputed that American has issued tickets in exchange for rewards points purchased through Frequent Flyer. With regard to those tickets, then, American has performed under the applicable User Agreements. Thus, even if American's consideration was illusory when it entered into the applicable User Agreements, its subsequent performance under those agreements established consideration, rendering those agreements enforceable. *See Hutchings,* 174 S.W.2d at 489; *Cherokee Commc'ns,* 893 S.W.2d at 316.

The same holds true for tickets that American will issue in exchange for rewards points in the future. If American does not issue any such tickets, then the question of whether American can enforce the no-sale rule is moot. But if American does issue tickets in exchange for rewards points acquired through purchase or barter—then it will again have partially performed under the User Agreements at issue, thus establishing the necessary consideration to render those agreements enforceable. *See Hutchings,* 174 S.W.2d at 489; *Cherokee Commc'ns,* 893 S.W.2d at 316. [5]

For these reasons, we conclude and hold that American's AAdvantage® User Agreements do not fail for lack of mutuality, and we overrule appellants' third issue.

### *226  Continuance

In their fourth issue, appellants claim that the trial court abused its discretion by refusing to continue the temporary injunction hearing.

 **[23]**　Appellants moved for a continuance both before and after the temporary injunction hearing on the ground that American had refused to produce documents in response to appellants' Third Request for Production. Appellants requested these documents in conjunction with their counterclaims against American for interference with contractual and business relations, tortious interference with prospective relations, a declaratory judgment that appellants' actions in purchasing and selling AAdvantage® rewards points are not improper, violations of the Texas Free Enterprise Act, violations of the DTPA, and injunctive relief. In particular, appellants claimed they needed additional discovery on their antitrust claims, their equitable defenses, and whether American had an adequate remedy at law. The gist of appellants' counterclaims is that American is a competitor and is unlawfully attempting to restrict their ability to maintain a competing business.

Appellants' complaint fails initially because they failed to support their written motion for continuance with an affidavit as required by rule 251. Tex.R. Civ. P. 251. Generally, when a movant fails to comply with rule 251, we presume the trial court did not abuse its discretion by denying a motion for continuance. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986); *Sw. Country Enters., Inc. v. Lucky Lady Oil Co.,* 991 S.W.2d 490, 493 (Tex.App.-Fort Worth 1999, pet. denied); *see also Tri–Steel*

*Structures, Inc. v. Baptist Found. of Tex.,* 166 S.W.3d 443, 448–49 (Tex.App.-Fort Worth 2005, pet. denied) (holding that trial court did not abuse its discretion by denying motion for continuance when not in proper "affidavit form").

 [24]    Appellants did not comply with rule 251; thus, we conclude and hold that the trial court did not abuse its discretion by denying their motion for continuance. Moreover, if necessary to protect a proven legal right, a temporary injunction may issue even if it has the effect of restraining competition, so long as it is narrowly tailored to preserve the status quo. *Sharma,* 231 S.W.3d at 428–29 ("While ordinarily a temporary injunction should operate as a corrective rather than a punitive measure, when a choice must be made between a failure to provide adequate protection of a recognized legal right and the punitive operation of the writ, the latter course must be taken."). We overrule appellants' fourth issue.


## Proof of Injury

Appellants' fifth issue complains that American failed to meet its burden to prove that it was injured.

American alleged that it is injured by Frequent Flyer's actions because customers who purchase void rewards points from appellants (because those purchases violate the no-sale rule) would likely have purchased tickets from American had they not obtained the void tickets; thus, those customers likely displaced other AAdvantage® members or other paying American customers who would have purchased tickets had the seats not been occupied by travelers using the void tickets. American also alleged that it lost goodwill with AAdvantage® members in that those members were prevented from using their AAdvantage® rewards points because seats were occupied by persons using the void tickets. Appellants contend that American "offered no evidence of any identified passenger, actual or potential, who suffered any aspect **\*227** of [American's] litany of claimed injuries."

 [25]    [26]    A party proves irreparable injury for injunction purposes by proving that damages would not adequately compensate the party or cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204; *Fox,* 121 S.W.3d at 857. An injunction is not proper when the claimed injury is merely speculative, however; fear and apprehension of injury are not sufficient to support a temporary injunction. *Jordan v. Landry's Seafood Rest., Inc.,* 89 S.W.3d 737, 742 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g).

 [27]    American offered the testimony of Jim Balsom, Manager of AAdvantage® systems and partner support. He testified without objection that American is reluctant to challenge the veracity of AAdvantage® members' representations when booking travel because "that would not engender goodwill[;] in fact, [it would] probably cost [American] significant goodwill if we were to do that." Additionally, he testified that such an inquiry "[w]ould take [a] significant amount of time and add significantly to [American's] costs."

Balsom further testified that brokering operations such as Frequent Flyer's "cause[ ] customers to question [American's] ability to manage and maintain the program and deliver the benefits that we've promised to customers." He said that when American discovers a void transaction due to Frequent Flyer's activities, its business is disrupted and it must divert resources away from legitimate customers to deal with the void transactions. He also testified that freezing the AAdvantage® accounts at issue causes ill will for the member. Balsom further stated that dealing with these types of transactions causes "operational difficulties or issues."

Regarding displacement, Balsom testified that when Frequent Flyer sells an AAdvantage® member's rewards points to a third party, that third party displaces a customer "who would either pay cash for that ticket or ... who would redeem AAdvantage® miles for the seat." He said it also "does use resources through [American's] reservations office [and] potentially AA.com for other business purposes" instead of valid ticket sales.

Appellants challenge American's displacement evidence, pointing to Securities and Exchange Commission reports filed by AMR, American's parent company, showing that, generally, between 2003 and 2007, twenty to thirty percent of seats on American's flights were empty. It also points to statements in those reports to the effect that, with respect to the AAdvantage® program, AMR "believes displacement of revenue passengers is minimal given the Company's load factors, its ability to manage frequent flyer inventory, and the relatively low ratio of free award usage to total passengers boarded." According to appellants, absent evidence from specific flights on which displacement occurred, American cannot overcome this evidence of empty seats on its flights.

The SEC filings do not give information for specific flights; indeed, the vacancies in paying seats may be higher due to higher numbers of business travelers paying a lower price for rewards points tickets through Frequent Flyer than paying for typical full-fare seats. [6] And the isolated **\*228** statement that displacement is minimal is clearly in relation to the function of the program according to its guidelines; in other words, passenger displacement is minimal when the program is operating without outside influences.

American points to additional evidence as supporting the proof of injury requirement, such as the fact that it is virtually impossible to police appellants' actions (when American discovers a void ticket, Frequent Flyer simply buys more miles and issues a new one), that American has to devote resources to investigating and policing appellants' actions that disrupt its operation and divert its resources from legitimate customers, and the unobjected-to evidence that American's inability to police activities such as Frequent Flyer's causes AAdvantage® members to question its ability to effectively run the program.

 [28]     Disruption to a business can be irreparable harm. *Lavigne v. Holder,* 186 S.W.3d 625, 629 (Tex.App.-Fort Worth 2006, no pet.); *David v. Bache Halsey Stuart Shields, Inc.,* 630 S.W.2d 754, 757 (Tex.App.-Houston [1st Dist.] 1982, no writ) ("This harm would not only disrupt the organized business dealings of Bache but would also threaten customer confidence in Bache's handling of their private affairs, and probably cause Bache to lose not only customers but profits as well."). Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy. *Martin v. Linen Sys. for Hosps., Inc.,* 671 S.W.2d 706, 710 (Tex.App.-Houston [1st Dist.] 1984, no writ).

American offered specific, undisputed evidence of intangible harm to its business, including the AAdvantage® program, resulting from appellants' actions. Balsom's testimony was not speculative and is supported by the Pirkles' own testimony about Frequent Flyer's operations, specifically, its instructions to AAdvantage® members intended to conceal its activities from American.

We conclude and hold that American presented evidence of an irreparable injury. Thus, we overrule appellants' fifth issue.


### Adequate Remedy

In their sixth issue, appellants claim that if American presented sufficient evidence to meet its burden of proof as to injury, that same evidence shows that American has an adequate remedy in damages. Specifically, appellants claim that damages can be calculated easily from AMR's SEC filings if American can provide the identity of specific displaced passengers. They also contend that American cannot show lost profits because it has not made any profit since at least 2002.

 [29]     American counters that even if damages can be assigned to displaced passengers, appellants "do not refute the evidence ... that their conduct disrupts American's business ... in many ways and affects the reputation and loyalty it has developed over years with its customers."

 **\*229**  [30]     [31]     An adequate remedy is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Mabrey,* 124 S.W.3d at 317. Damages are an inadequate remedy if they are difficult to calculate. *Id.* at 318–19.

[32]     According to American, while the evidence appellants point to may show that some of its damages are calculable, it does not show a way to calculate damages for American's claims of loss of goodwill and other intangibles. We agree. As we have already stated, the intangible types of injuries testified to by Balsom are the types of injuries to which a dollar value may not easily be assigned. *Martin,* 671 S.W.2d at 710. A remedy is not adequate simply because some of the proven damages are calculable. *See Tex. Indus. Gas v. Phoenix Metallurgical Corp.,* 828 S.W.2d 529, 532 (Tex.App.-Houston [1st Dist.] 1992, no writ) ("For a legal remedy to be adequate, it must give the applicant complete, final, and equal relief."); *see also Towers v. Grogan,* No. 01–97–00946–CV, 1998 WL 191760, at *4 (Tex.App.-Houston [1st Dist.] Apr. 23, 1998, no pet.) (not designated for publication) (holding that although some breach of contract damages were calculable, specific damages for which Grogan sought injunctive relief were intangibles, incapable of being measured by damages).

We conclude and hold that American proved that damages are not adequate to fully compensate it for its injuries. Accordingly, we overrule appellants' sixth issue.

## Equitable Concerns

Appellants' seventh issue raises equitable claims, including laches and unclean hands.

Appellants first contend that American's temporary injunction claim is barred by laches because American has failed to take action against appellants despite knowing since 2002 the type of business Frequent Flyer was engaged in. Appellants claim Frequent Flyer has been prejudiced by American's inaction because the Pirkles never would have expanded the business since 2002 had they known American objected to Frequent Flyer's conduct.

[33]     [34]     A party asserting the defense of laches must show both an unreasonable delay by the other party in asserting its rights and harm resulting to it because of the delay. *Rogers v. Ricane Enters. Inc.,* 772 S.W.2d 76, 80 (Tex.1989); *In re Roxsane R.,* 249 S.W.3d 764, 771 (Tex.App.-Fort Worth 2008, orig. proceeding). Here, we have already discussed the lack of evidence that American knew or should have known of appellants' activities when its lawyer contacted George Pirkle in 2002 about the domain names. In addition, we have also pointed to the evidence that Frequent Flyer purposefully concealed its dealings from American and instructed AAdvantage® members to do the same. Accordingly, we do not believe that the evidence shows that American deliberately slumbered on its rights with regard to appellants' conduct.

Moreover, there was evidence from which the trial court could have concluded that appellants failed to show prejudice; the trial court elicited testimony from George that Frequent Flyer's expansion also had to do with increased trade in other airlines' frequent flyer miles. George also testified that he had been aware of American's no-sale provision since at least 2005 because American had stopped travel on tickets bought with rewards points sold by Frequent Flyer before that time. Accordingly, we conclude and hold that the trial court did not abuse its discretion by rejecting appellants' claim of laches.

[35]     Appellants contend that American has unclean hands because "the evidence **\*230** shows that [American] is part of an illegal conspiracy with regard to the antitrust laws of the United States and the State of Texas." According to appellants, the temporary injunction prevents (and American's suit seeks to prevent) them from competing with American. Appellants also claim that American must do equity to obtain equity and that American has failed to do so by authorizing Points.com and its airline partners to trade with members for AAdvantage® rewards points. This argument appears to incorporate appellants' antitrust and anticompetition claims. But as we have already held, an otherwise proper injunction will not be rendered improper by claims that such an injunction would have a preclusive effect on competition. *See Sharma,* 231 S.W.3d at 429. Thus, we conclude and hold that the trial court did not abuse its discretion by rejecting appellants' equitable defenses.

We overrule appellants' seventh issue.

## Conclusion

Having overruled all of appellants' issues, we affirm the trial court's order granting the temporary injunction.

**All Citations**

281 S.W.3d 215

Footnotes

1    American says in its brief that the depositions had been delayed due to George Pirkle's poor health; appellants do not dispute this.

2    Appellants do not challenge on appeal whether American proved a probable right to recover on its causes of action.

3    George and Robert both testified that Frequent Flyer instructs customers who purchase rewards points from it to tell American that the points are a gift and that such representations are lies.

4    The agreement also states that American "may amend its rules of the Program at any time without notice."

5    Moreover, we note that, as a practical matter, American is effectively conceding the enforceability of the User Agreements. Appellants criticize American for relying on cases construing similar airline passenger incentive agreements because in those cases the passengers themselves—who were seeking to enforce the agreements—conceded the existence of enforceable agreements. *See Monzingo v. Alaska Air Group, Inc.,* 112 P.3d 655, 661–62 (Alaska 2005); *Grossman v. USAir, Inc.,* 33 Phila.Co.Rptr. 427, 431–32 (C.P.1997). But the key factor that makes this case similar to those is that the party seeking enforcement-here, American-effectively concedes enforceability of the agreements by attempting to enforce them.

6    As the United State Supreme Court noted in *Morales,*

    The expenses involved in operating an airline flight are almost entirely fixed costs; they increase very little with each additional passenger. The market for these flights is divided between consumers whose volume of purchases is relatively insensitive to price (primarily business travelers) and consumers whose demand is very price sensitive indeed (primarily pleasure travelers). Accordingly, airlines try to sell as many seats per flight as possible at higher prices to the first group, and then to fill up the flight by selling seats at much lower prices to the second group (since almost all the costs are fixed, even a passenger paying far below average cost is preferable to an empty seat). In order for this marketing process to work, and for it ultimately to redound to the benefit of price-conscious travelers, the airlines must be able to place substantial restrictions on the availability of the lower priced seats (so as to sell as many seats as possible at the higher rate), and must be able to advertise the lower fares. 504 U.S. at 389, 112 S.Ct. at 2040.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1404364
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

***MEMORANDUM OPINION***
Court of Appeals of Texas,
Austin.

Roger W. JENKINS, Appellant

v.

TRANSDEL CORPORATION, Appellee.

No. 03–04–00033–CV. | June 24, 2004.

**Synopsis**
**Background:** Majority shareholder of corporation brought shareholder's derivative suit against former president of corporation, alleging that he violated fiduciary duties by attempting to acquire the corporation's assets and divert business to his new competing corporation. The 274th Judicial District Court, Hays County, Charles R. Ramsay, J., granted corporation's request for a temporary injunction and enjoined president from interfering with the corporation, withholding its assets, or attempting to divert its business. President appealed.

**Holdings:** The Court of Appeals, Patterson, J., held that:

[1] corporation demonstrated probable right of recovery, as required for temporary injunction;

[2] evidence that president was trying to divert customers was sufficient to establish probable injury in the interim with no adequate remedy by law, as required for temporary injunction;

[3] status quo to be maintained by injunction was the relationship between corporation and president before he purportedly resigned and established his competing corporation;

[4] order granting temporary injunction adequately set forth the reasons for its issuance and the acts to be restrained;

[5] temporary injunction was not overbroad; and

[6] temporary injunction was not an impermissible prior restraint on president's free speech.

Affirmed.

West Headnotes (7)

**[1]** **Corporations and Business Organizations** 👈 President, chief executive officer, or vice president

Business Corporation Act would not apply to agreement between corporation and its president, where vice-president was misled into signing agreement on behalf of corporation. V.A.T.S., Bus.Corp.Act, arts. 2.30-1, 2.35-1A.

Cases that cite this headnote

**[2]** **Injunction** Directors, officers, and agents

Corporation alleging that its president violated fiduciary duties by attempting to divert business to his new competing corporation demonstrated probable right of recovery in shareholder's derivative suit, as required for temporary injunction barring such conduct, given evidence that vice-president was misled into signing agreement waiving any fiduciary duty owed by president and that president did contact its customers in bad faith.

Cases that cite this headnote

**[3]** **Injunction** Directors, officers, and agents

Evidence that president of corporation was attempting to divert customers to his new competing corporation under false pretenses was sufficient to establish a probable injury to the corporation while its shareholder's derivative action alleging breach of fiduciary duties was being litigated with no adequate remedy by law, as required for temporary injunction barring such conduct.

Cases that cite this headnote

**[4]** **Injunction** Directors, officers, and agents

For purposes of determining whether temporary injunction was warranted in connection with shareholder's derivative suit against corporate president who was allegedly diverting customers to his own competing corporation in violation of his fiduciary duties, the "status quo" to be maintained was the relationship between president and corporation before he purportedly resigned and established the competing corporation.

Cases that cite this headnote

**[5]** **Injunction** Directors, officers, and agents

Order granting temporary injunction in connection with shareholder's derivative suit against corporate president who was attempting to divert customers to his new competing corporation in violation of his fiduciary duties adequately set forth the reasons for its issuance and the acts to be restrained, where it explained what president had done, what he was forbidden to do in the future, and how corporation stood to suffer injury in the absence of an injunction. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[6]** **Injunction** Non-competition and non-solicitation issues

Temporary injunction issued in connection with shareholder's derivative suit for breach of fiduciary duties against corporate president who was attempting to divert customers to his new competing corporation, which ordered president to refrain from trying to acquire corporation's customers while lawsuit was pending, was not overbroad.

Cases that cite this headnote

**[7]** **Constitutional Law** Trade or Business

**Injunction** Directors, officers, and agents

Temporary injunction issued in connection with shareholder's derivative suit alleging breach of fiduciary duties against corporate president who was attempting to divert customers to his new competing corporation, which ordered president to refrain from contacting corporation's customers other than to collect balances due while lawsuit was pending, was not an impermissible prior restraint on his free speech. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

From the District Court of Hays County, 274th Judicial District, No.2003–1925, Honorable Charles R. Ramsay, Judge Presiding.

**Attorneys and Law Firms**

Frank B. Suhr Jr. and Jim Duvall, for Roger W. Jenkins.

W.W. McNeal III, for TransDel Corporation.

Before Chief Justice LAW, Justices PATTERSON and PURYEAR.

*MEMORANDUM OPINION*

JAN P. PATTERSON, Justice.

 **\*1**  Appellant Roger W. Jenkins, one of two board members and president of appellee TransDel Corporation, owned forty-nine percent of the company's stock. George Hilton, TransDel's vice-president, board member, and majority stockholder, filed this shareholder's derivative suit, alleging that Jenkins violated his fiduciary duties by attempting to acquire TransDel's assets and divert its business to All About Freight Services, Inc., Jenkins's new corporation. TransDel requested a temporary injunction barring Jenkins from interfering with TransDel's business, contacting TransDel's customers, or attempting to collect any funds owed to TransDel.

Following a hearing, the trial court granted TransDel's request and enjoined Jenkins from interfering with Hilton's management and operation of TransDel, withholding TransDel's assets, contacting TransDel's customers, or attempting to divert TransDel's business in any way. Jenkins was ordered to return a truck to Hilton and give him information stored in TransDel's computer. Jenkins was allowed to contact TransDel customers that were also All About Freight customers for purposes of collecting balances due to All About Freight. The trial court filed findings of fact and conclusions of law related to the temporary injunction. In this accelerated interlocutory appeal, Jenkins contends that TransDel did not establish (1) a probable right of recovery or (2) interim injury without an adequate remedy at law, and that the injunction (3) does not maintain the status quo, (4) violates rule 683 of the rules of civil procedure, (5) is overbroad, and (6) amounts to a prior restraint on Jenkins's constitutional right to free speech. We affirm the trial court's order.

**Standard of Review**

A temporary injunction is intended to preserve the status quo pending a trial on the merits. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993); *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 576 (Tex.App.-Austin 2000, no pet.). A party seeking a temporary injunction need not establish that he will prevail at trial, but must show a probable right of recovery and a probable injury in the interim. *Walling,* 863 S.W.2d at 57–58; *Universal Health,* 24 S.W.3d at 576.We review a trial court's decision to grant a temporary injunction under an abuse of discretion standard.*Walling,* 863 S.W.2d at 58; *Universal Health,* 24 S.W.3d at 576.Our review of the granting of a temporary injunction is confined to the validity of the trial court's order, and we do not consider the merits of the underlying lawsuit. *Universal Health,* 24 S.W.3d at 576.Nor may we substitute our judgment for

that of the trial court. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). We will reverse only if we find that the trial court acted unreasonably or arbitrarily or without reference to guiding rules and principles. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). In reviewing the granting of a temporary injunction, we view the evidence in the light most favorable to the trial court's decision and indulge all reasonable inferences in its favor to determine whether the decision was so arbitrary as to exceed the bounds of reasonable discretion. [1] *Universal Health,* 24 S.W.3d at 576.If the trial court heard conflicting evidence and the record contains evidence that reasonably supports the court's decision, we will affirm the order. *Id.* It is not an abuse of discretion for a trial court to base its decision on conflicting evidence. *Davis,* 571 S.W.2d at 862.

## Factual Background

**\*2** Hilton and Jenkins were business partners for about twenty years. In 2003, TransDel owed money to the Internal Revenue Service and was behind in rent payments. Relations between Hilton and Jenkins soured, apparently having to do at least in part with Hilton's decision as majority shareholder to fire Jenkins's wife, who was working part-time for TransDel. In late August 2003, Jenkins prepared a letter resigning as president of TransDel and stating that he would remain only as an employee; the parties disagree about when Hilton saw that letter and whether he believed Jenkins was still acting as president of TransDel during the fall of 2003. TransDel alleged that Jenkins developed a plan that he represented would help TransDel pay its past due rent; under the plan, All About Freight would assume the lease and TransDel would sublease the premises from All About Freight. In September 2003, a truck belonging to TransDel was transferred into Jenkins's name. Hilton believed the transfer was done to get a loan for a final balloon payment on the truck and thought that the truck still belonged to TransDel. Jenkins testified that the truck was transferred to him because he took out a personal loan to provide $4,000 for the truck. He also testified that TransDel paid $7,300 to buy the truck and made the payments on the $4,000 loan that Jenkins took out for the remaining balance.

In October 2003, Jenkins and Hilton signed an agreement that stated that Jenkins was starting All About Freight in the same line of business as TransDel ("the Agreement"). The Agreement further stated that TransDel waived any fiduciary duty owed it by Jenkins. Hilton testified that he did not read the entire document but instead relied on Jenkins's representations about what the Agreement entailed because he trusted Jenkins after their years of working together. Jenkins also drafted a proposal stating that All About Freight was taking over TransDel's business accounts; Hilton testified that he first saw this document in November 2003, when Jenkins left it behind in a vehicle he had driven. Jenkins then wrote a letter to TransDel's customers on letterhead listing both TransDel's and All About Freight's names, signing as "President." The letter stated that TransDel was revamping its structure and changing its name and asked the customers to send payments to All About Freight's post office box, while all other correspondence should continue to be sent to TransDel's address. Hilton discovered this when a letter was returned to TransDel as undeliverable. TransDel alleged that Jenkins misrepresented that his plans would help clear up TransDel's debts, when in fact Jenkins was diverting business to his new company.

## Discussion

**[1]** **[2]** In his first issue, Jenkins contends that TransDel failed to establish a probable right to recovery, arguing that Hilton signed the Agreement and therefore should be bound by its terms, which included a waiver of any fiduciary duty owed by Jenkins to TransDel. However, although Jenkins argues that Hilton should be bound by the Agreement, there was testimony that Hilton did not know the full substance and import of the document when he signed it and that he signed it in reliance on misrepresentations by Jenkins and in light of a long history of working together and trusting Jenkins's word. [2] Jenkins urges that the agreement is valid "as long as this Court does not hold that JENKINS' conduct of contacting TRANSDEL customers on behalf of [All About Freight] does not constitute self-dealing, bad faith, an intentional adverse act, or an act made with reckless indifference."However, in reviewing the grant of temporary injunctive relief, we view the evidence in the light most favorable to the trial court's decision. There was testimony that Hilton was misled into signing the Agreement and that Jenkins did contact TransDel's customers in bad faith, seeking to lure TransDel's customers to All About Freight. We make no holding on the merits

as to whether Jenkins acted wrongly. Such a decision is not before us in this appeal. Based on the record before us and viewing the testimony in the light most favorable to the trial court's decision, we cannot hold it was an abuse of discretion for the trial court to find that TransDel had demonstrated a probable right of recovery. We overrule Jenkins's first issue on appeal.

**\*3** **[3]** Jenkins next contends that TransDel failed to establish a probable injury in the interim with no adequate remedy by law, noting that the trial court did not in its order expressly find imminent or irreparable harm or inadequate remedy. However, there was evidence that All About Freight was interfering with TransDel's business relationships and attempting to acquire TransDel's customers. Jenkins's letter to TransDel's customers stated that TransDel was reorganizing and changing its name and asked that payments be sent to All About Freight. This can be interpreted as some evidence that Jenkins was attempting to acquire TransDel's customers under false pretenses, and the trial court could have concluded that such behavior could result in imminent and irreparable harm of a kind that would not be fairly compensable following trial. *See Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 602 (Tex.App.-Amarillo 1995, no writ) (demise of existing business may constitute irreparable harm); *Martin v. Linen Sys. for Hosps., Inc.,* 671 S.W.2d 706, 710 (Tex.App.-Houston [1st Dist.] 1984, no writ) (difficult to assign dollar value to loss of clientele, goodwill, stability). Thus, it was not an abuse of discretion for the trial court to find that TransDel established a probable injury in the interim with no adequate remedy at law. We overrule Jenkins's second issue.

**[4]** In his third issue, Jenkins contends that the injunction does not maintain the status quo. Status quo is the " 'last, actual, peaceable, noncontested' " state of affairs preceding the controversy. *Universal Health,* 24 S.W.3d at 577 (quoting *Transport Co. of Tex. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553–54 (Tex.1953)). If one party's act changes the relationship between him and another, and the other party contests that action, the status quo to be maintained is not the relationship as it existed after the act, but rather is the state of things as they were before the controversy arose. *Id.* (quoting *Benavides Indep. Sch. Dist. v. Guerra,* 681 S.W.2d 246, 249 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.)). Jenkins asserts that the last uncontested situation was in November 2003, just before Hilton realized that Jenkins was trying to acquire TransDel's customers. Up until then, Jenkins asserts, the parties were operating peaceably under the Agreement, and by that time All About Freight had already contacted and perhaps acquired some of TransDel's customers. However, as discussed earlier, Hilton asserted that he signed the Agreement due to Jenkins's misrepresentations. The trial court could have found that the last uncontested status was prior to the fall of 2003, Jenkins's purported resignation of his presidency, and his establishment of All About Freight. We cannot find that the trial court abused its discretion in making such a finding. We overrule Jenkins's third issue.

In his fourth issue, Jenkins contends that the injunction violates rule 683 of the rules of civil procedure because it does not explain how TransDel's right to recover will be harmed if Jenkins is not enjoined from contacting its customers and does not specify what imminent injury may occur. Jenkins argues that because he is no longer TransDel's officer or director, his competition violates no fiduciary duty and cannot endanger TransDel's right to recover.

**\*4** **[5]** An order granting a temporary injunction must set forth the reasons for its issuance and describe in "reasonable detail" the acts to be restrained. Tex.R. Civ. P. 683. The trial court's order states that Jenkins was at all relevant times a TransDel board member, diverted business to All About Freight in violation of his fiduciary duty to TransDel, and took possession of TransDel's property. Jenkins was enjoined from (1) interfering with Hilton's operation of TransDel by withholding TransDel's assets and (2) contacting TransDel's customers or trying to divert its business to All About Freight. Jenkins was allowed to contact All About Freight customers that are "coincidentally" TransDel customers for the purpose of collecting outstanding balances due All About Freight. Jenkins was also ordered to return certain property to TransDel.

Rule 683 does not mandate that an order set out each and every element that must be shown by a party seeking a temporary injunction .[3] Instead, it requires a trial court to set out with reasonable specificity and detail the reasons for the injunction and the acts to be enjoined. *See Transport Co.,* 261 S.W.2d at 552–53 (rule 683 does not require order to state specifically why applicant will probably prevail on final trial, only why probable right to recover will be endangered without injunction; enjoined party may seek findings of fact and conclusions of law). This order does precisely that. The trial court explained what Jenkins had done and explained what he was forbidden to do in the future. Those statements sufficiently describe the situation and how

TransDel stands to suffer injury in the absence of an injunction. We hold that the order complied with the requirements of rule 683 and overrule Jenkins's fourth issue.

Finally, in his fifth and sixth issues, Jenkins argues that the injunction is overbroad and amounts to a prior restraint on his constitutional rights to free speech. Jenkins again urges that because he is no longer a TransDel director or officer, he owes TransDel no fiduciary duty and should have the right to seek customers for All About Freight. However, under this argument, as soon as a corporate officer resigned from his company, he could use any information or asset he acquired in trust from his former company in direct competition against it and to acquire its customers and business, even using misrepresentations to do so.

**[6]** TransDel argues that All About Freight was established and began to acquire customers under false pretenses and in derogation of Jenkins's fiduciary duties. Jenkins wrote to TransDel's customers that TransDel was reorganizing, including a name change, and that all payments should in the future be sent to All About Freight. It is conceivable that TransDel's customers could be confused and believe that All About Freight was TransDel's new name, not realizing it was in fact TransDel's competitor. It is not overly restrictive to order Jenkins to refrain from trying to acquire TransDel's customers while this lawsuit is pending.

**\*5** **[7]** Nor does this amount to an impermissible prior restraint on free speech. Commercial speech is related "solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Because commercial speech is "more verifiable" than other speech and is so important to business, traditional prohibitions against prior restraint may not be applicable. *Amalgamated Acme Affiliates, Inc. v. Minton,* 33 S.W.3d 387, 394 (Tex.App.-Austin 2000, no pet.)(citing *Friedman v. Rogers,* 440 U.S. 1, 10, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); *State Bd. of Med. Exam'rs v. Burzynski,* 917 S.W.2d 365, 370 (Tex.App.-Austin 1996, writ denied)). Commercial communications that are deceptive, confusing, or even potentially misleading may be enjoined. *Id.*

Jenkins is enjoined from contacting TransDel's customers, other than to collect any outstanding balances due to All About Freight. In the context of the record here, especially considering the November 2003 letter sent to TransDel's customers regarding payments, we cannot hold the trial court abused its discretion in enjoining Jenkins from continuing to contact TransDel's customers or in otherwise interfering with TransDel's operations. We overrule Jenkins's fifth and sixth issues on appeal.

### Conclusion

We have viewed the record in the light most favorable to the trial court's order of injunction and without evaluating the merits of TransDel's claims. Having overruled all of Jenkins's issues on appeal, we affirm the trial court's order.

**All Citations**

Not Reported in S.W.3d, 2004 WL 1404364

Footnotes

1    Generally, a trial court's findings of fact in a bench case have the same weight and authority as a jury's verdict and are reviewed under the same standards in reviewing legal or factual sufficiency of evidence supporting a jury's answer. *AT & T Corp. v.. Rylander,* 2 S.W.3d 546, 551 (Tex.App.-Austin 1999, pet. denied). In an interlocutory appeal such as this, a trial court *may* file findings of fact and conclusions of law but is not required to do so. Tex.R.App. P. 28.1; *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 884 (Tex.App.-Dallas 2003, no pet.). Findings and conclusions may be helpful in reviewing for an abuse of discretion, but do not carry the same weight as findings made after a trial on the merits and are not binding when we are reviewing a trial court's exercise of discretion. *Tom James of Dallas,* 109 S.W.3d at 884.

2        Jenkins cites to the Business Corporation Act, which governs when and what kind of agreements between corporations and their directors or shareholders are valid. *See* Tex. Bus. Corp. Act Ann. arts. 2.30–1, 2.35–1A (West 2003). Because there was testimony that Hilton was misled into signing any such agreement, we cannot hold that it was an abuse of discretion for the trial court to decide that the Act would not apply in this case.

3        Rule 683 does require an injunction order to include a trial setting, Tex.R. Civ. P. 683, and the absence of such a setting renders an injunction order voidable. *See Qwest Communications Corp. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000). The order in this cause includes the required trial setting.

---

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

25 S.W.3d 845
Court of Appeals of Texas,
Houston (14th Dist.).

JIM RUTHERFORD INVESTMENTS, INC., and Jim Rutherford, Individually, Appellant,

v.

TERRAMAR BEACH COMMUNITY ASSOCIATION, Appellee.

No. 14–99–00132–CV.  |  Aug. 3, 2000.

Association of subdivision homeowners filed suit against developer, seeking temporary and permanent injunctions to enforce deed restrictions. Developer counterclaimed based on wrongful injunction and sought his own injunction against association to prohibit interference with construction of remaining residential homes in development. The 122nd District Court, Galveston County, Frank Carmona, J., granted temporary injunction and granted summary judgment to association on all claims except its request for attorney fees. Developer appealed and association cross-appealed. The Court of Appeals, Anderson, J., held that: (1) association was not required to show that violations of the restrictions would cause it irreparable injury, as prerequisite to obtaining a permanent injunction; (2) association was entitled to permanent injunction to enforce deed restrictions; (3) developer did not establish affirmative defenses of waiver, estoppel, or laches; and (4) association was entitled to statutory attorney fees.

Affirmed in part and reversed and remanded in part.

West Headnotes (20)

**[1]** **Appeal and Error** ⬥ Injunction

**Appeal and Error** ⬥ Refusing injunction

**Injunction** ⬥ Discretionary Nature of Remedy

**Injunction** ⬥ Commission of crime in general

The grant or refusal of a permanent or temporary injunction is ordinarily within the trial court's sound discretion, and on appeal, review of the trial court's action is limited to the question of whether the action constituted a clear abuse of discretion; however, where the facts conclusively show that a party is violating the substantive law, the trial court should enjoin the violation, and in such case, there is no discretion to be exercised.

10 Cases that cite this headnote

**[2]** **Injunction** ⬥ Grounds in general; multiple factors

Ordinarily, injunctive relief may only be granted upon a showing of (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law.

29 Cases that cite this headnote

**[3]** **Injunction** ⬥ Covenants as to Use of Property

A movant seeking a permanent injunction to enforce a restrictive covenant is not required to show proof of irreparable injury; instead, the movant is only required to prove that the defendant intends to do an act that would breach the restrictive covenant.

11 Cases that cite this headnote

**[4]** **Injunction** 🔑 Covenants as to Use of Property

Homeowners' association seeking to enforce deed restrictions was not required to show that violations of the restrictions would cause it irreparable injury, as prerequisite to obtaining a permanent injunction against developer, where developer purchased the property with full knowledge of the recorded deed restrictions and then promptly violated them.

5 Cases that cite this headnote

**[5]** **Injunction** 🔑 Buildings and other structures

Equities favoring homeowners' association significantly outweighed those favoring developer, and thus, association was entitled to permanent injunction to enforce deed restrictions; developer purchased property with knowledge of recorded restrictions, he admitted that he breached restriction requiring prior approval of building specifications and that he never received approval for setback violations, and when informed of violations and asked to stop construction, he failed to do so and sought an injunction against association, but association repeatedly informed developer of need to comply with restrictions and only instituted legal action when he would not willingly do so.

2 Cases that cite this headnote

**[6]** **Estoppel** 🔑 Nature and elements of waiver

Waiver is the voluntary relinquishment of a known right.

1 Cases that cite this headnote

**[7]** **Covenants** 🔑 Waiver of breach

To establish waiver in a deed restrictions case, the nonconforming user must prove that violations then existing are so great as to lead the mind of the average man to reasonably conclude that the restriction in question has been abandoned and its enforcement waived.

3 Cases that cite this headnote

**[8]** **Covenants** 🔑 Waiver of breach

Among the factors to be considered by the average man to reach reasonable conclusion that a deed restriction has been abandoned and its enforcement waived are the number, nature, and severity of the then existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant.

4 Cases that cite this headnote

**[9]** **Common Interest Communities** 🔑 Restrictions on unit owners
**Common Interest Communities** 🔑 Approval

Homeowners' association's approval of five-foot setbacks on two of developer's lots in subdivision did not waive its right to enforce deed restriction requiring 10-foot setback on a third lot, where developer did not seek requisite approval for third lot, admitted that association did not approve third lot's setback violation, and was put on notice

within 10 days of meeting approving the five-foot setbacks that association would not allow his violation of either the approval or setback restrictions as to third lot.

Cases that cite this headnote

[10]    **Common Interest Communities**  Restrictions on unit owners

In determining whether homeowners' association waived setback deed restriction for subdivision, only alleged violations of setback restriction would be considered, where deed restrictions contained severability clause, providing that waiver of any one of the restrictions would not impair enforceability of remaining restrictions.

1 Cases that cite this headnote

[11]    **Covenants**  Waiver of breach

One violation of setback deed restriction within subdivision was not so great as to lead the mind of the average man to reasonably conclude that the restriction in question had been abandoned and its enforcement waived as to other homes in subdivision.

4 Cases that cite this headnote

[12]    **Common Interest Communities**  Restrictions on unit owners

Developer failed to demonstrate that he changed his position in reliance on actions of homeowners' association, as required to estop association from enforcing setback deed restriction, where his position, which was that he intended to build in violation of the setback restrictions, never changed.

1 Cases that cite this headnote

[13]    **Common Interest Communities**  Limitations and laches

Homeowners' association did not unreasonably delay in asserting its legal right to enforce deed restrictions against developer, precluding developer from asserting laches as an affirmative defense, where attorney for homeowners' association informed developer of need to comply with setback restriction within four weeks of start of construction and brought suit two weeks later when developer refused to do so.

1 Cases that cite this headnote

[14]    **Equity**  Application of doctrine in general

**Estoppel**  Presumptions and burden of proof

Laches, like waiver and estoppel, is an affirmative defense, which defendant has the burden to prove.

4 Cases that cite this headnote

[15]    **Equity**  Prejudice from Delay in General

The two elements of laches are: (1) an unreasonable delay in asserting a legal or equitable right; and (2) a party's good faith change of position to his detriment in reliance upon the delay.

1 Cases that cite this headnote

**[16]**   **Equity**   What constitutes unreasonable delay in general

When a party takes no steps to enforce its known rights until the other party has, in good faith, so changed its position that it cannot be restored to its former state, the delay becomes inequitable and may estop the assertion of the right.

1 Cases that cite this headnote

**[17]**   **Equity**   Delay short of statutory period

As a general rule, laches does not bar a plaintiff's suit before the statute of limitations has run unless estoppel or extraordinary circumstances are present.

Cases that cite this headnote

**[18]**   **Equity**   Acquiescence

Laches does not apply where the defendant has acted in open and known hostility to a plaintiff's rights and has not been misled by the plaintiff's apparent acquiescence.

Cases that cite this headnote

**[19]**   **Common Interest Communities**   Costs and attorney fees

Homeowners' association, as prevailing party in an action to enforce deed restrictions against developer, was entitled by statute to its reasonable attorney fees. V.T.C.A., Property Code § 5.006.

2 Cases that cite this headnote

**[20]**   **Costs**   Duties and proceedings of taxing officer

Issue of whether attorney fees are authorized in a particular case is a question of law to be determined by the court; however, the determination of the amount to be awarded as reasonable attorney fees is a question of fact to be determined by the trier of fact.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*847** William D. Vaughn, Kenneth J. Bower, Galveston, for appellants.

Charles A. Daughtry, Shannon L. Burke, Houston, for appellees.

Panel consists of Justices ANDERSON, FROST and EVANS.

# O P I N I O N

JOHN S. ANDERSON, Justice.

This is an appeal from a summary judgment involving deed restrictions. Appellants, Rutherford Investments Inc. and Jim Rutherford, individually (Rutherford), appeal the trial court's grant of appellee's, Terramar Beach Community (Terramar),

motion for summary judgment. The trial court granted Terramar's summary judgment, permanently enjoining Rutherford from violating deed restrictions in the future in Terramar Beach subdivision. Terramar also cross-appeals the trial court's denial of reasonable attorney's fees. We affirm in part and reverse and remand in part.

## I.

### Factual Background

Rutherford is a real estate developer who purchased twenty-seven of the fifty-four lots in Section 6 in the Terramar Beach subdivision on Galveston Island for $1.8 million. The lots Rutherford purchased in Section 6 were subject to deed restrictions requiring, among other things, that all buildings be set back ten feet from the property side lines and that no building shall be erected until the Terramar Beach Association Architectural Control Committee had approved the construction plans. It is uncontroverted that Rutherford knew of these restrictions and failed to follow them.

On January 10, 1998, two days prior to commencing construction, Rutherford attended a general Terramar Association meeting and introduced himself and his plans for development to the association. **\*848** Although he did not have the required specifications, he told the group about his plans, and also told them he was not required to follow the deed restrictions in his section because "it states in the deed restriction that 100% of the property owners on that section right there can really do whatever they want to do. We can voluntarily withdraw from the ceremony." Based on these representations, the committee approved Rutherford's plans for two homes (Lots 8 and 9) that violated the setback restriction; however, the committee did not approve the construction plans for a third home (Lot 7) that violated the restriction. Rutherford's construction of this third home and his proposed construction of other homes in the subdivision form the basis of this suit.

## II.

### Procedural History

On January 20, 1998, ten days after the association meeting, the Architectural Control Committee chairman, Gordon Hopkins, told Sherman Eagleton, Rutherford's foreman, that the plans for Lot 7 would have to comply with the setback restriction. On February 5, 1998, the association's legal counsel wrote to Rutherford, reminding him that the lots were still subject to the setback requirements and that he needed approval by the Architectural Control Committee before beginning construction. Following these encounters, Rutherford contacted his attorney and refused to halt construction. Therefore, on February 18, 1998, Terramar filed suit in district court seeking temporary and permanent injunctions to enforce the deed restrictions. Rutherford answered, counterclaiming based on wrongful injunction and asserting the affirmative defenses of waiver, laches, estoppel, and fraud. Rutherford also sought his own injunction against Terramar to "keep it from interfering in the construction of the remaining residential homes in the development."

The district court granted Terramar's motion for temporary injunction, finding it likely that Terramar would prevail in its suit for a permanent injunction. Terramar then moved for summary judgment as to all of its claims against Rutherford, Rutherford's affirmative defenses, Rutherford's counterclaim, and its own reasonable attorney's fees. The trial court partly granted Terramar's motion, permanently enjoining Rutherford from further violations of the subdivision's deed restrictions, denying Rutherford's counterclaim, and rejecting Rutherford's affirmative defenses. The trial court, however, denied Terramar's summary judgment motion for recovery of attorney's fees. On appeal, Rutherford challenges the trial court's grant of Terramar's summary judgment, and Terramar contests the trial court's denial of its attorney's fees.

**III.**

**Permanent Injunction Summary Judgment**

**A. Standards of Review**

 **[1]**    The grant or refusal of a permanent or temporary injunction is ordinarily within the trial court's sound discretion, and on appeal, review of the trial court's action is limited to the question of whether the action constituted a clear abuse of discretion. *See Priest v. Texas Animal Health Com'n,* 780 S.W.2d 874, 875 (Tex.App.—Dallas 1989, no writ). However, where the facts conclusively show that a party is violating the substantive law, the trial court should enjoin the violation, and in such case, there is no discretion to be exercised. *See id.* at 876.

The standard of review becomes more complex when the permanent injunction is issued by the trial court's grant of a motion for summary judgment. A trial court may render summary judgment only if the pleadings, depositions, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c);    **\*849**    *see also Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, we indulge every reasonable inference in favor of the non-movant and resolve any doubts in his favor. *See O'Bryant v. Century 21 South Central States, Inc.,* 899 S.W.2d 270, 271 (Tex.App.—Houston [14th Dist.] 1995, no writ). If the movant's motion and summary judgment proof facially establish his right to judgment as a matter of law, then the burden shifts to the non-movant to raise fact issues precluding summary judgment. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). Moreover, if the non-movant relies on an affirmative defense to defeat summary judgment, he must present summary judgment proof sufficient to raise a fact issue as to each element of that defense. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). With both standards of review in mind, we turn to the propriety of the trial court's issuance of the permanent injunction.

**B. Permanent Injunction Elements**

 **[2]**    **[3]**    **[4]**    On appeal, Rutherford complains the trial court erred in permanently enjoining his construction because Terramar has not demonstrated his violations of the deed restrictions will cause irreparable injury. Ordinarily, injunctive relief may only be granted upon a showing of (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law. *See Priest,* 780 S.W.2d at 875. However, when the basis of the suit is enforcement of deed restrictions, the elements differ slightly. In *Munson v. Milton,* the court held "a movant seeking a temporary injunction to enforce a restrictive covenant is not required to show proof of irreparable injury." 948 S.W.2d 813, 815 (Tex.App.—San Antonio 1997, pet. denied). Instead, the movant is only required to prove that the defendant intends to do an act that would breach the restrictive covenant. *See id.* Although *Munson* involved a temporary rather than a permanent injunction, we believe the rule applied in *Munson* also applies here. *See Tien Tao Ass'n v. Kingsbridge Park Community Ass'n, Inc.,* 953 S.W.2d 525, 529–530 (Tex.App.—Houston [1st Dist] 1997, no pet.) (holding a party must substantially violate a deed restriction before the trial court may issue a permanent injunction); *see also Gigowski v. Russell,* 718 S.W.2d 16, 21 (Tex.App.—Tyler 1986, writ ref'd n.r.e.) (citing *Protestant Episcopal Church Council v. McKinney,* 339 S.W.2d 400, 403–04 (Tex.Civ.App.—Eastland 1960, writ ref'd) for proposition that a well-settled exception in restrictive covenant cases allows issuance of a permanent injunction where a distinct or substantial breach is shown without regard to damages or irreparable injury).

The deed restrictions for Section 6, at issue here, were duly recorded with the County Clerk of Galveston County in 1969. It is undisputed that Rutherford purchased the lots with full knowledge of the setback and prior approval of building specifications deed restrictions. Because he purchased the property with knowledge of the recorded deed restrictions and then promptly violated the restrictions, the additional burden should not be upon Terramar to demonstrate irreparable injury. Thus, Rutherford's contention that Terramar has not demonstrated irreparable injury has no effect on our analysis. *See Tien Tao,* 953 S.W.2d at 529–30; *see also Munson,* 948 S.W.2d at 816.

## C. Application of Law to Facts

**[5]** The trial court's issuance of a permanent injunction was proper. First, Terramar's summary judgment proof demonstrates Rutherford substantially breached the setback and prior approval of building specifications deed restrictions. Rutherford admitted he never received approval for the setback violations for Lot 7. Further, the record clearly demonstrates the home Rutherford built on Lot 7 has side **\*850** setback lines seven and one-half feet from the edges of the lot, thereby violating the ten foot setback restriction by two and one-half feet. The record also demonstrates that when asked to stop construction on Lot 7 because of deed restriction violations, Rutherford did not stop. Instead, he contacted his attorney and sought his own injunction to enjoin Terramar from impeding his construction in the future. Moreover, Terramar submitted evidence that demonstrates Rutherford's activities were considered substantial breaches of the deed restrictions by homeowners and board members. *See Tien Tao,* 953 S.W.2d at 531 (noting association's perception of the violation as "substantial" constituted evidence of substantial breach).

Second, a balance of the equities demonstrates that those favoring Terramar significantly outweigh any equities favoring Rutherford. *See Beere v. Duren,* 985 S.W.2d 243, 247 (Tex.App.—Beaumont 1999, pet. denied) (citing rule from *Cowling v. Colligan,* 158 Tex. 458, 312 S.W.2d 943, 945–46 (1958) regarding the necessity of balancing the equities when enforcing restrictive covenants). As discussed, Rutherford purchased the property with knowledge of the restrictions. At the meeting, he represented he did not have to follow the deed restrictions. Finally, when informed his property was subject to the deed restrictions, he refused to halt construction and sought an injunction to keep Terramar at bay. By contrast, Terramar consulted its legal counsel following the meeting and repeatedly informed Rutherford he needed to comply with the existing deed restrictions. Further, when it became apparent Rutherford would not willingly comply, Terramar instituted legal action to force him into compliance with the deed restrictions. Thus, the equities of enforcing the deed restrictions favor Terramar.

Based on this evidence, Terramar conclusively proved its entitlement to summary judgment as a matter of law. Therefore, the trial court did not abuse its discretion by permanently enjoining Rutherford from violating the Terramar Beach deed restrictions.

## IV.

## Affirmative Defenses

On appeal, Rutherford also challenges the trial court's grant of Terramar's motion for summary judgment based on his affirmative defenses. Rutherford insists there are fact issues to be resolved concerning three of his asserted defenses: waiver, estoppel, and laches. [1] Because Terramar moved for a Rule 166a(i) no-evidence summary judgment as to Rutherford's affirmative defenses, we will review the trial court's grant as we would a directed verdict. *See Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied); *see also Judge David Hittner and Lynne Liberato, No–Evidence Summary Judgments Under the New Rule,* in STATE BAR OF TEXAS PROF. DEV. PROGRAM, 20 ADVANCED CIVIL TRIAL D, D–5 (1997). The trial court may not grant a no-evidence summary judgment if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i); *see also Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The relevant inquiry is whether the non-movants asserting an affirmative defense have raised a fact issue upon each element **\*851** of that defense by evidence which would be admissible upon the trial of the case. *See Finkelstein v. Southampton Civic Club,* 675 S.W.2d 271, 278 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). We will begin our analysis with the affirmative defense of waiver.

## A. Waiver

**[6]** **[7]** **[8]** Waiver is the voluntary relinquishment of a known right. *See Finkelstein,* 675 S.W.2d at 278. To establish waiver in a deed restrictions case, the nonconforming user must prove that violations then existing are so great as to lead the mind

of the "average man" to reasonably conclude that the restriction in question has been abandoned and its enforcement waived. *See New Jerusalem Baptist Church, Inc. v. City of Houston,* 598 S.W.2d 666, 669 (Tex.Civ.App.—Houston [14th Dist.] 1980). Among the factors to be considered by the "average man" are the number, nature, and severity of the then existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant. *See id.*

**[9]** First, Rutherford argues that Terramar waived its setback deed restriction as to Lot 7 when it approved his five foot setbacks on Lots 8 and 9. Based on his assertions, our inquiry is whether an average person could reasonably conclude that based on the prior approvals, Terramar had abandoned its setback and approval restrictions. However, Rutherford admitted that although Terramar approved Lots 8 and 9, he knew Terramar did not approve the Lot 7 setback violation. In fact, Rutherford admitted he did not submit the required specifications in order to obtain approval for Lot 7. Further, within ten days of the association meeting, Rutherford was on notice that Terramar would not allow his violation of either the approval or setback restrictions as to Lot 7. [2]

**[10]** Second, Rutherford claims Terramar waived its setback restriction because four other homes in Section 6 of the subdivision violate the deed restrictions. [3] However, the deed restrictions in question contain a severability clause, stating "[t]he invalidity, violation, abandonment or waiver of any one or more of or any part of the Restrictions shall in no wise affect or impair the remaining Restrictions or parts therof which shall remain in full force and effect." Therefore, we will not consider the alleged waiver of deed restrictions other than side setback violations in our analysis of the setback restriction. *See Tanglewood Homes Ass'n v. Henke,* 728 S.W.2d 39, 41–42 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Thus, the only support for Rutherford's waiver argument is the evidence of one other setback violation in Section 6.

In *Tanglewood,* the court was faced with five violations of a certain deed restriction which the appellees, in violation of that restriction, argued was abandoned. The court adverted to this court's analysis of the issue of waiver of deed restrictions in **\*852** *New Jerusalem Baptist Church,* 598 S.W.2d at 669. This court in *New Jerusalem* stated that to establish the affirmative defense of waiver in a deed restriction case, the non-conforming user must prove that the violations then existing are so great as to lead the average man to conclude the restriction in question had been abandoned and its enforcement waived. *See id.* Among the factors to be considered by the average man are the number, nature, and severity of the then existing violations, any prior acts of enforcement, and whether it is still possible to realize the benefits intended through the covenant. *See id.*

**[11]** In *New Jerusalem* this court held that four non-conforming uses within the subdivision did not constitute abandonment of the restrictions. *See id.* Similarly, in *Tanglewood,* the court held that five violations of the main residence restriction were insufficient in number, nature and severity to constitute a waiver of the restrictive covenant's benefits. *See Tanglewood,* 728 S.W.2d at 44. Here, because Rutherford points to only one violation of the side setback restriction, we hold that one violation is not so great as to lead the mind of the average man to reasonably conclude that the restriction in question had been abandoned and its enforcement waived. *See New Jerusalem,* 598 S.W.2d at 669.

## B. Estoppel

Estoppel has been defined as follows:

> the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

**[12]** *Finkelstein,* 675 S.W.2d at 278. Estoppel does not apply in this case primarily because Rutherford presented no evidence that he changed his position regarding the setback violations on Lot 7 based on Terramar's conduct.

At the meeting, Rutherford announced he intended to begin construction on Lot 7 in two days. His plans demonstrated a violation of the setback restriction at the time of the meeting and at all times thereafter. Thus, Rutherford cannot demonstrate he *changed* position in reliance on Terramar's actions when his position, the violation of the setback restrictions, never *changed.* Having failed to present more than a scintilla of probative evidence as to each element of estoppel, Rutherford may not rely on this affirmative defense. We now address Rutherford's final defense, laches.

## C. Laches

 [13]    [14]    [15]    [16]    [17]    [18]    Laches, like waiver and estoppel, is an affirmative defense, [4] which Rutherford had the burden to prove. *See Caldwell v. Barnes,* 975 S.W.2d 535, 538 (Tex.1998); *see also City of Houston v. Muse,* 788 S.W.2d 419, 422 (Tex.App.—Houston [1st Dist.] 1990, no writ). The two elements of laches are: (1) an unreasonable delay in asserting a legal or equitable right; and (2) a good faith change of position by Rutherford to his detriment in reliance upon the delay. *See Muse,* 788 S.W.2d at 422. When a party takes no steps to enforce its known rights until the other party has, in good faith, so changed its position that it cannot be restored to its former state, the delay becomes inequitable and may estop the assertion of the right. *See Id., see also Culver v. Pickens,* 142 Tex. 87, 91, 176 S.W.2d 167, 170–71 (1943). As a general rule, laches does not bar a plaintiff's suit before the statute of limitations has run unless estoppel or "extraordinary circumstances" are present. *See Green v. Parrack,* 974 S.W.2d 200, 204 (Tex.App.—San Antonio 1998, no pet.). **\*853** Moreover, laches does not apply where the defendant has acted in open and known hostility to a plaintiff's rights and has not been misled by the plaintiff's apparent acquiescence. *See Muse,* 788 S.W.2d at 423.

Here, there are no extraordinary circumstances, and as previously discussed, no estoppel is present. Rutherford began construction on Lot 7, without the requisite approval, on January 12, 1998. Terramar's legal counsel wrote him a letter discussing his compliance with the setback restriction on February 5, 1998. When Rutherford refused to halt construction or comply with the restriction, Terramar filed suit on February 18, 1998. Therefore, Terramar did not unreasonably delay in asserting its legal right to enforce the restrictions. Thus, Rutherford has not met his burden of bringing forth more than a scintilla of probative evidence as to both elements of laches. Because Rutherford failed to adequately support each element of his affirmative defenses, the trial court correctly granted Terramar's no-evidence summary judgment. Accordingly, we affirm that portion of the trial court's judgment.

## V.

## Attorney's Fees

 [19]    [20]    Finally, Terramar cross-appeals the trial court's denial of attorney's fees. Terramar appeals this portion of the trial court's order asserting that reasonable attorney's fees are mandated by the property code for the prevailing party in an action to enforce deed restrictions. *See TEX. PROP.CODE ANN. § 5.006(a)* (Vernon 1984); *see also Beere,* 985 S.W.2d at 249. We agree with Terramar, inasmuch as the issue of whether attorney's fees are authorized in a particular case is a question of law to be determined by the court. *See id.* However, the determination of the amount to be awarded as reasonable attorney's fees is a question of fact to be determined by the trier of fact. *See id.* Here, the trial court should have awarded reasonable attorney's fees. Therefore, the trial court erred by refusing to award attorney's fees to Terramar, the prevailing party. However, the award, if any, must be supported by competent evidence. *See id.* Although Terramar claims attorney's fees in the amount of $25,000 at the trial level, $10,000 at the intermediate appellate level, and $7,500 if the case is appealed to the Texas Supreme Court, section 5.006 only authorizes the award of *reasonable* attorney's fees. That statute also provides the trial court with four factors to consider in its determination of reasonable attorney's fees. [5] Terramar submitted evidence of all factors for the court to consider except evidence relating to the time and labor factors. Because the amount of fees is a fact question, we remand this case to

the trial court to award Terramar reasonable attorney's fees, based on the factors outlined in section 5.006(b) of the Property Code. Accordingly, we sustain Terramar's cross-point on appeal.

## VI.

### Conclusion

We affirm the trial court's judgment permanently enjoining Rutherford from violating Terramar Beach's deed restrictions in the future. We likewise affirm the trial court's grant of Terramar's motion for a no-evidence summary judgment as to Rutherford's affirmative defenses of waiver, estoppel, and laches. However, we reverse the trial court's denial of attorney fees for Terramar, the prevailing party in this suit to enforce deed restrictions, and remand this case to the trial court for **\*854** further proceedings consistent with this opinion.

**All Citations**

25 S.W.3d 845

Footnotes

1       Rutherford also raised the affirmative defense of fraud at trial. However because he has not challenged the summary judgment's denial of that claim on appeal, we do not reach the issue of whether he brought forth more than a scintilla of evidence on each element of fraud so as to defeat Terramar's no evidence summary judgment on Rutherford's affirmative defenses.

2       Arguably, Rutherford was on notice seven days after the meeting that the approval restriction was still in force because his foreman, Sherman Eagleton, signed and returned the "Important Notice to All Terramar Property Owners and Builders Requirements to Build." This document was submitted with the application fee to the Association. The Notice states: (1) that two complete plans with specifications "shall" be furnished to the Architectural Control Committee; (2) that the plans are subject to approval by the Committee; (3) that violation of these requirements "shall be sufficient cause for legal process against owner, builder, and contractor;" (4) that plan approval is required fifteen days prior to start of construction, and (5) that the Architectural Chairman "shall have the owner to halt construction if requirements are not met." Rutherford admitted Eagleton, as his agent, had authority to sign this agreement and bind him.

3       In support of his waiver argument, Rutherford submitted the affidavit of David Watson. Watson noted numerous deed restriction violations in Sections 3, 4, 6, and the Marina, but only one setback violation in Section 6.

4       *See* TEX.R. CIV. P. 94.

5       "To determine reasonable attorney's fees, the court shall consider:
          (1) the time and labor required;
          (2) the novelty and difficulty of the questions;
          (3) the expertise, reputation, and ability of the attorney; and
          (4) any other factor."
       TEX. PROP.CODE ANN. § 5.006(b) (Vernon 1984).

---

**End of Document**                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

946 S.W.2d 124
Court of Appeals of Texas,
Austin.

Nirvana KEIGHTLEY and Glen Keightley, Individually and as
next friends of Glena and William Keightley, Minors, Appellants,

v.

REPUBLIC INSURANCE COMPANY, Appellee.

No. 03–96–00073–CV.   |   May 8, 1997.   |   Rehearing Overruled June 19, 1997.

Insured assigned his causes of action against insolvent insurer's reinsurer to third parties who had recovered judgment against him in excess of policy limits. The 126th Judicial District Court, Travis County, Suzanne Covington, J., dismissed causes of action against reinsurer, which had assumed insurer's claims handling when insurer began to experience financial difficulties. Judgment creditors appealed. The Court of Appeals, Powers, J., held that: (1) insured had statutory cause of action against reinsurer for unfair or deceptive acts or practices in business of insurance; (2) insured did not have cause of action for violation of Deceptive Trade Practices Act absent privity of contract; (3) insured did not have claim for breach of duty of good faith and fair dealing; and (4) insured had claim for negligence or gross negligence.

Reversed and remanded.

West Headnotes (12)

**[1]**    **Appeal and Error**  &#128273; Contentions Other Than Those Made on the Hearing

Assignment of error raised for first time in motion for rehearing in Court of Appeals is too late to be considered, unless error can be classified as fundamental.

1 Cases that cite this headnote

**[2]**    **Appeal and Error**  &#128273; Contentions Other Than Those Made on the Hearing

Intervening case law invalidating assignments of causes of action against insurer could not be raised for first time on motion for rehearing on appeal where retroactive effect of such invalidation was limited to assignments to which objection had been preserved.

Cases that cite this headnote

**[3]**    **Insurance**  &#128273; Settlements by Reinsurer

Insured could maintain statutory cause of action for "unfair or deceptive practices" in business of insurance against reinsurer who took over insurer's claims handling, notwithstanding lack of privity of contract; privity was not stated element of claim under statute, which explicitly defined standing in terms of any person sustained actual damages. V.A.T.S. Insurance Code, art. 21.21, § 16(a).

1 Cases that cite this headnote

**[4]**    **Antitrust and Trade Regulation**  &#128273; Goods or Services

**Antitrust and Trade Regulation** 👈 Private Entities or Individuals

Insured could not maintain cause of action under Deceptive Trade Practices Act against reinsurer which took over insurer's claims handling when insurer began to experience financial difficulties; insured did not purchase or lease goods or services from reinsurer and was not intended beneficiary of reinsurance contract. V.T.C.A., Bus. & C. § 17.45(4); V.A.T.S. Insurance Code, art. 21.21, § 16(a).

1 Cases that cite this headnote

[5] **Contracts** 👈 Privity of Contract in General

Absent privity of contract, duty of good faith and fair dealing does not arise.

Cases that cite this headnote

[6] **Insurance** 👈 Settlements by Reinsurer

Insured did not have cause of action for breach of duty of good faith and fair dealing against reinsurer that took over insurer's claims handling when insurer began to suffer financial difficulties, given lack of privity of contract necessary to support action.

2 Cases that cite this headnote

[7] **Insurance** 👈 Settlements by Reinsurer

Insured did not have *Stowers* claim for breach of duty of ordinary care in settlement of third-party claims against reinsurer that took over insurer's claims handling, in that insured was not party to any contract with reinsurer.

1 Cases that cite this headnote

[8] **Negligence** 👈 Voluntarily Assumed Duties

Law places duty of ordinary care upon any person who voluntarily enters upon affirmative course of action affecting another's interest.

2 Cases that cite this headnote

[9] **Insurance** 👈 Settlements by Reinsurer

Insured would have causes of action for negligence and gross negligence against reinsurer in failing to settle third party's liability claims if reinsurer affirmatively undertook course of action, not required by law or contract, in assuming insurer's claims handling duties and thereby assumed legal duty to act with ordinary care.

1 Cases that cite this headnote

[10] **Insurance** 👈 Settlements by Reinsurer

Insured was not barred from recovering consequential damages based on reinsurer's wrongful conduct in performing claims handling duties under insured's policy with insurer by injunction in insolvent insurer's receivership proceeding requiring reinsurer to pay any amounts due under reinsurance contracts to receiver.

Cases that cite this headnote

**[11]**　　**Estoppel** 🔑 Nature and Application of Estoppel in Pais

　　　　**Estoppel** 🔑 Nature and Elements of Waiver

"Waiver" and "estoppel" are not causes of action because they cannot create liability in and of themselves.

Cases that cite this headnote

**[12]**　　**Appeal and Error** 🔑 Judgment

Plaintiffs who did not raise waiver and estoppel in opposition to defendant's summary judgment motion could not, on appeal, claim error in entry of summary judgment against them based on their pleading waiver and estoppel in complaint.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*126** Ellen Malow, Hagood & Malow, L.L.P., Alvin, for Appellants.

Dean A. Schaffer, Fulbright & Jaworski, L.L.P., Austin, for Appellee.

Before POWERS, ABOUSSIE and JONES, JJ.

**Opinion**

POWERS, Justice.

We withdraw our previous opinion and judgment dated March 6, 1997, and issue the following in order to address matters raised by Republic Insurance Company in its motion for rehearing.

**[1]** **[2]** Fred W. Morish assigned to Nirvana and Glen Keightley causes of action Morish claimed against Republic Insurance Company. [1] The Keightleys sued Republic on each cause of action and appeal now from a summary judgment that they take nothing. We will reverse the judgment in part, affirm the remainder, and remand the cause to the trial court for proceedings not inconsistent with this opinion.

We believe our discussion will be more easily understood if we generally refer to Morish as if he had been the plaintiff in the court below and refer to the Keightleys only where required for clarity.

### THE CONTROVERSY

National County Mutual Fire Insurance Company issued a liability-insurance policy to Morish. The policy was among several that National County reinsured with Republic. In October 1987, owing to National County's financial difficulties, Republic began to administer the reinsured policies. This lasted until October 1988 when a court-appointed receiver took over National County's affairs and property. *See* Tex.Ins.Code Ann. art. 21.28–C (West Supp.1997). The Keightleys recovered a judgment against Morish in excess of the limits of his National County policy.

Morish sued Republic on causes of action allegedly arising from Republic's refusal to settle, within policy limits, on terms offered by the Keightleys between October 1987 and October 1988—the period when Republic administered the Morish policy

before the receivership proceeding. The causes of action were as follows (1) a statutory cause of action under article 21.21, section 16(a), of the Texas Insurance Code, for unfair and deceptive acts or practices in the business of insurance; (2) a statutory cause of action under the Texas Deceptive Trade Practices Act, Texas Business and Commerce Code, section 17.46(a), for false, misleading, or deceptive acts or practices in the conduct of commerce; [2] (3) a common law cause of action for Republic's breach of a duty of good faith and fair dealing owed Morish; and (4) a common law cause of action for Republic's negligence **\*127** and gross negligence in failing to settle the Keightleys' claim within policy limits.

It is undisputed in the summary judgment record that Morish was not a party to the reinsurance contract between Republic and National County nor any other contract with Republic. The basis for Morish's claims is Republic's alleged conduct during October 1987—October 1988 in relation to the National County policy, as that conduct is set out in the summary judgment record: with the knowledge and consent of National County, Republic assigned a claims manager to manage the Morish claim and other claims against National County insureds; dealt directly with National County's defense counsel; investigated, evaluated, negotiated, and settled such claims; employed independent insurance adjusters and lawyers in defending the claims and paid attendant litigation expenses; exercised settlement authority over the claims; and established and funded a bank account in National County's name. The summary judgment record includes the affidavit of John W. Berkel, an attorney engaged to defend Morish against the Keightleys' claim. Berkel swore that Republic "took over the duties and responsibilities with regard to settlement authority and claims adjusting ... prior to the time National County went into receivership;" and, that Republic paid Berkel's fees and expenses directly and issued drafts against a National County bank account that were signed by a Republic employee.

Republic moved for summary judgment on the following grounds: (1) Morish had no claim against Republic on the reinsurance contract because he was not a party to it; (2) in the absence of a contractual relationship between Republic and Morish, he had "no standing to assert any statutory or common law causes of action against Republic," specifically "no standing to assert any claim for common law bad faith claims handling, for any violation of the DTPA or for any violation of the Insurance Code;" and (3) "Republic had a reasonable basis for denying any obligation" to pay the Keightleys' claims against Morish because an injunction issued in the receivership proceeding prohibited such payment.

The summary judgment ordered by the trial court does not specify the ground or grounds upon which the court rendered judgment as a matter of law. We must therefore examine the summary judgment record, in relation to each of the causes of action pleaded, under the familiar rules applicable to such judgments on appeal. *See Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *Johnston v. American Cometra, Inc.,* 837 S.W.2d 711, 714 (Tex.App.—Austin 1992, writ denied).

Under point of error one, the parties join issue on whether the judgment below is erroneous with respect to Morish's four causes of action, which we shall discuss in order.

### STATUTORY CAUSES OF ACTION

Article 21.21, section 16(a), of the Insurance Code creates and authorizes a statutory cause of action in the following terms:

> Any person who has sustained actual damages caused by another's engaging in an act or practice declared in Section 4 of this Article to be ... unfair or deceptive acts or practices in the business of insurance *or* in any practice specifically enumerated in a subdivision of Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices.

Tex.Ins.Code Ann. art. 21.21, § 16(a) (West Supp.1997) (emphasis added). Morish alleged causes of action against Republic for "unfair or deceptive acts or practices in the business of insurance" *and* for a "practice specifically enumerated in a subdivision of Section 17.46(b)" of the Business and Commerce Code, a part of the Deceptive Trade Practices Act.

 **[3]**    We conclude Republic was not entitled to judgment as a matter of law respecting Morish's cause of action for "unfair or deceptive practices in the business of insurance." Article 21.21, section 16(a), states the requisite elements for the statutory cause of action: (1) actual damages (2) sustained by any person and (3) caused by another's engaging **\*128** in an act or practice (4) declared unfair or deceptive in section 4 of the article. Privity of contract is not a stated element. Instead, the statute explicitly defines standing in terms of any person sustaining actual damages caused by another's engaging in an unfair or deceptive act or practice described in article 21.21. The statutory elements are *exclusive;* we may not add to them the element of contractual privity. *See Mingus v. Wadley,* 115 Tex. 551, 285 S.W. 1084, 1087 (1926). We hold erroneous and reverse this part of the judgment below. We sustain point of error one in that respect. [3]

 **[4]**    We believe Republic was entitled to judgment as a matter of law respecting Morish's cause of action based upon an alleged violation of the Deceptive Trade Practices Act as that statute is incorporated in article 21.21, section 16(a), of the Texas Insurance Code. The statutory cause of action is available only to "consumers," a word defined as a person who acquires goods or services "by purchase or lease." *See* Tex.Bus. & Com.Code Ann. § 17.45(4) (West Supp.1997); *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995). Morish did not *purchase* or *lease* goods or services from Republic. May "consumer" status be imputed to him nevertheless because of his "relationship" to the reinsurance contract between Republic and National County? *See Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 352 (Tex.1987). We believe not. The reported decisions establish that the qualifying "relationship" is one of *intended beneficiary* under a contract between others. [4]   That is to say, the circumstances must justify a conclusion that the contracting parties *intended* that the stranger have the use and benefit of the goods or services furnished under the contract. *See, e.g., Kitchener v. T.C. Trailers, Inc.,* 715 F.Supp. 798 (S.D.Tex.1988); *see also Brandon v. American Sterilizer Co.,* 880 S.W.2d 488, 492 (Tex.App.—Austin 1994, no writ); *Lara v. Lile,* 828 S.W.2d 536, 541–42 (Tex.App.—Corpus Christi 1992, writ denied); *Rodriguez v. Ed Hicks,* 767 S.W.2d 187, 191 (Tex.App.—Corpus Christi 1989, no writ). The reinsurance contract between Republic and National County is included in the summary judgment record. We find in its terms nothing to indicate that Morish was an intended beneficiary. We hold, therefore, that the trial court did not err in its summary judgment respecting Morish's statutory cause of action based upon the Deceptive Trade Practices Act. We overrule in this respect point of error one.

**COMMON LAW CAUSES OF ACTION**

 **[5]**    **[6]**    We conclude the trial court did not err in awarding Republic judgment as a matter of law on Morish's cause of action for breach of a common law duty of good faith and fair dealing. Absent privity of contract, the duty does not arise. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 697–98 (Tex.1994). We overrule point of error one in this respect and turn to Morish's claimed causes of action for negligence.

 **[7]**    Morish alleged that Republic breached a duty of ordinary care in the settlement **\*129** of the Keightley's claims. That is, of course, a duty that an insurer owes an insured—a duty imputed to their insurance contract. *See G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 547 (Tex.Comm'n App.1929, holding approved). Morish was not an insured under any contract to which Republic was also a party as an insurer. Morish, therefore, cannot have a *Stowers* claim against Republic.

 **[8]**    **[9]**    There is, however, a more general rule made applicable to the case by the pleadings and the remainder of the summary judgment record: the law places a duty of ordinary care upon any person who voluntarily enters upon an affirmative course of action affecting another's interest. *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983); *Colonial Savings Ass'n v. Taylor,* 544 S.W.2d 116, 120 (Tex.1976); *State Farm Fire & Casualty Co. v. Gandy,* 880 S.W.2d 129, 136 (Tex.App.—Texarkana 1994, no writ), *reversed on other grounds* 925 S.W.2d 696 (Tex.1996). Morish's pleadings alleged and the summary judgment

record substantiated prima facie that Republic affirmatively undertook a particular course of action, not required by law or contract, that affected Morish's interests. If the allegations are ultimately established, Republic voluntarily assumed a legal duty to act in such matters with ordinary care. Nothing in the summary judgment record defeats as a matter of law Morish's cause of action for negligence in that regard. We hold Republic was not entitled to judgment as a matter of law respecting Morish's causes of action based upon allegations of negligence and gross negligence; and we sustain in this respect point of error one.

In its motion for rehearing, Republic argues against our holding on a theory that Morish's sole cause of action for negligence is a *Stowers* claim—a claim we have stated Morish does not have because he was not Republic's insured. In support of Republic's theory, it cites *Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc.,* 938 S.W.2d 27 (Tex.1997). *Head* does not suggest the theory Republic imputes to the decision. *Head* hold that an *insured* is adequately protected against his liability *insurer's* mishandling of a claim against the insured by the duties imposed upon the insurer in the insurance contract, augmented by the *Stowers* doctrine; consequently it is unnecessary to impose upon the insurer an additional common law duty of good faith and fair dealing in handling such a claim. *Head,* 938 S.W.2d at 28–29. Both *Head* and *Stowers* deal with common law duties arising expressly or by implication from the *contract relationship of insurer and insured. See G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 547 (Tex.Comm'n App.1929). Our holding, in contrast, does not derive from such a relationship. Our holding derives instead from the relationship created when one undertakes, gratuitously or for his own benefit, an affirmative course of action that affects the interest of another. Upon that relationship, the supreme court in *Otis Engineering* and *Colonial Savings* has fixed a duty in the actor to conduct his undertaking with ordinary care. We adhere to our holding that the summary judgment record does not defeat, as a matter of law, the Keightley's cause of action based on such a duty.

### REPUBLIC'S AFFIRMATIVE DEFENSE

 **[10]**    Republic contended in its motion for summary judgment that it could not pay the Keightleys' claims against Morish because Republic was legally required by the injunction order, issued in the receivership proceeding, to pay the receiver any sums owed by Republic under the reinsurance contract. Presumably, the defense referred to all the actions pleaded against Republic. The pleadings disclose, however, that the Keightleys did not allege a cause of action to recover sums owed under Republic's reinsurance contract. Instead, they sued on Morish's causes of action for consequential damages allegedly caused by Republic's wrongful *conduct* in relation to Morish's insurance contract with National County; moreover, they alleged that such conduct occurred before the receivership proceeding began and before the injunction was issued. We hold Republic was not entitled to judgment as a matter of law, on its affirmative defense, as to Morish's common law causes of action for negligence **\*130**  or gross negligence and his statutory cause of action under article 21.21, section 16(a), of the Texas Insurance Code, for unfair or deceptive acts or practices in the business of insurance. We need not discuss Republic's affirmative defense in relation to Morish's other causes of action because we have rejected them on other grounds stated previously.

### INSUFFICIENCY OF REPUBLIC'S MOTION FOR SUMMARY JUDGMENT

In point of error two, the Keightleys complain that Republic's motion for summary judgment did not attack their "causes of action" for negligence, gross negligence, waiver, and estoppel as set out in their petition. We have previously discussed the causes of action for negligence and gross negligence and need not refer to them again.

 **[11]**   **[12]**   "Waiver" and "estoppel" are not causes of action because they cannot create liability in and of themselves. *See Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988). The Keightleys did not, in their response to Republic's motion for summary judgment, raise waiver and estoppel in opposition to Republic's contention that it was entitled to judgment as a matter of law. For that reason they may not, on appeal, claim error based alone upon their pleading of waiver and estoppel. *Id.* We hold accordingly and overrule point of error two.

## CONCLUSION

For the reasons given, we reverse the trial court judgment that the Keightleys take nothing by their statutory cause of action for unfair or deceptive acts or practices in the business of insurance, under article 21.21, section 16(a), of the Insurance Code, and their common law causes of action for ordinary and gross negligence. We sever and remand to the trial court those causes of action for proceedings not inconsistent with our opinion. We affirm the remainder of the trial court judgment.

**All Citations**

946 S.W.2d 124

Footnotes

1    In its motion for rehearing Republic challenges for the first time in the cause the validity of the assignment, contending the supreme court recently held that such assignments are void. *See State Farm Fire and Casualty Co. v. Gandy,* 925 S.W.2d 696, 720 (Tex.1996). An assignment of error raised for the first time in a motion for rehearing in the Court of Appeals is too late to be considered, unless the error can be classified as fundamental. *Lone Star Gas Co. v. Sheaner,* 157 Tex. 508, 305 S.W.2d 150, 153 (1959); *Washington v. Walker County,* 708 S.W.2d 493, 497 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Gillen v. Diadrill* 624 S.W.2d 259, 264 (Tex.App.—Corpus Christi 1981, writ dism'd). We may assume the error assigned is not fundamental because the holding in *Gandy* specifically limited its retroactive effect to invalidate only those assignments to which an objection has been preserved. *State Farm Fire and Casualty Co. v. Gandy,* 925 S.W.2d 696, 720 (Tex.1996). We, therefore, overrule Republic's new assignments of error relating to the validity of the assignment.

2    Section 17.46(a) of the Texas Deceptive Trade Practices Act is incorporated in article 21.21, section 16(a) of the Texas Insurance Code.

3    In its motion for rehearing, Republic contends that because article 1.14–1 § 2(b)(2) statutorily exempts the "lawful transaction of reinsurance" from the definition of "business of insurance" we cannot hold Republic liable under article 21.21. *See* Tex.Ins.Code Ann. art. 1.14–1 § 2(b)(2) (West Supp.1997). We do not find this argument persuasive. The supreme court recently analyzed this provision and found that article 1.14–1(2) was enacted *after* article 21.21 and was not intended to alter the scope of the term "business of insurance" as it was used in article 21.21. *Great American Ins. Co. v. North Austin Mun. Utility District No. 1,* 908 S.W.2d 415, 420–423 (Tex.1995). Article 1.14–1 § 2(a) does not evidence the legislature's intention to promulgate a uniform definition of acts which constitute doing an insurance business; rather, they indicate concern that particular parties may escape the jurisdiction of the State Board of Insurance. *Id.* Republic undertook to investigate, adjust, settle, and defend claims against Morish. We believe these actions are encompassed by the term "business of insurance" as used in article 21.21.

4    *See, e.g., Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361 (Tex.1987); *Kennedy v. Sale,* 689 S.W.2d 890, 892 (Tex.1985); *D/FW Commercial Roofing Co. v. Mehra,* 854 S.W.2d 182 (Tex.App.—Dallas 1993, no writ); *Allied Towing Serv. v. Mitchell,* 833 S.W.2d 577 (Tex.App.—Dallas 1992, no writ); *HOW Ins. Co. v. Patriot Fin. Servs. of Tex., Inc.,* 786 S.W.2d 533 (Tex.App.—Austin 1990, writ denied); *Parker v. Carnahan,* 772 S.W.2d 151 (Tex.App.—Texarkana 1989, writ denied); *Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420 (5th Cir.1992).

937 S.W.2d 60
Court of Appeals of Texas,
Houston (14th Dist.).

OPERATION RESCUE–NATIONAL, Rescue America, Dallas Rescue, Philip
L. "Flip" Benham, Bob Jewitt, Keith Tucci, and Don Treshman, Appellants,

v.

PLANNED PARENTHOOD OF HOUSTON AND SOUTHEAST TEXAS, INC., West Loop Clinic,
A–Z Women's Health Services, Downtown Women's Clinic, Houston Women's Clinic, Women's
Pavilion, Women's Medical Center of N.W. Houston, AAA Concerned Women's Center, Aaron's Family
Planning Clinic of Houston, Suburban Women's Clinic, Dr. Jerry Edwards, Dr. Robert P. Kaminsky,
Dr. Doug Karpen, Dr. Bernard Rosenfeld, Dr. John Coleman, and Dr. Adebayo Adesomo, Appellees.

No. 14–95–00363–CV.   |   Dec. 19, 1996.   |   Rehearing Overruled Jan. 23, 1997.

Doctors who performed abortions and ten women's clinics brought action against antiabortion groups and their leaders, seeking injunctive relief and damages in connection with abortion protest activities. The 333rd District Court, Harris County, Eileen O'Neill, Richard Bianchi, JJ., entered judgment on jury verdict finding defendants liable for civil conspiracy, tortious interference, and invasion of privacy and property rights, and awarded actual and punitive damages, as well as permanent injunctive relief. Defendants appealed. The Court of Appeals, Ross A. Sears, J. (Assigned), held that: (1) jury instruction on definition of civil conspiracy, together with damages questions, sufficiently encompassed elements of conspiracy; (2) evidence was sufficient to support injunctive relief granted; (3) permanent injunction did not violate defendants' free speech rights under Federal or State Constitutions; (4) evidence supported award of actual damages in total amount of $204,585; (5) evidence supported awards of punitive damages in total amount of $1,010,000; (6) defendants failed to show surprise by amendment of damages request after jury verdict but before rendition of judgment; (7) amendment of enforcement paragraph in injunction was permissible correction of "clerical error"; (8) trial court had authority to retax costs; and (9) there was no abuse of discretion in permitting plaintiffs to recover their costs.

Affirmed.

Amidei, J., dissented and filed separate opinion.

West Headnotes (79)

**[1]      Appeal and Error**    To verdict, findings, or judgment

Abortion protestors, by failing to allege error in point of error, waived any complaint as to sufficiency of evidence supporting jury's findings that they participated in conspiracy to interfere with business of clinics providing abortion services and that they or their operatives tortiously interfered with clinics' business.

Cases that cite this headnote

**[2]      Appeal and Error**    Necessity of timely objection

By failing to object to trial court's refusal to strike objectionable jurors until after peremptory strikes were made, appellants waived any error.

2 Cases that cite this headnote

**[3]** **Appeal and Error** 🔑 Necessity of timely objection

**Appeal and Error** 🔑 Necessity of Specific Objection

To preserve error in trial court's failure to strike objectionable jurors, complaining party must timely bring its complaint to trial court's attention before making its peremptory challenges; objecting party must specifically inform trial court which objectionable jurors will remain after all peremptory strikes are made, and that notice must be given before actual exercise of strikes.

2 Cases that cite this headnote

**[4]** **Trial** 🔑 Definition or explanation of terms

Trial court has broad discretion in submitting explanatory instructions and definitions.

Cases that cite this headnote

**[5]** **Appeal and Error** 🔑 Necessity of objection in general

**Appeal and Error** 🔑 Necessity of timely objection

**Appeal and Error** 🔑 Necessity of Ruling on Objection or Motion

To preserve error in jury charge, party must make trial court aware of complaint, timely and plainly, and obtain ruling. Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

3 Cases that cite this headnote

**[6]** **Appeal and Error** 🔑 Necessity of timely objection

In order to preserve error in jury charge, objections must be made before charge is read to jury. Vernon's Ann.Texas Rules Civ.Proc., Rule 272.

2 Cases that cite this headnote

**[7]** **Appeal and Error** 🔑 Sufficiency of requests and questions raised

**Appeal and Error** 🔑 Requests and rulings thereon

Appellants properly preserved complaints that jury charge on civil conspiracy was erroneous in failing to include requirement that acts to further conspiracy be "overt" and "unlawful," and that instruction was fatally flawed for failure to include requirement that there be damages proximately resulting from conspiracy; at charge conference, appellants objected that instruction did not require "unlawful overt act," and that there was no element of damages included in cause of action, it could be presumed that objection was overruled, as trial court made no change in charge, and appellants were not required to submit substantially correct instruction, such that omission of term "unlawful" in tendered question was not fatal to preservation of error.

2 Cases that cite this headnote

**[8]** **Appeal and Error** 🔑 Requests and rulings thereon

When objection to jury charge is made and court makes no change in charge, it is presumed that objection was properly and timely presented and that objection was overruled.

1 Cases that cite this headnote

**[9]    Appeal and Error** 👉 Nature of Interrogatory or Finding

Defendants failed to preserve error as to claim that defective definition of civil conspiracy infected jury's answers on liability and damages in jury questions; no objections were made by any defendant to those questions because of allegedly erroneous conspiracy definition.

Cases that cite this headnote

**[10]    Appeal and Error** 👉 Scope and Effect of Objection

Party cannot enlarge on appeal objection made in trial court.

2 Cases that cite this headnote

**[11]    Appeal and Error** 👉 Scope and Effect of Objection

Objection on appeal that is not same as that urged at trial presents nothing for review.

2 Cases that cite this headnote

**[12]    Conspiracy** 👉 Trial

Trial court did not err in submitting damages separately from jury instruction defining civil conspiracy; question regarding injury, harm or damages was predicated on affirmative answer to liability questions on conspiracy. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[13]    Conspiracy** 👉 Damage caused

Gist of civil conspiracy is injury that is intended to be caused.

Cases that cite this headnote

**[14]    Conspiracy** 👉 Trial

Deviation in jury charge from elements of civil conspiracy set forth by Supreme Court, particularly addition of requirement that jury find "at least one act to further the conspiracy," was not error; according to court's instructions, jury was required to find act furthering defendants' "unlawful purpose," or act forming "unlawful means" of accomplishing their conspiracy.

Cases that cite this headnote

**[15]    Conspiracy** 👉 Trial

Trial court, in instructing jury on definition of civil conspiracy, was not required to submit element of "overt, unlawful" act, as the only disputed issue was whether acts were part of conspiracy so that each coconspirator was responsible for all acts done by any of conspirators.

Cases that cite this headnote

**[16]    Trial** 🔑 Construction and Effect of Charge as a Whole

When error in jury charge is found, appellate court must review pleadings, evidence, and entire charge to determine if error was harmful.

Cases that cite this headnote

**[17]    Appeal and Error** 🔑 Particular Cases

Any error in trial court's definition of civil conspiracy, which did not include requirement that acts furthering conspiracy have been "overt" and "unlawful," was harmless in action brought against abortion protestors in connection with their interference with access to homes and clinics of doctors who performed abortions; evidence supporting conspiracy to commit illegal acts, as well as commission of illegal acts, was overwhelming.

Cases that cite this headnote

**[18]    Injunction** 🔑 Questions of law or fact

Question of imminent harm, for purposes of injunctive relief, is not proper issue to submit to jury, but is question for court to decide as court of equity.

Cases that cite this headnote

**[19]    Jury** 🔑 Issues of Fact in Equitable Actions

Although litigant has right to trial by jury in equitable action, only ultimate issues of fact are submitted for jury's determination.

Cases that cite this headnote

**[20]    Injunction** 🔑 Grounds in general; multiple factors

**Injunction** 🔑 Irreparable injury

To be entitled to permanent injunctive relief, plaintiffs must plead and prove valid cause of action against defendants, must show that harm is imminent, and must establish that imminent harm will be irreparable if injunction is not issued.

3 Cases that cite this headnote

**[21]    Appeal and Error** 🔑 Sufficiency of evidence and amount of recovery

**Appeal and Error** 🔑 Specification of Errors

Filing of motion for new trial, raising specific points as to sufficiency of evidence supporting jury's answers, is effective to preserve error for factual sufficiency point; separate point of error complaining of overruling of motion for new trial is duplicitous and unnecessary.

Cases that cite this headnote

**[22]    Appeal and Error** 🔑 Burden of showing error

**Appeal and Error** 🔑 Sufficiency of Evidence in Support

**Appeal and Error** 🔑 Manifest weight of evidence

When party attacks finding concerning issue upon which it did not have burden of proof, party must demonstrate that there is insufficient evidence to support adverse finding; test is whether, after examining all evidence, evidence supporting finding is so slight, or evidence against it is so strong, that finding is manifestly unjust and clearly wrong.

Cases that cite this headnote

**[23]** **Appeal and Error** 👉 Same effect as verdict

Trial court's findings of fact have same force and dignity as jury's verdict upon jury questions and are reviewable for sufficiency of evidence by same standards as are applied in reviewing evidence supporting jury's answers.

Cases that cite this headnote

**[24]** **Appeal and Error** 👉 Findings of fact and conclusions of law

Although trial court's conclusions of law may not be challenged for factual insufficiency, trial court's conclusions drawn from facts may be reviewed to determine their correctness.

Cases that cite this headnote

**[25]** **Evidence** 👉 Circumstantial evidence

Any ultimate fact may be proven by circumstantial evidence.

Cases that cite this headnote

**[26]** **Abortion and Birth Control** 👉 Remedies; injunction

Permanent injunction against abortion protestors, prohibiting them from interfering with access to homes and clinics of doctors who performed abortions, was supported by evidence of conspiracy to interfere with business, property and privacy rights of clinics and doctors, which threatened imminent, irreparable harm; protestors had engaged in blockades, used aggressive "sidewalk counseling" by yelling, screaming and following patients at clinics, made death threats, engaged in fire bombing and acid attacks, and picketed doctors' homes, psychologists testified as to harmful psychological and emotional effects on staff and patients of clinics, and there was evidence that threats of violence, interference, and invasion of personal and property rights continued up to and during trial.

Cases that cite this headnote

**[27]** **Injunction** 👉 Clear, likely, threatened, anticipated, or intended injury

Party seeking injunction must establish that defendant will engage in activity enjoined.

Cases that cite this headnote

**[28]** **Injunction** 👉 Clear, likely, threatened, anticipated, or intended injury

In making determination of imminent harm, for purposes of determining appropriateness of injunctive relief, trial court may determine that, when violations are shown up to or near date of trial, defendant has engaged in course of conduct and court may assume that it will continue, absent clear proof to contrary; probability of continuation of prohibited practices is not subject to direct proof, and injunctive relief is proper when trial court finds it justified under rules of equity, notwithstanding defendants' cessation of activity or promise to cease activity.

1 Cases that cite this headnote

**[29]** **Civil Rights** Injunction

Violation of constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief.

Cases that cite this headnote

**[30]** **Injunction** Injury to or restraint of trade or business in general

Disruption of business constitutes type of harm for which injunction may issue.

Cases that cite this headnote

**[31]** **Conspiracy** Persons Liable

It is not essential that each conspirator be shown to have acted in concert with his coconspirators but, rather, once civil conspiracy is proven, each conspirator is responsible for acts done by any other conspirator to further conspiracy.

1 Cases that cite this headnote

**[32]** **Evidence** Credibility of witnesses in general

Jury, as sole judge of credibility of witnesses and weight to be given their testimony, was free to disregard testimony of any witness and resolve inconsistencies in testimony.

Cases that cite this headnote

**[33]** **Abortion and Birth Control** Remedies; injunction
**Constitutional Law** Abortion and health care

Buffer zones established by injunction prohibiting abortion protestors from interfering with access to homes and clinics of doctors who performed abortions were least restrictive means and were essential to preserve right of clinic access, thus satisfying free speech protections of First Amendment and State Constitution; width and breadth of each zone varied widely depending on physical characteristics and locations of each clinic, ranging from 15 to 32 feet, depending upon particular requirements for adequate access. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[34]** **Constitutional Law** Relation between state and federal rights
**Constitutional Law** Injunctions and restraining orders

Texas Constitution's broad command that "[e]very person shall be at liberty to speak ... opinions on any subject" provides greater rights of free expression than First Amendment of Federal Constitution and, thus, restraints on expression may be imposed only if injunctive relief granted encompasses least restrictive means of protecting against alleged imminent and irreparable harm caused by expression. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[35]** **Constitutional Law** ☞ Abortion and health care

Standards of review for constitutionality of injunction prohibiting abortion protestors from interfering with access to homes and clinics of doctors who performed abortions were essentially same under both First Amendment and State Constitution; buffer zone injunction had to "burden no more speech than necessary" and be "least restrictive means" to protect unimpeded access to clinics and residences. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[36]** **Abortion and Birth Control** ☞ Remedies; injunction

Governmental interests were sufficiently significant to justify and demand injunctive relief against abortion protestors, prohibiting them from interfering with access to homes and clinics of doctors who performed abortions; those interests included woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, ensuring public safety and order, promoting free flow of traffic on public streets and sidewalks, protecting property rights of citizens, and protecting residential and medical privacy. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[37]** **Abortion and Birth Control** ☞ Remedies; injunction

**Constitutional Law** ☞ Abortion and health care

Injunction against abortion protestors demonstrating within buffer zones around clinics was not unconstitutionally overbroad on ground that it banned all speech included within term "demonstrating." U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[38]** **Abortion and Birth Control** ☞ Remedies; injunction

**Constitutional Law** ☞ Abortion and health care

**Constitutional Law** ☞ Abortion and health care

Abortion protestors' free speech rights were not violated by injunction's ban on picketing, patrolling, or demonstrating within zones along entire street edge of property of physicians performing abortions, extending 13 feet from property line into street where residence was located; injunction prohibited protests in small zone in front of each physicians' residence, and there were time limits within each 24–hour period and limits on sound amplification within 100 feet of residences. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

Cases that cite this headnote

**[39]** **Constitutional Law** ☞ Narrow tailoring

Speech restriction is narrowly tailored, for purposes of First Amendment analysis, if it eliminates no more than exact source of evil it seeks to remedy. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[40]** **Constitutional Law** ☞ Offensive, vulgar, abusive, or insulting speech

First Amendment permits government to prohibit offensive speech as intrusive when captive audience cannot avoid objectionable speech. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[41]    Constitutional Law** ☛ Injunctions and restraining orders

Supreme Court applies somewhat more stringent application of First Amendment principles when evaluating injunctive order than it does when content-neutral, generally applicable statute is reviewed and, thus, injunction must burden no more speech than necessary to serve significant government interest. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[42]    Appeal and Error** ☛ Findings of fact and conclusions of law

By failing to request additional findings, abortion protestors waived any right to complain about omitted or incorrect findings in support of injunctive relief. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

6 Cases that cite this headnote

**[43]    Appeal and Error** ☛ Findings of fact and conclusions of law

When part of cause is decided by jury and part by court, party appealing court-decided issue should request findings of fact and conclusions of law in order to preserve findings for review. Vernon's Ann.Texas Rules Civ.Proc., Rule 296.

3 Cases that cite this headnote

**[44]    Injunction** ☛ Specificity, vagueness, overbreadth, and narrowly-tailored relief

**Injunction** ☛ Form and requisites

Requirements of rule governing injunction are mandatory and must be strictly followed, including provision requiring that orders granting injunction set forth reasons for its issuance, be specific in terms, and describe in reasonable detail and not by reference to complaint or other document act or acts sought to be restrained. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**[45]    Injunction** ☛ Form and requisites

**Injunction** ☛ Findings and conclusions

Findings of fact are not required to challenge validity of injunctive order that fails to state reason for its issuance. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[46]    Injunction** ☛ Form and requisites

**Injunction** ☛ Findings and conclusions

While every order granting injunction must set forth reasons for its issuance in order itself, if enjoined party wishes additional, detailed findings, that party may make request under rules of procedure governing findings of fact generally. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

2 Cases that cite this headnote

**[47]** **Appeal and Error** 🔑 Findings of fact and conclusions of law

Where enjoined party fails to request additional or amended findings after court files its original findings, that party waives right to complain on appeal that findings were not full and complete or that court failed to enter additional findings of fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

4 Cases that cite this headnote

**[48]** **Abortion and Birth Control** 🔑 Remedies; injunction

Injunctive order prohibiting abortion protestors from interfering with access to homes and clinics of doctors who performed abortions adequately stated specific reasons for its issuance; court found that protestors had continued their activities despite existing injunctions, concluded that they were likely to continue to engage in their tortious conduct absent injunctive relief, and detailed specific, narrowly tailored zone around each clinics' entrance. Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

Cases that cite this headnote

**[49]** **Appeal and Error** 🔑 Findings of fact and conclusions of law

New trial motion could not be construed as timely request for additional findings, so as to preclude finding of waiver of challenge to findings supporting injunction against abortion protestors. Vernon's Ann.Texas Rules Civ.Proc., Rules 296, 298.

Cases that cite this headnote

**[50]** **Appeal and Error** 🔑 Implied findings in general

Absent request for additional findings in support of injunctive relief, omitted findings will be presumed in support of judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 296.

Cases that cite this headnote

**[51]** **Conspiracy** 🔑 Damages

**Damages** 🔑 Injuries to Property

Evidence in action for interference with business relations and civil conspiracy supported damage award in amount of $204,585 against abortion protestors, despite their claims that it was not known who committed acts of vandalism necessitating repairs to clinic at which abortions were performed, that damages were excessive, and that other costs on which damages were based were associated with increased security measures and not properly recompensable as items of damages; evidence demonstrated that protestors acted intentionally to shut down clinics and to keep patients away, it was foreseeable that clinic would be forced to respond to threats and acts of vandalism with appropriate security measures, and witness testified that changes made were essential to continued clinic operation.

Cases that cite this headnote

**[52]** **Damages** 🔑 Natural and probable consequences of torts

In action for interference with business relations, plaintiff may recover such damages as are natural and proximate consequence of interference.

Cases that cite this headnote

**[53]** **Conspiracy** 🗝 Damages

Plaintiff is entitled to recover all damages that naturally flow from civil conspiracy.

2 Cases that cite this headnote

**[54]** **Appeal and Error** 🗝 Instructions

Abortion protestors' challenge to award of punitive damages based only on conspiracy, on ground that jury did not award specific actual damages caused by protestors' conduct in maliciously engaging in conspiracy to interfere with business of clinics performing abortions, was waived absent objection to jury charge on basis that damages could result from either conspiracy or wrongful interference with clinics; damages questions were predicated on affirmative answer to either conspiracy finding or finding of wrongful interference. Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

Cases that cite this headnote

**[55]** **Damages** 🗝 Amount Awarded in Particular Cases

Awards of punitive damages against antiabortion groups and their leaders totaling $1,010,000, were supported by evidence; amount of actual damages awarded was $204,585, there was evidence that defendants had engaged in fire bombing, acid attacks, and death threats in effort to prevent abortions, amounts found against individual defendants were substantially less than those against groups, and jury awarded $5,000 additional punitive damages over and above amount originally requested against one group and its leader, for whom there was abundant evidence of involvement in organizing protests and encouraging acts of vandalism.

Cases that cite this headnote

**[56]** **Appeal and Error** 🗝 Form and requisites

When appellate court conducts factual sufficiency review of punitive damages award, it must detail relevant evidence in its opinion as to why evidence supports or does not support punitive damages in light of five factors: nature of wrong; character of conduct involved; degree of culpability of wrongdoer; situation and sensibilities of parties concerned; and extent to which such conduct offends public sense of justice and propriety.

Cases that cite this headnote

**[57]** **Damages** 🗝 Actual damage or compensatory damages; relationship and ratio

Exemplary damages must be reasonably proportioned to actual damages.

1 Cases that cite this headnote

**[58]** **Appeal and Error** 🗝 Necessity of timely objection

**Appeal and Error** 🗝 Amount of recovery or extent of relief

Absent objection, prior to verdict, to participation in punitive damages deliberations by two jurors who did not join in verdict on actual damages, complaint was waived; appellants in fact demanded the participation by the two dissenting jurors. Rules App.Proc., Rule 52(a).

Cases that cite this headnote

**[59]** **Appeal and Error** 🔑 Amount

Any error in participation in punitive damages deliberations by two jurors who did not join in verdict on actual damages was harmless, as same ten jurors that voted to award actual damages found punitive damages.

Cases that cite this headnote

**[60]** **Abortion and Birth Control** 🔑 Remedies; injunction

Abortion protestors failed to show that they were surprised by clinic's amendment of its damages request after jury verdict but prior to rendition of judgment and, thus, permitting prejudgment amendment to pleadings was not abuse of discretion; jury awarded $5,000 additional punitive damages, above amount requested, against two protestors. Vernon's Ann.Texas Rules Civ.Proc., Rule 47.

Cases that cite this headnote

**[61]** **Pleading** 🔑 Statement of cause of action in general

Pleading is sufficient when it gives fair and adequate notice of facts upon which pleader bases its claim.

Cases that cite this headnote

**[62]** **Pleading** 🔑 Statement of cause of action in general

Purpose of rule requiring pleading setting forth claim for relief to give fair notice of claim involved and to state that damages sought are within jurisdictional limits of court is to give opposing party information sufficient to enable him to prepare defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 47.

Cases that cite this headnote

**[63]** **Pleading** 🔑 During trial

Trial court has no discretion to deny trial amendment to pleading unless appellants demonstrate surprise. Vernon's Ann.Texas Rules Civ.Proc. Rules 63, 66.

Cases that cite this headnote

**[64]** **Appeal and Error** 🔑 Insufficient discussion of objections

Absent citation of authority in support of claim that trial court's failure to include "take-nothing" provisions in judgment was reversible error, claim was waived.

Cases that cite this headnote

**[65]** **Appeal and Error** 🔑 Insufficient discussion of objections

Unsupported points of error are waived.

Cases that cite this headnote

**[66]** **Injunction** 🔑 Particular cases

Change in enforcement paragraph of injunction, adding "any officer, agent, servant, employee, attorney, or person acting in active concert with defendant, who has actual notice of order," was permissible correction of "clerical error";

correction was necessary for consistency with injunctive order section of judgment, and to comply with terms of rule governing injunctions. Vernon's Ann.Texas Rules Civ.Proc., Rules 316, 329b(h), 683.

2 Cases that cite this headnote

**[67]    Judgment** 👉 Authority of Court, Judge, or Judicial Officer

**Judgment** 👉 Clerical errors

"Clerical error" is mistake or omission that prevents judgment as entered from reflecting judgment as rendered, and trial court may correct such clerical mistake even if it has lost plenary jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rules 316, 329b(h).

1 Cases that cite this headnote

**[68]    Judgment** 👉 Errors or irregularities in previous entry

Inadvertent failure to attach exhibits to judgment was "clerical error," not "judicial error," and trial court therefore could properly enter judgment nunc pro tunc after expiration of its plenary power in order to correct error. Vernon's Ann.Texas Rules Civ.Proc., Rules 316, 329b(h).

3 Cases that cite this headnote

**[69]    Costs** 👉 Who is prevailing party in general

"Successful party" entitled by rule to recover costs from its adversary is one who obtains judgment of competent court vindicating civil claim of right. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

10 Cases that cite this headnote

**[70]    Appeal and Error** 👉 Costs and Allowances

**Costs** 👉 Apportionment

Allocation of costs is matter for trial court's discretion and cannot be overturned absent showing of abuse. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

3 Cases that cite this headnote

**[71]    Costs** 👉 Nature and amount of items in general

Court may not adjudge costs other than as provided by rule unless good cause is shown. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

1 Cases that cite this headnote

**[72]    Costs** 👉 Discretion of Court

Absent explanation for assessing costs contrary to governing rule, trial court abuses its discretion. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

1 Cases that cite this headnote

**[73]    Costs** 👉 Form and requisites of application in general

**Costs** 🔑 Motion for retaxation

"Motion to adjudge costs" involves assessment by court as to who shall pay costs, while "motion to retax costs" involves question of amount of costs assessed; motion to retax costs is one to correct ministerial act of clerk of court in tabulating costs.

5 Cases that cite this headnote

**[74]** **Appeal and Error** 🔑 Specification of Errors

Where complaint is made of ruling of court in adjudging costs against wrong party, error is inherent in judgment and must be properly assigned, just as any other alleged error.

Cases that cite this headnote

**[75]** **Costs** 🔑 Retaxation by court on motion or appeal

Trial court had authority to retax costs against defendants, even though more than 30 days had elapsed from time defendants' motion for new trial was overruled.

2 Cases that cite this headnote

**[76]** **Costs** 🔑 Nature of proceeding

**Costs** 🔑 Motion for retaxation

Taxing of costs, as distinguished from adjudication of costs, is merely ministerial duty of clerk, and thus error may be corrected upon injured party's motion, even after case has been disposed of on appeal, as long as request is made before mandate issues and costs are paid.

5 Cases that cite this headnote

**[77]** **Costs** 🔑 Depositions and affidavits

**Costs** 🔑 Service of process

**Costs** 🔑 Demonstrative evidence, experiments, surveys, and views

**Costs** 🔑 Stenographers' fees

**Costs** 🔑 Printing or other reproduction of papers, exhibits, or evidence

It was not abuse of discretion to permit women's clinics and doctors who performed abortions to recover their costs in successful action against abortion protestors, particularly costs for citing by publication 10,000 John and Jane Doe defendants who were later nonsuited, for transcript of hearing on temporary injunction, for transcripts of four depositions taken by defendants, for rental of television and video recorder, for copies of videotapes, for photos of clinics and residences, for service of citation on eight defendants by private process servers, and for service of subpoenas; all of costs were necessary to conduct of trial, and most expenditures were specifically ordered by trial court. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

2 Cases that cite this headnote

**[78]** **Costs** 🔑 Depositions and affidavits

Deposition expenses are properly chargeable as court costs. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

2 Cases that cite this headnote

**[79]** **Costs** 🔑 Service of process

Subpoena and citation fees are recoverable as court costs. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*67** Jay Alan Sekulow, Washington, Cactus Jack Cagle, Houston, James Austin Pinedo, San Antonio, Richard W. Schmude, Tomball, for appellants.

Kathy D. Patrick, Neal S. Manne, Collyn A. Peddie, Houston, for appellees.

Before AMIDEI, ANDERSON and SEARS, [*] JJ.

## MAJORITY OPINION

SEARS, Justice (Assigned).

**[1]** This appeal is from a judgment awarding damages and permanently enjoining appellants, anti-abortion groups and their leaders, from interfering with access to appellees' homes and clinics. Appellees are ten women's clinics and several doctors who sometimes perform abortions. Based upon the jury's findings that appellants were liable for civil conspiracy, tortious interference, invasion of privacy and property rights, the judgment awarded actual and punitive damages to appellee Planned Parenthood of Houston and Southeast Texas, Inc. ("Planned Parenthood"). Appellants, Philip "Flip" Benham and Bob Jewitt, are referred to as "B/J," and appellants, Operation Rescue–National, Rescue America, Dallas Rescue, Don Treshman and Keith Tucci, are collectively referred to as "OR." In separate briefs, B/J raise thirty-seven points of error and OR raise fifty-four points, for a total of ninety-one points of error, many of which overlap. Both groups contend the permanent injunction violates both the Texas and United States Constitutions. They also attack the sufficiency of the evidence to substantiate the trial court's findings supporting the injunctive relief. They complain of errors in the jury instructions, in the composition of the jury, in the amended and corrected judgments, and in the assessment of costs. In addition, OR challenge the sufficiency of the evidence supporting the actual and punitive damages imposed against them. [1] We affirm the judgment of the trial court.

## Background

Appellants sought to interfere with the activities of Planned Parenthood and other family planning clinics in August 1992 during the Republican National Convention in Houston. **\*68** Don Treshman, the National Director of appellant Rescue America, announced a plan for a concerted, large-scale assault on Houston abortion providers. Treshman met with leaders of Operation Rescue–National before the GOP Convention. The groups agreed to jointly exert pressure on Planned Parenthood and other clinics to force them to close during the Convention. The primary tactic was conducting or sponsoring "rescues" which are blockades of clinics. In addition, Operation Rescue planned to promote residential pickets of physicians who worked at the clinics, and Rescue America was to coordinate information on these pickets. Pat Mahoney, a spokesman for Operation Rescue–National, acknowledged that the two groups had a common purpose and plan and were "all working toward a common goal." Appellants also announced their plan at a press conference.

In response, appellees and others filed suit and obtained a temporary restraining order (TRO) preventing appellants from coming within a 100–foot "buffer zone" of appellees' clinics and homes. Appellants Tucci, Benham and Jewitt, along with others who are not parties to this appeal, intentionally violated that part of the TRO barring demonstrations within the 100–foot zone around the clinics' entrances and exits, and they were jailed. All sought habeas relief, which the Texas Supreme Court granted. The supreme court held that the TRO imposing a 100–foot speech-free zone around the clinics' entrances and exits violated the protestors' constitutional right to freedom of expression because there was no showing the zone was the "least restrictive" means of protecting the clinics from harm. *Ex parte Tucci,* 859 S.W.2d 1, 7 (Tex.1993) (plurality opinion).

Appellees then amended their pleadings, sought a permanent injunction, and Planned Parenthood later asked for actual and punitive damages. Following a six-week jury trial and a two-day evidentiary hearing on the particulars of the proposed injunctive relief, Judge Eileen O'Neill of the 190th District Court signed a Judgment and Permanent Injunction on December 5, 1994. The judgment awarded the following damages to Planned Parenthood, plus pre- and post-judgment interest:

> **$204,585 in actual damages** from Operation Rescue–National, Rescue America, Don Treshman, and Keith Tucci, jointly and severally; plus punitive damages as follows: $350,000 from Operation Rescue–National; $355,000 from Rescue America; $155,000 from Don Treshman; and $150,000 from Keith Tucci, for **a total of $1,010,000 in punitive damages.**

The judgment permanently enjoined and restrained appellants from interfering with the clinics, harassing the physicians and their family members, and demonstrating within a specific zone as to each clinic and doctor's residence. These zones range from fifteen feet to thirty-two feet around the entrances to the clinics and are outlined on maps attached to the injunctive order. The demonstration-free zones also extend thirteen feet from the property line in front of each physician's residence. The judgment incorporates the trial court's findings of fact and conclusions of law as to the injunctive relief.

After entry of the judgment, the cause was transferred to the 333rd District Court, where Judge Richard Bianchi signed an Amended Judgment and Permanent Injunction on February 1, 1995, to correct two errors in the judgment. Subsequently, on June 15, 1995, the same court entered a Judgment Nunc Pro Tunc and Permanent Injunction to include the attachment of exhibits inadvertently omitted from the Amended Judgment. This appeal resulted.

### Jury Composition

 **[2]**    In their points forty-six and forty-seven, OR contend the trial court erred in refusing to strike certain jurors for cause, requiring them to use all of their peremptory challenges and accept jurors they found objectionable. B/J raise the same complaints in their points twenty-nine and thirty.

 **[3]**    To preserve error in the trial court's failure to strike objectionable jurors, the complaining party must timely bring its complaint to the trial court's attention before making its peremptory challenges. **\*69** *Hallett v. Houston Northwest Medical Center,* 689 S.W.2d 888, 889–90 (Tex.1985). The objecting party must specifically inform the trial court which objectionable jurors will remain after all peremptory strikes are made, and this notice must be given before the actual exercise of the strikes. *Id; see also Beavers v. Northrop Worldwide Aircraft Services, Inc.,* 821 S.W.2d 669, 673 (Tex.App.—Amarillo 1991, writ denied); *Carpenter v. Wyatt Constr. Co.,* 501 S.W.2d 748, 750–51 (Tex.Civ.App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.).

In this case, after the trial court excused several potential jurors for cause, the court overruled appellants' challenges for cause as to twenty-one additional venire members. The parties then made their peremptory strikes. Appellants did not object to the trial court's denial of their challenges for cause until after all parties had exercised their peremptory strikes and the jury was about to be sworn. They argued that two jurors about to be impaneled were objectionable and would have been challenged peremptorily if they could have done so. They then listed seven jurors on whom they would have used a peremptory strike, but they failed to fully articulate their objection and obtain a ruling. In addition, appellants did not seek additional peremptory challenges. By

failing to object to the trial court's refusal to strike objectionable jurors until after the peremptory strikes were made, appellants have waived error, if any. B/J's points twenty-nine and thirty and OR's points forty-six and forty-seven are overruled.

**Charge Error**

In B/J's points of error four through seven and OR's points one through seven, appellants complain about alleged errors in Jury Instruction No. 2, which provided in relevant part:

"*Civil conspiracy*" means a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. To find a civil conspiracy, you must find the following:

1. a combination of two or more persons,

2. who agree or have a meeting of the minds on a common purpose or course of action,

3. who have knowledge of the purpose or course of action, and

4. at least one of such persons commits at least one act to further the conspiracy.

"Unlawful" means violative of either criminal or civil law.

 **[4]**    The trial court has broad discretion in submitting explanatory instructions and definitions. *Wisenbarger v. Gonzales Warm Springs Rehab. Hosp., Inc.,* 789 S.W.2d 688, 692 (Tex.App.—Corpus Christi 1990, writ denied). Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and they aid the jury in answering the questions in the charge. TEX.R. CIV. P. 277, 278.

 **[5]**    **[6]**    To preserve error in the jury charge, a party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. *State Dept. of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); TEX.R. CIV. P. 274. A party is required to object when the court submits an erroneous question, instruction or definition. TEX.R. CIV. P. 274; *see, e.g., Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994). Objections must be made before the charge is read to the jury. *Missouri Pac. R.R. Co. v. Cross,* 501 S.W.2d 868, 873 (Tex.1973); TEX.R. CIV. P. 272. If a submitted instruction is erroneous, it does not matter which party has the burden of proof. *Religious of the Sacred Heart v. City of Houston,* 836 S.W.2d 606, 613–14 (Tex.1992). A written request is required only when a question, instruction or definition is omitted. TEX.R. CIV. P. 278.

 **[7]**    Appellants contend the trial court's instruction on conspiracy is erroneous because it does not include a requirement that the acts to further the conspiracy be "overt" and "unlawful." In addition, they contend the instruction is fatally flawed because it failed to include a requirement that there be damages proximately resulting from the conspiracy.

 **[8]**    We reject appellees' contention that appellants failed to properly preserve all of its complaints about the charge. At the charge conference, appellants objected that  **\*70**  the instruction did not require an "unlawful overt act" and that there was no element of damages included in the cause of action. The attorney representing Benham and Jewitt objected to the definition in Instruction No. 2, and tendered another definition, which was refused. The parties stipulated at trial that objections made by one defendant were applicable to the others. Appellees contend Rescue America and Treshman have waived any complaint as to the conspiracy definition because their attorney did not receive a ruling. However, when an objection is made and the court made no change in the charge, it is presumed that the objection was properly and timely presented and that the objection was overruled. *Acord v. General Motors Corp.,* 669 S.W.2d 111, 114 (Tex.1984); TEX.R. CIV. P. 272. In addition, appellants were only required to object to an erroneous instruction to preserve error; they were not required to submit a substantially correct instruction. Therefore, the fact that appellants' tendered question also omitted the term "unlawful" is not fatal to preservation of their challenge on appeal.

 **[9]**     **[10]**     **[11]**     However, we do agree that appellants failed to preserve error alleged in OR points three through seven and B/J points six and seven. In these points, appellants complain that the defective definition of conspiracy infected the jury's answers on liability and damages in Question Nos. 1 through 4 and 6 through 10. No objections were made by any defendant to these questions because of the allegedly erroneous conspiracy definition. A party cannot enlarge on appeal an objection made in the trial court. *Conner v. Bean,* 630 S.W.2d 697, 701 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). An objection on appeal that is not the same as that urged at trial presents nothing for review. *Holland v. Hayden,* 901 S.W.2d 763, 765 (Tex.App.—Houston [14th Dist.] 1995, writ denied). Nor can a party raise a new objection for the first time on appeal. *See* TEX.R.APP. P. 52(a);  TEX.R. CIV. P. 274. We overrule OR's points three through seven and B/J's points six and seven.

 **[12]**     First, as to the alleged failure to include a damages element in Instruction No. 2, we note that Question No. 3 asked: "Did any of the Plaintiff Clinics, Plaintiff Physicians, or Intervenors suffer injury, harm, or damages that were proximately caused by the conspiracy?" Question No. 3 was predicated on an affirmative answer to the liability questions on conspiracy to interfere with the business, privacy or property rights of appellees. Rule 277 expressly permits predication of damage questions on affirmative findings on liability. TEX.R. CIV. P. 277. We hold that the trial court did not err in submitting damages separately.

 **[13]**     The Texas Supreme Court has repeatedly defined a civil conspiracy as "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Firestone Steel Products Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996); *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995); *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). The definition in this case is identical. The elements of the cause of action must be taken in the context of this basic definition stating that the object to be accomplished, or the means by which it is accomplished, is unlawful. *Triplex Communications,* 900 S.W.2d at 720; *Massey,* 652 S.W.2d at 934. The "gist of a civil conspiracy" is the injury that is intended to be caused. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968).

 **[14]**     In *Massey,* the Supreme Court listed the essential elements of civil conspiracy as: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey,* 652 S.W.2d at 934. The instruction in this case is substantially the same, except that it requires the jury to find "at least one act to further the conspiracy." When the elements submitted in this case are considered in the context of the basic conspiracy definition, we find no error in this slight deviation from the *Massey* elements. According to the court's instruction in this case, the jury was required to find an act furthering appellants' "unlawful  **\*71**  purpose," or an act forming the "unlawful means" of accomplishing their conspiracy.

 **[15]**     In addition, while not every act of protest described at trial was illegal, it was uncontroverted that one or more of appellants' actions were unlawful. The charge defined "unlawful" as "violative of either criminal or civil law." Appellants admitted many of their actions, at the very least, violated appellees' common law rights as well as the initial injunctive order. There is also no dispute that the actions at issue in this case were "overt." It was therefore established that some appellants committed overt, unlawful acts, and the only *disputed* issue was whether these acts were part of a conspiracy so that each co-conspirator is responsible for all acts done by any of the conspirators. *See Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 926 (Tex.1979). Since only the *disputed* issues must be submitted, the trial court was not required to submit the element of an "overt, unlawful" act. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 223 (Tex.1992) (holding that only disputed issues must be submitted to the jury); *Employers Cas. Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988) (same); *Kiel v. Brinkman,* 668 S.W.2d 926, 929 (Tex.App.—Houston [14th Dist.] 1984, no writ) (holding that the trial court did not err in submitting only one of three required elements when the other two were not disputed). We hold that the court's instruction, together with the damages questions, sufficiently encompassed the elements of conspiracy in this case.

 **[16]**     **[17]**     When error in the charge is found, we must review the pleadings, evidence, and the entire charge to determine if the error is harmful. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). To reverse based on error in the charge, appellants must establish that the error amounted to such a denial of their rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP. P. 81(b)(1). Here, the evidence supporting conspiracy to commit illegal acts, as well as the commission of illegal acts, was overwhelming.[2] Based

on the testimony of the appellants and their admitted, illegal overt acts, the jury found appellants tortiously interfered with the clinics' business and violated the physicians' privacy rights. Therefore, even if we were to find that the trial court erred in its instruction on the conspiracy definition, we would find the error to be harmless.

In conclusion, we find no reversible error in the court's charge on conspiracy. B/J's points of error four and five and OR's points one and two are overruled.

 **[18]  [19]**    Appellants also complain about the omission of a question or instruction on imminent harm relating to the injunctive relief in B/J point of error twenty-eight and OR point forty-five. The Texas Supreme Court has determined that the question of imminent harm is not a proper issue to submit to the jury, but instead is a question for the court to decide as a court of equity. *State v. Texas Pet Foods,* 591 S.W.2d 800, 804 (Tex.1979). Although a litigant has a right to trial by jury in an equitable action, only ultimate issues of fact are submitted for the jury's determination. *Id.* We overrule B/J point of error twenty-eight and OR point forty-five.

## Injunctive Relief

 **[20]**    To be entitled to permanent injunctive relief, the plaintiffs must plead and prove a valid cause of action against the defendants. *See Valenzuela v. Aquino,* 853 S.W.2d 512, 513 (Tex.1993) (holding that because Texas has no cause of action for negligent infliction of emotional distress, the trial court improperly entered a permanent injunction **\*72** enjoining residential picketing). The plaintiffs must show that harm is imminent. *Henderson v. KRTS, Inc.,* 822 S.W.2d 769, 773 (Tex.App.—Houston [1st Dist.] 1992, no writ). They must also establish that this imminent harm will be irreparable if the injunction is not issued. *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.,* 812 S.W.2d 663, 666 (Tex.App.—Houston [14th Dist.] 1991, no writ).

Appellants present a two-pronged attack on the injunctive relief granted by the trial court. First, we address their contention that the evidence is insufficient to support the injunctive relief granted by the trial court. Secondly, we consider appellants' contention that the permanent injunction violates both the United States and Texas Constitutions.

## A. Sufficiency of the Evidence

 **[21]**    Appellants attack the sufficiency of the evidence supporting the injunctive relief and the trial court's findings and conclusions. In response, appellees first assert that appellants have waived every factual sufficiency point of error, and any objection that damages were excessive, by failing to bring a *separate* point of error complaining of the trial court's overruling of their motion for new trial. To preserve error on factual sufficiency complaints, a party must include an objection in a motion for new trial. *See* TEX.R. CIV. P. 324(b)(2), (b)(4); *Luna v. Southern Pacific Transp. Co.,* 724 S.W.2d 383, 384 (Tex.1987). Appellees argue that appellants must complain of the overruling of a motion for new trial by point of error when the objection, such as an objection to the factual sufficiency of the evidence, is made for the first time in the motion for new trial. Appellees cite no case authority directly on point, relying only on *O'Connor's Texas Rules * Civil Appeals* (1993). We find no other authority requiring such a strict interpretation of the briefing rules. We hold the filing of a motion for new trial, raising specific points in the motion as to the sufficiency of the evidence supporting the jury's answers, as appellants did in this case, is effective to preserve error for factual sufficiency points. A separate point of error complaining of the overruling of the motion for new trial is duplicitous and unnecessary.

 **[22]**    When a party attacks a finding concerning an issue upon which it did not have the burden of proof, it must demonstrate that there is insufficient evidence to support the adverse finding. *See Hickey v. Couchman,* 797 S.W.2d 103, 109–10 (Tex.App.—Corpus Christi 1990, writ denied). The test is whether, after examining all the evidence, the evidence supporting the finding is so slight, or the evidence against it so strong, that the finding is manifestly unjust and clearly wrong. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

 [23]   [24]   The trial court's findings of fact have the same force and dignity as a jury's verdict upon jury questions and are reviewable for sufficiency of the evidence by the same standards as are applied in reviewing the evidence supporting the jury's answers. *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex.App.—Houston [14th Dist.] 1990, no writ); *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Although the court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Dallas County v. Sweitzer,* 881 S.W.2d 757, 763 (Tex.App.—Dallas 1994, writ denied).

 [25]   Any ultimate fact may be proven by circumstantial evidence. *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 285 (Tex.1995). Because of its nature, proof of a conspiracy usually must be made by circumstantial evidence. *King v. Acker,* 725 S.W.2d 750, 755 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Carr v. Hunt,* 651 S.W.2d 875, 882 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The jury was instructed in this case that:

> A fact may be established by direct or by circumstantial evidence. A fact is established by direct evidence when proved by documentary evidence or by [a] witness who saw the act done or the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

 **\*73**  [26]   Appellants contend the evidence is insufficient to support the jury's finding that appellants conspired to violate, or actually violated, the doctors' privacy or property rights. They also argue the evidence is insufficient to support a finding of imminent harm to the doctors. In OR points of error eight through twenty-four, they assert the evidence is insufficient to show that appellants will engage in the enjoined activity in the future or that there was imminent risk of harm as to physician appellees. B/J essentially make the same argument in points eight through twenty. In points twenty-five through thirty, OR challenge each of the trial court's findings of fact supporting the permanent injunction. B/J's corresponding points are points twenty-one through twenty-six. The court's findings as to the injunctive relief are as follows:

1. Defendants' conduct threatens access to plaintiff clinics by women seeking abortion and other medical services;

2. Defendants' conduct threatens the use and enjoyment of plaintiff clinics' and physicians' property rights;

3. Defendants' aggressive and harassing manner of protesting and sidewalk counseling of clinic patients increases the medical risks attendant to the abortion procedure;

4. Defendants' targeted picketing of plaintiff physicians' homes threatens and interferes with plaintiff physicians' rights of privacy;

5. Defendants have not abandoned their activities toward plaintiffs, but (1) remain committed to their particular protest tactics and would use them again toward plaintiffs if the circumstance (such as a national media event in Houston) presented itself; (2) have aided and abetted others in continuing to engage in conduct that is either tortious or in violation of plaintiffs' constitutional rights; and (3) principle defendants, and those found by the jury to have acted with malice, are either locally based (such as Rescue America and Don Treshman) or have recently increased their organizational presence in Texas (Operation Rescue–National);

6. Despite existing injunctions imposing place and manner restrictions on defendants' protest activities targeting plaintiff clinics, defendants (or those found by the jury to be acting in concert with them) have continued to engage in protest activity toward some of the clinics using tactics that are harassing to patients and clinic staffs, that are violative of plaintiff clinics' common law and constitutional rights, and that threaten safe, accessible abortions for women seeking medical services at plaintiff clinics.

Appellants also attack the sufficiency of the evidence supporting the trial court's first conclusion of law in B/J point twenty-seven OR point thirty-one. They argue that because the findings are erroneous, the court's conclusion cannot stand because it is without a factual base. Conclusion of Law No. 1 states:

> Absent injunctive relief, defendants are likely to continue to engage in the tortious conduct found by the jury to be in violation of plaintiff clinics and physicians' common law and constitutional rights, and such conduct is likely to cause plaintiff clinics and physicians irreparable harm.

Appellants argue the evidence is insufficient to support the injunction because appellees called only three witnesses to testify at the hearing on the injunctive relief, and these witnesses did not provide testimony relevant to the standard for determining the necessity for and nature of constitutionally permissible injunctive relief. Our review of the record, however, reveals evidence of the conspiracy to interfere with the business, property and privacy rights of appellees, which threatened imminent, irreparable harm.

In addition to the evidence adduced at the hearing on the injunction, ample evidence supporting the injunctive relief was provided at the jury trial. The record contains evidence of appellants' interference with business, privacy and property rights, which is relevant to the harm element necessary for the permanent injunction. Appellees presented evidence that from early 1992 up to **\*74** and including the time of trial, appellants engaged in blockades and used aggressive "sidewalk counseling" by yelling, screaming and following patients at the clinics. The jury saw numerous videotapes and photos of blockades at the clinics during the Convention. At times during the Convention there were estimated to be a thousand people outside Planned Parenthood. Judy Reiner, Planned Parenthood's Deputy Director, Dr. Jerry Edwards, an appellee, and Larissa Lindsay, a clinic escort, all testified they saw appellants and those operating at their direction attempting to or successfully impeding or preventing clinic access. Reiner testified that it was obvious the protests were organized and that the large numbers of people were not appearing spontaneously. Reiner testified she saw Keith Tucci, the former national director of Operation Rescue, outside her clinic several times. Reiner testified the protesters were not peaceful, but instead attempted to block patients' access to the clinic. They got within inches of the patients' faces and often touched them. She told how "escorts" had to form a human circle around patients to get through the mobs to the entrance during large protests. She described the patients' and staff's attempts to gain access to the clinics "like running a gauntlet."

Reiner testified Planned Parenthood has had bomb threats, defacement of the building, thrown bottles and rocks, the locks glued shut, and two butyric acid attacks. She described an invasion at Planned Parenthood that occurred in 1989 or 1990 for which Treshman claimed credit. The protesters entered Planned Parenthood and chained their necks to cement blocks. Daniel Scott, a Planned Parenthood employee, testified he fears being shot every time he leaves the building. Jesse Miller, a protester associated with Rescue America, told Scott in March 1994, "This is the day you die, brother." Reiner testified that Planned Parenthood and the other clinics and physicians took seriously the threats made by Tucci and Treshman and those who work under their direction. She testified to the repairs made to the building and measures taken to safeguard the building, staff and patients.

Don Treshman testified about the aggressive sidewalk counseling promoted by Rescue America and discussed rescues or blockades conducted at the plaintiff clinics. Although Treshman did not participate, his publication, Rescue America's Newsline, advertised a picket at Dr. Kaminsky's house. Treshman invited Rev. Michael Bray, who advocated justifiable homicide of abortionists, to speak at a Rescue America conference in the summer of 1993. Treshman acknowledged that Rescue America will use any methods it deems necessary to save unborn children. The jury saw the videotaped confession of Joshua Graff, admitting he "interfered" with the operation of the West Loop Clinic by trying to blow it up. Treshman admitted that the technique Graff used to firebomb the West Loop Clinic was virtually identical to the one he described in detail on his hotline. Tucci wrote to followers on Operation Rescue letterhead, "if you believe abortion is murder, act like it's murder."

Many of those engaged in protest activities, such as Tom Wieghard and Rusty Thomas, advertised themselves as members of Operation Rescue by wearing its T-shirts. Both told Reiner they acted on behalf of Operation Rescue. Thomas was shown on a video shouting "Murderer" at a protest. John Moloney, described as a Rescue America operative, testified that the common goal

of those he worked with was to end abortion by preventing women from going inside the clinics and by preventing physicians from performing abortions. Moloney was seen at clinic protests hundreds of times and also conducted many residential pickets. At these protests, Moloney was seen directing Daniel Ware, who was later arrested on weapons charges for carrying prohibited firearms in his car.

The physicians testified that appellants' actions negatively affected their patients' mental and physical health and made medical procedures more risky. In addition, they testified about the protests at their homes. Dr. Jerry Edwards testified his home had been picketed twelve or fifteen times, the picketing continued after the Republican Convention up to "last weekend." He testified that protesters bring signs, come into his **\*75** yard, play loud music, yell and make threats. Photographs were admitted showing the protesters at his residence. He testified he and his young daughter received death threats. He testified he did not feel comfortable at his home and had placed it for sale. He also described protest activities at Planned Parenthood, where he worked as medical director. These activities interfered with his ability to work and caused stress to his patients. Judy Reiner of Planned Parenthood testified she was present at two pickets at the homes of Drs. Edwards and Rosenfeld and saw people associated with Rescue America. She did not see Treshman, Tucci, Benham or Jewitt, however.

Dr. Robert Kaminsky testified his office, Women's Medical Center of Northwest Houston, is picketed regularly. He saw Treshman picket there about five times. He testified James Doyle followed him in his car once. The previous Saturday his business was significantly interfered with by picketers. He testified the activities of protestors pose a health risk to his patients. His house has been picketed about two dozen times. A "Wanted" poster with a photograph of Dr. Kaminsky was used during the picketing. Mrs. Kaminsky testified their home had been picketed about fifteen times, the last time on the previous Saturday. Mrs. Kaminsky also testified she does not feel safe because the protesters follow them to work. Mrs. Kaminsky testified she saw several of Treshman's followers outside both her home and her husband's office several times. She could identify Treshman's followers because she saw them taking direction from him or from John Moloney. She saw John Moloney and James and Estelle Pratt picket their home. She had also seen the Pratts and James Doyle with Treshman in front of their office. A videotape of picketing at the Kaminsky residence was introduced into evidence. On the tape, Moloney shouted at Mrs. Kaminsky, "there is a just punishment that you deserve.... This is just a small taste of what's coming down the pike. We trust we won't have to do it." She described that picket as a "huge shoving match." She testified John Moloney grabbed her, and her teenage daughter was pushed to the ground by activists in her front yard. This incident occurred shortly after Dr. David Gunn was murdered outside an abortion clinic in Pensacola, Florida while a Rescue America-sponsored picket was taking place, and Mrs. Kaminsky testified she feared for her husband's safety. She did not want her husband to come outside during the confrontation with the picketers, but he eventually helped his wife and daughter return to the house. Mrs. Kaminsky testified the event was very scary and upsetting. She described it as "the most terrifying thing I've ever been through." A few days later, Treshman praised Moloney for the Kaminsky picket on his hotline.

Dr. Doug Karpen testified he had seen Treshman at clinic demonstrations and had met him at Hobby Airport, where Treshman and five others followed him. Treshman and Benham admitted monitoring and following Dr. Karpen in a joint effort with Dallas Rescue for more than six weeks. Dr. Karpen practices at Aaron's Women's Clinic and at Women's Pavilion. He testified protestors had tried numerous time to block access at Aaron's, including an attempted blockade during the Republican Convention and an actual blockade about that time, organized by Operation Rescue and Treshman. There were two attempted blockades at The Women's Pavilion during the Convention. Dr. Karpen's house had been picketed about three to four times, but not within the past two and a half years.

Dr. Bernard Rosenfeld testified demonstrations occur every Saturday at the Houston Women's Clinic where he works. The clinic had been subjected to acts of vandalism, including acid attacks, gluing of door locks, and flooding of his clinic. Many patients had been accosted by protestors and had been "extremely stressed out," making the medical procedures "much more dangerous." Dr. Rosenfeld testified that his house has been picketed about six to eight times and his driveway has been blockaded by protesters. This activity interfered with his ability to work and terrorized his wife and children. The activists told his three and four-year old children, "Your daddy kills babies." Photographs were admitted showing the protesters at his residence.

**\*76** Dr. Adebayo Adesomo testified Don Treshman of Rescue America was the leader of the protesters at his office at Suburban Women's Clinic during the Republican Convention. Treshman denied he was the leader of that protest, and claimed he only went there to talk to the press. Dr. Adesomo admitted his house had not been picketed. He testified that he was aware that an anti-abortion protester who was an admitted follower of Rescue America had killed a physician working at an abortion clinic, and he feared the same fate could happen to anyone performing abortions.

Dr. Coleman died before trial, and his deposition was not taken. He worked at A–Z Women's Health Services and at the West Loop Clinic. The evidence was that his house had been picketed several times. Treshman admitted he "organized, conducted and announced" a picket at Dr. Coleman's funeral. [3]

The evidence from the hearing on the injunctive relief is directed to the issue of irreparable harm and is summarized as follows.

Dr. Morris Taggart, a psychologist, testified about the emotional impact of picketing on patients and staff. He interviewed eight employees of Planned Parenthood. He characterized the reactions of those he interviewed as those of "people having undergone some kind of trauma." The workers reported being physically jostled on arrival at the clinic, and they were yelled at with cries of "baby murderer." The staff was upset and unable to work after these incidents. In Dr. Taggart's opinion, a buffer zone banning "harassing speech" was necessary because of the distress to staff and patients. He testified restrictions are necessary most importantly to prevent physical contact, but also to reduce the proximity of the yelling and screaming. He admitted that on four visits to the Planned Parenthood clinic, he observed only "peaceful protests."

Dr. Dale Hill, also a psychologist, interviewed three patients, three nurses, one doctor and one volunteer in January 1994. In her testimony, she described the encounters with protesters. The patients and staff reported being "hollered at" and "physically transgressed." Some received threats, such as, "You need to die." She concluded protesting was harmful to patients and staff, and a buffer zone is necessary to protect them from psychological and emotional trauma. She observed protests at Planned Parenthood, but never observed any violence at the protests. Her own ingress or egress was not blocked during her three trips to Planned Parenthood.

Laura Lindsay, a Planned Parenthood employee, primarily introduced photographs and diagrams of the clinics setting forth the requested buffer zone areas. She demonstrated through photographs that signs held outside the buffer zones could still be read. She admitted there are numerous differences about the clinics as to the level of traffic, noise, parking, or whether the clinic is in a residential area as opposed to downtown Houston. She acknowledged that, since the 1992 Republican Convention, Planned Parenthood has constructed a wall higher than six feet and a private enclosed drive provides access to the entrance door.

Appellants called Mary Hall Kleypass, a pro-life "sidewalk counselor." She testified she approaches women considering abortion and offers literature about the "development of the baby as well as a place where she could go for help." To be successful, "sidewalk counseling" involves "direct interaction" with the women, using "eye contact." She denied she uses intimidation or grabs anyone, but instead counsels "gently and quietly." She testified that counseling could not be done from across the street because she would be forced to yell and could not interact with the women. However, on cross-examination Kleypass admitted she is not a party to this case, does not know most of the appellants, does not act in concert with them, and is not subject to the injunction.

 **[27]**    The party seeking an injunction must establish the defendant "will engage in  **\*77**  the activity enjoined." *State v. Morales, 869 S.W.2d 941, 946 (Tex.1994).* Appellants argue there is no evidence of imminent harm because the spotlight of national politics has moved from Houston and most of the individual defendants have left Houston. They contend that all individuals except Flip Benham, who lives in Dallas, reside out of state. According to appellants, there is no continuing threat of irreparable harm.

We disagree. The evidence at trial shows that appellants Treshman and Rescue America are Houston-based. Appellant Operation Rescue has operatives here. Operation Rescue and its leaders directed and controlled the activities of sympathetic followers

in Houston. There was evidence presented at trial that Daniel Ware, Tom Weighard, Rusty Thomas, John Byrd, C.D. Money, Jesse Miller, and other persons in Houston act at the direction or control of appellants in harassing, threatening and interfering with appellees. Tom Wieghard, a member of Operation Rescue, signed Operation Rescue's pledge "to follow the mission's leadership" and engage in its activities "as directed." Weighard admitted his intention was to interfere with Planned Parenthood's business. He admitted he supervised and instructed "anyone who was out there" in front of the clinics, including Joshua Graff, and that he assisted at the blockade of the A–Z Clinic. He testified he had been taught techniques for these activities by coordinators for Operation Rescue–National. Jeff White, director of Operation GOP ("Guard Our Preborn"), the name given the protest activities during the Convention, announced that after the Convention, Operation Rescue "had left behind a thriving pastor-lead rescue community in Houston."

None of the appellants testified that they were willing to stop their activities. Most expressed a clear intention to violate any court order that interfered with their activities. Pat Mahoney of Operation Rescue testified to holding a "Boston Tea Party" where he publicly destroyed a copy of Judge O'Neill's initial TRO and said he would do the same thing again. Flip Benham, national director of Operation Rescue, testified he intended to continue his activities. He testified that Operation Rescue will "live out its gospel in the streets despite injunctions and court orders." Operation Rescue literature makes it clear that "[t]he threats of rescues will hang over the killers' heads every day." Treshman testified Rescue America intends to continue to blockade clinics, "continue to use any effective means we feel will save lives," continue residential picketing, and "continue all activities and all avenues that are effective in stopping the abortion Holocaust." Bob Jewitt wrote to Operation Rescue supporters that "[t]hose of us included in the injunction admitted that we already had an injunction from God to rescue children no matter how the judge would rule." Keith Tucci, former national director of Operation Rescue, wrote, "[n]o matter what the laws say, we are committed to keep rescuing children." He stated in another letter "we will continue our ... direct action...." Reiner testified the protests continued through her testimony at trial.

[28]    In making its determination of imminent harm, the trial court may determine that, when violations are shown up to or near the date of trial, the defendant has engaged in a course of conduct and the court may assume that it will continue, absent clear proof to the contrary. *Texas Pet Foods,* 591 S.W.2d at 804. The probability of the continuation of the prohibited practices is not subject to direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or promise to cease the activity. *Id.* Here, there was evidence that threats of violence, interference, and invasion of personal and property rights continued up to and during trial. There was no "clear proof to the contrary."

[29]    [30]    Under Texas law, a violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief. *Southwestern Newspapers Corp. v. Curtis,* 584 S.W.2d 362, 368 (Tex.Civ.App.—Amarillo 1979, no writ); *see also Iranian Muslim Organization v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981). In addition, disruption of business constitutes the type of harm for which an injunction may issue. *Liberty Mut. Ins. Co.,* 812 S.W.2d at 666.  **\*78**  When faced with similar facts, this court found that violation of a clinic lessee's constitutional property rights caused irreparable harm. *Right to Life Advocates, Inc. v. Aaron Women's Clinic,* 737 S.W.2d 564, 571 (Tex.App.—Houston [14th Dist.] 1987, writ denied), *cert. denied,* 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 47 (1988). When the clinic faced a continuation of picketing and harassment by abortion protesters, we determined that a suit for money damages for loss of business was insufficient, and the only adequate remedy was an injunction limiting the protests. *Id.*

[31]    In this case, when the jury inquired whether it had to determine that each appellant personally violated the physicians' privacy and property rights, the court instructed that it could "consider the acts of non-defendants if those persons committed the act, if any, as agents of the listed Defendants. An agent is one who consents to act on behalf of and subject to control of another, the principal, who has manifested consent that the agent shall so act." Appellants make no complaint on appeal as to this instruction. Therefore, we conclude that it is immaterial that each of the individual appellants were not identified as personally engaging in many of the protest activities. It is not essential that each conspirator be shown to have acted in concert with his co-conspirators. *See Bourland v. State,* 528 S.W.2d 350, 354 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.). Once a

civil conspiracy is proven, each conspirator is responsible for the acts done by any other conspirator to further the conspiracy. *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 926 (Tex.1979).

 **[32]**    We find sufficient evidence for the jury to have concluded that the participants in the illegal protests followed the direction of Operation Rescue and Rescue America and their leaders. While appellants denied they organized the protests, many of their denials were impeached by their own writings and deposition testimony. The jury, as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, was free to disregard the testimony of any witness and resolve inconsistencies in the testimony. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Skrepnek v. Shearson Lehman Bros., Inc.,* 889 S.W.2d 578, 579 (Tex.App.—Houston [14th Dist.] 1994, no writ).

We conclude that the evidence is sufficient to support the jury's finding that appellants conspired to violate, and did violate, the privacy and property rights of the physicians. In addition, the evidence is factually sufficient to support the trial court's findings in granting the requested injunctive relief both as to the clinics and in favor of the physicians. The contrary evidence is not so overwhelming as to render the court's judgment unjust. Therefore, we also conclude that the trial court's conclusion of law in support of the necessity of the injunction is not erroneous. We overrule OR's points of error eight through thirty-one and B/J's points eight through twenty-seven.

## B. Constitutional Complaints

 **[33]**    In B/J point one and OR point forty-three, appellants contend the permanent injunction order is void because it violates the right to freedom of speech guaranteed in the First Amendment of the United States Constitution, as construed in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). They also contend the injunction is unconstitutionally overbroad in violation of the First Amendment rights of freedom of speech, press and association in B/J point three and OR point forty-four.

In *Madsen,* the United States Supreme Court set forth the standard for evaluating the constitutionality of a content-neutral injunction such as the one at issue here. We must determine "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. at 2525. This standard is based on the Court's earlier pronouncement that when sanctionable "conduct occurs in the context of constitutionally protected activity ... 'precision of regulation' is demanded." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982).

 **\*79**  **[34]**    In B/J point two and OR point forty-two, appellants also complain the injunction violates the Texas constitution and is not the least restrictive means of protecting the governmental interests involved, in violation of *Ex parte Tucci,* 859 S.W.2d 1 (Tex.1993) (plurality opinion). The Texas Constitution's broad command that "[e]very person shall be at liberty to speak ... opinions on any subject" provides greater rights of free expression than the First Amendment of the United States Constitution. *Davenport v. Garcia,* 834 S.W.2d 4, 10 (Tex.1992) (citing TEX. CONST. art. I, § 8). For this reason, restraints on expression may be imposed only if the injunctive relief granted encompasses "the least restrictive means" of protecting against the alleged imminent and irreparable harm caused by the expression. *Tucci,* 859 S.W.2d at 6.

The Texas Supreme Court recognized in *Tucci* that constitutional protection of freedom of speech and assembly does not license obstruction of public ways or entrances and exits from places of business. *Tucci,* 859 S.W.2d at 4. Without unimpaired access to appropriate counseling and medical facilities, women are deprived of their constitutional guarantee of choice. *Id.*

In *Tucci,* the supreme court considered only the portion of the temporary restraining orders on which the contempt convictions were based and which barred:

> Demonstrating within one-hundred (100) feet from either side of or in front of any doorway entrance or exit, parking lot, parking lot entrance or exit, driveway, or driveway entrance or exit at [any of the] clinic[s] or parking lots.

*Id.* at 4–5. In striking down the 100–foot speech free zone, the supreme court found the limited record before the trial court did not support the ban and noted that although a map of the Planned Parenthood facility was referred to at the hearing on the restraining orders, no evidence was admitted as to the different physical facilities of the various clinics. *Id.* at 6. Instead, those seeking the restraint urged a uniform restriction for "administrative convenience." *Id.* The court left open the possibility of a permanent injunction imposing a limited geographical ban on activity as long as any restriction is "justified by a proper evidentiary showing that such measures are essential to preserve the right of clinic access, and that each satisfies fully the standard we have required under the Texas Constitution." *Id.* The court required "specific findings supported by evidence" that the speech-free zone is the least restrictive means to insure unimpeded access to clinics and guard against intimidation and harassment. *Id.*

 **[35]**    While we recognize that our supreme court has held that the Texas constitution generally provides greater free speech rights than those provided under the federal constitution, we conclude that the standards of review for the constitutionality of this injunction are essentially the same under both the United States Constitution and the Texas Constitution. Any buffer zone injunction must "burden no more speech than necessary" and be the "least restrictive means" to protect unimpeded access to the clinics and residences.

In *Madsen,* the United States Supreme Court considered the constitutionality of a state court injunction prohibiting anti-abortion protestors, including Operation Rescue and "Operation Rescue America," from demonstrating outside a health clinic in Florida. Among other restrictions, the injunction prohibited the protestors, from "congregating, picketing, patrolling, demonstrating or entering" any portion of the public right-of-way or private property within 36 feet of the property line of the clinic to ensure access to the clinic. *Madsen*, 512 U.S. at 768, 114 S.Ct. at 2526. In upholding this part of the injunction, the Supreme Court recognized that the state court had "few other options to protect access," and the Court gave deference to the state court's familiarity with the facts and the background of the dispute between the parties, even in light of its heightened review. *Id.* at 769, 114 S.Ct. at 2527. The Court considered the fact that an earlier, more narrow injunction failed to accomplish its purpose, but stopped short of setting any requirement for a similar failure of a narrow restriction as a prerequisite for injunctions in future cases. *Id.* The Court concluded that "the 36–foot buffer zone around the clinic  **\*80**  entrances and driveway burdens no more speech than necessary to accomplish the governmental interest at stake." *Id.*

 **[36]**    The Supreme Court in *Madsen* also identified numerous significant government interests protected by the injunction, including: a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy; ensuring public safety and order; promoting the free flow of traffic on public streets and sidewalks; protecting the property rights of citizens; and protecting residential and medical privacy. *Madsen*, 512 U.S. at 767–68, 114 S.Ct. at 2526. The Court found that these governmental interests were sufficient to justify an appropriately tailored injunction to protect them. *Id.*

Here, the same significant governmental interests exist, and almost identical interests are listed in the trial court's conclusions of law. We hold that the governmental interests in this case are sufficiently significant to justify and demand injunctive relief. We now must evaluate the terms of the injunction to determine if they contain the least restrictive means of protection and are tailored to burden no more speech than necessary.

In *Madsen,* the United States Supreme Court upheld a complete buffer zone to protect access to the abortion clinic at issue. The only provision of the clinic buffer zone that the Court struck down was that portion which extended onto the private property of adjoining landowners at the sides of the clinic. [4] The zones at issue here do not extend onto private property other than the property on which their clinics or homes are situated. Each of the distance restrictions in the buffer zones in this case are narrower than the 36–foot zone upheld in *Madsen.*

The trial court in this case conducted an evidentiary hearing in addition to the jury trial. Appellants agreed to stipulate to maps, photographs and written descriptions of the proposed buffer zones that were introduced in evidence. Photographic evidence demonstrated that appellants could still be seen outside the prohibited zones. Each zone has been specifically tailored to the geography of the particular clinic. The width and breadth of each zone varies widely depending on the physical characteristics and location of each clinic. The zones range from fifteen to thirty-two feet, depending upon the particular requirements for adequate clinic access.

For example, there was testimony that patients were required to cross two streets from the parking lot to the Planned Parenthood entrance. Narrow corridors were provided across these streets to enable patients to cross the streets without fear of unwanted interference. At the A–Z Women's Clinic, which is located in a high-rise office building, the prohibited zone is fifteen feet from the driveways leading to the clinic's private parking lots, leaving one lane of traffic open for cars to enter and exit. Appellants can still be seen and heard at these locations. The West Loop Clinic has one of the largest buffer zones, thirty-one feet. It is justified due to the physical lay-out of the clinic which fails to provide any separation between appellants and arriving patients. In addition, the West Loop Clinic has been the target of repeated and dangerous acts of protest, including butyric acid attacks and fire-bombing.

We believe that the injunction satisfies the Texas Supreme Court's concern that distances not be imposed based solely upon "administrative convenience." *Tucci,* 859 S.W.2d at 6. We find that the evidence established that these zones are the least restrictive means and are "essential to preserve the right of clinic access" as required by *Tucci. See Tucci,* 859 S.W.2d at 7. In addition, we find the injunction satisfies *Madsen*'s requirement for "precision of regulation" to insure that the injunction burdens no more speech than necessary. *Madsen*, 512 U.S. at 767, 114 S.Ct. at 2525–26.

[37]     Appellants also argue, as part of B/J's points one through three, that the injunction on picketing near the clinics and physicians' residences is overbroad. OR   *81   raise essentially the same argument under their point of error forty-four. They contend that the injunction improperly bans *all* speech included within the term "demonstrating" within the buffer zones. This argument is unpersuasive because the United States Supreme Court upheld a complete ban on "demonstrating" within a 36–foot "speech-free" zone in *Madsen. Id.* at 768–69, 114 S.Ct. at 2526–27.

[38]     Appellants also contend the ban on residential picketing is unconstitutional. The injunction banned all "picketing, patrolling, or demonstrating within ... zone[s] along the entire ... street edge of [each physician's] property extending 13 feet from the property line" into the street where the residence is located.

Appellants maintain that the United States Supreme Court's decision in *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) controls the constitutionality of the ban on protests at the physicians' residences. The Court traditionally subjects restrictions on public issue picketing to careful scrutiny. The restrictions must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication. *Id.* at 482, 108 S.Ct. at 2501. In *Frisby,* the Court upheld an ordinance banning picketing in residential neighborhoods, finding anti-abortion protestors had ample alternative means to proselytize their views. *Id.* at 484, 108 S.Ct. at 2502. The Court construed the ban narrowly as prohibiting focused picketing taking place in front of a particular residence. *Id.* at 483, 108 S.Ct. at 2501–02.

[39]     [40]     The Court also found the restriction served a significant government interest: the protection of residential privacy. *Id.* A restriction is narrowly tailored if it eliminates no more than the exact source of the "evil" it seeks to remedy. *Id.* at 485, 108 S.Ct. at 2502–03. The Court found that focused picketing inherently and offensively intrudes on residential privacy. *Id.* at 486, 108 S.Ct. at 2503. The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectionable speech. *Id.* at 487, 108 S.Ct. at 2503–04. The Court concluded that a complete ban on targeted picketing is narrowly tailored to eliminate the "evil" of an unwelcome visitor at the home. *Id.*

[41]     The Supreme Court applies a "somewhat more stringent application of First Amendment principles" when evaluating an injunctive order than it does when a content-neutral, generally applicable statute is reviewed, as was the case in *Frisby. Madsen,*

512 U.S. at 765, 114 S.Ct. at 2524. Consequently, the injunction must satisfy the review announced in *Madsen,* that is, it must burden no more speech than necessary to serve a significant government interest. *Id.* at 765, 114 S.Ct. at 2525.

The injunction in *Madsen* prohibited picketing and demonstrating within 300 feet of the residences of clinic staff. *Id.* at 774, 114 S.Ct. at 2529. In striking down this provision, the Court found a 300–foot zone would ban general marching through the neighborhood or even a walking route in front of an entire block of houses, instead of a prohibition on "focused picketing taking place solely in front of a particular residence" that the Court had approved in *Frisby. Id.* at 775, 114 S.Ct. at 2530. The court recognized that a "limitation on time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." *Id.*

The more narrow restriction proposed by the U.S. Supreme Court is precisely what the trial court imposed in this case. This injunction prohibits protests in a small zone in front of each doctor's residence. There are time limits within each 24–hour period and limits on sound amplification within 100 feet of the residences. In *Madsen,* the Supreme Court approved even broader limitations on sound amplification near the residences of clinic staff. *Id.* at 774, 114 S.Ct. at 2529. Appellants complain that the buffer zone impermissibly prohibits them from passing through the neighborhood. However, the zone is only thirteen feet deep, and protestors have ample access to picket through the neighborhood, so long as they do not "focus" on the area in front of a particular doctor's residence. The thirteen-foot zone is necessary to permit the doctors' families to have **\*82** access to their driveways, and it leaves one lane of traffic open for alternate channels of communication by appellants or others.

We hold the injunction on protests at the doctors' residences satisfies the criteria set forth in *Frisby* as well as *Madsen,* and is therefore constitutional.

[42]  [43]  Appellants also contend the trial court made no specific factual findings supporting the injunctive relief. They argue the court instead made mere conclusions that appellants conduct "threatened" the access and use of the clinics. Appellants failed to preserve this complaint for our review. In any cause tried without a jury, any party may request the court to state in writing its findings of fact and conclusions of law. TEX.R. CIV. P. 296. When part of a cause is decided by a jury and part by the court, the party appealing the court-decided issue should request findings of fact and conclusions of law. *Heafner & Assocs. v. Koecher,* 851 S.W.2d 309, 313 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Shenandoah Assocs. v. J & K Properties, Inc.,* 741 S.W.2d 470, 484 (Tex.App.—Dallas 1987, writ denied).

[44]  [45]  [46]  [47]  The findings in this case satisfy the general requirements for injunctions. Rule 683 governs injunctions, and provides in relevant part:

> Every order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

TEX.R. CIV. P. 683. The requirements of Rule 683 are mandatory and must be strictly followed. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986). Findings of fact are not required to challenge the validity of an injunctive order that fails to state a reason for its issuance. *Courtlandt Place Historical Found. v. Doerner,* 768 S.W.2d 924, 926 (Tex.App.—Houston [1st Dist.] 1989, no writ). While every order granting an injunction must set forth the reasons for its issuance in the order itself, if the enjoined party wishes additional, detailed findings, the party may make a request under the rules of procedure governing findings of fact generally. *Transport Co. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553 (1953). Where a party fails to request additional or amended findings after the court files its original findings, the party waives the right to complain on appeal that the findings were not full and complete or that the court failed to enter additional findings of fact. *McDuffie v. Blassingame,* 883 S.W.2d 329, 337 (Tex.App.—Amarillo 1994, writ denied).

 [48]    [49]    [50]    Here, the trial court's injunctive order adequately stated the specific reasons for its issuance. If additional findings were needed, appellants should have requested them. By failing to request additional findings, appellants have waived any right to complain about omitted or incorrect findings. [5] *See Dallas Morning News Co. v. Board of Trustees Dallas ISD,* 861 S.W.2d 532, 538 (Tex.App.—Dallas 1993, writ denied). Without a request, omitted findings will be presumed in support of the judgment. *James Holmes Enters., Inc. v. John Bankston Constr. & Equip. Rental, Inc.,* 664 S.W.2d 832, 834 (Tex.App. —Beaumont 1983, writ ref'd n.r.e.).

The court recited appellants' specific conduct which justified the injunctive relief. The court found that appellants continued their protest activity despite existing injunctions imposing place and manner restrictions, and concluded that absent injunctive relief, defendants were likely to continue to engage in their tortious conduct. In fact, appellants have brazenly ignored the previous orders of judges in several states. The court determined that narrowly tailored injunctive relief was required to protect several significant governmental interests, which are substantially **\*83**  the same as those identified in *Madsen.* The court detailed the specific, narrowly tailored zone around each clinic's entrance. Each zone was a "[m]eans of protecting unfettered ingress and egress from the clinic, ensuring that [appellants] do not block traffic." *Madsen,* 512 U.S. at 769, 114 S.Ct. at 2526. These zones, by their very descriptions, demonstrate that they are designed to limit no more than the very evil of "in-your-face" harassment shown by the evidence at trial and to permit adequate access to the clinics. We hold that the court's findings are adequate and correct.

In conclusion, we find that the permanent injunction violates neither the federal nor state constitution. B/J points one through three, and OR points forty-two through forty-four are overruled.


### Actual Damages

 [51]    In points of error thirty-two through thirty-six, OR attack the actual damages. They first argue the evidence is insufficient to support causation and foreseeability. They contend that it is not known who committed the acts of vandalism which necessitated repairs to the clinic. In point of error thirty-six, OR argues the damages are excessive. They contend the other costs on which damages were based are associated with increased security measures, and are not properly recompensable as items of damages.

 [52]    [53]    In an action for interference with business relations, a plaintiff may recover "[s]uch damages ... as are a natural and proximate consequence of the interference." *Gonzalez v. Gutierrez,* 694 S.W.2d 384, 390 (Tex.App.—San Antonio 1985, no writ). For civil conspiracy, a Texas plaintiff is entitled to recover all damages that "naturally flow from the civil conspiracy." *Fenslage v. Dawkins,* 629 F.2d 1107, 1110 (5th Cir.1980) (citing *Great Nat'l Life Ins. Co. v. Chapa,* 377 S.W.2d 632, 635 (Tex.1964)).

Reiner testified to the following costs of repairs, alterations, and safety measures at Planned Parenthood: (1) construction costs totalling $109,467, which included: $30,812 for a security system; $5,030 for a halon fire suppression system; $42,650 for a more sophisticated sprinkler system; $1,149 for extra fencing; $7,658 for guard services during construction; $3,896 for bullet resistant glass windows; $485 for covering the air conditioning lines; $403 for repairs to the vandalized air conditioning lines; $17,384 for upgrade of the fire alarm system; (2) $33,468 for an additional security guard during the Republican Convention; (3) $21,650 in damages caused by a butyric acid attack; and (4) costs for an escort program totalling approximately $40,000. These sums total $204,585, the amount of actual damages awarded by the jury.

In addition to evidence of appellants' conduct already cited, Reiner testified appellants were responsible for the damages at Planned Parenthood, which required repairs and alterations to the building. By way of example, Reiner testified she heard Treshman describe over his hot line how to conduct a butyric acid attack. Her clinic was then the target of just such an acid attack. Roof and floor tiles were "permeated with a horrible stench" and had to be replaced. She testified that "[b]ecause of the fear of fire bombs, we needed some extra protection." She testified these changes to the building were necessitated solely by

appellants' conduct, along with that of their co-conspirators and agents. She stated that "these four defendants [against whom damages were awarded] clearly have conspired to initiate additional costs through their very actions and deeds and their own statements." This testimony was uncontradicted.

Planned Parenthood sought reimbursement for out-of-pocket expenses it incurred as a result of appellants' illegal protest activity. The evidence previously recited demonstrates that appellants acted intentionally to shut down the clinics and to keep patients away. It was foreseeable that Planned Parenthood would be forced to respond to the threats and acts of vandalism with appropriate security measures. Appellants cite to no evidence in the record that Planned Parenthood's expenses were excessive or unnecessary. Judy Reiner testified these changes were essential to continued clinic operation. We conclude that the evidence in the record is factually sufficient to support the actual **\*84** damages awarded by the jury. We overrule OR's points of error thirty-two through thirty-six.

## Punitive Damages

 **[54]**   In points of error thirty-seven and thirty-nine, OR assert the punitive damages awarded are erroneous because the jury did not award specific actual damages caused by appellants' conduct in maliciously engaging in a conspiracy to interfere with Planned Parenthood's business. OR argue that a reasonable proportionality between actual and punitive damages cannot be shown as required by the Texas Supreme Court.

Actual damages were based on affirmative answers to either Question No. 6, in which the jury found appellants wrongfully interfered with the ability of the clinics to provide medical services, or Question No. 3 on proximate cause of damages from the conspiracy. In answer to Question No. 1, on which Question No. 3 was predicated, the jury found appellants engaged in a conspiracy to interfere with the clinics' business. Question No. 4, which asked whether OR acted with malice, was limited to malice as to the conspiracy.

Appellants correctly cite the general rule there must be a finding of actual damages in tort to uphold an award of punitive damages. *See Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986). Here, the jury awarded actual damages in tort, but awarded punitive damages based only on conspiracy.

OR did not object to the charge on the basis that the damages could result from the conspiracy or wrongful interference with the clinics. It raised no objection to Questions Nos. 7–10, the damages questions, which were predicated on an affirmative answer to **either** a conspiracy finding or a finding of wrongful interference. Therefore, OR has waived any error in this regard. *Cosgrove v. Grimes,* 774 S.W.2d 662, 665–66 (Tex.1989) (holding the defendant waived error by failing to object to defective damages submission); TEX.R. CIV. P. 274. We overrule points of error thirty-seven and thirty-nine.

 **[55]**   **[56]**   **[57]**   In point thirty-eight OR contest the factual sufficiency of the evidence supporting punitive damages. In considering the propriety of an award of punitive damages, we must apply the review enunciated in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994). The Texas Supreme Court requires that when we conduct a factual sufficiency review of a punitive damages award, we must detail the relevant evidence in our opinion as to why the evidence supports or does not support the punitive damages in light of the factors in *Alamo Nat. Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). *Id.* at 31. These factors are: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus,* 616 S.W.2d at 910. Exemplary damages must be reasonably proportioned to actual damages. *Id.* The Supreme Court acknowledged in *Kraus,* however, that there is no set ratio between actual and punitive damages. *Id.*

The amount of actual damages awarded was $204,585 and the total amount of punitive damages were $1,010,000. Similar ratios are routinely approved by courts of this state. It is significant that the amounts found against the individual defendants were

substantially less than those against the organizations. It is also significant that the jury awarded $5,000 additional punitive damages, over and above the amount originally requested, against Rescue America, and its leader Don Treshman, for whom there was abundant evidence of involvement in organizing the protests and encouraging acts of vandalism. The evidence already discussed shows that the organizers acted intentionally and with malice. They were unconcerned about the consequences so long as their goal of stopping abortion was achieved. The evidence of appellants' conduct in this case, such as firebombing, acid attacks, and death threats, is so egregious as to be highly offensive and repugnant to law abiding citizens.

We conclude that the evidence supporting the jury's award of punitive damages is factually **\*85** sufficient. OR's point of error thirty-eight is overruled.

[58]    In point of error forty, OR challenge the award of punitive damages because two of the jurors voting for punitive damages did not join in the verdict on actual damages. Only ten of the twelve jurors voted to award actual damages.

Rule 292 provides that the same ten members of an original jury of twelve may render a verdict. TEX.R. CIV. P. 292; *Palmer Well Servs., Inc. v. Mack Trucks, Inc.,* 776 S.W.2d 575, 576 (Tex.1989). There is a split of authority as to whether the same ten jurors who found liability in the first phase of the trial must agree upon the amount of punitive damages in the second phase of a bifurcated trial. The Corpus Christi Court of Appeals determined that they did not, finding Rule 292 does not apply. *Greater Houston Transportation Co. v. Zrubeck,* 850 S.W.2d 579, 588 (Tex.App.—Corpus Christi 1993, writ denied). Recently, the Amarillo Court of Appeals reached the opposite conclusion. *See Hyman Farm Serv., Inc. v. Earth Oil & Gas, Inc.,* 920 S.W.2d 452 (Tex.App.—Amarillo 1996, no writ). In *Hyman,* the court rejected what it called "dicta" in *Zrubeck,* and held that Rule 292 requires the same ten or more jurors to concur in all answers necessary to a judgment, including the answer to the amount of punitive damages awarded, if any, in a bifurcated trial. *Id.* at 457–58.

[59]    We need not decide whether Rule 292 applies because appellants made no objection before the verdict to the two dissenting jurors' participation in the punitive damages deliberations. In fact, appellants demanded the two jurors' participation. Thus, they have waived any complaint. TEX.R.APP. P. 52(a). Moreover, the punitive damages verdict was unanimous. Therefore, the same ten jurors that voted to award actual damages found punitives. In the event it was error for the other two jurors to join in the verdict, it is clearly harmless. We overrule point of error forty.

[60]    In point of error forty-one, OR challenge Planned Parenthood's amendment of its damages request after the jury verdict but before rendition of judgment. The jury awarded $5,000 additional punitive damages, above the amount requested, against Treshman and Rescue America. Planned Parenthood requested a pre-judgment trial amendment, which the court granted. The trial court then incorporated the amended amounts in its judgment. OR contend the amendment operated to their surprise and prejudice, and that it was violative of Rule 47.

[61]    [62]    Rule 47 requires a pleading setting forth a claim for relief to give fair notice of the claim involved and to state that the damages sought are within the jurisdictional limits of the court. TEX.R. CIV. P. 47. A pleading is sufficient when it gives fair and adequate notice of the facts upon which the pleader basis its claim. *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). The purpose of Rule 47 is to give the opposing party information sufficient to enable him to prepare a defense. *Id.*

[63]    The trial court has no discretion to deny a trial amendment unless appellants *demonstrate* surprise. *Chapin & Chapin, Inc. v. Texas Sand & Gravel Co.,* 844 S.W.2d 664, 665 (Tex.1992); *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990); TEX.R. CIV. P. 63 (requiring leave to amend to be granted absent a showing of surprise); TEX.R. CIV. P. 66 (requiring the court to freely allow amendment in absence of showing of prejudice). Appellants failed to show they were surprised by the amendment. We hold the trial court did not abuse its discretion in permitting the pre-judgment amendment to appellees' pleadings. OR point of error forty-one is overruled.

## Errors in the Judgment

[64]    [65]    OR complain in point of error forty-eight, and B/J complain in point thirty-one, that the trial court erred in failing to include "take-nothing" provisions in favor of appellants against some of the plaintiffs. The jury did not find that appellants violated the rights of Dr. Richard Cunningham, Dr. Howard Novick, or two businesses adjoining Planned Parenthood, Brian G. Martinez, D.D.S., and O'Connor & Co., d/b/a Adkins Architectural Antiques. The court recited in **\*86** the judgment, however, the jury's answers to each question as to each plaintiff and intervenor. Appellants cite no authority that the trial court's failure to include "take-nothing" provisions is reversible error. Unsupported points of error are waived. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983). We overrule OR point of error forty-eight and B/J point of error thirty-one.

[66]    In OR's points forty-nine and fifty and B/J's points thirty-two and thirty-three, appellants argue that the trial court erroneously amended its judgment. Appellees requested the court to correct two matters they deemed "clerical errors." The two changes were: (1) to correct the parenthetical numerical in the award of punitive damages to $355,000 to coincide with the wording; and (2) to change the enforcement paragraph in the injunction by adding "any officer, agent, servant, employee, attorney, or person acting in active concert with defendant, who has actual notice of the order." OR assert that this second change is not a clerical error. OR concede that the transferee court had plenary jurisdiction over the judgment by virtue of appellants' timely filed motion for new trial, but argue the court could not correct a "judicial error" in the enforcement paragraph of the judgment.

[67]    "Clerical errors" are mistakes or omissions that prevent the judgment as entered from reflecting the judgment as rendered. The trial court may correct clerical mistakes even if it has lost plenary jurisdiction. *Andrews v. Koch,* 702 S.W.2d 584, 585 (Tex.1986); TEX.R. CIV. P. 316, 329b(h).

First, we note that the injunctive order section of the judgment provides that: "defendants, their officers, directors, agents, representatives, employees, attorneys, and all persons acting in concert with or participating with, by or through them are enjoined and restrained from the following:...." Thus, we find that addition of the same language to the enforcement paragraph was necessary and proper to correct a clerical error. In addition, we note that Rule 683 contemplates the injunctive order being binding upon "parties, their officers, agents, servants, employes, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order." *See* TEX.R. CIV. P. 683. Therefore, the correction to comply with the terms of the rule was properly made. We find no error in the correction in the amended judgment of this clerical error and overrule OR's points forty-nine and fifty and B/J's points thirty-two and thirty-three.

[68]    In OR point of error fifty-one and B/J point thirty-four, they argue the trial court had no authority to enter the judgment nunc pro tunc to correct the amended judgment. Appellants' motion for new trial was overruled on February 10, 1995. The trial court entered a judgment nunc pro tunc on June 15, 1995 to include attachment of exhibits describing the buffer zones. These exhibits were referred to in the original judgment, and were attached to that judgment. When the judgment was first amended, the exhibits were inadvertently omitted. Failure to attach the exhibits to the judgment is a clerical error, not a judicial error. Therefore, the trial court could properly enter a judgment nunc pro tunc after expiration of it plenary power. TEX.R. CIV. P. 316, 329b(h). We overrule OR point of error fifty-one and B/J point of error thirty-four.

## Costs

Appellants complain about the trial court's allocation of costs in OR's points of error fifty-two through fifty-four and B/J points thirty-five through thirty-seven. On May 23, 1995, the court ordered the district clerk to issue a new cost bill reflecting "previously taxed costs" of $15,057.75 and adding "retaxed additional costs" of $15,087.82.

[69] [70] The successful party shall recover costs from its adversary. TEX.R. CIV. P. 131. A "successful party" is one who obtains a judgment of a competent court vindicating a civil claim of right. *Perez v. Baker Packers,* 694 S.W.2d 138, 143 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Allocation of costs is a matter for the trial court's discretion and cannot be overturned absent a showing of abuse. *Hill v. Robinson,* 592 S.W.2d 376, 378 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.); **\*87** *Coleman v. Donaho,* 559 S.W.2d 860, 864 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ dism'd).

[71] [72] A court may not adjudge costs other than as provided by Rule 131 unless good cause is shown. *Dover Elevator Co. v. Servellon,* 876 S.W.2d 166, 169 (Tex.App.—Dallas 1993, no writ); *Contemporary Health Management, Inc. v. Palacios,* 832 S.W.2d 743, 745 (Tex.App.—Houston [14th Dist.] 1992, no writ); TEX.R. CIV. P. 141. In the absence of an explanation for assessing costs contrary to the rule, the trial court abuses its discretion. *See Guerra v. Perez & Assoc.,* 885 S.W.2d 531, 533–34 (Tex.App.—El Paso 1994, no writ); *Dover Elevator Co. v. Servellon,* 812 S.W.2d 366, 367 (Tex.App.—Dallas 1991, no writ).

[73] A motion to adjudge costs involves an assessment by the court as to who shall pay the costs, while a motion to retax costs involves the question of the amount of costs assessed. *Reaugh v. McCollum Exploration Co.,* 140 Tex. 322, 167 S.W.2d 727, 728 (1943); *City of Ingleside v. Stewart,* 554 S.W.2d 939, 948 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). A motion to retax costs is one to correct the ministerial act of the clerk of the court in tabulating costs. *Wood v. Wood,* 159 Tex. 350, 320 S.W.2d 807, 813 (1959).

[74] In OR point fifty-two and B/J point thirty-five, appellants complain that the court failed to reduce the costs awarded against them by a proportionate amount for the two plaintiffs against whom all defendants were successful and the eight plaintiffs against whom one of the defendants was successful. We are cited to no authority requiring the trial court to make this proportionate reduction in costs. Moreover, rather than retaxing of costs, this proportionate reduction is an allocation or adjudication of costs, which was required to be made within the trial court's plenary power. Where the complaint is made of the ruling of a court in adjudging costs against the wrong party, the error is inherent in the judgment and must be properly assigned, just as any other alleged error. *Reaugh,* 167 S.W.2d at 728.

[75] [76] In OR point fifty-three and B/J point thirty-six, appellants argue the court was without jurisdiction to retax costs because more that thirty days had elapsed since appellants' motion for new trial was overruled. Because taxing of costs, as distinguished from the adjudication of costs, is merely a ministerial duty of the clerk, an error may be corrected upon the injured party's motion, even after the case has been disposed of on appeal, as long as the request is made before the mandate issues and the costs are paid. *Hartzell Propeller, Inc. v. Alexander,* 517 S.W.2d 455, 456 (Tex.Civ.App.—Texarkana 1974, no writ). We find the trial court had authority to retax costs.

[77] In OR point fifty-four and B/J point thirty-seven, appellants contend the retaxed costs are in error.

The Civil Practice and Remedies Code Provides in relevant part:

A judge of any court may include in any order or judgment all costs, including the following:

(1) fees of the clerk and service fees due the county;

(2) fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit;

(3) masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and

(4) such other costs and fees as may be permitted by these rules and state statutes.

TEX. CIV. PRAC. & REM.CODE ANN. § 31.007(b) (Vernon Supp.1996).

Appellants complain about being assessed the costs for the following: (1) $6,030.53 for citing by publication 10,000 John and Jane Doe defendants who were later nonsuited; (2) $5,308.80 and $1,245 for the transcript of the hearing on the temporary

injunction; (3) $859.40 for transcripts of four depositions taken by defendants; (4) $2,355 for rental of a television and video recorder; (5) $120 for copies of videotapes (6) $416 and $118.77 for photos of the clinics and residences; (7) $3,627.50 for service of citation on eight defendants by private process servers; and (8) $382.35 for service of subpoenas.

**\*88** **[78]** **[79]** All of these costs were necessary to the conduct of the trial. Most of these expenditures, such as rental of the television and video recorder, were specifically ordered by the trial court. The trial court also ordered appellees to provide appellants with copies of the videotapes they intended to show at trial. It was also the trial court who ordered the unknown Doe defendants to be served because they would be bound by the injunction as appellants' agents. The affidavit from Neal Manne, appellees' counsel, substantiates that the trial court ordered these expenses and that they were reasonably and necessarily incurred in the prosecution of the suit. In addition, the affidavit from Judy Reiner states that the fees were reasonable and necessary to prosecute the suit. Deposition expenses are properly chargeable as court costs. *Wallace v. Briggs,* 162 Tex. 485, 348 S.W.2d 523, 527 (1961); *Shenandoah Assocs. v. J & K Properties, Inc.,* 741 S.W.2d 470, 487 (Tex.App.—Dallas 1987, writ denied). Subpoena and citation fees are recoverable as court costs. *Shenandoah,* 741 S.W.2d at 487. The affidavits attached to appellees' motion support a determination by the trial court that the transcript from the temporary injunction hearing was "necessarily obtained for use at trial," in accordance with TEX. CIV. PRAC. & REM.CODE ANN. § 31.007(b)(2).

Attached to the trial court's order retaxing costs are the original itemization from the district clerk and an amended itemization with numerous items deleted from the original list. According to appellees' motion, the redacted items were for costs incurred by plaintiffs other than appellees. From this itemization, it appears that appellees have not been awarded costs for plaintiffs that did not recover. The court's order also reflects that a hearing was conducted on appellees' motion to retax costs. We have no record of the hearing, and in the absence of a record, we cannot determine the basis for the court's order. It is appellants' burden to furnish a sufficient record to demonstrate error. TEX.R.APP. P. 50(d).

We find no abuse of discretion in permitting appellees, the prevailing parties, to recover their costs. We overrule OR's points of error fifty-two through fifty-four and B/J's points of error thirty-five through thirty-seven.

We affirm the judgment of the trial court.

AMIDEI, Justice, dissenting.
I respectfully dissent from the court's majority opinion.

The portion of the judgment awarding a permanent injunction is void and should be reversed and rendered for one or more of the reasons as follows:

1. The trial court did not make a finding there was a threat of imminent harm. The trial court must make such finding to support a permanent injunction. *Frey v. DeCordova Bend Estates,* 632 S.W.2d 877, 881 (Tex.App.—Fort Worth 1982), *affirmed,* 647 S.W.2d 246 (Tex.1983); *Isuani v. Manske–Sheffield,* 805 S.W.2d 602, 605 (Tex.App.—Beaumont 1991, writ denied); *Green v. Unauthorized Practice of Law Committee,* 883 S.W.2d 293 (Tex.App.—Dallas 1994, no writ) (a prevailing, successful petitioner for injunctive relief must demonstrate the following grounds: (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate and realistically complete remedy.); *Univ. Interscholastic League v. Buchanan,* 848 S.W.2d 298, 301 (Tex.App.—Austin 1993, no writ); *Hues v. Warren Petroleum Co.,* 814 S.W.2d 526, 529 (Tex.App.—Houston [14th Dist] 1991, writ denied).

The trial court merely made the following conclusion of law:

"1. Absent injunctive relief, defendants are *likely* to continue to engage in the tortious conduct found by the jury to be in violation of Plaintiff clinics and physicians' common law and constitutional rights, and such conduct is *likely* to cause plaintiff clinics and physician *irreparable* harm." (Emphasis added)

There is no language in such conclusion which directly stated or implied there was at the time of trial a threat of imminent harm. The Republican National Convention had long since been over as well as the picketing activities the subject of this action. There **\*89** was no threat of imminent harm, and the trial court found none. For this reason alone the injunctive portion of the judgment should be held void and reversed and rendered in favor of the appellants.

The question regarding "imminent harm" cannot be deemed because the appellants submitted jury question and instruction no. 4 to the court asking whether the appellees were subject to imminent harm. The court refused such question and instruction.

2. There was no irreparable harm notwithstanding the finding in the above stated conclusion no. 1. Injunctive relief is not proper when an adequate remedy at law, i.e. a claim for damages, was available. *Id.* at 530; *Mitchison v. Houston I.S.D.,* 803 S.W.2d 769 (Tex.App.—Houston [14th Dist] 1991, writ denied) (a party demonstrates irreparable harm when he shows that an award of damages a month later will not provide adequate compensation). To state it is likely there will be harm in the future is not to say it is an imminent threat. Further, the appellees recovered a jury verdict in the amount of $1,214,585 not including personal injuries against the appellants. If this type award is not adequate, then it was the will of the jury, which could have made it more. I believe the award is more than adequate under the circumstances. If there are any damages in the future, which is unlikely, another jury will be available to make the appellees whole. Damages awarded by the jury far exceeded any out of pocket expenses of the appellees.

3. The trial court failed to state reasons for its issuance pursuant to Rule 683 Texas Rules of Civil Procedure. Rule 683 requires the court in *every* order granting an injunction to set forth the reason for its issuance. Further, the reasons shall be specific in terms and shall describe in reasonable detail and not by reference to the complaint or document, the act or acts sought to be restrained. Rule 683 Texas Rules of Civil Procedure.

The trial court made the following findings:

1. Defendants' conduct threatens access to plaintiff clinics by women seeking abortion and other medical services; [in Point of Error 25]

2. Defendants' conduct threatens the use and enjoyment of plaintiff clinics' and physicians' property rights; [in Point of Error 26]

3. Defendants' aggressive and harassing manner of protesting and sidewalk counseling of clinic patients increases the risk attendant to the abortion procedure; [in Point of Error 27]

4. Defendants' targeted picketing of plaintiff physicians' homes threatens and interferes with plaintiff physicians' right of privacy [;] [in Point of Error 28]

5. Defendants have not abandoned their activities toward plaintiffs, but (1) remain committed to their particular protest tactics and would use them again toward plaintiffs if the circumstances (such as a national media event in Houston) presented itself; (2) have aided and abetted others in continuing to engage in conduct that is either tortious or in violation of plaintiffs' constitutional rights; and (3) principle (sic) defendants, and those found by the jury to have acted with malice, are either locally based (such as Rescue America and Don Treshman) or have recently increased their organizational presence in Texas (Operation Rescue—National[;] [in Point of Error 29])

6. Despite existing injunctions imposing place and manner restrictions on defendants' protect activities targeting plaintiff clinics, defendants (or those found by the jury to be acting in concert with them) have continued to engage in protest activity toward some of the clinics using tactics that are harassing to patients and clinic staffs, that is violative of clinics' common law and constitutional rights, and that threatens safe, accessible abortions for women seeking medical services at plaintiff clinics. [in Point of Error 30]

These findings are conclusions and do not state the act or acts sought to be restrained. They do not state facts which they could even be tested. This is important because the court was stating reasons to enjoin twenty- **\*90** eight different parties. The differing operative facts as to all such parties, including where located, militate against the sweep treatment the court displayed for permanent injunction purposes. The Court failed to state what conduct the appellants were protesting or what they did.

The trial court must state these reasons without any request of the parties. The Court was not required to make findings of fact and conclusions of law as this was a jury case. Rule 296 Texas Rules Civil Procedure specifically provides that findings may be requested in any case tried "without an jury." Therefore, the reasons for injunction could not be waived for not asking for findings of fact and conclusions of law as suggested by the majority.

4. The Permanent Injunction is unconstitutionally overbroad. The Permanent Injunction portion of the judgment provides in Section E that appellants are prohibited from "demonstrating" within described zones that circumvent nine facilities belonging to appellees. "Demonstrating" was defined as "oral or other expression that publicly displays, manifests, or expresses one's feelings or opinions ... and expressly includes 'sidewalk counseling.' " These zones also extend from the edges of the properties into any adjoining public streets, approximately to the center line of the respective streets adjoining each of the facilities. The zones are shown on plats of each facility attached as exhibits to the judgment. The Planned Parenthood facility also has two protected corridors, fifteen feet wide, extending from two parking lots across the public streets to the facility. The widest zone is thirty-two feet (Women's Medical Center of N.W. Houston) and the narrowest zone is fifteen feet (AAA Concerned Women's Center). Similarly, Section I of the judgment provides restrictions pertaining to the five physician appellees prohibiting "congregating, picketing, patrolling, or demonstrating" within thirteen foot zones extending from their respective property lines into the adjoining streets.

The record does not show any evidence that "such measures are essential to preserve the right of clinic access, and that each satisfies fully the standard we have required under the Texas Constitution" as required by *Ex Parte Tucci,* 859 S.W.2d 1, 7 (Tex.1993). *Tucci* held: "Unless such a restriction is proved to be the least restrictive means of guarding against an irreparable and imminent injury, it is an impermissible infringement on our state constitutional right of free expression." *Id.*

In *Tucci,* Rev. Keith Tucci, and six other abortion protestors, had been held in contempt for violating a temporary restraining order previously entered in these proceedings. The parties, four of whom are appellants in this appeal, brought original habeas corpus proceeding in the Texas Supreme Court asserting they had been confined for expression which is protected under article I, section 8 of the Texas Constitution (freedom of expression). The temporary restraining order, in part, barred demonstrating within one hundred (100) feet of any of the nine clinics, appellees in this appeal. The relators in *Tucci* did not attack any of the other provisions of the restraining orders but challenged only the one-hundred foot limitation as unconstitutional. The confinement of relators was premised solely on their having disregarded portions of the one-hundred foot limitation. The other provisions of the restraining orders were clearly directed to protecting against the specific injuries alleged by the women, clinics and businesses and access by injunctive relief that barred:

> [t]respassing on, physically invading, entering without consent, damaging, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any part of the Planned Parenthood [1] facility ..., including the entrances and exits, the parking lots ..., and any of the clinic's or parking lots' entrances and driveways.

Additionally, the temporary restraining orders contained four independent provisions to guard against intimidation and harassment that prohibited:

Demonstrating within twenty-five (25) feet of any person seeking access to or leaving the clinic, its parking lots, or intervenors' businesses or parking lots, or in any way **\*91** impeding such person's entrance to or exit from the clinic, parking lots or businesses;

Physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, or crowding persons entering or leaving, working at, or using any services at Planned Parenthood's above-referenced facility or at the intervenors' businesses;

Harassing, intimidating or physically abusing any doctor, health care professional, or other staff member, employee or volunteer who assists in the provision of services at the ... facility; and

Making any sound or noise (whether by mechanical loudspeaker, sound amplification device or otherwise) that is so loud that it disturbs, injures, or endangers the health or safety of any patient or staff person of the ... facility.

In this case, in an effort to comply with *Tucci,* the trial court conducted an evidentiary hearing on the issues of injunctive relief. The plats of the proposed limited geographical ban were introduced into evidence and attached as exhibits to the judgment. However, there was no evidence introduced at this hearing or during the jury trial that these geographical bans were the least restrictive means available to ensure unimpeded access to clinics and guard against intimidation and harassment. *Tucci* mandates that such restrictions *must* be justified by a proper evidentiary showing that such measures are *essential* to preserve the rights of clinic access and that such restrictions are the least intrusive as to individual liberties. *Tucci,* 859 S.W.2d at 7.

The judgment contains provisions clearly directed to protecting against the specific injuries alleged by the women and clinics. Injunctive relief bars:

A. Entering without consent upon or damaging any part of the premises, facilities and parking lots of [the nine clinics].

B. Blocking or attempting to block, barricade, or in any other manner obstruct the entrances to, or the premises of [the nine clinics].

C. Inhibiting, impeding, obstructing or interfering with, or attempting to inhibit, impede, or obstruct or interfere with the free and unmolested ingress and egress of persons (either pedestrian or vehicular) to and from the facilities and parking lots and the streets and sidewalks adjacent to the facilities and parking lots of [the nine clinics].

D. Touching, physically abusing, intimidating, or harassing any individual attempting to enter or exit the facilities or parking lots of [the nine clinics].

Section E, as written in the judgment, concerning "demonstrating" violates Article I, Section 8 of the Texas Constitution, as set out in this opinion. However, the above restrictions A through D would be the least restrictive means to protect against the intimidation and harassment complained of. Sections A through D are the least restrictive means that are essential to preserve the right of clinic access or if there is evidence to prove that demonstration-free zones would be the least restrictive means to protect a woman's right to have an abortion as set out in *Tucci* at 7.

For the same reasons, the restrictions in Sections F through H, that pertain to the residences of the physicians specifically provide for injunctive relief that would protect the physicians against the conduct complained of. These restrictions are:

F. Trespassing on, sitting in, blocking or impeding plaintiff physicians, their family members and their guests or invitees from access to, ingress into or egress from any part of plaintiff physicians' residences.

G. Inhibiting, impeding or attempting to impede or inhibit the free ingress or egress of any person to the streets that provide access to the streets on which the plaintiff physicians' residences are located;

H. Harassing, threatening, assaulting, or physically abusing plaintiff physicians, their family members, guests or invitees.

However, Section I of the judgment providing for the 13 foot zone is likewise void under *Tucci* as there was no evidence introduced at the trial or at the hearing on the **\*92** injunction that would prove that such a zone would be the least restrictive means to prevent the harm complained of. The United States Supreme Court has approved prior restraints against free speech.

*Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Frisby,* abortion protestors brought suit seeking to enjoin the enforcement of a municipal ordinance prohibiting picketing before or about the residence or dwelling of any individual. The Court found that the ordinance did not ban all picketing in residential areas, but only prohibited focused picketing taking place solely in front of particular residences. The ordinance served a significant government interest of protecting residential privacy. An important aspect of such privacy is the protection of unwilling listeners within their homes from the intrusion of objectionable or unwanted speech. The ordinance is "narrowly tailored" to serve that governmental interest, since it targets and eliminates no more than the exact source of "evil" it seeks to remedy: offensive and disturbing picketing focused on a "captive" home audience. It does not prohibit more generally directed means of public communication that may not be completely banned. *Id.* 487 U.S. at 487–89, 108 S.Ct. at 2504. Although injunctive relief is available to prevent picketing, similar to the picketing in *Frisby, Tucci* mandates an evidentiary hearing to prove that a buffer zone, such as is the case here, is the least restrictive means of preventing this harm. Section I could read: "Congregating, picketing, patrolling, or demonstrating in front of the [physician's] residence" if the court finds this is the least restrictive means of preventing the harm. *Id; see also Ex Parte Pierce,* 161 Tex. 524, 342 S.W.2d 424, 427 (1961) (Constitutional protection of the right to free speech and free assembly does not license interference with and obstruction of public ways or entrances to and exists from places of business by picketing).

Further, I would reverse and remand the damages portion (including punitive) of the judgment for the following reasons:

The appellants' complaint that the trial court refused to include in the charge a complete definition of the essential elements of an actionable civil conspiracy as requested has merit. Omitted over objection were the essential elements: (1) one or more overt acts, and (2) damages resulting from the conspiracy. *Massey v. Armco Steel Company,* 652 S.W.2d 932, 934 (Tex.1983); *Metzger v. Sebek,* 892 S.W.2d 20 (Tex.App.—Houston [1st Dist] 1994, writ denied). The essential elements are:

> The plaintiff in a civil conspiracy action must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey,* 652 S.W.2d at 934; *Bernstein v. Portland Sav. and Loan Ass'n,* 850 S.W.2d 694, 705 (Tex.App.—Corpus Christi 1993, writ denied) The "unlawful, overt acts" must be acts in furtherance of the conspiracy. *Massey,* 652 S.W.2d at 934.

In *Massey* the court held plaintiffs had not alleged a cause of action for conspiracy because of failure to allege an unlawful overt act. Harmful error resulted from such omission because the definition of conspiracy was the basis of appellees' causes of action. The first two questions to establish liability on the appellants and questions 3 through 9 establishing damages use the term "conspiracy." It is obvious it was harmful to appellants because a $1,214,585 judgment was rendered against them. This judgment does not include damages for personal injuries, and seems excessive for what was involved. The jury could very well have decided the case differently had the omitted elements been included by the trial judge. The error, in light of the entire record, was reasonably calculated to and probably did cause the rendition of an improper judgment. *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995).

**All Citations**

937 S.W.2d 60

Footnotes

\*   The Honorable Ross A. Sears sitting by assignment.

1   Appellants have not raised any points of error attacking the sufficiency of the evidence supporting the jury's findings that they participated in a conspiracy to interfere with the business of the clinics or that they and their operatives tortiously interfered with the clinic's business. By failing to allege error in a point of error, any complaint as to these findings has been waived. *San Jacinto River Authority v. Duke,* 783 S.W.2d 209, 210 (Tex.1990).

2   We note that in addition to violations of civil law, as well as local and state criminal laws appellants may have violated, their actions would now also be violative of federal law. In 1994, the federal government passed the Freedom of Access to Clinic Entrances Act.

18 U.S.C.A. § 248 (West 1996) (applicable to conduct occurring on or after May 26, 1994). This Act was prompted by the violence at abortion clinics all over the United States, and it is aimed directly at these appellants and their other conspirators who blockade abortion clinics or threaten employees or patients. The Act makes it a crime to interfere "by force or threat of force *or by physical obstruction* " with anyone who is seeking or performing an abortion or other reproductive health service. 18 U.S.C.A. § 248(a)(1) (emphasis added).

3      Even though appellants allege four points of error challenging the sufficiency of the evidence supporting the jury's finding that appellants violated Dr. John Coleman's rights, the finding is immaterial because Dr. Coleman was awarded no damages and obtained no injunctive relief.

4      The Court also struck down other prohibitions in the injunction, apart from the buffer zone, that are not at issue here.

5      Appellants objected to the trial court's findings in their motion for new trial. The record does not contain a request for additional findings, however, and the motion for new trial cannot be construed as a timely request. *See* TEX.R. CIV. P. 298.

1      Near identical provisions were included in the order applicable to the other clinics.

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

212 S.W.3d 513
Court of Appeals of Texas,
Austin.

DAVID JASON WEST AND PYDIA, INC. d/b/a www.bankopp.com, Appellants,

v.

STATE of Texas, Appellee.

No. 03–05–00724–CV.    |    July 21, 2006.

**Synopsis**

**Background:** State brought action against individual and business, alleging violations of the Deceptive Trade Practices–Consumer Protection Act (DTPA) arising out of defendants' offers to eliminate consumers' debt. The District Court, Travis County, 353rd Judicial District, Margaret A. Cooper, J., granted State's motion for supplemental restraining order, freezing defendants' funds, and supplemental temporary injunction maintaining the freeze on the account. Defendants appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] State demonstrated a probable right to recovery;

[2] sufficient evidence supported findings that defendants violated DTPA and that temporary injunction was in the public interest;

[3] temporary injunction complied with statutory requirements under the DTPA; and

[4] temporary injunction satisfied specificity requirement of Rules of Civil Procedure.

Affirmed.

West Headnotes (8)

**[1]**     **Injunction** 🔑 Preservation of status quo

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits.

Cases that cite this headnote

**[2]**     **Appeal and Error** 🔑 Injunction

**Appeal and Error** 🔑 Refusing injunction

Because the decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, the Court of Appeals will not disturb that decision absent a clear abuse of discretion.

1 Cases that cite this headnote

**[3]**    **Appeal and Error** 👉 Injunction

When reviewing a trial court's decision to grant or deny a temporary injunction, the Court of Appeals views the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor.

1 Cases that cite this headnote

**[4]**    **Antitrust and Trade Regulation** 👉 Credit repair and counseling

Debt elimination service offered by business was that of a credit services organization, rather than a loan and was, thus, subject to the Deceptive Trade Practices–Consumer Protection Act (DTPA), such that State demonstrated a probable right to recovery in its DTPA action against business, in support of its motion for a temporary injunction freezing business's assets, where business advertised a "banking opportunity" on radio, in a telephone message, and on the Internet, offering debt elimination, for $5,000, to any "U.S. Citizen" for any type of debt through a "loan" that would not require repayment. V.T.C.A., Bus. & C. §§ 17.46(a, b), 17.47.

1 Cases that cite this headnote

**[5]**    **Injunction** 👉 Irreparable injury

**Injunction** 👉 Adequacy of remedy at law

Probable injury, as required for issuance of a temporary injunction under the common law, includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law.

10 Cases that cite this headnote

**[6]**    **Antitrust and Trade Regulation** 👉 Credit repair and counseling

Sufficient evidence supported trial court's findings that business that advertised "banking opportunity," offering debt elimination for $5,000, may have been violating the Deceptive Trade Practices–Consumer Protection Act (DTPA), and that State's efforts to freeze business's assets were in public interest, as required for issuance of temporary injunction under the DTPA provision governing restraining orders and injunctions; business's Internet site contained repeated assertions that participants would not repay bank because loans would be forgiven, and evidence showed that account to which participants' $5000 had been transferred belonged to business's owner. V.T.C.A., Bus. & C. § 17.47(a).

Cases that cite this headnote

**[7]**    **Antitrust and Trade Regulation** 👉 Particular cases

District Court's temporary injunction freezing business's assets, complied with statutory requirements for temporary injunctions issued under the Deceptive Trade Practices–Consumer Protection Act (DTPA), where court found that business may have been violating the DTPA through its "banking opportunity," and that the temporary injunction was in the public interest. V.T.C.A., Bus. & C. § 17.47(a, b).

Cases that cite this headnote

**[8]**    **Antitrust and Trade Regulation** 👉 Particular cases

District Court's temporary injunction freezing business's assets, satisfied specificity requirement of the Rule of Civil Procedure governing the form and scope of temporary injunctions, where court found that, unless business was "immediately restrained from the acts prohibited," business would "dissipate funds obtained from consumers through

misrepresentations in violation of the Deceptive Trade Practices Act" (DTPA). V.T.C.A., Bus. & C. § 17.47(a); Vernon's Ann.Texas Rules Civ.Proc., Rule 683.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*514** Mark D. Hopkins and C. Wilson Shirley, III, Savrick, Schumann, Johnson, McGarr, Kaminski & Shirley, Austin, for Appellants.

David M. Ashton, Mary Taylor Henderon, Nanette Marie Dinunzio, Asst. Atty. Gen., Austin, for Appellees.

Before Chief Justice LAW, Justices PURYEAR and PEMBERTON.

*OPINION*

BOB PEMBERTON, Justice.

In this interlocutory appeal, we must determine whether the district court abused its discretion by granting the State's request for a supplemental temporary injunction and asset freeze against appellants, David West and Pydia, Inc. d/b/a *www.bankopp.com* (collectively "West"). In three issues, West asserts that the district court erred by granting **\*515** the temporary injunction because the State did not demonstrate (1) a probable right to recovery or (2) a probable injury, and (3) the order did not specifically state the reasons for its issuance. Because we hold that the district court did not abuse its discretion, we affirm the supplemental temporary injunction order.

**BACKGROUND**

At the supplemental temporary injunction hearing, the court admitted evidence of a printed copy of West's Web site, testimony from an investigator employed by the Consumer Protection and Public Health Division of the Texas Attorney General's office, and documents from Hibernia National Bank in Baton Rouge provided in response to the State's civil investigative demand. The investigator's testimony and the Web site evidence revealed that West used an Austin radio commercial, a recorded telephone message (identified as a "phone overview"), and a Web site to advertise meetings at a local hotel about a "banking opportunity" that would allow any "U.S. Citizen" to pay off all personal debt—including "credit cards, mortgages, student loans, vehicles, loans, IRS settlements, and back child support"—before December 31, 2005, by securing a "loan" from an unnamed bank. West's "*www.bankopp.com* " Web site also stated that "David [West] found a Bank that is willing to give individuals loans to pay off their debts. Then the Bank is willing to turn around and forgive that loan so it doesn't have to be paid off." It asserted that "two little known banking practices ... Fractional Banking and Forgiven Loans" made this "one shot opportunity" possible. The site claimed that although "this opportunity is legal," the "Federal Reserve will undoubtedly close the loopholes that allowed the project to take place this once. While the system intended on well connected, wealthy individuals to be able to take advantage of this, it was never intended that regular every day people would gain access to it."

The site further claimed that the unnamed bank had agreed to pay off $100 million in debt and that "[the] project is about David [West]'s looking for others to add their debt to the pile David started." The idea was to accumulate $100 million in debt for the bank to "fractionalize then forgive" so that "the bank can make money and the folks with David can get out of debt." The site claimed that, after "David told his 10 closest friends about the project," word spread quickly throughout Louisiana and Mississippi. The site also explained that West accelerated its marketing of the project following Hurricane Katrina:

> After Hurricane Katrina hit the area he had been putting the word out in, David switched gears to Radio advertising across the South and is now starting a hectic schedule of FREE open meetings in major Southern Cities. These Open Meetings will have hundreds of people in attendance and are expected to help reach[ ] the goal of $100 Million in debt before Thanksgiving. This would leave plenty of time for the bank to pay before December 31st (the bank only needs 10 business days).

As a signal of their "commitment to be involved with the project," the site asked participants to deposit a wire transfer of $5,000 to a bank account in Panama, or to the "Del Sur International Holdings" account with Hibernia National Bank in Baton Rouge. According to the site, after the money was submitted, the bank would perform a financial analysis and might contact the participant to discuss any issues: "[T]he bank will analyze each project member's debt and provide feedback if there are concerns." Also after wiring their $5,000 "commitment/deposit money," the site stated that participants would receive **\*516** a document "guarantee[ing] that the loan that [they] are signing will be forgiven and that [they] will not have to pay it back!" Visitors to the Web site were not informed that the Del Sur International Holdings account, to which the $5,000 wire transfers were directed, was the sole proprietorship of David West.

The State filed suit under the Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com.Code Ann. §§ 17.46(a)-(b), .47 (West Supp.2005) ( "DTPA") against David West, Roxana Suadi West, [1] Carlos M. Suadi, and Pydia, Inc. d/b/a www.bankopp.com, seeking civil penalties and injunctive relief based on the debt elimination "service for sale to consumers." The State obtained a temporary restraining order and temporary injunction against West, preventing any further marketing in Texas of the "banking opportunity." [2]

After learning that David West attempted to withdraw all funds from the Baton Rouge account to which the participants' $5,000 wire transfers had been directed, [3] the State obtained a supplemental restraining order, freezing the funds in the Hibernia bank account. The State also sought to convert the supplemental restraining order into a supplemental temporary injunction, maintaining the freeze on the account. Following a hearing on October 25, 2005, the district court entered an order preventing David West, Roxana Suadi West, Carlos M. Suadi, and Pydia, Inc. d/b/a www.bankopp.com from accessing the Hibernia bank account.

Specifically, the order enjoined them (and those associated with them) from

- transferring, spending, hypothecating, concealing, encumbering, withdrawing, removing or allowing the transfer, removal, or withdrawal of any funds from Account # [ ], held at Hibernia National Bank; and

- transferring, spending, hypothecating, concealing, encumbering, withdrawing, removing or allowing the transfer, removal, or withdrawal of any funds from any other financial institution and/or account into which Defendants have placed or caused to be placed, funds from consumers to participate in Defendants' "bank opportunity."

The order also set the case for trial.

West appeals only from the district court's October 25 supplemental temporary injunction order that froze the assets in the Hibernia bank account. It asserts that the district court abused its discretion by entering the supplemental temporary injunction because the State did not demonstrate (1) a probable right to recovery or (2) a probable injury, and (3) the order did not specifically state the reasons for its issuance. We consider each of these assertions.

## DISCUSSION

**Standard of review**

 **[1]** **[2]** **[3]** The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). Because the decision to grant or deny a **\*517** temporary injunction lies within the sound discretion of the trial court, we will not disturb that decision absent a clear abuse of discretion. *Id.* at 204. We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor. *Brammer v. K.B. Home Lone Star, L.P.,* 114 S.W.3d 101, 105–06 (Tex.App.-Austin 2003, no pet.). This Court may not substitute its judgment for that of the trial court unless its action was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru,* 84 S.W.3d at 204. The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Id.* at 211.

### Probable right to recovery

 **[4]** In its first issue, West argues that the district court erred in granting the temporary injunction because the State did not demonstrate a probable right to recovery. West asserts that the transaction at issue is a loan of money, which is neither a "good" nor a "service" under the DTPA. *See Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex.1980); *see also* Tex. Bus. & Com.Code Ann. § 17.45(1), (2) (West 2002). West argues that the DTPA applies to transactions in which the borrower's objective is to purchase or lease goods or services, but the DTPA is inapplicable if a borrower's objective is merely an attempt to acquire money. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 566–67 (Tex.1984); *Megason v. Red River Employees Fed. Credit Union,* 868 S.W.2d 871, 872 (Tex.Civ.App.-Texarkana 1993, no writ).

The State responds that West's "banking opportunity" is not a "loan" because it specifies that repayment is unnecessary. *Cf.* Tex. Fin.Code Ann. § 301.002(a)(10) (West Supp.2005) (defining "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor"). Alternatively, the State argues that West is offering a loan forgiveness service.

The district court's finding of a probable right to recovery under the DTPA is supported by the evidence that West's Web site, offers a service—specifically, the elimination of debt—in exchange for $5,000. According to the site, after the money was submitted, "the bank [would] analyze each project member's debt and provide feedback if there are concerns." The site also informed the public that, after wiring $5,000, participants would receive a document "guarantee [ing] that the loan that [they] are signing will be forgiven and that [they] will not have to pay it back!"

"Services" are defined in the DTPA as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." Tex. Bus. & Com.Code Ann. § 17.45(2). The State's suit complains that West's service violates the DTPA because it (1) fails to disclose the factual basis for its representations that David West has found a bank willing to give individuals "loans" to pay their debts without expectation of repayment and (2) encourages consumers to wire $5,000 to an account that is not identified as belonging to David West.

The debt elimination opportunity that West offered is similar to the function of a "credit services organization," defined in the finance code as

> a person who provides, or represents that the person can or will provide, for the payment of valuable consideration, any of the following services with respect to the extension of consumer credit by others:

> (A) improving a consumer's credit history or rating;

> (B) obtaining an extension of consumer credit for a consumer; or

> **\*518** (C) providing advice or assistance to a consumer with regard to Paragraph (A) or (B).

Tex. Fin.Code Ann. § 393.001 (West 1998). A credit services organization is prohibited from making false or misleading representations in the offer or sale of its services, including any unfounded guarantees to "erase bad credit" or to obtain an

extension of consumer credit "regardless of credit history." *Id.* § 393.304 (West 1998). A violation of chapter 393 is actionable under the DTPA. *Id.* § 393.504 (West 1998).

One company was held to have been a credit services organization based on its:

- television commercials "targeting consumers with debt problems and urging them to contact [the company] for relief from these woes;"

- printed materials informing a debtor that it could assist in obtaining and repairing credit; and

- Web site, which stated that the company could provide advice or assistance to "empower debtors [to] make an informed decision on how to manage, service or liquidate their debts."

*In re Zuniga,* 332 B.R. 760, 786 (Bankr.S.D.Tex., 2005) (applying Texas law). These activities parallel West's "banking opportunity"—advertised on the radio, in a telephone message, and on the Web—offering debt elimination, for $5,000 as specified on the Web site, to any "U.S. Citizen" for any type of debt through a "loan" that would not require repayment. The service West promoted on its Web site included financial analysis, by which "the bank [would] analyze each project member's debt and provide feedback if there are concerns."

We conclude that the district court did not abuse its discretion in determining that the State demonstrated a probable right to recovery under the DTPA. We overrule West's first issue.

**Probable injury**

 [5]    In its second issue, West argues that the district court erred in granting the temporary injunction because the State did not demonstrate a probable injury prior to final trial on the merits. *Butnaru,* 84 S.W.3d at 204. Probable injury includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law. *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 577 (Tex.App.-Austin 2000, no pet.) (citing *Surko Enters., Inc. v. Borg–Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no writ)).

West argues that the State did not produce any competent evidence that money in the Hibernia bank account in Louisiana belonged to any Texas consumer or that West would dissipate the funds from the account. The State contends that the common law requirements for a temporary injunction—including balancing of the equities, proof of irreparable harm or injury, and lack of an adequate remedy at law—are inapplicable when the State is seeking statutorily-authorized injunctive relief. *See* Tex. Bus. & Com.Code Ann. § 17.47(a). Section 17.47 of the DTPA states that

> whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

*Id.* The Texas Supreme Court has ruled that "when it is determined that [a] statute is being violated, it is within the province of the district court to restrain it." *State* **\*519** *v. Texas Pet Foods, Inc.,* 591 S.W.2d 800, 805 (Tex.1979) (affirming award of permanent injunctive relief based on threatened violation of environmental statutes). The court observed that the doctrine of balancing the equities had no application to statutorily-authorized injunctive relief. *Id.*

Texas courts have likewise held that when an applicant relies upon a statutory source for injunctive relief, such as the DTPA, the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law. *See, e.g., Shields v. State,* 27 S.W.3d 267, 273 (Tex.App.-Austin 2000, no pet.) (State need not prove likelihood of future violations because injunctive relief available under Securities Act for past acts alone);

*MortgageBanc & Trust, Inc. v. State,* 718 S.W.2d 865, 869 (Tex.App.-Austin 1986, no writ) (express statutory language of Securities Act authorizing injunction supersedes equitable requirements generally applicable to common law injunctive relief); *Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 921 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.) (State need only meet statutory provisions of Securities Act and is not required to otherwise show probable injury); *Gulf Holding Corp. v. Brazoria County,* 497 S.W.2d 614, 619 (Tex.Civ.App.-Houston [14th Dist] 1973, writ ref'd n.r.e.) (State need not prove irreparable injury to be entitled to injunction under Open Beach Act); *see also Household Retail Servs., Inc. v. State,* No. 04–00–00734–CV, 2001 Tex.App. LEXIS 5893, at *9, 2001 WL 984779, at *3, (Tex.App.-San Antonio Aug.29, 2001, no pet.) (holding that when legislature authorized attorney general to seek injunctions on behalf of multiple consumers, it determined that past or threatened DTPA violation coupled with public need constituted sufficient "irreparable risk of harm" to support entry of injunction).

 **[6]**    Accordingly, the State argues that, to be entitled to a temporary injunction under the DTPA, it need only demonstrate to the court its reason to believe that (1) any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by the DTPA, and (2) that proceedings would be in the public interest. *See* Tex. Bus. & Com.Code Ann. § 17.47(a). The fact that a person has ceased its unlawful conduct will not affect the State's entitlement to injunctive relief. *Id.* Furthermore, the DTPA authorizes the court to "make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which *may have been* acquired by means of any unlawful act or practice." *Id.* § 17.47(d) (emphasis added).

At the October 25 hearing on the supplemental temporary injunction, the State introduced evidence of West's "*www.bankopp.com* " Web site, promoting a "banking opportunity" that would allow any "U.S. Citizen" to pay off all personal debt—including "credit cards, mortgages, student loans, vehicles, loans, IRS settlements, and back child support"—before December 31, 2005, by securing a "loan" from an unnamed bank. The site contained repeated assertions that participants will not repay the bank because the "loans" will be forgiven. It claimed that "two little known banking practices ... Fractional Banking and Forgiven Loans" made this "one shot opportunity" possible. The site also claimed that although "this opportunity is legal," the "Federal Reserve will undoubtedly close the loopholes that allowed the project to take place this once. While the system intended on well connected, wealthy individuals to be able to take advantage of this, it was never intended that regular every day people would gain access to it." The site also asked participants to deposit a wire transfer of $5,000—as a signal of their "commitment  **\*520**  to be involved with the project"—to a bank account in Panama, or to an account with Hibernia National Bank in Baton Rouge.

The State also introduced into evidence documents that the Hibernia National Bank in Baton Rouge, Louisiana provided in response to the State's civil investigative demand. The documents included a commercial new account information card for Del Sur International Holdings and its "sole proprietorship resolution certificate," along with a copy of a Louisiana driver's license issued to David Jason West. These documents show that David West opened a free small business checking account with $100 cash at Hibernia on August 8, 2005, under the business name of Del Sur International Holdings. He is the sole owner and signatory on the account. The account number assigned to the Del Sur International Holdings checking account matches the account number on the Web site to which the participants' $5,000 wire transfers had been directed. The Web site does not disclose that the $5,000 transfers of participants' "commitment money" were deposited into an account owned by David West.

Based on this evidence, the district court determined that West "may be violating the DTPA" and that the State's action "was in the public interest." Indulging every reasonable inference in favor of the court's order as we must, we conclude that there is sufficient evidence to support the court's findings in accordance with section 17.47(a). Thus, we overrule West's second issue.

### Specificity of order under rule 683

 **[7]**    **[8]**    In its third issue, West claims that the district court's temporary injunction violated rule 683 because it did not state the reasons for its order with specificity. *See* Tex.R. Civ. P. 683. West argues that the district court's order does not specifically state the reasons why injury will be suffered if the interlocutory relief is not ordered. West also faults the order for its failure to state why the identified probable injury is an irreparable one for which the State has no adequate legal remedy. Under Rule 683

[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

Tex.R. Civ. P. 683.

The State responds that West waived its complaint about the specificity of the court's order by failing to object when the court inquired about its agreement to the form of the order. Because we conclude that the order was sufficiently specific under rule 683, we need not address the waiver issue. [4]

**\*521** Relying on rule 693, the State responds that "the principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with these rules *or the provisions of the statutes."* Tex.R. Civ. P. 693 (emphasis added); *see also* *Texas Pet Foods, Inc.,* 591 S.W.2d at 805 ("When it is determined that the statute is being violated, it is within the province of the district court to restrain it .... [t]he doctrine of balancing the equities has no application to this statutorily authorized injunctive relief.").

The State reiterates that section 17.47(a) of the DTPA authorizes the State's consumer protection division to bring an action for injunctive relief when "it has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by [the DTPA], and that proceedings would be in the public interest." Tex. Bus. & Com.Code Ann. § 17.47(a). The DTPA also authorizes the court to "make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice." *Id.* § 17.47(d). The State contends that the order is proper because it contains the essential findings that "Defendants may be violating § 17.47(a) and (b) of the Texas Deceptive Trade Practices–Consumer Protection Act," and that "this action is in the public interest."

The court found that the freeze was necessary to prevent West from dissipating funds in the account to which the participants' wire transfers had been directed:

> [U]nless Defendants are immediately restrained from the acts prohibited below, Defendants will dissipate funds obtained from consumers through misrepresentations in violation of the Deceptive Trade Practices Act, before a full trial can be held on the merits of the State's claims. To the extent required by law, Plaintiff [State] has proved that continued violation of these laws will continue to cause Plaintiff and the general public to suffer irreparable harm.

We conclude that this order complied with the statutory prerequisites under section 17.47(a) of the DTPA by finding that "Defendants may be violating § 17.47(a) and (b) of the Texas Deceptive Trade Practices–Consumer Protection Act," and that "this action is in the public interest." The order also satisfied the specificity requirement of rule 683 by finding that, "unless Defendants are immediately restrained **\*522** from the acts prohibited below, Defendants will dissipate funds obtained from consumers through misrepresentations in violation of the Deceptive Trade Practices Act, before a full trial can be held on the merits of the State's claims." Accordingly, we overrule West's third issue.

## CONCLUSION

Based on the record before us, West has not shown that the district court acted outside the bounds of its reasonable discretion by granting the supplemental temporary injunction. Accordingly, we affirm the court's order.

## All Citations

212 S.W.3d 513

Footnotes

1 Roxana Suadi West and Carlos M. Suadi are not parties to this appeal. The State's petition implicates them by alleging that the radio advertisements for the "debt elimination" seminar were paid by Pydia, Inc. with West's and Suadi's credit cards. The petition also alleges that Roxana West paid for the seminar room at the hotel where the meetings were scheduled.

2 David West and Pydia, Inc. d/b/a *www.bankopp.com* (collectively "West") did not appeal from this temporary injunction.

3 The State made this assertion, which West did not dispute, at the supplemental temporary injunction hearing.

4 The record shows that, after an initial objection to the order, West denied any further objection to its form:

 THE COURT: Do you want to take a moment to look at it?

 [West's counsel]: Thank you, Your Honor. (Pause). Your Honor, the proposed order states that given the exhibits and sworn affidavits attached thereto, that unless defendants are immediately restrained from the acts prohibited below, defendants will dissipate funds obtained from consumers through misrepresentation. Is that the court's ruling today?

 THE COURT: Well, we didn't have any sworn affidavits, I don't think, introduced into evidence, did we?

 [State's counsel]: No, Your Honor.

 THE COURT: Okay. I'll make that change. Any other objections to the form?

 [West's counsel]: No, Your Honor.

 The State acknowledges that Texas courts are split on whether failure to object to a temporary injunction order results in waiver on appeal or a fatally defective order. *Compare* Tex.R.App. P. 33(a)(1); *Texas Tech Univ. Health Scis. Ctr. v. Rao,* 105 S.W.3d 763, 768 (Tex.App.-Amarillo 2003, pet. dism'd) (finding waiver of complaint about order's lack of specificity); *Shields v. State,* 27 S.W.3d 267, 273 (Tex.App.-Austin 2000, no pet.) (same); *Emerson v. Fires Out, Inc.,* 735 S.W.2d 492, 493–94 (Tex.App.-Austin 1987, no writ) (same); *with* Tex.R.App. P. 683; *Monsanto Co. v. Davis,* 25 S.W.3d 773, 789 (Tex.App.-Waco 2000, pet. dism'd w.o.j.) (voiding order for failure to explain reasons for its issuance); *University Interscholastic League v. Torres,* 616 S.W.2d 355, 358 (Tex.Civ.App.-San Antonio 1981, no writ) (same); *Smith v. Hamby,* 609 S.W.2d 866, 868 (Tex.Civ.App.-Fort Worth 1980, no writ) (same). We need not address that issue here, however.

**End of Document**   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 66458
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

***MEMORANDUM OPINION***
Court of Appeals of Texas,
Austin.

R & R RESOURCES CORPORATION, Appellant

v.

ECHELON OIL AND GAS, L.L.C.; Tex–El Oil and Gas, Inc.; and BairTex Energy, Inc., Appellees.

No. 03–05–00479–CV.    |    Jan. 10, 2006.

**Synopsis**
**Background:** Non-operating owners of working interests in oil and gas wells brought action against operator to enforce their vote replacing operator and seeking damages for breach of contract and cloud on title. The 155th Judicial District Court, Fayette County, Dan R. Beck, J., issued temporary injunction compelling operator to comply with the transfer of operations to its replacement. Operator appealed.

**Holdings:** The Court of Appeals, Jan P. Patterson, J., held that:

[1] non-operators had standing to seek temporary injunction;

[2] operator did not have statutory right to determine the identities of non-operators' investors;

[3] operator did not have contractual right to determine the identities of non-operators' investors;

[4] trial court did not abuse its discretion by concluding that non-operators would suffer irreparable injury absent temporary injunction;

[5] non-operators were not required to demonstrate the absence of an adequate legal remedy;

[6] trial court did not abuse its discretion by concluding that non-operators established a probable right of recovery;

[7] operator received adequate notice of non-operators' intention to replace it;

[8] temporary relief was not identical to the permanent relief requested by non-operators; and

[9] operator was not entitled to present evidence on the issues of standing and irreparable injury at status hearing.

Affirmed.

West Headnotes (10)

**[1]** **Mines and Minerals** 🔑 Injunction and receivers

Non-operating owners of working interests in oil and gas wells had standing to seek a temporary injunction removing operator, pursuant to a provision in joint operating agreements permitting removal "by affirmative vote of Non-Operators owning a majority interest," even though non-operators sold portions of their interests; non-operators retained some direct ownership of the wells, non-operators had agreements with their respective investors giving them decision-making authority over the interests of those investors, and non-operators and their investors collectively owned a majority of the working interest in the wells.

Cases that cite this headnote

**[2]** **Mines and Minerals** 🔑 Associations, joint-stock companies, and other joint enterprises

Statute requiring owners and operators of oil and gas wells to make their books available for inspection by "any stockholder, shareholder, or royalty owner in the business" did not allow operator of oil and gas wells to determine the identities of investors in non-operating owners of working interests in the wells, for the purpose of soliciting their opinions on a lawsuit brought by non-operators against operator to enforce their vote removing it as operator; statute required non-operators to open their books to their own investors, not to all owners of an interest in the same well. V.T.C.A., Natural Resources Code § 91.141(b).

Cases that cite this headnote

**[3]** **Mines and Minerals** 🔑 Associations, joint-stock companies, and other joint enterprises

Provision in joint operating agreements for oil and gas wells that stated that successor operator of the wells would be selected by affirmative vote of two or more parties owning a majority interest in wells did not require non-operating owners of working interests in the wells, who voted to replace operator, to disclose to operator the identities of their respective investors so that operator could solicit their opinions on lawsuit brought by non-operators to enforce operator's removal; non-operators and their investors owned a majority interest, and investors delegated decision making authority to non-operators.

Cases that cite this headnote

**[4]** **Mines and Minerals** 🔑 Injunction and receivers

Trial court did not abuse its discretion, in action by non-operating owners of working interests in oil and gas wells to enforce their vote replacing operator, by concluding that non-operators would suffer irreparable injury absent issuance of temporary injunction requiring operator to comply with the transfer of operations to its replacement; trial court heard evidence that operator was usually late in paying interest owners and vendors, that its operational charges were excessive, that price it received from sale of salvage was too low, that it failed to take adequate care of materials and equipment, and that such harms would likely continue absent a transfer of operations.

Cases that cite this headnote

**[5]** **Mines and Minerals** 🔑 Injunction and receivers

Non-operating owners of working interests in oil and gas wells, who voted to remove operator, were not required to demonstrate the absence of an adequate legal remedy in order to be entitled to a temporary injunction compelling

operator to comply with the transfer of operations to its replacement, where non-operators also asserted claims for cloud on title and injury to real property. V.T.C.A., Civil Practice & Remedies Code § 65.011(4, 5).

Cases that cite this headnote

**[6]** **Mines and Minerals** 🔑 Injunction and receivers

Fact that temporary injunction issued by trial court in action by non-operating owners of working interests in oil and gas wells to enforce their vote replacing operator, which required operator to comply with the transfer of operations to its replacement, applied to only two of the three wells at issue did not necessitate the conclusion that non-operators would not be irreparably harmed by the absence of an injunction; well to which injunction did not apply was not expressly covered by joint operating agreements governing the other two wells, and trial court's decision not to include well in scope of injunction could have been based on that fact.

Cases that cite this headnote

**[7]** **Mines and Minerals** 🔑 Injunction and receivers

Trial court did not abuse its discretion, in action by non-operating owners of working interests in oil and gas wells to enforce their vote replacing operator, by concluding that non-operators established a probable right of recovery, so as to support issuance of a temporary injunction requiring operator to comply with the transfer of operations to its replacement; joint operating agreement authorized removal of operator for material breach of its obligations, and non-operators alleged, and presented evidence of, improper accounting and operation practices by operator.

Cases that cite this headnote

**[8]** **Equity** 🔑 He Who Comes Into Equity Must Come with Clean Hands

Operator of oil and gas wells that was sued by non-operating owners of working interests in the wells received adequate notice of non-operators' intention to replace it as operator, and thus doctrine of unclean hands did not bar non-operators from seeking equitable relief in the form of a temporary injunction compelling operator to comply with the transfer of operations to its replacement; non-operators gave operator formal notice of its alleged failures, operator's response did not address most of the allegations, and non-operators did not first seek to enforce their removal of operator until several months after the notice, and did not file suit until over a year after the notice.

Cases that cite this headnote

**[9]** **Mines and Minerals** 🔑 Injunction and receivers

Temporary relief requested by non-operating owners of working interests in oil and gas wells who brought action against operator to enforce their vote replacing operator, which was a temporary injunction compelling operator to comply with the transfer of operations to its replacements, was not identical to the permanent relief requested in non-operators' action, and thus operators were not equitably barred from obtaining such temporary relief; non-operators sought injunction as to an additional well not covered by the temporary injunction, as well as damages for breach of contract and cloud on title.

Cases that cite this headnote

**[10]** **Mines and Minerals** 🔑 Injunction and receivers

Operator of oil and gas wells that was temporarily enjoined to comply with the transfer of operations to its replacement was not entitled to present evidence on the issues of standing and irreparable injury at status hearing; status hearing

was set for trial court to determine whether injunction order was being followed, not to revisit the issues addressed at the injunction hearing.

Cases that cite this headnote

From the District Court of Fayette County, 155th Judicial District, No.2005V–107, Dan R. Beck, Judge Presiding.

**Attorneys and Law Firms**

Jeffrey R. Bale, Anne E. Kennedy, Bale & Godkin, LLP, Sugar Land, for appellant.

Max E. Roesch, Max E. Roesch, P.C., Giddings, for appellees.

Before Justices B.A. SMITH, PATTERSON and PURYEAR.

### *MEMORANDUM OPINION*

JAN P. PATTERSON, Justice.

**\*1** This is an accelerated appeal from an order granting a temporary injunction. R & R Resources Corporation is the operator and a working interest [1] owner of three oil and gas wells—the Ullrich, Goebel Brothers, and Toennis—located in Fayette County. Echelon Oil and Gas, L.L.C., Tex–El Oil and Gas, Inc., and BairTex Energy, Inc. are also working interest owners. R & R Resources appeals a temporary injunction entered against it that prevents it from opposing the designation of Leexus Oil & Gas, L.L.P. as the new operator of the Ullrich and Goebel Brothers wells. R & R Resources challenges the trial court's order as an abuse of discretion, arguing that the order violated the rules of equity and that Echelon, Tex–El, and BairTex did not demonstrate standing to seek injunctive relief, a probable right of recovery, or irreparable injury. R & R Resources's reply brief added two issues: (i) that R & R Resources was denied an opportunity to be heard at a subsequent status hearing on September 9, 2005, and (ii) that the trial court's order was impermissibly speculative. Because we find that the trial court did not abuse its discretion by granting the temporary injunction, we affirm the trial court's order.

### BACKGROUND

Echelon, Tex–El, and BairTex are in the business of purchasing and selling interests in oil and gas producing properties. As part of this business, Echelon, Tex–El, and BairTex purchased certain working interests in the Ullrich, Goebel Brothers, and Toennis oil and gas wells. [2] The parties operate the wells under two identical joint operating agreements, the 1989 American Association of Petroleum Landmen Form 610 Model Form Operating Agreements. These forms are agreements between oil and gas lease owners and interest holders for the exploration and development of oil and gas within the "contract area" described in the agreements. The agreements in this case designate R & R Resources as the "Operator," that conducts, directs, and controls operations in the contract area. All other parties to the agreements—Echelon, Tex–El, [3] and BairTex—are designated as "Non–Operators."

The parties conducted business through their respective corporate presidents: Frederick Doutel, Jr. of R & R Resources, Roger Slayton of Tex–El, Randal Snider of Echelon, and Warren Bair of BairTex. On November 14, 2003, after Slayton complained to Doutel about R & R Resources's operations and accounting procedures concerning the wells, Doutel sent an e-mail offering to arrange for Slayton to "take over operations on [the] Goebel, Ullrich and/or Toennis" wells "th[at] afternoon." Later that day, Doutel sent another e-mail to Slayton stating, "Sorry, we'll do it December 1st. You will be the operator."

Shortly afterward, Slayton sought to audit R & R Resources's books and requested that, at the completion of the audit, the parties sign the Texas Railroad Commission's P–4 forms that would change the operator to Echelon.[4] On November 24, 2003, Doutel wrote a letter to Slayton, copied to Snider and Bair, stating that R & R Resources would convey operations of the Ullrich and Toennis wells but would retain operation of the Goebel Brothers well. His letter also stated that R & R Resources was "working up a letter agreement regarding conditions for operator transfer," including a requirement that the new operator use particular vendors. Tex–El, Echelon, and BairTex audited R & R Resources's books in December 2003, but afterward Doutel did not sign the P–4 forms.

 **\*2** Unsuccessful in its attempts to have R & R Resources transfer operation of the wells, Echelon, Tex–El, and BairTex retained counsel. Their attorney wrote to Doutel on April 30, 2004, advising that his clients, who were "majority interest" owners in the three wells, had voted to remove R & R Resources as operator for "good cause" pursuant to the joint operating agreements' terms. The letter proceeded to list the ways in which R & R Resources had "failed and refused to act as a reasonably prudent operator."Counsel's letter also demanded that R & R Resources: (i) relinquish operation of the wells to a new operator to be designated by Echelon, Tex–El, and BairTex, and (ii) pay a refund owed to them. Doutel's May 28 response letter denied the request to relinquish operation of the wells and stated that he had instructed his accountant to remit the funds due to Echelon, Tex–El, and BairTex within ten days.[5] Doutel's response did not address the other allegations in counsel's letter. Bill Jaehne of Leexus Oil & Gas also called Doutel to ask whether he would turn the operations over to Leexus, but Doutel refused.

Almost four months after sending its demand letter, Echelon, Tex–El, and BairTex (collectively, the "Non–Operators") requested the Texas Railroad Commission's approval of single-signature P–4 forms designating Leexus Oil & Gas, L.L.P. as the new operator of the three wells. The request explained that, although R & R Resources had been removed as operator under the terms of the joint operating agreements because of its "operational and/or billing discrepancies," R & R Resources refused to cease operations and transfer the P–4s to another operator. The Commission requested a response from R & R Resources in support of R & R Resources's good faith claim to operate the leases. It noted that R & R Resources was not required to refute Leexus's good faith claim but only to substantiate R & R Resources's own good faith claim to operate the wells.

On November 19, 2004, after R & R Resources responded with copies of the wells' leases and operating agreements, the Commission informed the parties that "[w]hether Leexus is entitled to become the designated operator of the subject leases appears to turn on the question of whether the owners of a majority of the working interest in the leases had the right to remove R & R Resources as operator."The Commission stated that it lacked jurisdiction to construe the terms of the operating agreements, determine what constituted "good cause" for removal under the agreements, and otherwise determine the parties' contractual rights. Accordingly, it deferred these determinations to the courts and declined to process the single-signature P–4s.

The Non–Operators filed suit against R & R Resources on May 18, 2005, and sought a temporary injunction. On July 1, 2005, after a two-day hearing held on June 15 and 17, the trial court entered an order preventing R & R Resources from opposing the designation of Leexus as the operator of the Ullrich Lease and Goebel Brothers Lease.[6] In summary, the order enjoined R & R Resources from

 **\*3** • refusing to join in the immediate execution and delivery of proper joint form P–4s designating Leexus as the operator for and of the Ullrich Lease and Goebel Brothers Lease;

• interfering, opposing, preventing or refusing to cooperate with Plaintiffs' and/or Leexus's efforts to file and obtain approval from the Texas Railroad Commission of joint form P–4s designating Leexus (for Commission purposes) as the operator of the Ullrich Lease and Goebel Brothers Lease;

• further operating or performing operations on the Ullrich Lease and Goebel Brothers Lease following the Commission's approval of the joint form P–4s;

- interfering, opposing, preventing or refusing to cooperate with Leexus's operation of the Ullrich Lease and Goebel Brothers Lease, following the Commission's approval of the joint form P–4s; and

- refusing to deliver to Leexus—upon the Commission's approval of Leexus's joint form P–4 operator status for the Ullrich Lease and Goebel Brothers Lease—the well files, records, data, and all other documentation relating to the previous operation of the leases or necessary to continue the operation of the leases.

The trial court entered findings of fact and conclusions of law concerning the temporary injunction. When R & R Resources did not comply with the injunction, the Non–Operators sought this Court's emergency enforcement of the order pending resolution of R & R Resources's interlocutory appeal. We granted the motion.

After R & R Resources did not comply with our order enforcing the trial court's temporary injunction, the Non–Operators filed a motion for contempt, and R & R Resources filed a motion for reconsideration of our order based on an *in camera* inspection of documents that the trial court was to begin on or about November 4, 2005. We have not received any order that the court may have entered during or subsequent to the pretrial hearing on October 12, 2005. We referred enforcement of this Court's order to the trial court for findings and recommendations concerning R & R Resources's compliance with our order enforcing the trial court's order. *See* Tex.R.App. P. 29.4(b); *In re Sheshtawy,* 154 S.W.3d 114, 124–125 (Tex.2004). We have not received the trial court's findings and recommendations. Jury trial is set for January 18, 2006, to determine whether the Non–Operators are entitled to declaratory relief and damages for R & R Resources's alleged breach of the joint operating agreements' terms governing the accounting and operation of the wells.

## ANALYSIS

**Standard of Review**

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). Injunctions may also issue when the status quo is not a condition of rest but of action, because the condition of rest will inflict irreparable injury on the complainant. *RP & R, Inc. v. Territo,* 32 S.W.3d 396, 401 n. 3 (Tex.App.-Houston [14th Dist.] 2000, no pet .). To obtain a temporary injunction, the applicant must plead and prove a cause of action against the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim. *Butnaru,* 84 S.W.3d at 204.

**\*4** The decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, and we will not disturb that decision absent a clear abuse of discretion. *Id.* at 204.This Court may neither substitute its judgment for that of the trial court nor consider the merits of the underlying lawsuit; we consider only the validity of the order.*Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 574, 576 (Tex.App.-Austin 2000, no pet.); *see also Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 884 (Tex.App.-Dallas 2003, no pet.). Viewing the evidence in the light most favorable to the trial court's order and indulging every reasonable inference in its favor, we determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Universal Health Servs.,* 24 S.W.3d at 576; *Tom James of Dallas,* 109 S.W.3d at 883.If the court heard conflicting evidence and the record contains evidence that reasonably supports its decision, we will affirm the order. *Universal Health Servs.,* 24 S.W.3d at 576;*see also Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978).

In an interlocutory appeal such as this, a trial court may file findings of fact and conclusions of law, but it is not required to do so. Tex.R.App. P. 28.1; *Tom James of Dallas,* 109 S.W.3d at 884.While findings and conclusions may be helpful in reviewing for an abuse of discretion, they do not carry the same weight as findings made after a trial on the merits and are not binding when we are reviewing a trial court's exercise of discretion. *Tom James of Dallas,* 109 S.W.3d at 884 (citing *IKB Indus., Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992)).

**Standing**

 **[1]**    In its first issue, R & R Resources contends that Echelon, Tex–El, and BairTex lacked standing to request the temporary injunction because they lack any direct ownership in the wells at issue. R & R Resources quotes language in the joint operating agreements that permits removal of the operator "by the affirmative vote of Non–Operators owning a majority interest."But the testimony at the temporary injunction hearing revealed that, although Echelon, Tex–El, and BairTex sold portions of the working interests that they had purchased, they also reserved portions of those oil and gas interests for themselves.

Additionally, Slayton and Bair testified that Echelon, Tex–El, and BairTex owned a majority of the working interest in the wells through participation or subscription agreements with their respective investors that had delegated decision-making and voting authority over their interests to Echelon, Tex–El, and BairTex. Slayton testified that Tex–El and its investors own 20% of the working interest in the Ullrich well and 15% of the working interest in the Goebel Brothers well. The parties, including R & R Resources, stipulated to the testimony concerning BairTex's and Echelon's interests in the wells. [7] With regard to the Ullrich well, the parties stipulated to the testimony that BairTex and its investors own 12.40% of the working interest while Echelon and its investors own 36.20% of the working interest. The parties further stipulated to the testimony that, with regard to the Goebel Brothers well, BairTex and its investors own 10% of the working interest while Echelon and its investors own 37% of the working interest. The parties also stipulated to the testimony that Echelon, Tex–El, and BairTex—along with their investors who purchased a portion of the working interests—collectively owned 69% of the total working interest in the Ullrich well and 62% of the total working interest in the Goebel Brothers well.

 **\*5**   **[2]**    R & R Resources next contends that it had a statutory right to determine the identities of Echelon's, Tex–El's, and BairTex's investors and obtain their opinions on the lawsuit. *See* Tex. Nat. Res.Code Ann. § 91.141(b) (West 2001). Its understanding of section 91.141 of the natural resources code entitles "any stockholder, or shareholder, or royalty owner *in an oil well* " to inspect the records of any owners and operators of oil and gas wells. But that section of the code states that "[t]he books shall be kept open for inspection of the commission or any accredited representative of the commission and any stockholder, shareholder, or royalty owner *in the business.*" *Id.* (emphasis added). This statute requires Echelon, Tex–El, and BairTex each to keep its books open for its own stockholders, shareholders, and royalty interest owners. R & R Resources does not cite any authority for its contention that the books must be opened to "any stockholder, or shareholder, or royalty owner *in an oil well,*" other than its interpretation of excerpts from section 91.141 of the natural resources code. We do not find its argument under section 91.141 persuasive.

 **[3]**    R & R Resources's reliance on a contractual right to disclosure under the joint operating agreements is similarly misplaced. It asserts that paragraph V.B.2 of the joint operating agreements entitles it to determine whether Echelon, Tex–El, and BairTex conducted a valid vote or polling of their investors prior to removal of the operator. Paragraph V.B.2 of the agreements states that the successor operator shall be selected by the affirmative vote of two or more parties owning a majority interest. As previously noted, there was testimony at the hearing that Echelon, Tex–El, and BairTex owned a majority of the working interest in the wells through participation or subscription agreements with their respective investors and that each of these agreements delegated decision-making and voting authority over their interests to Echelon, Tex–El, and BairTex.

The trial court found that "Plaintiffs [Echelon, Tex–El, and BairTex] own or, by virtue of written agreements with their respective investors, exclusively control (including all voting and decision making rights) a majority of the working interest" in the Ullrich and Goebel Brothers leases. The court further found that in April 2004, plaintiffs notified R & R Resources of their affirmative vote to remove R & R Resources as operator of the three leases. Because there was some evidence adduced at the hearing that Echelon, Tex–El, and BairTex have direct ownership in the Ullrich and Goebel Brothers wells, that their interests combined with those of their investors constituted a majority, and that they affirmatively voted to remove R & Resources as operator, we do not find that the court abused its discretion in determining that Echelon, Tex–El, and BairTex had standing to request a temporary injunction. We overrule R & R Resources's first issue.

**Probable, Imminent, and Irreparable Injury**

**\*6** **[4]**    In its second issue, R & R Resources argues that the trial court abused its discretion in finding "irreparable injury" because Echelon, Tex–El, and BairTex did not establish that they would sustain imminent, irreparable injury without the entry of a temporary injunction. R & R Resources also argues that the Non–Operators have an adequate legal remedy in the form of a contractual suit for damages. Probable injury includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law for damages. *Telephone Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 607 (Tex.App.-Houston [1st Dist.] 2002, no pet.). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204. An adequate legal remedy is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Universal Health Servs.,* 24 S.W.3d at 577.

R & R Resources argues that the wells at issue have produced oil and gas in paying quantities under its operatorship, that it has made proportional distributions of this income each month, and that the audit of its financial records did not reveal any unpaid invoices, pollution, loss of acreage, liens, or claims against the wells. But Echelon, Tex–El, and BairTex introduced evidence that R & R Resources was billing them for expenses incurred at least two months earlier, or expenses incurred in the same month as the billing, that their revenues were reduced by the amount of these untimely billings, and that R & R Resources delayed paying the expenses for several months despite its ability to pay them. There was evidence that the Goebel Brothers refund was not paid until seventeen months after the well was drilled, $100,000 of the Goebel Brothers well expenses were unpaid for ten months, revenue checks to some owners were dated weeks before they were mailed, and the audit of R & R Resources raised questions about whether certain bills were paid at all.

Mark Jaehne of Leexus testified that, although he received checks for his override interest from Doutel in three or four weeks from the time the check was "cut," Doutel was further behind because Doutel's check represented payment for the preceding month's production; it was not an advance payment. Jaehne explained that if Tex–On, an oil and gas gatherer, typically wired payment to Doutel on the 20th, but Doutel did not write a check to the interest owner until the 5th of the next month and did not mail it until three or four weeks after the date on that check, the interest owner would not be paid for production until sixty to seventy-five days after Doutel received payment. Jaehne also testified that he had a conversation with Tex–On about being paid directly, but Doutel would not allow Tex–On to make such direct payments.

Jaehne further testified that continual late payments may cause vendors to refuse to extend credit, charge higher prices, or refuse to provide services. He testified that R & R Resources's operational charges were excessive; that the price it received from the sale of salvage was too low; that it failed to install continuous chemical treating systems, the lack of which can corrode equipment and affect production; and that it failed to adequately determine the need for replacement materials and equipment. Additionally, Snider testified that Leexus could do a better job, had more experience, more personnel, and a better location.

**\*7**  Slayton characterized Doutel's demeanor as, "I'm going to do it the way I'm going to do it and you can like it or dislike it." Slayton also testified that an investor on the Ullrich and Goebel Brothers wells resolved never to invest with Slayton again because the "operational bills were too high," and that vendors complained about the way their bills had been handled by R & R Resources. Doutel testified that he was "not concerned about what vendors think."

 **[5]**    Ongoing and continuing harm resulting from an operator's refusal to relinquish operations is at least one basis for finding irreparable injury in support of a temporary injunction. *See Tri–Star Petroleum Co. v. Tipperary Corp.,* 101 S.W.3d 583, 591 (Tex.App.-El Paso 2003, pet. denied). Moreover, Echelon, Tex–El, and BairTex made claims for cloud on title and injury to real property, which do not require a showing that an adequate legal remedy is lacking to support an award of injunctive relief. *See* Tex. Civ. Prac. & Rem.Code Ann. § 65.011(4)-(5) (West 1997). The trial court's order found that Echelon, Tex–El, and BairTex would suffer injury for which there was no adequate remedy at law, noting that R & R Resources's improper accounting and operational practices

> have caused and will continue to cause loss and/or delay of revenue; payment of excessive and/or unnecessary lease/well expenses; late payment of lease/well expenses; exposure to lease/well creditors

> <mark>for non or late payment; the loss, interruption, and/or delay in production of valuable minerals; and the injury and/or damage to the well bores and/or equipment and materials located on the leases/wells.</mark>

The trial court also determined that the above damages would continue to occur so long as R & R Resources was operating the lease and that Echelon, Tex–El, and BairTex and their respective investors lacked an adequate legal remedy absent the issuance of the temporary injunction. The trial court was within its discretion to make such determinations based on the evidence before it. Furthermore, the court could have issued the temporary injunction without finding a lack of adequate legal remedy based on section 65.011(4)-(5) of the Texas Civil Practice and Remedies Code. *See id.*

 **[6]**   R & R Resources also argues that, although the operations for the three wells at issue have been conducted under the terms of the joint operating agreements for the Ullrich and Goebel Brothers wells, the court granted a temporary injunction as to only two of the three wells. Although the temporary injunction was inapplicable to the Toennis well, the record shows that, of the three wells in the underlying suit, the Toennis is the only well that is not expressly covered by a joint operating agreement. The court heard Benny Jaehne of Leexus testify that, because the Toennis does not have any operating agreement, if R & R Resources did not want to pay another bill it "would not be bound to anything." The trial court's findings state that, while the parties did not execute a joint operating agreement for the Toennis lease, R & R Resources argued without objection that the terms of the agreements for the Ullrich and Goebel Brothers leases applied to the Toennis lease by implication. Indulging every reasonable inference in favor of the court's order, we may infer that the trial court declined to include the Toennis well within the temporary injunction because it is not expressly covered by either of the two joint operating agreements. We overrule R & R Resources's second issue.

### Probable Right to the Relief Sought

 **\*8**   **[7]**   In its third issue, R & R Resources urges that the trial court abused its discretion in finding a "probable right of recovery" because Echelon, Tex–El, and BairTex did not obtain a finding of R & R Resources's gross negligence, willful misconduct, material breach, or total inability to perform. A probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Telephone Equip. Network, Inc.,* 80 S.W.3d at 607. The temporary injunction applicant is not required to establish that it will prevail on final trial. *Butnaru,* 84 S.W.3d 198, 211.

The relevant provisions in the joint operating agreements are found in the first two sections of article V.B.:

1. *Resignation or Removal of Operator:* Operator may resign at any time by giving written notice thereof to Non–Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non–Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non–Operators owning a majority interest based on ownership as shown on Exhibit "A"[8] remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non–Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to perform its obligations under this agreement.

   Subject to Article VII.D.1,[9] such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non–Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non–Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. *Selection of Successor Operator:* Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

**\*9** The trial court found that Echelon, Tex–El, and BairTex had shown a probable right of recovery because (i) Echelon, Tex–El, and BairTex—who were non-operators owning a majority working interest under the joint operating agreements —affirmatively voted to remove R & R Resources as operator and to select Leexus as operator; (ii) R & R Resources's improper accounting and operation practices—which were a material breach of the standards of operation and/or inability to meet the standards of operation and a material failure or inability to perform obligations under the joint operating agreements—constituted "good cause" for its removal as operator; and (iii) R & R Resources violated article V.B.1–2 of the joint operating agreements by refusing to relinquish its operator status and transfer operations to Leexus after Leexus was selected and appointed as successor operator of all the wells.

Echelon, Tex–El, and BairTex's petition alleged that Leexus had a right to be the successor operator based on a majority vote. The evidence included a letter that Echelon, Tex–El, and BairTex's counsel wrote to Doutel on April 30, 2004, advising that his clients had voted to remove R & R Resources as operator for "good cause" pursuant to the joint operating agreements' terms. The letter listed the ways in which R & R Resources had "failed and refused to act as a reasonably prudent operator" and demanded that R & R Resources relinquish operation of the wells. Doutel's May 28 response letter denied the request to relinquish operation of the wells.

R & R Resources urges that the trial court should have applied a gross negligence standard. But the first paragraph of article V.B. in the joint operating agreements clarifies that good cause for an operator's removal "shall mean not only gross negligence or willful misconduct but also the material breach of or inability to perform its obligations under this agreement."Furthermore, R & R Resources does not cite any authority supporting application of an exculpatory clause that concerns the manner in which an operator conducts drilling operations, as in article V.A. of these joint operating agreements, to equitable claims that do not involve R & R Resources's "liability" for damages, or to claims for damages that are not based on drilling operations. *See Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 759 (Tex.App.-El Paso 2000, no pet.); *see also Cone v. Fagadau Energy Corp.,* 68 S.W.3d 147, 155 (Tex.App.-Eastland 2001, pet. denied).

R & R Resources's alternative argument that the evidence in the record fails to support its removal as operator for "failing or refusing to carry out its duties" is not persuasive. Failure to make prompt adjustments to an operating account and improperly assessed charges—similar to the allegations in this case—have been bases for finding that an operator "failed or refused to carry out its duties," which would support the entry of a temporary injunction. *See Tri–Star Petroleum Co.,* 101 S.W.3d at 589–90.Reviewing the evidence in the light most favorable to the trial court's order, we cannot conclude the trial court abused its discretion in finding that Echelon, Tex–El, and BairTex established a probable right of recovery in support of their request for temporary injunction. We overrule R & R Resources's third issue.

**Violations of Equity**

**\*10** **[8]** In its final issue, R & R Resources claims that the trial court's temporary injunction violated the rules of equity because Echelon, Tex–El, and BairTex materially breached the notice and removal provisions of the joint operating agreements and thus did not have "clean hands" when they sought equitable relief. The evidence adduced at the hearing does not support this contention. On April 30, 2004, Echelon, Tex–El, and BairTex gave R & R Resources formal notice of the ways in which it

had "failed and refused to act as a reasonably prudent operator."Doutel's May 28 response letter did not address the majority of the other allegations in counsel's letter. Almost four months after sending its demand letter, the Non–Operators requested the assistance of the Texas Railroad Commission via single-signature P–4s. That request was denied on November 19, 2004. The Non–Operators did not seek an injunction against R & R Resources until May 18, 2005, when they filed suit. R & R Resources's argument that it did not have thirty days to cure the Non–Operators' complaints is not persuasive. Similarly, its arguments that it did not have written notice of the accounting discrepancies or receive a copy of the audit prior to the lawsuit are not persuasive because they are not prerequisites to filing suit under the terms of the joint operating agreements.

[9] R & R Resources's final argument is that the trial court's temporary injunction violated the rules of equity because the temporary relief requested was identical to the permanent relief requested. It claims that the Non–Operators' temporary injunction effectively accomplished the entire purpose of their lawsuit and made the court's order a ruling on the merits of whether R & R Resources should be removed as operator. A ruling on temporary injunctive relief may not be used to obtain an advance ruling on the merits. *See Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981). But Echelon, Tex–El, and BairTex did not receive all the relief requested in their motion for temporary injunction or in their petition. The temporary injunction does not cover the Toennis well. Additionally, the petition makes claims for damages based on breach of contract and cloud on the title. Thus, the trial court did not grant relief identical to that which the Non–Operators sought in their lawsuit by issuing the temporary injunction concerning the Ullrich and Goebel Brothers wells. We overrule R & R Resources's fourth issue.

## Opportunity to be Heard at Subsequent Status Hearing

[10] In its fifth issue, R & R Resources urges that it was denied an opportunity to be heard at a subsequent status hearing on September 5, 2005. R & R Resources argues that it should have been able to present additional evidence on the issues of authority and irreparable injury. The court had previously scheduled the status hearing to determine whether its temporary injunction order was being followed, not as a continuation of the two-day temporary injunction hearing held in June. We have found that the court had some evidence to support its findings on the issue of authority—as noted in the earlier discussion of the Non–Operators' standing to seek the temporary injunction—and irreparable injury. We also note that the court agreed to conduct an *in camera* inspection on November 4, 2005, to address the issue of Echelon, Tex–El, and BairTex's authority, thus R & R Resources had an additional opportunity to raise this issue with the trial court. We overrule R & R Resources's fifth issue.

## Impermissibly Speculative Order

**\*11** R & R Resources's sixth issue argues that the trial court's order was impermissibly speculative because it did not make findings of gross negligence or willful misconduct on the part of R & R Resources and that its findings on irreparable injury are not supported by the evidence. We previously noted that article V.B.1 in these joint operating agreements states that "good cause" for an operator's removal includes the operator's "material breach of or inability to perform its obligations under th[e] agreement[s]" and found that the trial court had some evidence to support its finding that R & R Resources "failed or refused to carry out its duties" to support the entry of a temporary injunction. We also found that ongoing and continuing harm resulting from an operator's refusal to relinquish operations is at least one basis for finding irreparable injury in support of a temporary injunction. We overrule R & R Resources's sixth issue.

## CONCLUSION

Based on the record before us, R & R Resources has not shown that the district court acted outside the bounds of reasonable discretion by granting the temporary injunction. Accordingly, we affirm the court's order.

**All Citations**

Not Reported in S.W.3d, 2006 WL 66458

Footnotes

1       A "working interest" is the operating interest under an oil and gas lease that is subject to all costs of exploration and development. 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law, Manual of Terms 1191 (2004).

2       While these working interest owners bear the costs of exploration and development, they also own a share of the production of oil and gas from the wells.

3       Tex–El Oil and Gas, Inc. was previously known as Raytex Energy, Inc.

4       Slayton's letter to Doutel stated that Echelon was in the process of obtaining an operator number from the Texas Railroad Commission so that Echelon could take over operation of the wells.

5       At the temporary injunction hearing, Slayton testified that the refunds were not paid until about sixty days after R & R Resources's letter, which was seventeen months after the well was drilled.

6       The temporary injunction order was inapplicable to the Toennis well. The record shows that, of the three wells in the underlying suit, the Toennis is the only well that is not expressly covered by a joint operating agreement.

7       R & R Resources stipulated that these statements constituted a proffer of two witnesses' testimony, but it did not stipulate to the numbers.

8       The Non–Operators' ownership percentages shown in Exhibit "A" reflect the amounts that each owned before selling portions of their interests to investors. The parties stipulated to the testimony concerning BairTex's and Echelon's interests in the wells, although R & R Resources did not stipulate to the numbers.

9       Article VII.D.1 permits the appointment of a new Operator "effective immediately" under certain circumstances. The parties do not contend that this provision is applicable to this case.

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

272 S.W.2d 948
Court of Civil Appeals of Texas, Fort Worth.

RATTIKIN TITLE COMPANY, Appellant,

v.

GRIEVANCE COMMITTEE OF THE STATE BAR OF TEXAS, Appellee.

No. 15592.  |  Oct. 29, 1954.  |  Rehearing Denied Dec. 10, 1954.

The Grievance Committee of the State Bar of Texas brought suit against title company to enjoin it from engaging in allegedly illegal practice of law. The District Court of Tarrant County, Floyd Jones, Special Judge, entered judgment granting temporary injunction, and title company appealed, and committee cross appealed. The Court of Civil Appeals, Massey, C. J., held that where title company prepared legal instruments for persons and corporations other than itself and its principal in transactions whereby it neither had nor acquired any interest in the subject matter of the transaction, and also gave advice or made statements to persons other than its principal and its employees as to purpose and effect of legal instruments in transactions to which neither title company for its principal was a party, title company was engaged in the illegal practice of law and such activity would be restrained by temporary injunction.

Judgment affirmed.

West Headnotes (14)

**[1]**  **Injunction**  Operation and effect

Temporary injunction enjoining title company from preparing legal instruments as part of any transaction, to which it was not itself a party or agent of a party, and from making statements to any person, firm, or corporation for which it was not the agent, regarding purpose or effect of some legal instrument constituting part of any transaction to which it was neither a party nor agent of a party, was operative to restrain attorneys, agents, servants and employees of title company, but would not restrain attorneys, agents, servants, and employees from performing enjoined acts for other purposes, if such acts could be legitimately performed. Vernon's Ann.Civ.St. art. 4661.

Cases that cite this headnote

**[2]**  **Attorney and Client**  Standards, canons, or codes of conduct

Rules of State Bar of Texas, enacted as provided by statute, have same force and legal effect on matters to which they relate as the Texas Rules of Civil Procedure have to matters to which they relate. Vernon's Ann.Civ.St. art. 320a–1, § 4.

6 Cases that cite this headnote

**[3]**  **Attorney and Client**  Drafting or preparation of documents in general

**Attorney and Client**  Real estate;  mortgages and liens;  title insurance

Acts of any person in drawing deeds, notes, mortgages, and releases relating to property rights of others, when performed for a consideration, constitute the "practice of law."

1 Cases that cite this headnote

**[4]**     **Attorney and Client**   ☞   Drafting or preparation of documents in general

Those who give advice for consideration to interested parties as to purpose and legal effect of an instrument drawn by them for such interested parties engage in the "practice of law."

1 Cases that cite this headnote

**[5]**     **Injunction**   ☞   Attorneys; unauthorized practice of law

When a corporation furnishes legal services to others and collects fees or receives profits therefor, directly or indirectly, the corporation engages in the "practice of law," and such activity may be enjoined.

Cases that cite this headnote

**[6]**     **Injunction**   ☞   Right or necessity

If pleadings of Grievance Committee of the State Bar alleged the commission by title company of acts, which constituted the practice of law, or a future intent on part of title company to commit such acts, unless company is restrained from so doing, committee was entitled to a hearing on its application for temporary injunction.

Cases that cite this headnote

**[7]**     **Injunction**   ☞   Attorneys; unauthorized practice of law

If evidence introduced by Grievance Committee of the State Bar showed that alleged illegal acts of title company in engaging in the practice of law are occurring or will occur in absence of restraint, application for temporary injunction should be granted.

Cases that cite this headnote

**[8]**     **Injunction**   ☞   Attorneys; unauthorized practice of law

Where title company prepared legal instruments for persons and corporations other than itself and its principal in transactions whereby it neither had nor acquired any interest in the subject matter of the transaction, and also gave advice or made statements to persons other than its principal and its employees as to purpose and effect of legal instruments in transactions to which neither title company nor its principal was a party, title company was engaged in illegal "practice of law" and such activity would be restrained by temporary injunction.

Cases that cite this headnote

**[9]**     **Injunction**   ☞   Preservation of status quo

In hearing on application for temporary injunction, only question before trial court is right of applicant to preservation of status quo of subject matter of suit pending final trial of case on its merits.

5 Cases that cite this headnote

**[10]**     **Injunction**   ☞   Preservation of status quo

In an injunction case, wherein very acts sought to be enjoined are acts which prima facie constitute violation of expressed law, status quo can never be a condition of affairs where respondent will be permitted to continue acts constituting that violation, and in such instances, the status quo to be preserved by temporary injunction is the last,

actual, peaceable, noncontested status which preceded pending controversy, and when it is determined that the law is being violated it is the province and duty of the court to restrain it.

11 Cases that cite this headnote

**[11]** **Injunction** Preservation of status quo

If preservation of status quo by temporary injunction should accomplish the objective of the suit, the temporary injunction is nevertheless proper.

2 Cases that cite this headnote

**[12]** **Injunction** Attorneys; unauthorized practice of law

Contention of Grievance Committee of the State Bar that title company was engaging in illegal practice of law in acting as attorney for mortgage loan companies to extent of determining that certain legal instruments were in proper form before delivering over money lent by them to other parties, presented a doubtful question of law, and therefore trial judge, in exercise of his discretion, properly refused to restrain such activity of the title company by temporary injunction.

1 Cases that cite this headnote

**[13]** **Appeal and Error** Injunction

On appeal from judgment granting a temporary injunction, Court of Civil Appeals performed no function other than to determine whether trial judge abused his discretion.

Cases that cite this headnote

**[14]** **Appeal and Error** Injunction

On appeal from judgment granting temporary injunction, action of trial judge would not be disturbed on appeal but for abuse of discretion.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*949** Richard Owens, Thompson, Walker, Smith & Shannon, Fort Worth, F. L. Kuykendall, Austin, for appellant.

Earl P. Hall, Austin, Rawlings, Sayers, Scurlock & Eidson, Nelson Scurlock, Fort Worth, for appellee.

**Opinion**

MASSEY, Chief Justice.

This is an appeal by the Rattikin Title Company, a corporation, from a temporary injunction entered against it upon the application of the Grievance Committee of the State Bar of Texas. The Title Company was enjoined from preparing legal instruments as a part of any transaction to which it was not itself a party or the agent of a party,-and from making statements to any person, firm or corporation for which it was not the agent, regarding the purpose or effect of some legal instrument constituting a part of any transaction to which it was neither a party nor the agent of a party.

Judgment affirmed.

**\*950** **[1]** We shall premise our opinion in this case by pointing out that both the appellant and appellee seem to be of the opinion that certain individuals who are lawyers, engaged in the practice of law as such (and the agents, servants and employees of such lawyers), are affected by the order appealed from. The appeal has been taken by the corporation, Rattikin Title Company, and it and it alone is the appellant in the case before us. Therefore, of necessity we must disregard even the question of whether any other person, firm or corporation had the right of appeal, for only the Title Company appealed. Certainly the temporary injunction is operative to restrain the attorneys, agents, servants and employees of the party enjoined under provisions of Article 4661, R.C.S., but this would not restrain the same attorneys, etc., from performing the enjoined acts for other persons if they would be legitimately performed by such other persons as their attorneys, agents or employees. We confine ourselves to the specific order of the court below as same applies to the Title Company, and to the findings and conclusions of the trial judge relating to and purporting to support the order's entry. Of course, we resort to the records of the pleadings and the evidence as necessary to determine the propriety of such findings and conclusions and order.

The specific order of the court reads as follows:

'It Is Therefore Ordered that a temporary injunction be issued to continue in force and effect until this case is finally disposed of on its merits, enjoining and restraining the Rattikin Title Company, a corporation, and any officer, director, employee, attorney or stockholder thereof, from preparing any legal instrument which is not for execution by Rattikin Title Company or by a person or persons employed by it and to which neither the Rattikin Title Company nor the Kansas City Title Insurance Company is a party and in which these companies neither have nor acquire any interest in the subject matter of the instruments; and restraining and enjoining any officer, director, employee, attorney or stockholder of the Rattikin Title Company from giving advice, whether oral or written, to persons who are not employees of said title companies, as to the purpose and legal effect of instruments to which neither the Rattikin Title Company nor Kansas City Title Insurance Company is a party; and such temporary injunction shall be binding upon all persons having notice thereof in active concert or participation with the defendant, Rattikin Title Company. However, it is not intended by this order that any Notary Public who may be employed by Rattikin Title Company shall refrain from complying with the provisions of Article 6605, R.C.S. of Texas, in regard to taking the acknowledgment of a married woman privily and apart from her husband.

'All relief prayed for by way of temporary injunction, which is not hereby granted, is denied.'

It is clear from the record that the appellant Title Company was the agent for the Kansas City Title Insurance Company, by which Insurance Company all the titles approved by the Title Company were insured. The Title Company was left free by the order of temporary injunction to do everything for its principal, the Insurance Company it was enjoined from doing as to third persons. It was also left free to do the same things for its own employees. The record reflects that the Title Company had attorneys employed as its servants rather than as attorneys are ordinarily employed to perform legal services for clients. By the provisions of the order of temporary injunction its attorney-employees were left free to prepare legal instruments as a part of any transaction to which the Title Company itself was a party, or to which the Insurance Company for which it was the agent was a party, or to which one of its employees was a party. Such attorney-employees were left free to make statements and representations regarding the purpose and effect of legal instruments (prepared by them or not) to persons they did not or could not represent and to whom they owed no duty, in connection with transactions to which either the Title Company or its principal, the named Insurance Company, was a party.

**\*951** These same attorney-employees, as well as others in the employ of the Title Company, were, as the result of the court's order, enjoined from preparing legal instruments which would become a part of any transaction where such privity would not exist. They were likewise enjoined from making statements or giving advice as to the purpose or effect of any such character of instrument to any person, firm or corporation other than their employer and the Insurance Company for which it was agent in or in connection with any transaction to which neither such employer nor said principal were privy parties.

**[2]** It was the contention of the appellee that the appellant was doing and performing the very things which it was enjoined from doing by the temporary injunction order. Reference to the record before us satisfies us that the Grievance Committee's petition

alleged a cause of action, and that there was evidence of sufficient probative force to entitle the court below to determine that such things, alleged by the petition to constitute the unlawful practice of law by the Title Company, were being done. Appellee sought their enjoinder as constituting the unlawful practice of law. The Texas State Bar Act, in part at least, is statutory. See Article 320a-1, R.C.S. of Texas. The Rules of the State Bar of Texas, enacted as provided by Section 4 of said Article, are to be found in Vernon's Annotated Texas Civil Statutes immediately following the Article. These Rules have the same force and legal effect upon the matters to which they relate as the Texas Rules of Civil Procedure have to the matters to which they relate. By such Rules of the State Bar of Texas 'all persons not members of the State Bar are hereby prohibited from practicing law in this State.' The members in question are those attorneys licensed to practice law by the Supreme Court of Texas. There is no question but what the appellant Title Company is not, nor could it be, such a 'person.' Article XII of such Rules provides for an agency of the State Bar, to-wit: the Grievance Committee (which is the appellee herein and which was the plaintiff-petitioner in the court below) to prosecute appropriate suits against persons, firms and corporations other than the members of the State Bar for the purpose of suppressing, prohibiting or preventing the unauthorized practice of law by such others.

The 'practice of law' is not defined by any statute presently in effect. This has been true since the repeal in 1949 of Article 430a of Vernon's Annotated Penal Code. Even when that Article was in effect, however, it was held that it was within the power and authority of the judicial branch of the government to determine what services and what acts constitute the practice of law. Grievance Committee of State Bar of Texas, Twenty-first Congressional Dist. v. Dean, Tex.Civ.App., Austin 1945, 190 S.W.2d 126.

It has been held that 'conveyancing', 'preparation of legal instruments of all kinds', and 'all advice to clients' involve the practice of law. Stewart Abstract Co. v. Judicial Commission of Jefferson County, Tex.Civ.App., Beaumont 1939, 131 S.W.2d 686; In re Duncan, 1909, 83 S.C. 186, 65 S.E. 210, 24 L.R.A., N.S., 750.

[3] [4] As to the 'preparation of legal instruments', those acts of any person in drawing deeds, notes, mortgages and releases relating to the property rights of others, when performed for a consideration, constitute the practice of law,-and those who give advice for a consideration to interested parties as to the purpose and legal effect of an instrument drawn by them for such interested parties practice law. See Hexter Title & Abstract Co. v. Grievance Committee, Fifth Congressional Dist., State Bar of Texas, 1944, 142 Tex. 506, 179 S.W.2d 946, 157 A.L.R. 268, affirming Bar Ass'n of Dallas v. Hexter Title & Abstract Co., 175 S.W.2d 108, the Fort Worth Court of Civil Appeals.

[5] When a corporation furnishes legal services to others and collects fees or receives profits therefor, directly or indirectly, such constitutes the practice of law, the performance of which may be enjoined. Stewart Abstract Co. v. Judicial Commission **\*952** of Jefferson County, supra. See also the cases cited at page 952 of 179 S.W.2d of the opinion in the Hexter Title & Abstract Co. v. Grievance Committee, Etc., case, supra.

[6] [7] It is thus clear that the Title Company has, perforce the temporary injunction order, been enjoined from doing specific things which our courts have declared to constitute the practice of law. Such things, when done by a party such as the Title Company, are illegal acts. If the pleadings alleged the present commission of such acts or a future intent on the part of the Title Company to commit such acts unless it is restrained from so doing, the Grievance Committee was entitled to a hearing upon its application for a temporary injunction. As applied to the instant controversy, if upon that hearing the evidence introduced by it showed that such illegal acts are occurring or will occur in the absence of restraint, then the record shows that the Grievance Committee has demonstrated the existence of a probable right on the part of the organization for which it acts, the State Bar, to have an injunction writ issue, and a probable injury to that body should injunction writ be withheld.

The question of whether the very acts enjoined constitute the unlawful practice of law is not new in Texas. It is settled law that these acts constitute such unlawful practice when performed by an incorporated 'Title and Abstract Company.' In the case of Hexter Title & Abstract Co. v. Grievance Committee, Etc., supra, Chief Justice Alexander had a case which bore directly upon the question posed in the present instance. The Hexter Company was incorporated for the identical purposes that the Rattikin Title Company was incorporated (to-wit: to make, compile and own abstracts of title to lands and liens of all character on any

property, or any other abstracts of record in this State, or county thereof, required by law), and the Hexter Company had a title insurance company for which it was agent, just as does the Rattikin Title Company in the Kansas City Title Insurance Company. In the Hexter case, however, there was no third ingredient, to-wit: a law firm which purported to do all the things which constituted the practice of law. In the instant case this ingredient has been added in the law firm of Rattikin and Spiller, attorneys. In the Hexter case, all those acts constituting the practice of law (and which the authorities have held to constitute such practice) were done and performed by the Hexter Company through attorneys solely employed by it in its legal department. The Hexter Company defended that very similar suit on the theory, in part, that its acts through its agents who were also attorneys did not constitute the practice of law because there was no charge made for their services. The Supreme Court readily perceived and held that the work of such agent-attorneys was paid for by the Hexter Company's customers through the consideration paid the Hexter Company for other express services. In the present instance, the Title Company attempted to refrain from performing such acts, channeling their performance into the hands of attorneys, particularly Rattikin and Spiller. Messrs. Rattikin and Spiller are attorneys, and their association together is as a law firm which purports to do all of such things for clients which were held by the Hexter case to constitute the unlawful practice of law by the Title Company. These things the law firm performs for specific charges as attorney's fees. Certain of the very acts the Title Company was enjoined from performing,-the preparation of the instruments for conveyancing and for mortgaging and in the curing of titles,-were acts such Title Company contends it did not perform. It contends that the independent firm of Rattikin and Spiller performed such acts. But the record reflects that many of such acts were frequently and more or less continuously performed by the Title Company.

Another theory upon which the Hexter Company sought to defend the suit against it was based upon the premise that it, the Hexter Company, was a party to the negotiation and consummation of a particular transaction, culmination of which was its **\*953** issuance of a title insurance policy,-and if such a transaction be not properly considered as one and indivisible, then the transaction to which it was a party, to-wit: the examination of title to determine that it was one which it would insure with the insurance company for which it was the agent,-and the act of effectuating such title insurance, necessarily entailed the action of its attorney-employees in the preparation of the instruments of conveyance, etc., and in the curing of title defects, and in the supervision and direction of the acts involved in conveyancing, mortgaging, etc. The Supreme Court held, in effect, that in the issuance of a title policy, to which the title company would be a party or be acting for a party, the seller would not be a party to that transaction though he paid the premium therefor, and that in the conveyance of real estate to a buyer by a seller, the title company would not be a party to that transaction for it neither had nor acquired any interest in the property by reason thereof. In his opinion, Judge Alexander pointed out by analogy to circumstances theorized in certain extremes the legal as well as practical necessity of considering certain facets of the involved negotiation and consummation of modern day real estate conveyancing and financing, etc., as several and distinct transactions-not necessarily incident to one another or inclusive one of the other. The reasoning of the opinion readily discloses that as to a mortgage of the property the seller is not necessarily a party to the mortgage transaction, especially where there was no mortgage on the property prior to the title conveyance,-nor would the buyer or seller necessarily be a party to a mortgagee's title policy issued only to protect the mortgagee. The Supreme Court held that it would only be as to transactions in which the Hexter Company was in privity as a party that the company's attorney-employees or other agents could prepare instruments whereby it either had or acquired an interest in property by reason thereof, and could make statement as to the purpose and effect of such instruments to third persons. In the present instance, there is no directly advanced defense by the Rattikin Title Company based upon this same defensive theory, though the 'thread' containing this thought on its part runs through all its argument as contained in its brief.

In the Hexter case, the title company frankly did the things constituting the practice of law, seeking primarily to justify the performance of these things by refraining (as it believed) from making any charge therefor, and in the alternative, to justify their performance by contending that it was a party to the single transaction involved, or all of the several transactions involved. Here the Rattikin Title Company has sought to refrain from doing these things as a corporation, acting as it must through its agents, servants, etc.,-and instead has sought to cast the responsibility for the performance of such acts upon attorneys who are not acting as its employees. In most instances it sought to cast such responsibility upon the law firm of Rattikin and Spiller. The question thus resolved is whether the Title Company actually has refrained from such actions or whether it is doing them despite any intent not to. As we have stated, the record demonstrates that it has done them and is doing them. In the main, it appears that such action was inadvertent, but it also appears that some acts were intentionally performed through a mistaken opinion as to what constitutes the practice of law. The principal instances where the latter appears seem to be those in which

legal instruments are in, or might be in, such form as satisfies the Title Company, in so far as the issuance of a title insurance policy would be concerned, but where the mortgage loan company requires additional provisions to be incorporated in the instruments as conditions precedent to the making of its loans.

A certain difficulty, unavoidable under the system of operation of the law business of Rattikin and Spiller and title business of Rattikin Title Company, was encountered in the maintenance of separate and distinct operations as between the Title Company and the law firm. Both members of the law firm were administrators of the business of **\*954** the Title Company. One of them was its chief executive. The law firm had numerous employees who were also employees of the Title Company, and many of these worked indiscriminately among and alongside the numberous employees of the Title Company alone, as well as among and alongside the numerous employees of the law firm alone. Adding to the difficulty was the fact that each of the members of the law firm, as administrators of the business of the Title Company, conducted the affairs of the Title Company from the same desk from which he conducted the business of the law firm. The public was misled, as well as even the clients of the law firm and the customers of the Title Company. In the record we see instances where the Title Company is frequently directed to do certain things which could only be properly done by an attorney, and we have no doubt but what members of the law firm (and its exclusive employees) were directed to do things properly done only by the Title Company. There is no doubt what in the case of any similar interrelated activity of a sizeable law firm with a title company of a size comparable to that of the Rattikin Title Company, with any lengthy period of such intermingling of personnel one would always discover that certain of the exclusive employees of the Title Company would find themselves doing legal work for the clients of the law firm, and several of those exclusively employed by the law firm would find themselves performing work for the Title Company.

 **[8]**    In the present instance, such interrelated activity by intermingled personnel resulted, as disclosed by the record, in the Rattikin Title Company (though its employees) performing acts which constituted the practice of law, to-wit: preparing legal instruments for persons and corporations other than itself and its principal in transactions whereby it neither had nor acquired any interest in the subject matter of the transaction,-and also resulted in it (through its employees) giving advice or making statements to persons other than its principal and its employees as to the purpose and effect of legal instruments in transactions to which neither the Title Company nor its principal was a party. These very acts on the part of the Title Company's employees constituted the unauthorized and illegal practice of law by the Title Company, and the trial court properly enjoined their continuance. The Title Company indirectly profited by such acts in the same manner that the Title Company profited in the Hexter case. That the Title Company might have committed or performed such acts inadvertently or unintentionally or through mistake constitutes no defense. It matters not why the acts were being done. That is not a matter for our inquiry and in this instance, at least, excuse for the commission of such acts is not before us.

Indeed, so long as the system of commingling the employees of the law firm with those of the Title Company shall persist, and so long as the system of doing business for both firms through individuals serving both (from the same 'side of the table') shall persist, we readily perceive how-in view of the record's disclosure as to the volume of business handled by both the Title Company and law firm-at least some of the acts constituting the unauthorized practice of law will again, in time, be performed or committed by the Title Company even should it in good faith do all things possible to prevent such. If such acts should recur, in view of any subsisting order enjoining them, their performance would be imprudent conduct on the part of the Title Company, to say the least, and, to paraphrase Justice Holmes, should the Title Company walk too near the line that divides prudent from imprudent conduct, it takes the risk, and if it oversteps the line, it must bear the consequences with fortitude.

Besides its points of error which are disposed of by what we have said above, the appellant Title Company has assigned additional points wherein it contends that there was no urgent necessity for granting the temporary injunction and that since its granting virtually accomplished the object of the suit, it should not have been granted. The Title Company contends that the main objective of the Grievance Committee is to prevent the lawyers who work part time for **\*955** the Title Company from working part time for the law firm of Rattikin and Spiller. We do not view this as the Grievance Committee's objective, but whether it is or not, such was not enjoined by the court's order.

As to the urgent necessity warranting the granting of a temporary injunction, the Title Company states, 'The rule for which we are now contending, namely that important and new questions of law should not be answered in a hearing on a temporary

injunction, in the absence of a clear showing of an immediate necessity or emergency and unless the law is clear and positive in view of the facts, is clearly stated by the Texas Supreme Court in the case of Texas Foundries v. International M. & F. Workers (151 Tex. 239), 248 S.W.2d 460, 464, as follows: * * *.' Thereafter follows the statement of the Supreme Court in that case to the effect that new and important law questions should reach the appellate courts for final determination in cases tried on their merits rather than in instances of temporary injunction.

 [9]    [10]    [11]    It is our opinion that the law is 'clear and positive' as to the illegality of the acts enjoined. Such is demonstrated by the authorities, including the Hexter case. It is also our opinion that the facts proved upon the temporary injunction hearing were sufficient to entitle the trial judge to believe and decide that there was a continuing violation of the substantive law. The order of temporary injunction commands, in effect, that the Title Company 'cease its unlawful action and desist from any resumption pending a trial of the merits of the case.' We recognize that in the hearing upon an application for a temporary injunction the only question before the trial court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits. James v. E. Weinstein & Sons, Tex.Com.App.1929, 12 S.W.2d 959; Transport Co. of Texas v. Robertson Transports, Tex.1953, 261 S.W.2d 549. But in an injunction case wherein the very acts sought to be enjoined are acts which prima facie constitute the violation of expressed law, the status quo could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation. In such instances, the status quo to be preserved by temporary injunction is the last, actual, peaceable, noncontested status which preceded the pending controversy, and when it is determined that the law is being violated it is the province and the duty of the court to restrain it. Gifford v. State, Tex. Civ.App., El Paso 1950, 229 S.W.2d 949; Transport Co. of Texas v. Robertson Transports, supra; Hartley v. Brady, Tex.Civ.App., Amarillo 1938, 114 S.W.2d 406; Dickard v. Crawley, Tex.Civ.App., Austin 1950, 230 S.W.2d 833. And in such instances, if the preservation of the status quo should accomplish the objective of the suit this is nevertheless as it should be, for no man may engage in actions in violation of the staturory law, or of a rule of law having similar force and authority. Gifford v. State, supra.

By a cross-point upon the appeal, the Grievance Committee contends that the trial court erred in refusing to enjoin the Title Company from acting as the attorney for mortgage loan companies to the extent of determining that certain legal instruments are in proper form before delivering over the money lent by them to other parties (contingent upon and in connection with pending purchase transactions) and held by the Title Company as an escrow agent.

 [12]    [13]    [14]    The cross-point presents a question of law not heretofore determined and not patently illegal. The right the Grievance Committee contends for will admit of doubt. The trial judge, in the exercise of his discretion, could therefore not be said to have abused that discretion in refusing to stay such action on the part of the Title Company in the order which he did enter upon temporary injunction proceedings. See 43 C.J.S., Injunctions, s 19, sub. (c), p. 434. We have no function on this appeal other than to determine whether or not the trial judge clearly abused his discretion. **\*956** Texas Foundries v. International Moulders & Foundry Workers' Union, 1952, 151 Tex. 239, 248 S.W.2d 460. But for such abuse his action will not be disturbed on appeal. Transport Co. of Texas v. Robertson Transports, supra.

Judgment of the trial court is affirmed.

**All Citations**

272 S.W.2d 948

---

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

601 S.W.2d 178
Court of Civil Appeals of Texas, Amarillo.

T & R ASSOCIATES, INC., d/b/a Scarlett O'Hara's, Appellant,

v.

CITY OF AMARILLO, Appellee.

No. 9130. | May 30, 1980.

City brought suit to restrain operation of lounge in violation of zoning and building code ordinances of city. The District Court, Potter County, Guy Hazlett, J., issued temporary injunction, and lounge operator appealed. The Court of Civil Appeals, Reynolds, C. J., held that: (1) in an appeal from interlocutory order granting or denying temporary injunction, merits of entire suit neither are presented for appellate review nor may be considered by appellate court, and (2) status quo to be preserved was status which existed before operation of lounge began in admitted violation of city's ordinance, and not state of affairs which would permit continuing violation of the law.

Affirmed.

West Headnotes (6)

**[1]** **Appeal and Error** 👈 Extent of Review Dependent on Nature of Decision Appealed from

In an appeal from interlocutory order granting or denying temporary injunction, merits of entire suit neither are presented for appellate review nor may be considered by appellate court.

Cases that cite this headnote

**[2]** **Appeal and Error** 👈 Injunction

**Appeal and Error** 👈 Refusing injunction

In an appeal from interlocutory order granting or denying temporary injunction, appellate court is strictly limited to determination whether there has been clear abuse of discretion by trial court.

Cases that cite this headnote

**[3]** **Injunction** 👈 Preservation of status quo

Status quo to be preserved by temporary injunction is the last, actual, peaceable, noncontested status which preceded pending controversy.

Cases that cite this headnote

**[4]** **Injunction** 👈 Preservation of status quo

**Zoning and Planning** 👈 Interim relief; preliminary injunction

On application of city for temporary injunction restraining operation of lounge in violation of zoning and building code ordinances of city, status quo to be preserved was status which existed before operation of lounge began in admitted violation of city's ordinance, and not state of affairs which would permit continuing violation of the law.

[1 Cases that cite this headnote](#)

**[5]**    **Injunction**  🔑 [Commission of crime in general](#)

If law is being violated, it is duty of court to restrain it and temporary injunction is an appropriate remedy.

[1 Cases that cite this headnote](#)

**[6]**    **Injunction**  🔑 [Abuse of discretion](#)

There is no abuse of discretion if court applies law to conceded or undisputed facts.

[Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*179** Judge & Brown, John Judge, Amarillo, for appellant.

Merril E. Nunn, City Atty., John M. Black, First Asst. City Atty., Amarillo, for appellee.

**Opinion**

REYNOLDS, Chief Justice.

T & R Associates, Inc., d/b/a Scarlett O'Hara's, complains of a temporary injunction, issued on the application of the City of Amarillo and to maintain the status quo pending a final hearing, restraining T & R Associates, Inc., from operating a lounge in violation of zoning and building code ordinances of the City. Inasmuch as T & R Associates, Inc., has stipulated its violations of the ordinances, the trial court properly exercised its discretion in granting the temporary injunction to maintain the status quo. Affirmed.

T & R Associates, Inc., operated a lounge known as Scarlett O'Hara's in Space 15-A, Sunset Center, an area of the City of Amarillo zoned as "General Retail." Alleging that the lounge operated in violation of zoning and building code ordinances, the City instituted this litigation. By its action, the City sought a temporary injunction, to be made permanent after a final hearing, directing T & R Associates, Inc., to cease and desist the lounge operation until and unless the ordinances were complied with by (a) obtaining a Special Use Permit and (b) providing two properly constructed and approved exits on the premises.

Responding, T & R Associates, Inc., pleaded, among other matters, that the City was estopped to seek, and was barred by laches, waiver, ratification and the clean hands doctrine from seeking, the equitable injunctive relief. T & R Associates, Inc., then pleaded for, together with other relief, a temporary injunction which, in essence, would restrain the City from impeding or terminating the operation of the lounge.

Hearing the temporary injunction evidence, the trial court found, inter alia, that:

(1) The operation of the lounge in a general retail zoning district without a Special Use Permit is a violation of the zoning laws of the City;

(2) The lounge is operated without having a minimum of two properly constructed and approved exits in violation of the Uniform Building Code adopted by the City; and

(3) In order to maintain the status quo pending final hearing on the merits of the cause, a temporary injunction should be ordered effective until a final hearing.

Accordingly and until a final hearing, the court's order temporarily enjoined T & R Associates, Inc., from operation of a lounge on the premises without (1) having first obtained a Special Use Permit required by the City's ordinance, and (2) a minimum of two properly constructed and approved exits required by the City's ordinance. The execution of the order requiring a minimum of two exits was stayed for a period of forty days to allow T & R Associates, Inc., to comply with the Uniform Building Code.

T & R Associates, Inc., perfected an appeal. During the time allowed for preparation of the appellate record, the court reporter's notes and transcription of the evidence heard by the trial court were stolen. The parties elected to proceed on appeal with a written "Stipulation of Evidence," the effect of which is an agreement to some facts established by, but a disagreement about other portions of, the evidence adduced in the trial court. Nevertheless, by the following numbered stipulations, the parties agree the uncontroverted evidence was that:

4. T AND R ASSOCIATES, INC., operates a tavern or a lounge at Space 15-A, Sunset Center, as those words are defined in Chapter 26-11 of the Amarillo Municipal Code;

5. The operation of a tavern or a lounge in a General Retail zoning district is prohibited by the provisions of Chapter 26 of the Amarillo Municipal Code;

*180  11. The exit doors to Space 15-A are not in compliance with Chapter 5 of the Amarillo Municipal Code;

12. RON TWITTY testified that T AND R agreed to bring its exit doors into compliance with the Municipal Code if it is allowed to continue operating as a tavern in Space 15-A;

13. T AND R ASSOCIATES, INC., has, on two occasions, made application to THE CITY OF AMARILLO for a specific use permit for the operation of the lounge at the premises in question as provided by s 26-22 of the Amarillo Municipal Code;

16. THE CITY OF AMARILLO City Commission has denied each application for a Specific Use Permit filed by T AND R ASSOCIATES, INC.

In pursuing its appeal, T & R Associates, Inc., has drafted twelve points of error, two of which have five subpoints, directed to its basic contentions that it was, and the City was not, entitled to temporary injunctive relief, and that the injunction order upset the status quo between the parties. By its points, as well as by its live trial pleadings, T & R Associates, Inc., does not question the validity of the City's ordinances; instead, it claims the City is estopped, barred and lacks clean hands to enforce the ordinances against T & R Associates, Inc.

 [1]  The grounds interposed by T & R Associates, Inc., to escape the force of the ordinances it admittedly violated may not be entertained. These grounds embrace matters which go to the merits of the underlying litigation, and undertaking their determination would be to give full consideration to the merits of the entire lawsuit, thereby denying a conventional trial on the merits. In an appeal from an interlocutory order granting or denying a temporary injunction, the merits of the entire suit neither are presented for appellate review nor may be considered by the appellate court. Davis v. Huey, 571 S.W.2d 859, 861-62 (Tex.1978).

 [2]  More properly in this situation, the roles of the courts are otherwise defined. The trial court only questions whether there is an entitlement to the preservation of the status quo of the subject matter of the suit pending trial on the merits. The appellate court is strictly limited to the determination whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory injunctive order. Davis v. Huey, supra, at 861-62.

 [3]   [4]  The status quo to be preserved by temporary injunction is "the last, actual, peaceable, noncontested status which preceded the pending controversy." Transport Co. of Texas v. Robertson Transports, 152 Tex. 551, 261 S.W.2d 549, 553-54

(1953). In this action, the status quo to be preserved is the status which existed before T & R Associates, Inc., began operation of its lounge in admitted violation of the City's ordinances, City of Corpus Christi v. Lone Star Fish & Oyster Co., 335 S.W.2d 621, 624 (Tex.Civ.App. San Antonio 1960, no writ), and not the state of affairs which would permit a continuing violation of the law. Wesware, Incorporated v. State, 488 S.W.2d 844, 850 (Tex.Civ.App. Austin 1972, no writ); Rattikin Title Company v. Grievance Committee, 272 S.W.2d 948, 955 (Tex.Civ.App. Fort Worth 1954, no writ).

 **[5]**    Indeed, if the law is being violated, it is the duty of the court to restrain it. Houston Compressed Steel Corp. v. State, 456 S.W.2d 768, 773 (Tex.Civ.App. Houston (1st Dist.) 1970, no writ); Rattikin Title Company v. Grievance Committee, supra, at 955. And a temporary injunction is an appropriate remedy. Gifford v. State, 229 S.W.2d 949, 952 (Tex.Civ.App. El Paso 1950, no writ).

 **[6]**    There is no abuse of discretion if, as here, the court applies the law to conceded or undisputed facts. Accord, Camp v. Shannon, 162 Tex. 515, 348 S.W.2d 517, 519 (1961). Therefore, the trial court did not abuse its discretion in granting the temporary injunction. It follows that the points of error advanced by T & R Associates, Inc., must be overruled.

The judgment of the trial court is affirmed.

**All Citations**

601 S.W.2d 178

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

965 S.W.2d 18
Court of Appeals of Texas,
Houston (1st Dist.).

T–N–T MOTORSPORTS, INC., Roy Terpstra and Joe Terpstra, Appellants,

v.

HENNESSEY MOTORSPORTS, INC., Appellee.

No. 01–97–00815–CV.　|　Feb. 12, 1998.　|　Rehearing Overruled March 13, 1998.

Employer sued former employees for misappropriation of trade secrets concerning employer's business of selling high performance upgrades for particular models of sports cars. The 234th District Court, Harris County, Tony Lindsay, J., granted temporary injunction. Appeal was taken. The Court of Appeals, Taft, J., held that: (1) record demonstrated probability of success on merits of claims for trade secret protection and that former employees misappropriated trade secrets, which thus supported temporary injunction; (2) potential damage to employer's business from misappropriation of trade secrets could not be easily calculated, which thus rendered damages inadequate and also supported temporary injunction; but (3) temporary injunction granted by trial court was overbroad and would be reformed to limit only former employees' disclosure and use of trade secrets.

Affirmed as reformed.

West Headnotes (22)

**[1]　Injunction** 🔑 Preservation of status quo

Sole issue before trial court in temporary injunction hearing is whether applicant may preserve status quo, pending trial on merits.

3 Cases that cite this headnote

**[2]　Appeal and Error** 🔑 Injunction

**Appeal and Error** 🔑 Refusing injunction

Review of grant or denial of temporary injunction is limited to determining whether trial court clearly abused its discretion in entering interlocutory order.

3 Cases that cite this headnote

**[3]　Appeal and Error** 🔑 Injunction

**Appeal and Error** 🔑 Refusing injunction

On review of grant or denial of temporary injunction, reviewing court will not substitute its judgment for that of trial court, but will only determine whether trial court's action was so arbitrary as to exceed bounds of reasonable discretion.

2 Cases that cite this headnote

**[4]　Appeal and Error** 🔑 Injunction

On review of grant or denial of temporary injunction, reviewing court draws all legitimate inferences from evidence in light most favorable to trial court's order.

4 Cases that cite this headnote

[5]  **Appeal and Error**  👈 Appeal from orders relating to injunctions

Appeal of order granting or denying temporary injunction is appeal from interlocutory order, and thus merits of applicant's case are not presented for appellate review.

2 Cases that cite this headnote

[6]  **Labor and Employment**  👈 Trade Secrets or Confidential Information

Certain duties, apart from any written contract, arise upon formation of employment relationship, including duty that forbids employee from using confidential or proprietary information acquired during relationship in manner adverse to employer.

10 Cases that cite this headnote

[7]  **Labor and Employment**  👈 Trade Secrets or Confidential Information

Obligation of employee not to use confidential or proprietary information acquired during relationship in manner adverse to employer survives termination of employment.

20 Cases that cite this headnote

[8]  **Labor and Employment**  👈 Post-Employment Duties

**Labor and Employment**  👈 Trade Secrets or Confidential Information

Former employee may not use confidential information or trade secrets acquired during course of employment, although this duty does not bar use of general knowledge, skill, and experience.

8 Cases that cite this headnote

[9]  **Antitrust and Trade Regulation**  👈 Confidential relation

When claim of improper disclosure or use of trade secrets arises from confidential relationship, injured party is not required to rely upon express agreement that offending party will hold trade secret in confidence.

10 Cases that cite this headnote

[10]  **Antitrust and Trade Regulation**  👈 What are "trade secrets" or other protected proprietary information, in general

Trade secret may consist of any formula, pattern, device, or compilation of information that is used in one's business, and which gives one opportunity to obtain advantage over competitors who do not know or use it.

16 Cases that cite this headnote

[11]  **Antitrust and Trade Regulation**  👈 What are "trade secrets" or other protected proprietary information, in general

Trade secret may be device or process which is patentable, but it also may be device or process which is clearly anticipated in prior art or one which is merely mechanical improvement that good mechanic can make.

Cases that cite this headnote

**[12]     Antitrust and Trade Regulation** ☞ What are "trade secrets" or other protected proprietary information, in general

   **Antitrust and Trade Regulation** ☞ Necessity that information be secret

Trade secret protection will exist when money and time are invested in development of procedure or device that is based on idea which is not new to particular industry, and when that certain procedure or device is not generally known.

Cases that cite this headnote

**[13]     Antitrust and Trade Regulation** ☞ Vigilance in protecting secret; abandonment or waiver

Trade secret protection is warranted when effort is made to keep material important to particular business from competitors.

2 Cases that cite this headnote

**[14]     Antitrust and Trade Regulation** ☞ What are "trade secrets" or other protected proprietary information, in general

Mere fact that knowledge of product may be acquired through inspection, experimentation, and analysis does not preclude trade secret protection from those who would secure that knowledge by unfair means.

1 Cases that cite this headnote

**[15]     Injunction** ☞ Disclosure or use of trade secrets or confidential information

Record indicating that information about specifics of employer's upgrade packages for sports cars, employer's customers, and its vendors was confidential and intended to be kept secret supported determination of probability of success on merits of employer's claims for trade secret protection, which thus supported grant of temporary injunction pending trial on merits.

4 Cases that cite this headnote

**[16]     Injunction** ☞ Grounds in general; multiple factors

To be entitled to temporary injunction, applicant is not required to prove that it will prevail at trial but must plead cause of action, show probable right to recover on that cause of action, show probable injury in interim, and show that no adequate legal remedy exists.

13 Cases that cite this headnote

**[17]     Injunction** ☞ Likelihood of success on merits

Probable right of success on merits, required for issuance of temporary injunction, is shown by alleging cause of action and presenting evidence that tends to sustain it.

11 Cases that cite this headnote

**[18]**   **Injunction**  &#9758; Irreparable injury

       **Injunction**  &#9758; Adequacy of remedy at law

Probable injury required to support issuance of temporary injunction includes elements of imminent harm, irreparable injury, and no adequate remedy at law for damages.

5 Cases that cite this headnote

**[19]**   **Injunction**  &#9758; Adequacy of remedy at law

       **Injunction**  &#9758; Recovery of damages

Legal remedy is inadequate, which thus supports issuance of temporary injunction, if damages are difficult to calculate or their award may come too late.

4 Cases that cite this headnote

**[20]**   **Injunction**  &#9758; Disclosure or use of trade secrets or confidential information

Record supported conclusion that employer demonstrated likelihood of success on merits of its claims against former employees for misappropriation of trade secrets concerning performance upgrade packages for particular type of sports car, which thus supported grant of temporary injunction; former employees possessed employer's confidential information, were in position to use it to compete directly with employer, and thus presented inherent threat to disclosure or use of appellee's trade secrets.

25 Cases that cite this headnote

**[21]**   **Injunction**  &#9758; Disclosure or use of trade secrets or confidential information

Potential damage to employer's business of selling performance upgrades for particular make of sports car from former employees' alleged misappropriation of trade secrets could not be easily calculated which thus rendered legal remedy of damages inadequate and supported issuance of temporary injunction pending trial on merits.

12 Cases that cite this headnote

**[22]**   **Injunction**  &#9758; Particular cases

Temporary injunction barring former employees from disclosing or using any information about particular models of sports cars and from working on, repairing, or providing any type of services on those models was overbroad and thus would be reformed to limit only disclosure and use of former employer's trade secrets concerning his business of selling high performance upgrades for those models.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*20** Michael K. Hurst, Marcie Lande Romick, Dallas, for Appellants.

William C. Norvell, Scott D. Marrs, Bruce Charles Morris, Houston, for Appellee.

**Opinion**

Before TAFT, MIRABAL and SMITH,[*] JJ.

[*] The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

## OPINION

TAFT, Justice.

This is an interlocutory appeal[1] from the grant of a temporary injunction against appellants, T–N–T Motorsports, Inc., Roy Terpstra, and Joe Terpstra. We address: (1) whether the trial court abused its discretion in enjoining former employees from using information regarding, or working on, three types of motor vehicles they had worked on for their former employer; and (2) whether the temporary injunction is overbroad. We reform, and affirm the temporary injunction as reformed.

### Facts

In 1991, John Hennessey founded Hennessey Motorsports, Inc. (appellee), which specializes in high performance upgrades for a variety of vehicles, including the Dodge Viper Roadster and Dodge Viper GTS coupe. By May 1993, appellee had designed its first custom performance and enhancement package for a Dodge Viper.[2] In late August 1993, appellee hired Roy Terpstra to assist in meeting the increased demand for the Venom upgrades and to perform research and development. In April 1994, appellee hired Joe Terpstra to again meet increased demand for its products.

In 1996, the Terpstras incorporated their part-time body shop as T–N–T Motorsports, Inc. Prior to T–N–T's incorporation, the Terpstras worked for T–N–T as well as for appellee, with appellee's knowledge. During this time period and with appellee's consent, T–N–T manufactured and designed products that it sold to appellee for use in connection with the Venom upgrades. Also with appellee's knowledge, T–N–T performed engine modifications for customers other than appellee's, although not on Vipers.

On May 20 1997, the Terpstras terminated their employment without notice to appellee, and began full-time employment with T–N–T. On May 30, 1997, Roy Terpstra attended a Viper Club meeting in Florida at which he distributed T–N–T business cards and T–N–T brochures advertising the availability of high grade performance upgrades for Vipers. Roy Terpstra told a private investigator hired by appellee that the T–N–T upgrades were identical to the Venom upgrades, that he had learned how to create these packages as an employee of appellee, and that he offered the same upgrades as appellee but at a better price. He said at least three of appellee's customers had already moved their **\*21** business to T–N–T. He also told the investigator that appellee was his only competitor.

In addition to using the same products and vendors, T–N–T also planned to perform the same tests and have an identical warranty on its cars as appellee, and use the same type of equipment that appellee used. T–N–T intended to use a similar name for its packages ("Serpent" instead of "Venom").

In June 1997, appellee sued appellants and successfully obtained temporary injunctive relief.

**Standard of Review**

 **[1]**    The sole issue before a trial court in a temporary injunction hearing is whether the applicant may preserve the status quo, pending trial on the merits. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.,* 819 S.W.2d 607, 610 (Tex.App.—Houston [1st Dist.] 1991, no writ).

 **[2]**    **[3]**    **[4]**    **[5]**    We limit our review of the grant or denial of a temporary injunction to determining whether the trial court clearly abused its discretion in entering the interlocutory order. *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 551 (Tex.App.—Dallas 1993, no writ); *Manufacturers Hanover,* 819 S.W.2d at 610. We will not substitute our judgment for that of the trial court, but will only determine whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion. *Rugen,* 864 S.W.2d at 551. We draw all legitimate inferences from the evidence in the light most favorable to the trial court's order. *Id.* Because an appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order, the merits of the applicant's case are not presented for appellate review. *Rugen,* 864 S.W.2d at 551; *Manufacturers Hanover,* 819 S.W.2d at 610.

**Abuse of Discretion**

In points of error one through five, appellants challenge the sufficiency of the evidence supporting the trial court's findings that appellee demonstrated (1) substantial probability of success on the merits, (2) probable injury in the interim, (3) substantial risk of imminent harm, (4) substantial risk of irreparable injury, and (5) absence of any adequate remedy at law. In point of error six, appellants complain the court erred as a matter of law in determining that appellee met the requisite elements of preliminary injunctive relief. In points of error seven through 12, appellants challenge the trial court's findings regarding appellee's confidential information, and assert no identifiable "trade secrets" exist that might be subject to misappropriation.

The basis of appellee's underlying suit is that, by virtue of their employment with appellee, the Terpstras acquired confidential information, [3] which they then used to compete directly with appellee. Appellee sued appellants alleging misappropriation and conversion of confidential information, breach of fiduciary duty, breach of contract, breach of confidential relationship, tortious interference with prospective relations, civil conspiracy, fraud or fraudulent concealment, and negligence or negligent misrepresentation.

Appellants' concerns are for their right to earn a livelihood in their area of expertise in competition with their former employer. Appellants invoke the free enterprise system as a basis for limiting the general right of former employees to wide-open competition with former employers only where employers have obtained: (1) covenants not to compete; or (2) confidentiality agreements. *See MPI Inc. v. Dupre,* 596 S.W.2d 251, 254 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). We deal here with a third exception to the general rule, which is one designed to protect the trade secrets of a former employer in the absence of a confidentiality agreement.

**A. Trade Secrets**

 **[6]**    **[7]**    **[8]**    Certain duties, apart from any written contract, arise upon the formation of  **\*22**  an employment relationship. *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 600 (Tex.App.—Amarillo 1995, no writ). One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. *Id.* This obligation survives termination of employment. *Id.* Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment. *Id.* at 600–601; *American Precision Vibrator Co. v. National Air Vibrator Co.,* 764 S.W.2d 274, 278 (Tex.App.—Houston [1st Dist.] 1988, no writ).

 **[9]**    When a claim of improper disclosure or use of trade secrets arises from a confidential relationship, the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence. *Gonzales v. Zamora,* 791 S.W.2d 258, 265 (Tex.App.—Corpus Christi 1990, no writ).* However, the employer must show that the information was, in fact, a trade secret. *American Precision,* 764 S.W.2d at 279.

 **[10]    [11]    [12]    [13]**    A trade secret may consist of any formula, pattern, device, or compilation of information that is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996); *Rugen,* 864 S.W.2d at 548. "A trade secret may be a device or process which is patentable; but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make." *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,* 158 Tex. 594, 314 S.W.2d 782, 789 (1958). When money and time are invested in the development of a procedure or device that is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist. *K & G Oil Tool,* 314 S.W.2d at 785; *Gonzales,* 791 S.W.2d at 264. Further, when an effort is made to keep material important to a particular business from competitors, trade secret protection is warranted. *Rugen,* 864 S.W.2d at 552; *Gonzales,* 791 S.W.2d at 265. Items such as customer lists, pricing information, client information, customer preferences, buyer contacts, market strategies, blueprints, and drawings have been shown to be trade secrets. *Miller Paper,* 901 S.W.2d at 601; *American Precision,* 764 S.W.2d at 278.

 **[14]**    The word "secret" implies that the information is not generally known or readily available. *Rugen,* 864 S.W.2d at 552; *Gonzales,* 791 S.W.2d at 264. Courts have refused to give trade secret protection when the material or procedure sought to be protected has been publicly disclosed. *Gonzales,* 791 S.W.2d at 264. The mere fact that knowledge of a product may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. *K & G Oil Tool,* 314 S.W.2d at 788; *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 901 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.).

Appellants assert that they are merely utilizing general knowledge and expertise acquired through years of experience within the automotive industry, both prior to and during their tenure with appellee. They also contend that a lack of secrecy prevents appellee's alleged confidential information from being trade secrets. They assert that the specifications of the performance upgrades and the identities of appellee's customers and vendors are available to the public, and are common knowledge through publication of various magazine articles about appellee's upgrades and via appellee's Internet website. However, Roy Terpstra admitted John Hennessey told him the information he learned on behalf of appellee about designing, modifying, and building the Venom upgrades was proprietary.

The idea of upgrading the performance of any vehicle is not a new idea. However, the specific means by which appellee upgrades the performance of the Vipers is not common knowledge. Hennessey explained that through years of trial and error, appellee **\*23**  builds the "fastest normally aspirated [4] Vipers." He knows which components work and which do not. Appellee spent a substantial amount of time and money developing the upgrade packages that would fit the exact needs of its clientele. Hennessey testified that the component parts used by appellee in its upgrade packages are confidential. Many components are not available and need to be built from the ground up. Although materials for these parts are purchased from outside vendors, most parts are then modified to fit together and work in concert with all the other components to achieve the desired horsepower, so that the car performs reliably and is cost efficient and profitable. Even appellee's customers are not told the exact specifications of the work done on their vehicles.

Hennessey testified it has taken him four years to compile a list of vendors he considers capable of providing the materials and service he needs, who have the best prices, and who are the most reliable. Although retail prices are public, the overall cost of the Venom upgrades, the cost of items sold separately, the cost of components and sub-assemblies, and the cost of labor associated with assembling and process development is not public.

 **[15]**    Contrary to appellants' assertions, the specifics of the Venom upgrades, appellee's customer and vendor information, and appellee's pricing are not known to the general public. The magazine articles and appellee's website do not reveal how the various parts are assembled, or explain the process of designing or modifying the various parts that go into a Venom upgrade. There is no access to this information except through appellee.

Hennessey testified that only certain people within the company have access to and were trained to use its computer systems. Computers containing certain information are located in a locked room separate from employees. Access to the customer database requires a password. Appellee's customer database contains information such as names, addresses, and telephone numbers, the types of vehicles they own, whether other upgrades have been done on the vehicle, birthdays, and e-mail addresses. Hennessey testified that some customers even leave instructions not to tell their wives how much money was spent on the upgrades. Although appellee purchases a list of new vehicle buyers from an outside source, this information is contained in a separate database from its customer list. The customer list has been compiled over a four-year period, and appellee does not sell it to outsiders.

Appellee's shop is a large, non-air-conditioned airplane hangar. Hennessey stated the shop is at a remote location because he does not want off-the-street customers wandering in. The airport has a secured access gate from 6:00 p.m. to 6:00 a.m. that requires a code for entry. Non-employees are allowed in the shop area only after they have checked in with the office. Cylinder heads and specific components are kept in a separate area from the shop.

The record indicates the information about the specifics of the Venom upgrades, appellee's customers, and its vendors is confidential and intended to be kept a secret. The court did not abuse its discretion in determining that appellee had shown a probability of success in proving that its confidential information deserved trade secret protection.

## B. Temporary Injunction

 **[16]**    At the preliminary hearing, the applicant is not required to prove it will prevail at final trial. *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex.1968). To be entitled to a temporary injunction, an applicant must plead a cause of action, show a probable right to recover on that cause of action, and show a probable injury in the interim. *Sun Oil,* 424 S.W.2d at 218; *Manufacturers Hanover,* 819 S.W.2d at 610. The applicant also must show that no adequate legal remedy exists. *Manufacturers Hanover,* 819 S.W.2d at 610.

 **[17]**    **[18]**    **[19]**    A probable right of success on the merits is shown by alleging a cause of  **\*24**  action and presenting evidence that tends to sustain it. *Miller Paper Co.,* 901 S.W.2d at 597. Probable injury includes elements of imminent harm, irreparable injury, and no adequate remedy at law for damages. *Surko Enters., Inc. v. Borg–Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.—Houston 1989, no writ). A legal remedy is inadequate if damages are difficult to calculate or their award may come too late. *Miller Paper,* 901 S.W.2d at 597.

 **[20]**    Prior to leaving appellee's employ, Roy Terpstra was the director of Viper operations, and he admitted this was a position of trust. He performed specialized performance upgrades on vehicles, and designed, developed, tested, and assembled parts for the Venom upgrades. He worked with Hennessey in strategizing product development. He admitted that both T–N–T and appellee were in the business of custom high performance upgrades.

Although he had the knowledge to build the same various upgrades done by appellee for other vehicles prior to his employment with appellee, Roy Terpstra had never designed, modified, or built certain parts specifically for the Viper. It was while employed by appellee that he learned about Viper upgrades. He located vendors who could fabricate, modify, or supply parts for the upgrades for different types of vehicles, and he knew who were the best and most reliable. He also learned how to increase the horsepower of a vehicle, such as the Viper, because of the research and development done at appellee's shop. He admitted that the Venom upgrades took time and money to develop, and it was appellee who paid for product development.

The Terpstras did not, and were not required to, sign any agreement not to compete or confidentiality agreement. But a former employee may not use, for his own advantage and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment. *Rugen,* 864 S.W.2d at 551. "Injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets." *Id.* The record supports the court's conclusion that appellee demonstrated a likelihood of success on the merits of its claims against appellants.

The record indicates that appellants possess appellee's confidential information and are in a position to use it to compete directly with appellee. Under these circumstances, it is likely appellants will use the information to appellee's detriment. The record supports the court's conclusion that use of this information by appellants to perform services on the two types of Dodge Vipers or the Mitsubishi 3000 GT poses an inherent threat to the disclosure or use of appellee's trade secrets.

 **[21]**   Appellants argue that any damages suffered by appellee are compensable through money damages, and, therefore, appellee has not demonstrated that no adequate remedy at law exists. Injunctive relief is proper to prevent a party, which has appropriated another's trade secrets, from gaining an unfair market advantage. The only effective relief available to appellee is to restrain appellants' use of its trade secrets and confidential information pending trial. At the time of the injunction hearing, appellee had over 20 Vipers in its shop. Hennessey stated that if the Venom upgrades could be obtained anywhere, there would be no reason for people to send their Vipers to appellee. He testified that if the confidential information was distributed, appellee would lose its advantage. He estimated that appellee's gross sales for 1997 would drop from approximately $4 million to about $2 million. He also said the loss of good will was immeasurable. The potential damage to appellee's business cannot be easily calculated; therefore, a legal remedy is inadequate.

We hold that appellee satisfied its burden so that the trial court did not abuse its discretion by granting the temporary injunction against appellants. Accordingly, we overrule points of error one through 12.


**Injunction Overbreadth**

In point of error thirteen, appellants contend the court granted relief that was not specifically sought by appellee. Specifically, appellants assert the decretal paragraphs of the injunction make no mention of the confidential information as defined by the court. **\*25**  In point of error fourteen, appellants contend the court granted broader relief than was necessary. Appellants argue that the injunction is not limited to appellee's alleged trade secrets or confidential information. Instead, appellants assert, the injunction restrains not only them, but other nondisclosed and nonascertainable entities from disclosing, using, selling, or testing any information related to the two types of Dodge Vipers or the Mitsubishi 3000 GT. Appellants also contend the injunction prevents them and various other parties from working on or providing any type of service for Dodge Viper GTS, Dodge Viper Roadster, or Mitsubishi 3000 GT vehicles. Appellants assert that, read literally, the injunction would prevent former customers of appellants from even changing the oil or rotating the tires on their own cars.

Rule 683 of the Texas Rules of Civil Procedure provides:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

> Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

TEX.R. CIV. P. 683.

The injunction tracks this language by including within its scope appellants, "their officers, agents, servants, employees, representatives, attorneys, and all persons, firms, corporations or other entities, acting or purporting to act in concert or participation with any of them who receive actual notice of this Order by service or otherwise...." The injunction does not impose any restraint on individuals or entities other than appellants, except to the extent others act or purport to act in concert or participation with appellants.

The trial court found that:

> [Appellee's] trade secrets include the compilation of certain assembly techniques, design information, future product information, installation techniques, machining specifications, manufacturing processes, performance specifications on component parts, wholesale pricing information, product compositions, product specifications, servicing procedures and specifications, testing methods and results, customer and vendor information regarding customer performance enhancements (defined as any custom enhancements made for the purpose of improving the performance and horsepower of the motor vehicle) that [appellee] performs on Dodge Vipers and Mitsubishi 3000 GT motor vehicles (collectively the "Hennessey Trade Secrets")....

However, as appellants observe, the temporary injunction did not enjoin appellants from using or disclosing *only* trade secrets or confidential information. The pertinent portion of the order restrains appellants from:

1. directly or indirectly disclosing, using, selling or testing, for any purpose, (or imparting to any other person, firm, corporation or other entity) *any information* relating to the Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles; and

2. working on, designing, repairing, installing, testing, soliciting, contacting, accepting any business from and/or providing *any types of services* on any Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles, regardless of model year, except that Defendants may finish the work they were doing on the remaining Dodge Vipers owned by Ken Addington and Joe Bob Shirley.

(Emphasis added.)

 **[22]**     We agree with appellants that the temporary injunction is overbroad. We may modify an overbroad injunction. *See San Augustine Ind. Sch. Dist. v. Woods,* 521 S.W.2d 130, 133 (Tex.Civ.App.—Tyler 1975, no writ). Accordingly, we sustain appellants' thirteenth and fourteenth points of error and  **\*26**  grant appellants their alternative relief. We order that the above portion of the temporary injunction be reformed to limit disclosure and use of trade secrets, as follows:

1. directly or indirectly disclosing, using, selling or testing, for any purpose, (or imparting to any other person, firm, corporation or other entity) any *Hennessey Trade Secret* information relating to the Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles; and

2. working on, designing, repairing, installing, testing, soliciting, contacting, accepting any business from and/or providing any types of services *using Hennessey Trade Secret information* on any Dodge Viper GTS, Dodge Viper Roadster or Mitsubishi 3000 GT motor vehicles, regardless of model year, except that Defendants may finish the work they were doing on the remaining Dodge Vipers owned by Ken Addington and Joe Bob Shirley.

(Emphasis on language ordered to be added.)

### Conclusion

We reform the order of the trial court granting a temporary injunction against appellants and affirm the order as reformed.

**All Citations**

965 S.W.2d 18

Footnotes

1   TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon 1997).

2   Appellee has designed and installed a number of Viper upgrade packages (each of which uses "Venom" in its name), which collectively shall be referred to as the Venom upgrades.

3   Appellee defines the confidential information to include assembly techniques, compilation of products, customer information, design information, future product information, installation techniques, machining specifications, manufacturing processes, performance specifications on component parts, pricing information, product compositions, product specifications, servicing procedures and specifications, testing methods and results, and vendor information.

4   "Normally aspirated" means that no additional means are used to increase power to the motor; the car uses only the power from the motor itself.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

24 S.W.3d 570
Court of Appeals of Texas,
Austin.

UNIVERSAL HEALTH SERVICES, INC.; RCW of Edmond, Inc.; Renaissance Women's
Center of Austin L.L.C.; and Renaissance Women's Center of Austin, L.P., Appellants,

v.

Margaret THOMPSON, M.D.; Linda Litzinger, M.D.; Donna Hurley, M.D.; Melanie Collins, M.D.; Sherry
Neyman, M.D.; Laura Meritt, M.D.; Byron Darby, M.D.; and Renaissance Women's Group, P.A., Appellees.

No. 03–00–00052–CV.   |   July 13, 2000.   |   Released for Publication Aug. 31, 2000.

Doctors sued owners of women's health care hospital for breach of contract and fraud, and sought temporary injunction to prevent owners from closing hospital pending trial on the merits. The 345th Judicial District Court, Travis County, Paul Davis, J., granted injunctive relief and denied owners' subsequent motion to dissolve injunction. Owners brought interlocutory appeal. The Court of Appeals, Bea Ann Smith, J., held that: (1) injunction was a prohibitive injunction, not a mandatory injunction; (2) injunction preserved the status quo; (3) doctors adduced evidence of the requisite probable right of recovery and irreparable harm necessary to obtain injunction; (4) language of injunction was sufficiently specific as to the status quo to be maintained; and (5) testimony that another hospital had capacity to deliver babies scheduled to be delivered at women's hospital was not evidence of changed circumstances or fundamental error, such that trial court should have granted motion to dissolve.

Affirmed.

West Headnotes (29)

**[1]**   **Injunction** 👈 Preservation of status quo

The purpose of a temporary injunction is to preserve the status quo pending a trial on the merits.

6 Cases that cite this headnote

**[2]**   **Appeal and Error** 👈 Review of order granting, refusing, or dissolving injunction

In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief.

7 Cases that cite this headnote

**[3]**   **Appeal and Error** 👈 Injunction
**Appeal and Error** 👈 Refusing injunction
**Injunction** 👈 Discretionary Nature of Remedy

The decision to grant or deny an injunction lies within the sound discretion of the trial court, and the Court of Appeals will not reverse that decision absent a clear abuse of discretion.

4 Cases that cite this headnote

**[4]**  **Appeal and Error**  Review of order granting, refusing, or dissolving injunction

**Appeal and Error**  Injunction

**Appeal and Error**  Injunction

**Appeal and Error**  Refusing injunction

In an appeal from an order granting or denying a request for a temporary injunction, the Court of Appeals may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit; rather, it views the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion.

17 Cases that cite this headnote

**[5]**  **Appeal and Error**  Contracts in general; landlord and tenant

**Appeal and Error**  Fraud or mistake; mental capacity

The Court of Appeals cannot reverse a trial court's order granting or denying injunctive relief if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision.

11 Cases that cite this headnote

**[6]**  **Injunction**  Hospitals, pharmacies, and health care professionals

Temporary injunction requiring that defendant owners not close hospital pending trial on the merits was a "prohibitive injunction," not a "mandatory injunction," in action for breach of contract and fraud, even if its effect implied that owners had to seek funding to keep hospital open, where injunction included no provisions mandating that owners seek funding, and plaintiff doctors did not request such relief; any implication that owners seek funding was only incidental to injunction's primary function of preventing owners from closing hospital.

2 Cases that cite this headnote

**[7]**  **Injunction**  Prohibitory nature; preservation of status quo

**Injunction**  Mandatory injunctions; restoration of status quo

A "mandatory injunction" requires conduct from a party, whereas a "prohibitive injunction" forbids conduct.

1 Cases that cite this headnote

**[8]**  **Injunction**  Hospitals, pharmacies, and health care professionals

"Status quo" was the relationship between hospital owners and the doctors who worked there as it existed prior to owners' decision to close hospital, and thus, temporary injunction preserved the status quo by ordering that operations continue as they existed prior to defendant owners' attempt to close the hospital, in doctors action for breach of contract and fraud.

3 Cases that cite this headnote

**[9]**  **Injunction**  Preservation of status quo

"Status quo," for purposes of temporary injunction to preserve status quo pending trial, is defined as the last, actual, peaceable, noncontested status which preceded the pending controversy; if an act of one party alters the relationship

between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists after the action.

14 Cases that cite this headnote

**[10]**  **Injunction**  Likelihood of success on merits

To establish a probable right to recovery, as required for a temporary injunction, the party seeking the injunction must have a cause of action for which they may be granted relief.

5 Cases that cite this headnote

**[11]**  **Injunction**  Irreparable injury

Irreparable harm is an element of the probable injury requirement that the party must satisfy in order to obtain a temporary injunction.

2 Cases that cite this headnote

**[12]**  **Injunction**  Injury, Hardship, Harm, or Effect

**Injunction**  Adequacy of remedy at law

**Injunction**  Recovery of damages

To demonstrate probable injury or harm, as required to obtain a temporary injunction, an applicant must show an injury for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty, that is, a noncompensable injury.

5 Cases that cite this headnote

**[13]**  **Injunction**  Adequacy of remedy at law

An adequate remedy at law, as required to show the probable injury necessary to obtain a temporary injunction, is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.

7 Cases that cite this headnote

**[14]**  **Injunction**  Hospitals, pharmacies, and health care professionals

Doctors bringing breach-of-contract action against hospital owners adduced evidence of the requisite probable right of recovery necessary to obtain a temporary injunction preventing owners from closing hospital pending trial, where doctors' claim rested on owners' alleged failure to use reasonable efforts to maintain written agreements with insurance companies and health maintenance organizations, and doctors produced written contract in which owners agreed to make such efforts.

1 Cases that cite this headnote

**[15]**  **Injunction**  Hospitals, pharmacies, and health care professionals

Doctors bringing breach-of-contract action against hospital owners adduced evidence of irreparable harm for which there was no adequate remedy at law, as required to obtain a temporary injunction preventing owners from closing hospital pending trial, where there was evidence that doctors' ability to rush their patients into hospital within minutes saved lives and that other area facilities might not have room to accommodate all of hospital's patients if it closed.

1 Cases that cite this headnote

**[16]    Injunction** 🔑 Recovery of damages

Burden of party seeking temporary injunction was to show that an award of damages would be inadequate for the harm suffered, not that an award of damages would be wholly ineffectual; an award of damages could be deficient if the nature of the party's losses made damages difficult to calculate.

3 Cases that cite this headnote

**[17]    Injunction** 🔑 Hospitals, pharmacies, and health care professionals

Trial court's decision that equities balanced in favor of granting temporary injunction preventing owners from closing women's hospital pending trial because of risks involved in closing hospital was not an abuse of discretion; trial court balanced hardship to the doctors, as well as the public interest of the patients and their babies, against the hardship to the owners in maintaining the status quo until date of trial, noting that over 1000 babies were scheduled to be delivered during the eight months before the trial and that area facilities might not be able to handle delivery and care of so many babies.

7 Cases that cite this headnote

**[18]    Injunction** 🔑 Equitable considerations in general

In considering an application for a temporary injunction, a trial court balances the equities of the parties and the resulting conveniences and hardships.

3 Cases that cite this headnote

**[19]    Injunction** 🔑 Hospitals, pharmacies, and health care professionals

Order enjoining hospital's owners from closing the hospital or changing its status "from the women's health care hospital that was in operation" on date of filing of complaint against owners "until judgment in this cause" was rendered was sufficiently specific as to the status quo to be maintained; trial court was not required to examine the specific details associated with running the hospital, considering that owners were in the business of running hospitals.

Cases that cite this headnote

**[20]    Injunction** 🔑 Scope and duration of relief

Temporary injunctions must be as definite, clear and precise as possible, and when practicable they should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing, but the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or in somewhat different form calculated to circumvent the injunction as written.

2 Cases that cite this headnote

**[21]    Trial** 🔑 Reopening Case for Further Evidence

The decision to re-open a case to admit additional evidence is within the trial court's sound discretion.

3 Cases that cite this headnote

**[22]**   **Appeal and Error**   🔑   Rulings on admissibility of evidence in general

The Court of Appeals will not overturn a trial court's decision as to whether to re-open a case to admit additional evidence absent a clear abuse of discretion.

1 Cases that cite this headnote

**[23]**   **Injunction**   🔑   Admissibility

Trial court was under no duty to allow the defendants who opposed temporary injunction another opportunity to litigate the same issue prior to the trial on the merits, and thus, it was within the trial court's discretion to determine whether additional evidence on that issue was necessary to the due administration of justice, such as would permit defendants to introduce additional evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 270.

1 Cases that cite this headnote

**[24]**   **Appeal and Error**   🔑   Continuing, vacating, or dissolving

**Injunction**   🔑   Authority and discretion of court

A determination of whether to dissolve a temporary injunction lies within the sound discretion of the trial court, and the Court of Appeals will not overrule its determination absent an abuse of discretion.

2 Cases that cite this headnote

**[25]**   **Injunction**   🔑   Grounds in general

A trial court may modify a temporary injunction because of fundamental error or changed circumstances but has no duty to reconsider the grant of a temporary injunction if the movant fails to present new evidence showing fundamental error or changed conditions.

3 Cases that cite this headnote

**[26]**   **Injunction**   🔑   Grounds or cause in general

The purpose of the motion to dissolve is to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant.

Cases that cite this headnote

**[27]**   **Injunction**   🔑   Grounds in general

In determination of whether to modify a temporary injunction, "fundamental error" exists when the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas.

3 Cases that cite this headnote

**[28]**   **Injunction**   🔑   Grounds in general

In determination of whether to modify a temporary injunction, "changed circumstances" are conditions that altered the status quo existing after the temporary injunction was granted or that made the temporary injunction unnecessary or improper.

2 Cases that cite this headnote

**[29]    Injunction** 🔑 Particular cases

Testimony that another hospital had capacity to deliver babies scheduled to be delivered at women's hospital was not evidence of changed circumstances or fundamental error, such that trial court should have granted motion to dissolve injunction preventing owners from closing women's hospital pending trial, where such evidence was merely additional conflicting evidence to controvert plaintiff doctors' evidence that other facilities did not have the capacity to accommodate their patients if hospital closed.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*574** Roy Q. Minton, Minton, Burton, Foster & Collins, P.C., Austin, for Universal.

Mary Schaerdel Dietz, Marcy Hogan Greer, Fulbright & Jaworski, L.L.P., Austin, for Appellants.

R. James George, Jr., Patrick L. Reznik, George & Donaldson, L.L.P., Austin, W. Amon Burton, Jr., Austin, for Appellees.

Before Chief Justice ABOUSSIE, Justices KIDD and B.A. SMITH.

**Opinion**

BEA ANN SMITH, Justice.

This dispute grows out of a good idea that proved financially disappointing. Certain corporate investors contracted with a group of Austin gynecologists and obstetricians to open a unique medical facility housing a hospital, clinic, and doctors' offices, all dedicated to women's health care needs. Appellants are "the Investors" who owned and operated the facility; appellees are "the Doctors" who located their offices in the facility and sent their patients to its hospital. When the facility continued to lose money, the Investors decided to close the hospital. The Doctors responded by suing for breach of contract and fraud and seeking a temporary injunction to prevent the Investors from closing the hospital pending a trial on the merits, which is scheduled for August 7, 2000. The trial court granted the Doctors' application for a temporary injunction. In eight points of error, the Investors bring this consolidated, interlocutory appeal challenging both the order granting the injunction and a subsequent order denying their motion to dissolve the injunction. [1] We will affirm both orders.

### BACKGROUND

In 1995, the Investors [2] approached Margaret Thompson and Linda Litzinger, doctors specializing in obstetrics and gynecology, with the concept of a multi-service women's health care center to be known as Renaissance Women's Center of Austin (the Center). The two-story facility would offer a women's hospital on the first floor and physicians' offices and a clinic on the second floor. Thompson and Litzinger decided to commit to the project and on October 11, 1995, entered into a lease and letter agreement (the Agreement) with the Investors memorializing their commitment **\*575** to the contemplated Center. [3] The Agreement provides in relevant part:

5. Renaissance shall use reasonable efforts to obtain, and maintain in full force and effect throughout the Term of the Lease, written agreements ... certifying the Project as an approved hospital by all health insurance companies, health maintenance organizations, health care plans or other health care benefit providers ... for which [the Doctors] are approved providers.

....

8. This letter agreement shall remain in effect and binding on Renaissance and [the Doctors] throughout the term of the Lease. In the event of any conflict or inconsistency between the provisions of this letter agreement and the provisions of the Lease, the provisions of this letter agreement shall govern and control.

....

9. Each of Renaissance and [the Doctors] agree to act reasonably and in good faith in all of the matters which require the cooperation, approval or joinder of these parties under the provisions of this letter agreement. [4]

The Investors built a two-story building to house the facility, and the Center opened on September 7, 1997.

Throughout its operation, the Center suffered serious financial losses, allegedly due in part to managed care companies' low reimbursement levels for women's medical procedures. In late 1999, the Investors decided to close the hospital. Upon learning of the Investors' intention, the Doctors filed a lawsuit on December 10, pleading breach of contract and fraud. The Doctors claimed in part that the Investors had breached paragraph five of the Agreement by failing to use reasonable efforts throughout the term of the lease to certify the Center as a hospital approved by all insurance companies and health maintenance organizations for which the Doctors are approved providers. The Doctors also sought a temporary and a permanent injunction to prevent the closing of the Center. In their request for a temporary injunction, the Doctors claimed that they "have and are suffering harm and irreparable harm as a result of the actions of [the Investors]" and sought to enjoin the Investors "from closing the hospital, selling the hospital, reducing the hospital staff or nurses, or reducing the quality of women's health care services" during the pendency of the suit.

Following a hearing, the trial court granted the temporary injunction. In support of its decision, the court made the following findings: (1) the Doctors have a probable right of recovery; (2) the Doctors will suffer imminent, irreparable harm in the absence of the injunction; (3) the Doctors have no adequate remedy at law for their interim damages, and their financial damages will be immeasurable; and (4) the balance of hardships *and the public interest* favors an injunction maintaining the status quo. Until judgment is rendered in the pending suit, the Investors are enjoined from closing the hospital or changing its status from the women's health care hospital that was in operation as of the date the Doctors filed their petition. The trial court further ordered the Investors to "continue to use reasonable efforts to obtain, and maintain in full force and effect ... written agreements certifying the hospital **\*576** ... as an approved hospital by all health care insurance companies, health maintenance organizations, health care plans or other health care benefit providers for which [the Doctors] are approved providers." Having lost at the hearing, the Investors filed a motion to dissolve the temporary injunction based on fundamental error and changed circumstances. The trial court denied the motion. The Investors now appeal both the trial-court order granting the temporary injunction and the order refusing to dissolve it.

## DISCUSSION

**Standard of Review**

 [1]    [2]    [3]    [4]    [5]    The purpose of a temporary injunction is to preserve the status quo pending a trial on the merits. *See Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief. *See id.* The decision to grant or deny the injunction lies within the sound discretion of the court, and we will not reverse that decision absent a clear

abuse of discretion. *See id.* This Court may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit. *See id.; Texas Indus. Gas v. Phoenix Metallurgical Corp.,* 828 S.W.2d 529, 532 (Tex.App.—Houston [1st Dist.] 1992, no writ). Rather, we view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *See CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 262 (Tex.App.—Houston [1st Dist.] 1996, no writ). We cannot reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision. *See id.*

An applicant requesting a temporary injunction is not required to establish that she will prevail at trial. *See Walling,* 863 S.W.2d at 58. The applicant's burden is to establish a probable right of recovery following a trial on the merits and a probable injury in the interim, warranting preservation of the status quo pending the trial. *See id.* at 57.

### Mandatory or Prohibitive Injunction

 **[6]**    As a preliminary matter, the Investors argue that although the temporary injunction is couched in terms of prohibiting them from closing the hospital, the order is really mandatory in nature because it requires the Investors to seek funding to keep the hospital open. A mandatory injunction, urge the Investors, should be denied unless the right to relief is clear and compelling and a case of extreme necessity or hardship is presented. *See Rhodia, Inc. v. Harris County,* 470 S.W.2d 415, 419 (Tex.Civ.App.—Houston [1st Dist.] 1971, no writ).

 **[7]**    A mandatory injunction requires conduct from a party, whereas a prohibitive injunction forbids conduct. *See LeFaucheur v. Williams,* 807 S.W.2d 20, 22 (Tex.App.—Austin 1991, no writ). The primary function of the trial court's order here is to forbid the Investors from closing the hospital or changing its status. The order does not include any provisions mandating the Investors to seek funding for the hospital, nor did the Doctors request such relief. If the effect of the order implies that the Investors must seek funding, this implication is only incidental to the order's primary function of preventing the Investors from closing the hospital, and we will not presume such an order is mandatory. *See Woodward v. Smith,* 253 S.W. 847, 853 (Tex.Civ.App.—Austin 1923, no writ). We hold that the trial court's temporary injunction is prohibitive; its ordering provisions are preventive in nature and necessary for the preservation of the status quo.

### Preserving the Status Quo

 **[8]**    **[9]**    The Investors further contend that because the order requires that they  **\*577**  take some affirmative action, it disturbs the status quo. Status quo is defined as "the last, actual, peaceable, noncontested status which preceded the pending controversy." *Transport Co. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553–54 (1953) (internal quotations omitted). "If an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists *after* the action." *Benavides Indep. Sch. Dist. v. Guerra,* 681 S.W.2d 246, 249 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). If it were otherwise, the granting of an injunction would be rendered impossible. *See id.*

We hold that the trial court's temporary injunction preserves the status quo by ordering that operations continue as they existed *prior* to the Investors' attempt to close the hospital. It was the Investors' decision to close the hospital that altered the parties' relationship. This dispute arises from the attempted closing. Therefore, the status quo is the relationship of the Investors and the Doctors as it existed prior to the Investors' decision to close the hospital.

### Probable Right to Recovery, Irreparable Harm, Adequate Remedy, Balancing Equities

In their second, third, and fourth points of error, the Investors complain that the court abused its discretion in granting the temporary injunction because the Doctors failed to prove a probable right of recovery, irreparable harm, and the absence of an adequate remedy at law. In their fifth point of error, the Investors complain that the trial court erred in balancing the equities in favor of the temporary injunction.

 **[10]** **[11]** **[12]** **[13]** To establish a *probable right to recovery,* the Doctors must have a cause of action for which they may be granted relief. *See Walling,* 863 S.W.2d at 58; *Surko Enter., Inc. v. Borg–Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.—Houston [1st Dist.] 1989, no writ) (probable right to recovery includes element of wrongful conduct). *Irreparable harm* is an element of the probable injury requirement that the Doctors must satisfy in order to obtain a temporary injunction. *See Surko Enter.,* 782 S.W.2d at 225 (probable injury includes elements of imminent harm, irreparable injury, and no adequate remedy at law). To demonstrate probable injury or harm, an applicant must show an injury for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty, *i.e.,* a noncompensable injury. *See Texas Indus. Gas,* 828 S.W.2d at 533; *Martin v. Linen Sys. for Hosps., Inc.,* 671 S.W.2d 706, 710 (Tex.App.—Houston [1st Dist.] 1984, no writ) (examples of noncompensable injuries include company's loss of clientele, goodwill, marketing techniques, and office stability). An *adequate remedy at law* is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *See Texas Indus. Gas,* 828 S.W.2d at 532; *Surko Enter.,* 782 S.W.2d at 225 (quoting *Ballenger v. Ballenger,* 694 S.W.2d 72, 76 (Tex.App.—Corpus Christi 1985, no writ)).

The record before us does not include specific findings of fact and conclusions of law. Therefore, we will uphold the trial court's judgment on any legal theory supported by the record, indulging all reasonable presumptions in favor of there having been sufficient evidence to sustain the trial court's judgment. *See Martin,* 671 S.W.2d at 708–09.

 **[14]** Here, the wrongful conduct alleged was a breach of contract.[5] This claim rests on the Investors' alleged failure **\*578** to use reasonable efforts to maintain written agreements with insurance companies and health maintenance organizations. The evidence adduced in support of the wrongful conduct included the 1995 Agreement. Based on the Doctors' cause of action for breach of contract and the evidence adduced to sustain it, we hold the trial court did not abuse its discretion in finding that the Doctors had a probable right to recovery.[6]

 **[15]** **[16]** The Doctors also adduced evidence of irreparable harm for which there is no adequate remedy at law. The Doctors' burden was to show that an award of damages would be inadequate for the harm suffered; they were not required to show that an award of damages would be wholly ineffectual. *See Walling,* 863 S.W.2d at 58 ("Simply because the applicant ... asks only for damages as ultimate relief does not guarantee that damages are completely adequate as a remedy."); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir.1984). An award of damages may be deficient if the nature of the Doctors' losses makes damages difficult to calculate. *See Roland Mach. Co.,* 749 F.2d at 386. The trial court's order reflects that if the hospital were to close or change its status from a women's health care hospital, the Doctors would be unable "to provide to their pregnant mothers the care that they now receive and expect [or] to ensure the utmost safety of those mothers upon the delivery of their babies." One of the witnesses, Dr. Thompson, noted two instances where the ability of the Doctors to rush the patients downstairs to the hospital within minutes possibly saved the lives of the babies being delivered. The Doctors also provided some evidence that other area facilities may not have the capacity to accommodate all of the Center's patients.[7] This evidence was sufficient for the trial court to conclude that the Doctors would likely suffer irreparable injury and that the nature of the Doctors' and their patients' losses would make damages incapable of calculation.

 **[17]** **[18]** The Investors also complain that the district court erred in considering Universal Health Services' financial status in balancing the hardships and concluding that the equities weighed in favor of granting the temporary injunction.[8] In considering an application for a temporary injunction, a trial court "balances the equities of the parties and the resulting conveniences and hardships." *Surko Enter.,* 782 S.W.2d at 225. The trial court here balanced the hardship to the Doctors, as well as the public interest of the patients and their babies, against the hardship to the Investors in maintaining the status quo until August 7, the date set for the trial. In doing so, the court noted that over 1000 babies were scheduled to be delivered during the eight months before the trial. The court also acknowledged some evidence that other area facilities may not be adequately equipped to handle **\*579** the delivery and care of all of those babies. The trial court based its decision to maintain the status quo on the health risks involved if the hospital were closed. Indeed, the court's order states, "Maintaining the status quo of the hospital as the Renaissance Women's Center as a women's hospital will ensure that the quality of care these mothers and their babies expect to receive will not be compromised. The equities are balanced in favor of the [Doctors] *because of the risks involved in closing*

*the hospital.*" (Emphasis added.) While there were no doubt equities on both sides, we cannot say the trial court abused its discretion in balancing them in favor of the Doctors and their patients.

Applying the appropriate standard of review and viewing the evidence in the light most favorable to the trial court's order, as we must, we hold that appellants have not shown that the trial court abused its discretion in granting the temporary injunction. Our holding is limited to whether the trial court abused its discretion in attempting to preserve the status quo until August 7, the scheduled date of the trial. We note that if the Doctors had lost on the motion for a temporary injunction, the Investors had closed the hospital, and the trial court later determined that the Investors had breached the terms of the Agreement, the remedy of compelling the Investors to comply for a while longer with the reasonable efforts mandated in the Agreement would no longer be viable. While the Investors may have presented conflicting evidence in support of their claim that they should not be required to continue operating the hospital or that they have used reasonable efforts in accordance with the Agreement, we will not address the merits of the Investors' defenses on this interlocutory appeal.

### Specificity of the Temporary Injunction

 [19]    [20]    In its first and sixth points of error, the Investors argue that the trial court erred in granting an open-ended, over-broad injunction requiring the Investors to continue operations without specifying how the operations should be funded. The law in Texas regarding the specificity of temporary injunctions is that they must be

> as definite, clear and precise as possible and *when practicable* [they] should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing. But obviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written.

*San Antonio Bar Ass'n v. Guardian Abstract & Title Co.,* 156 Tex. 7, 291 S.W.2d 697, 702 (1956) (internal quotations and citations omitted).

The order before us enjoins the Investors "from closing the hospital at the Renaissance Women's Center, [or] changing the status of the hospital from the women's health care hospital that was in operation as of December 10, 1999, the date of the filing of Plaintiff's Original Petition, until judgment in this cause is rendered by this Court." The Investors are in the business of running hospitals and have been running this Center for almost three years. The trial court was not required to examine the specific details associated with running the hospital prior to December 10 in order to spell out what is necessary to maintain the status quo. A temporary injunction should not be greatly concerned with "rights of the defendants that are asserted largely in the abstract. Otherwise, it would probably take longer to write the decree than it would to try the case and the injunction might well become unintelligible and self-destructive." *Id.; see Wesware, Inc. v. State of Texas,* 488 S.W.2d 844, 849 (Tex.Civ.App.—Austin 1972, no writ). We overrule the Investors' **\*580** complaints that the order is unworkable because it does not sufficiently spell out the details of compliance.

### Reopening the Case

 [21]    [22]    In their seventh point of error, the Investors complain that the trial court erred in refusing to reopen the hearing on the application for a temporary injunction to allow more thorough exploration of the capacity of existing facilities to accommodate the Center's potentially displaced patients and their babies. Rule 270 of the Texas Rules of Civil Procedure provides: "When it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time...." Tex.R. Civ. P. 270. "The decision to re-open a case to admit additional evidence is within the trial court's sound discretion." *Turner v. Lone Star Indus., Inc.,* 733 S.W.2d 242, 245 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). We will not overturn a trial court's decision absent a clear abuse of discretion. *See id.*

[23]    The record before us reflects that the Investors produced Brian Blessing, a hospital administrator for the Center, as a witness. Blessing provided testimony indicating that Southwest Seton would have the capacity to accommodate between 800 and 1400 deliveries per year, thereby refuting the Doctors' evidence of insufficient capacity in the area hospitals. It was within the trial court's discretion to determine whether additional evidence regarding capacity was necessary to the due administration of justice. The court was under no duty to allow the Investors another opportunity to litigate the same issue prior to the trial on the merits. We cannot say that the trial court abused its discretion in refusing to reopen the evidence. The Investors' seventh point of error is overruled.

**Changed Circumstances and Fundamental Error**

[24]    [25]    [26]    In their final point of error, the Investors insist that the court erred in denying their motion to dissolve the temporary injunction in light of newly discovered evidence, changed circumstances, and fundamental error. A determination of whether to dissolve a temporary injunction lies within the sound discretion of the trial court, and we will not overrule its determination absent an abuse of discretion. *See Tober v. Turner of Texas, Inc.,* 668 S.W.2d 831, 834 (Tex.App.—Austin 1984, no writ). A trial court may modify a temporary injunction because of fundamental error or changed circumstances but has no duty to reconsider the grant of a temporary injunction if the movant fails to present *new* evidence showing fundamental error or changed conditions. *See Henke v. Peoples State Bank,* 6 S.W.3d 717, 721 (Tex.App.—Corpus Christi 1999, pet. dism'd w.o.j.). The purpose of the motion to dissolve is "to provide a means to show that changed circumstances or changes in the law require the modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant." *Tober,* 668 S.W.2d at 836.

[27]    [28]    Fundamental error exists when "the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). "Changed circumstances are conditions that altered the status quo existing after the temporary injunction was granted or that made the temporary injunction unnecessary or improper." *Henke,* 6 S.W.3d at 721.

[29]    The Investors argue that the trial court should have granted the motion to dissolve the temporary injunction because of new evidence they presented. The new evidence consisted of testimony from Laraine McIntyre, the Director of Women's Health Services for St. David's Hospital. McIntyre testified that St. David's Hospital has sufficient capacity to deliver the babies scheduled to be born at the Center  **\*581**  prior to the August 7 trial on the merits. This evidence, however, is not evidence of changed circumstances or of fundamental error. The Investors did not demonstrate how this evidence altered the status quo. Instead, McIntyre's testimony was merely additional conflicting evidence regarding the capacity of other hospitals to accommodate the Center's patients. The trial court did not abuse its discretion in denying the motion to dissolve when it was presented with additional conflicting evidence.

The Investors also argue that since the granting of the temporary injunction, the hospital's operating losses have increased. In their motion to dissolve, the Investors contend that the trial court did not clearly provide in its order how they should continue to fund the hospital operations. However, prior to the granting of the temporary injunction, the trial court was made aware of the hospital's operating losses. Upon balancing the equities, the trial court determined that a temporary injunction was necessary to preserve the status quo pending a trial on the merits. The Investors did not provide any new evidence of conditions that altered the status quo or revealed fundamental error. As we stated in *Tober,* the trial court has no duty to reconsider the validity of its original grant of the temporary injunction absent such new evidence. *See Tober,* 668 S.W.2d at 835. We overrule the Investors' final point of error.

## CONCLUSION

Having overruled all of the Investors' points of error and determined that the trial court did not abuse its discretion in granting the Doctors' application for a temporary injunction or in denying the Investors' motion to dissolve the temporary injunction, we affirm both trial-court orders.

## All Citations

24 S.W.3d 570

Footnotes

1    A party may appeal from a district court's interlocutory order granting a temporary injunction or overruling a motion to dissolve a temporary injunction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(4) (West Supp.2000).

2    Initially, Renaissance Centers for Women, Inc., an Oklahoma based corporation, approached the Doctors with the concept for a women's health care facility. That corporation was subsequently acquired by another corporation, RCW of Edmond, Inc. (RCW). RCW then created a limited partnership, Renaissance Women's Center of Austin, L.P., for the purpose of developing the proposed facility in Austin. After the facility was completed, a limited liability corporation, Renaissance Women's Center in Austin, L.L.C., was formed to own and operate the first floor hospital. The limited partnership retained ownership of the second floor doctors' offices. For the sake of convenience, we refer to all of these entities collectively as the Investors.

3    Although Thompson and Litzinger were the only two doctors involved at this stage of the Center's development, the 1995 letter agreement and all subsequent agreements were binding on any of the physicians employed by them, including all the doctor appellees.

4    The parties subsequently entered into a Second Agreement and a Second Modification and Ratification of Lease Agreement. The primary purpose of these agreements was to reflect subsequent name changes of the parties and to affirm their respective interests and obligations. The Second Modification and Ratification of Lease Agreement also acknowledged the Investors' satisfaction of certain obligations under the 1995 Agreement.

5    The Investors also argue that injunctions are not appropriate remedies for breach of contract claims because money damages are sufficient to compensate for these claims. The supreme court addressed this issue in *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993), in which it held that a trial court may grant a temporary injunction to preserve the status quo even though the cause of action is for damages resulting from breach of contract and does not request equitable relief.

6    Our decision on this point is not a reflection on the merits of the case. We merely examine the evidence through the filter of an abuse of discretion standard in upholding the trial court's decision.

7    The Investors claim that because subsequent evidence conclusively disproved the Doctors' evidence of lack of capacity in area hospitals, the court erroneously relied on lack of capacity as a basis for the temporary injunction. However, the Investors did not produce the subsequent evidence regarding existing hospital capacity during the hearing on the application for a temporary injunction. They presented the evidence at the hearing on the motion to dissolve the temporary injunction. As we discuss later, the trial court was under no duty to revisit the validity of its order granting the temporary injunction absent changed circumstances or fundamental error.

8    Universal Health Services, along with other shareholders, incorporated RCW of Edmond, Inc. (RCW). RCW currently manages the hospital on the first floor of the Center. The Investors argue that because Universal is only one investor in the hospital, owns neither the land nor the building that houses the Center, and was not a party to any of the agreements, the court should not have considered Universal's balance sheets in balancing the equities.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

regulation of the health care professions;   and
        (3)   other relevant information and recommendations
determined necessary by the council.
     (b)   The council shall send the report to the governor, the
lieutenant governor, and the speaker of the house of representatives
not later than February 1 of each year.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


          SUBCHAPTER E. GROUNDS FOR LICENSE REVOCATION OR DENIAL

     Sec. 101.201.   FALSE, MISLEADING, OR DECEPTIVE ADVERTISING.   (a)
A person may not use advertising that is false, misleading, deceptive,
or not readily subject to verification.
     (b)   False, misleading, or deceptive advertising or advertising
not readily subject to verification includes advertising that:
        (1)   makes a material misrepresentation of fact or omits a
fact necessary to make the statement as a whole not materially
misleading;
        (2)   makes a representation likely to create an unjustified
expectation about the results of a health care service or procedure;
        (3)   compares a health care professional's services with
another health care professional's services unless the comparison can
be factually substantiated;
        (4)   contains a testimonial;
        (5)   causes confusion or misunderstanding as to the
credentials, education, or licensing of a health care professional;
        (6)   represents that health care insurance deductibles or
copayments may be waived or are not applicable to health care services
to be provided if the deductibles or copayments are required;
        (7)   represents that the benefits of a health benefit plan
will be accepted as full payment when deductibles or copayments are
required;
        (8)   makes a representation that is designed to take
advantage of the fears or emotions of a particularly susceptible type
of patient;   or
        (9)   represents in the use of a professional name a title or
professional identification that is expressly or commonly reserved to

or used by another profession or professional.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 101.203.  OVERCHARGING OR OVERTREATING.  A health care
professional may not violate Section 311.0025, Health and Safety Code.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by
Acts 2001, 77th Leg., ch. 1420, Sec. 14.011(a), eff. Sept. 1, 2001.


     Sec. 101.204.  REMEDIES.  (a)  A violation of this subchapter is
subject to action by the appropriate health licensing agency as a
ground for revocation or denial of a license.
     (b)  A violation of Section 101.201 is grounds for action under
Section 17.47, 17.58, 17.60, or 17.61, Business & Commerce Code, by
the consumer protection division of the office of the attorney
general.
     (c)  A violation of Section 101.201 does not create a private
cause of action, including an action for breach of warranty or for an
implied contract or warranty for good and workmanlike service.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


                    SUBCHAPTER F. ENFORCEMENT

     Sec. 101.251.  CIVIL PENALTY.  (a)  A person who violates this
chapter is liable to the state for a civil penalty in an amount not to
exceed $1,000 for each violation.  Each day a violation occurs
constitutes a separate violation.
     (b)  The attorney general may initiate an action under this
section by filing suit in a district court in Travis County or in the
county in which the violation occurred.
     (c)  The attorney general may recover reasonable expenses
incurred in obtaining a civil penalty under this section, including
court costs, reasonable attorney's fees, reasonable investigative
costs, witness fees, and deposition expenses.
     (d)  A civil penalty recovered under this section shall be
deposited in the state treasury.

2001.
Amended by:
    Acts 2013, 83rd Leg., R.S., Ch. 418 (S.B. 406), Sec. 12, eff.
November 1, 2013.


    Sec. 204.157.  INACTIVE STATUS.  (a)  A person licensed under
this chapter may place the person's license on inactive status by
applying to the physician assistant board.  A person whose license is
on inactive status is excused from paying renewal fees for the
license.
    (b)  The holder of a license on inactive status may not practice
as a physician assistant.  A violation of this subsection is
considered to be practicing without a license.
    (c)  A person whose license is on inactive status under this
section may return the person's license to active status by:
        (1)  applying to the physician assistant board;
        (2)  satisfying the requirements of Section 204.156; and
        (3)  paying the fee established by the physician assistant
board for returning a license to active status.
    (d)  The physician assistant board by rule shall establish a
limit on the length of time a physician assistant's license may remain
on inactive status.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 2.20, eff.
September 1, 2005.


                SUBCHAPTER E. PRACTICE BY LICENSE HOLDER

    Sec. 204.201.  NOTICE OF INTENT TO PRACTICE.  (a)  Before
beginning practice, each physician assistant licensed under this
chapter shall submit on a form prescribed by the physician assistant
board notice of the license holder's intent to practice.  The notice
must include:
        (1)  the name, business address, license number, and
telephone number of the physician assistant;  and
        (2)  the name, business address, Texas license number, and

telephone number of the physician assistant's supervising physician.

(b)   A physician assistant shall notify the physician assistant board of any change in, or addition to, the person acting as a supervising physician for the physician assistant not later than the 30th day after the date the change or addition occurs.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 204.202.   SCOPE OF PRACTICE.   (a)   The practice of a physician assistant includes providing medical services delegated by a supervising physician that are within the education, training, and experience of the physician assistant.

(b)   Medical services provided by a physician assistant may include:

(1)   obtaining patient histories and performing physical examinations;

(2)   ordering or performing diagnostic and therapeutic procedures;

(3)   formulating a working diagnosis;

(4)   developing and implementing a treatment plan;

(5)   monitoring the effectiveness of therapeutic interventions;

(6)   assisting at surgery;

(7)   offering counseling and education to meet patient needs;

(8)   requesting, receiving, and signing for the receipt of pharmaceutical sample prescription medications and distributing the samples to patients in a specific practice setting in which the physician assistant is authorized to prescribe pharmaceutical medications and sign prescription drug orders as provided by Section 157.0512 or 157.054;

(9)   prescribing or ordering a drug or device as provided by Subchapter B, Chapter 157; and

(10)   making appropriate referrals.

(c)   The activities listed by Subsection (b) may be performed in any place authorized by a supervising physician, including a clinic, hospital, ambulatory surgical center, patient home, nursing home, or other institutional setting.

(d)   A physician assistant's signature attesting to the provision

telephone number of the physician assistant's supervising physician.

(b)   A physician assistant shall notify the physician assistant board of any change in, or addition to, the person acting as a supervising physician for the physician assistant not later than the 30th day after the date the change or addition occurs.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 204.202.   SCOPE OF PRACTICE.   (a)   The practice of a physician assistant includes providing medical services delegated by a supervising physician that are within the education, training, and experience of the physician assistant.

(b)   Medical services provided by a physician assistant may include:

(1)   obtaining patient histories and performing physical examinations;

(2)   ordering or performing diagnostic and therapeutic procedures;

(3)   formulating a working diagnosis;

(4)   developing and implementing a treatment plan;

(5)   monitoring the effectiveness of therapeutic interventions;

(6)   assisting at surgery;

(7)   offering counseling and education to meet patient needs;

(8)   requesting, receiving, and signing for the receipt of pharmaceutical sample prescription medications and distributing the samples to patients in a specific practice setting in which the physician assistant is authorized to prescribe pharmaceutical medications and sign prescription drug orders as provided by Section 157.0512 or 157.054;

(9)   prescribing or ordering a drug or device as provided by Subchapter B, Chapter 157; and

(10)   making appropriate referrals.

(c)   The activities listed by Subsection (b) may be performed in any place authorized by a supervising physician, including a clinic, hospital, ambulatory surgical center, patient home, nursing home, or other institutional setting.

(d)   A physician assistant's signature attesting to the provision

of a service the physician assistant is legally authorized to provide satisfies any documentation requirement for that service established by a state agency.

    (e)  A physician assistant is the agent of the physician assistant's supervising physician for any medical services that are delegated by that physician and that:

        (1)  are within the physician assistant's scope of practice; and

        (2)  are delineated by protocols, practice guidelines, or practice directives established by the supervising physician.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 112, Sec. 3, eff. May 11, 2001;  Acts 2001, 77th Leg., ch. 178, Sec. 1, eff. Sept. 1, 2001;  Acts 2001, 77th Leg., ch. 1420, Sec. 14.054(a), eff. Sept. 1, 2001.
Amended by:
    Acts 2013, 83rd Leg., R.S., Ch. 418 (S.B. 406), Sec. 13, eff. November 1, 2013.


    Sec. 204.203.  IDENTIFICATION REQUIREMENTS.  A physician assistant shall:

        (1)  keep the physician assistant's license available for inspection at the physician assistant's primary place of business; and

        (2)  when engaged in the physician assistant's professional activities, wear a name tag identifying the license holder as a physician assistant.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 204.204.  SUPERVISION REQUIREMENTS.  (a)  A physician assistant shall be supervised by a supervising physician.  A physician assistant may have more than one supervising physician.  The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant.

    (b)  Supervision of a physician assistant by a supervising physician must be continuous.  The supervision does not require the

of a service the physician assistant is legally authorized to provide satisfies any documentation requirement for that service established by a state agency.

        (e)  A physician assistant is the agent of the physician assistant's supervising physician for any medical services that are delegated by that physician and that:

                (1)  are within the physician assistant's scope of practice; and

                (2)  are delineated by protocols, practice guidelines, or practice directives established by the supervising physician.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 112, Sec. 3, eff. May 11, 2001;  Acts 2001, 77th Leg., ch. 178, Sec. 1, eff. Sept. 1, 2001;  Acts 2001, 77th Leg., ch. 1420, Sec. 14.054(a), eff. Sept. 1, 2001.
Amended by:
     Acts 2013, 83rd Leg., R.S., Ch. 418 (S.B. 406), Sec. 13, eff. November 1, 2013.


     Sec. 204.203.  IDENTIFICATION REQUIREMENTS.  A physician assistant shall:

        (1)  keep the physician assistant's license available for inspection at the physician assistant's primary place of business; and

        (2)  when engaged in the physician assistant's professional activities, wear a name tag identifying the license holder as a physician assistant.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 204.204.  SUPERVISION REQUIREMENTS.  (a)  A physician assistant shall be supervised by a supervising physician.  A physician assistant may have more than one supervising physician.  The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant.

        (b)  Supervision of a physician assistant by a supervising physician must be continuous.  The supervision does not require the

constant physical presence of the supervising physician where physician assistant services are being performed, but, if a supervising physician is not present, the supervising physician and the physician assistant must be, or must be able to easily be, in contact with one another by radio, telephone, or another telecommunication device.

(c)  The number of physician assistants a physician may supervise in a practice setting may not be less than the number of physician assistants to whom a physician may delegate the authority to prescribe or order a drug or device in that practice setting under Subchapter B, Chapter 157.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2013, 83rd Leg., R.S., Ch. 418 (S.B. 406), Sec. 14, eff. November 1, 2013.


Sec. 204.2045.  SERVICES PERFORMED DURING DISASTER.  (a)  The supervision and delegation requirements of this chapter and Subtitle B do not apply to medical tasks performed by a physician assistant during a disaster under the state emergency management plan adopted under Section 418.042, Government Code, or a disaster declared by the governor or United States government.  This section does not apply to medical tasks performed by a physician assistant for compensation or other remuneration.

(b)  A physician assistant performing medical tasks under this section is entitled to the immunity from liability provided by Section 74.151, Civil Practice and Remedies Code.

(c)  A physician assistant may perform tasks described by this section:

(1)  under the supervision of any physician who is also performing volunteer work in the disaster; or

(2)  without the supervision of a physician, if a physician is not available to provide supervision.

(d)  A physician assistant employed by the United States government or licensed in another state may perform medical tasks in this state in circumstances described by Subsection (a) without holding a license in this state.

(b)  A complaint delegated under this section shall be referred for informal proceedings under Section 204.312 if:

(1)  the committee of employees determines that the complaint should not be dismissed or settled;

(2)  the committee is unable to reach an agreed settlement; or

(3)  the affected physician assistant requests that the complaint be referred for informal proceedings.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 2.23, eff. September 1, 2005.


Sec. 204.302.  CONDUCT RELATED TO FRAUD OR MISREPRESENTATION. The physician assistant board may take action under Section 204.301 against an applicant or license holder who:

(1)  fraudulently or deceptively obtains or attempts to obtain a license;

(2)  fraudulently or deceptively uses a license;

(3)  falsely represents that the person is a physician;

(4)  acts in an unprofessional or dishonorable manner that is likely to deceive, defraud, or injure the public;

(5)  fraudulently alters a physician assistant license, certificate, or diploma;

(6)  uses a physician assistant license, certificate, or diploma that has been fraudulently purchased, issued, or counterfeited or that has been materially altered;

(7)  directly or indirectly aids or abets a person not licensed to practice as a physician assistant in practicing as a physician assistant;  or

(8)  unlawfully advertises in a false, misleading, or deceptive manner, as described by Section 101.201.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 204.303.  CONDUCT RELATED TO VIOLATION OF LAW.  (a)  The physician assistant board may take action under Section 204.301 against an applicant or license holder who:

(1)  violates this chapter or a rule adopted under this

the offense.

     (e)  If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both.

Added by Acts 1999, 76th Leg., ch. 1159, Sec. 1, eff. Sept. 1, 1999. Amended by Acts 2003, 78th Leg., ch. 1104, Sec. 4, eff. Sept. 1, 2003. Amended by:

     Acts 2007, 80th Leg., R.S., Ch. 631 (H.B. 649), Sec. 1, eff. September 1, 2007.

     Acts 2007, 80th Leg., R.S., Ch. 1163 (H.B. 126), Sec. 1, eff. September 1, 2007.

     Acts 2007, 80th Leg., R.S., Ch. 1173 (H.B. 460), Sec. 1, eff. September 1, 2007.

     Acts 2007, 80th Leg., R.S., Ch. 1173 (H.B. 460), Sec. 2, eff. September 1, 2007.

     Acts 2009, 81st Leg., R.S., Ch. 87 (S.B. 1969), Sec. 19.002, eff. September 1, 2009.

     Acts 2009, 81st Leg., R.S., Ch. 670 (H.B. 2328), Sec. 3, eff. September 1, 2009.

     Acts 2011, 82nd Leg., R.S., Ch. 276 (H.B. 1529), Sec. 1, eff. September 1, 2011.

     Acts 2013, 83rd Leg., R.S., Ch. 362 (H.B. 2637), Sec. 2, eff. September 1, 2013.


     Sec. 32.52.  FRAUDULENT, SUBSTANDARD, OR FICTITIOUS DEGREE.  (a) In this section, "fraudulent or substandard degree" has the meaning assigned by Section 61.302, Education Code.
     (b)  A person commits an offense if the person:
          (1)  uses or claims to hold a postsecondary degree that the person knows:
               (A)  is a fraudulent or substandard degree;
               (B)  is fictitious or has otherwise not been granted to the person; or
               (C)  has been revoked; and
          (2)  uses or claims to hold that degree:
               (A)  in a written or oral advertisement or other promotion of a business; or

(B)  with the intent to:

(i)  obtain employment;

(ii)  obtain a license or certificate to practice a trade, profession, or occupation;

(iii)  obtain a promotion, a compensation or other benefit, or an increase in compensation or other benefit, in employment or in the practice of a trade, profession, or occupation;

(iv)  obtain admission to an educational program in this state; or

(v)  gain a position in government with authority over another person, regardless of whether the actor receives compensation for the position.

(c)  An offense under this section is a Class B misdemeanor.

(d)  If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section or the other law.

Added by Acts 2005, 79th Leg., Ch. 1039 (H.B. 1173), Sec. 8, eff. September 1, 2005.


Sec. 32.53.  EXPLOITATION OF CHILD, ELDERLY INDIVIDUAL, OR DISABLED INDIVIDUAL.  (a)  In this section:

(1)  "Child," "elderly individual," and "disabled individual" have the meanings assigned by Section 22.04.

(2)  "Exploitation" means the illegal or improper use of a child, elderly individual, or disabled individual or of the resources of a child, elderly individual, or disabled individual for monetary or personal benefit, profit, or gain.

(b)  A person commits an offense if the person intentionally, knowingly, or recklessly causes the exploitation of a child, elderly individual, or disabled individual.

(c)  An offense under this section is a felony of the third degree.

(d)  A person who is subject to prosecution under both this section and another section of this code may be prosecuted under either or both sections.  Section 3.04 does not apply to criminal episodes prosecuted under both this section and another section of this code.  If a criminal episode is prosecuted under both this

REPORTER'S RECORD
VOLUME 2 OF 2 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-13-003516

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/21/2015 4:12:18 PM
JEFFREY D. KYLE
Clerk

NANCY SCHAEFER              )  IN THE DISTRICT COURT
                           )
vs.                        )  TRAVIS COUNTY, TEXAS
                           )
MICHAEL DeLITTA, ET AL     )  201ST JUDICIAL DISTRICT

_____

VOLUME 2 OF 3 VOLUMES

_____

On the 15th day of April, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Orlinda Naranjo, Judge Presiding, held in Austin, Travis County, Texas.

Proceedings reported by computerized stenotype machine.

properly licensed to perform the service that they're supposed to perform?

A. Yes, sir.

Q. Okay. Did Mr. DeLitta use the title "Doctor" both orally and in writing in connection with his employment with Axiom?

A. Yes.

Q. And do you see him do that and hear him do that?

A. No. I've seen many documents come across with Dr. Mike DeLitta on it. I do not recall ever seeing him personally say Dr. DeLitta.

Q. All right. Did he ever introduce himself as "Dr. DeLitta" in the medical context?

A. Again, as far as him introducing himself, no, I do not recall. But he has been introduced, numerous times, in front of me as "Dr. Michael DeLitta."

Q. By other staff members?

A. By other staff members in meetings and presentations.

THE COURT: And you need to speak up.

THE WITNESS: I'm sorry, yes.

THE COURT: Just move closer to the microphone. I didn't hear.

THE WITNESS: I'm hard of hearing, so it

sounds like I'm yelling.

THE COURT: I didn't hear your response.

THE WITNESS: Which response?

THE COURT: To the last question. Would you ask the question again.

Or Dora, would you read the question, or his response maybe?

(Portion read back as requested.)

THE COURT: Would you ask your question again.

Q (BY MR. TAYLOR) Did you see other people refer to him as Dr. DeLitta in the company?

A. I have seen other people introduce him or refer to him as Dr. Michael DeLitta, yes.

Q. Based upon what the company does and based upon the total context of him being the medical director, do you have an opinion as to whether or not his use of the term "Doctor" was confusing or misleading if he is not a medical doctor? Just a lay opinion.

MR. HERMAN: Well, I object to him eliciting any opinion testimony from this witness, Your Honor.

MR. TAYLOR: It's not a matter of expert. He has worked at the company. He is entitled to give a lay opinion as to whether or not, in this context, it

seemed confusing or misleading.

THE COURT: I think you need to lay further predicate, Counsel.

Q. (BY MR. TAYLOR) You are a registered nurse, correct?

A. Yes, sir.

Q. And you are familiar with the company's business, correct?

A. Yes, sir, very.

Q. You have interacted with other employees at Axiom?

A. Yes.

Q. You have seen them interact with Mr. DeLitta, correct?

A. Yes.

Q. And seen him -- based upon your observations of the way other people reacted to him and introduced himself, do you have an opinion as to whether the use of the term "Doctor" was false or misleading?

A. Absolutely, it has been misleading, yes.

Q. Did Mr. DeLitta ever clarify the situation by saying, I really have a psychology degree from an unlicensed university? Did he ever clarify that?

A. I never heard clarification regarding his license or status or whether or not he is a doctor.

the laws pertaining to limiting themselves to the license. And he has some personal knowledge that, in fact, he encouraged this particular witness to violate his own license. It shows a pattern.

THE COURT: Then let's just ask that question.

MR. TAYLOR: Okay.

THE COURT: Lay the predicate.

MR. TAYLOR: Okay.

Q. (BY MR. TAYLOR) You're licensed, correct?

A. I am licensed.

Q. What state are you licensed in?

A. I'm licensed in eleven states. I think I'm actually licensed in nine states currently. I have to check on the currently, but I'm licensed in Oklahoma.

Q. Was there ever a time when Mr. DeLitta encouraged you to perform nursing services in states in which you were not licensed?

A. Yes.

Q. And would that be a violation of the law?

A. Absolutely it would be.

Q. Was there a time when you thought that Mr. DeLitta was a medical doctor?

A. From almost the first year I worked there, I thought Mr. DeLitta was a physician as he was the

medical director. And as of now, speaking with other nurses in the past, I know that that has been not just my opinion.

MR. HERMAN: Objection, Your Honor. I move to strike whatever he heard from anyone else.

THE COURT: All right.

MR. TAYLOR: Your Honor, this is not offered for the truth of the perception within the company. We know he's not really a doctor. It's offered for the perception that he's created by using this designation.

MR. HERMAN: It doesn't make any difference. It doesn't clean it up for being hearsay.

MR. TAYLOR: It certainly does. It's not offered for the truth.

THE COURT: Well, let's not argue, please. Let's not argue with each other. Let the Court -- I'm going to hear your objection. I will hear a response and then I will make a ruling.

I'll sustain the objection as to the last part. Limit it to your opinion.

Q.   (BY MR. TAYLOR) Okay. Did you observe at any time Mr. DeLitta trying to clarify his status and what his actual license was?

A.   Never.

Q.   Has other people in the company told you to refer to him as Dr. DeLitta?

MR. HERMAN:  Objection, Your Honor.  It's hearsay.

MR. TAYLOR:  This is not hearsay, Judge. It's not offered for the truth.  The truth would be that he wasn't really a doctor.  It's offered to show a pattern and a practice and an illusion that's been created within the company.  That's strictly it.  It's not offered for the truth.

THE COURT:  The Court will allow it for that limited purpose.

THE WITNESS:  Can you repeat the question?

Q.   (BY MR. TAYLOR) Yes.

Have people told you to refer to him as Dr. DeLitta within the company?

A.   I personally have never been told to refer to him as Dr. DeLitta, no.

Q.   All right.  And were you terminated from the company?

A.   I was terminated from the company.

Q.   Did it have to do with refusing to perform nursing activities in states in which you were not licensed?

A.   Yes.

A.    Not from Gmail, no.

Q.    From some other --

A.    I have a Gmail account, but I don't use that.

Q.    Do you have an email account that says "OccDoc" --

A.    No.

Q.    -- with any e-mail provider?

A.    I have one that says Occdoc66@hotmail.com.

Q.    Okay.  And "Occdoc" refers to occupational doctor, correct?

A.    Not in this case, no.

Q.    And you're claiming that this is not an authentic version of your e-mail.  Is that what you're saying?

A.    I'm saying that I've never signed a document like that.

Q.    Did you send this e-mail?

A.    I'm telling you that I can't tell you if I sent that e-mail.  I can tell that you that that's not my signature.

Q.    Have you ever sent an e-mail where the signature block stated "Dr. Michael J. DeLitta, Axiom Medical Consulting, LLC," with a phone number?  Have you ever done that?

A.    Without having "Ph.D, PA-C" afterwards, no.

say?

A.    "OCC DOC."

Q.    And would you agree with me that Axion is in the occupational medicine field?

A.    Yes.

MR. TAYLOR:  Your Honor, I will offer Exhibits 7 and 8.

THE COURT:  Any objection?

MR. HERMAN:  No objection, Your Honor.

(Plaintiff's Exhibit Nos. 7 and 8 admitted.)

Q.    (BY MR. TAYLOR) Do you still refer to yourself as "Dr. Michael J. DeLitta, Ph.D"?

A.    Refer myself how, in writing or verbally?

Q.    Either way.

A.    I've never referred to myself as "Dr. DeLitta" verbally.

Q.    What is the IADC Committee?  A committee meeting?  Do you know what that is?

A.    I have no idea.

MR. TAYLOR:  Okay.  We will mark this.

Q.    (BY MR. TAYLOR) Isn't it true that back in 2012 you spoke on a medical consulting on the *Return to Work and Fit for Duty Program*?  There you are on the agenda?

A.    What -- spoke where?

Q.   And it's your testimony here that the license plate "OCC DOC" is not in reference to occupational doctor?

A.   It can be whatever you want it to be.  I mean, that's the reference, yes.

Q.   It can be anything you want it to be?

A.   Absolutely.  That's the purpose of a vanity plate.

Q.   And Mr. DeLitta, you don't intend to change in any way the way you represent yourself because you think it's proper, right?

A.   I don't understand your question.

Q.   Okay.  You don't think that you misrepresent your status in terms of misleading the public or employees and the public in general that you are a physician?

A.   I've never referenced myself as a physician nor do I refer myself as doctor.

Q.   And you don't think that there is anything you've done that's misleading at all in terms of the way you presented yourself, correct?

A.   No.

Q.   And you don't intend to change anything about the way you are doing it, do you?

A.   I don't know what there is to change.

Q.    I mean, if you put out a business card or you show up on an agenda as a doctor, that's just too bad because you can -- it's whatever want it to be, correct?

A.    That's not a fair statement, no.

Q.    Isn't that what you just said?  If people want to think you are a doctor, you are certainly not going to correct it, are you?

A.    That's not what I said.

MR. TAYLOR:  I think I'm about finished. Let's just check with my client.

Okay.  I pass the witness, Judge.

THE COURT:  Counsel?

**CROSS-EXAMINATION**

Q.    (BY MR. HERMAN) Mr. DeLitta, let's be clear. Have you ever represented yourself to anyone as a physician?

A.    No.

Q.    What was your title when you worked for Arco?

A.    I was the medical director for Arco Pipeline.

Q.    What did you do for Arco Pipeline?

A.    It depends on what time -- what year in question.  For the most part, I oversaw the medical department and the medical services.  Primarily what I am doing at Axiom is what I was doing at Arco.

Q.    So, just explain to Judge Naranjo, if an Arco

employee got injured on the job, what would you do as the medical director at Arco?

A. When I was at the refinery, they would actually come to the medical department. We had an on-site occupational clinic at the refinery, and I would actually see the patients and I would examine them, diagnose them, and ultimately treat them.

As I progressed in my career and became the medical director and I moved to another division, I then oversaw the programs.

So if an injured employee -- if an injury occurred and they were in another state, I would telephonically assess them, determine medical needs, and direct them to medical facilities, if their injury warranted.

Q. You'd direct them to medical facilities in that particular state?

A. Yes.

Q. Now, where did you get your Physician's Assistant degree?

A. I went to U.C.L.A., Charles Drew Medical School in Los Angeles.

Q. Okay. Did you get an undergraduate degree?

A. I got a bachelor's degree from Cal State Dominguez Hills.

objection and admit Exhibit 10.

You may continue.

(Plaintiff's Exhibit No. 10 admitted.)

Q.   (BY MR. TAYLOR) If you will remember the seminar where you couldn't remember speaking, it was in Houston at the Oceanic Hotel.  You said you don't remember presenting there?

A.   Correct.

Q.   Do you recall having been introduced as Dr. DeLitta before?

A.   At that seminar?

Q.   Or any seminar.  Have you ever been introduced as Dr. DeLitta?

A.   I can't answer that.  I don't recall.

Q.   Okay.  And by the way, you would agree that if the company is -- and this is a hypothetical -- if it's using false or misleading designations and they are doing something false or misleading or against the law, that that can harm the company, correct?

A.   Let me see if I understand your question.  If the company is doing something that's illegal, would it harm the company?

Q.   Yes.

A.   Of course, it would.

Q.   Okay.  And what's the problem with you just

saying, I won't call myself Doctor anymore?

A.   I don't call myself Doctor.

Q.   I will take up all the designations.  I won't refer to myself as Doctor, and I will call myself a physician's assistant?

You do call yourself Doctor.  You refer to yourself as Dr. DeLitta?

A.   No, I don't.

Q.   Well, the evidence here is, we have seen it in the marketing brochures, we've seen it on business cards.

We have seen it on other documentation that you do, in fact, have, in the past, as recent as 2012, referred to yourself as Dr. DeLitta?

A.   As recent as 2012, so from 2012 on I have not.

Q.   Are you willing to just agree that you will not use the Doctor designation in front of your name anymore?

A.   No, I won't agree with that.

Q.   And so in order --

A.   I don't use it, but I won't agree to it anyways.

Q.   Well, you do use it.  You put yourself down as Dr. Michael DeLitta and sometimes you will put the Ph.D after it, correct?

about the growth of the company and the prosperity of the company and so forth, right?

A. Yes.

Q. You disagree with what he said?

A. No.

Q. Okay. And can you point to any customer that ever complained about anyone referring to Mr. DeLitta as Doctor?

A. I don't believe that they complained about it, but I don't think that they understand that he's not a medical doctor.

Q. Okay. Well, has anybody threatened to sue you or to otherwise impose some harm on the company?

A. Not to my knowledge.

Q. And as a 50 percent owner, you participate in the management meetings on a regular basis, do you not?

A. No, I do not.

Q. You participate in the weekly meetings with the temporary receiver, do you not?

A. No, sir, I don't.

Q. Who does that on your behalf?

A. Carol Striker.

Q. Okay. And it's Ms. Striker that suggested that a way for you to gain some leverage in this lawsuit would be to you raise this very issue about DeLitta

any court anywhere for the relief you are seeking here today, did you?

A.    That's correct.

Q.    And you can't point to any specific injury to the company, can you?

A.    I think it's a total misrepresentation of himself to the company.

Q.    All right.  Well, let me put it to you this -- let me ask you this way.

What you are concerned about, I take it, or what you're fearful of is that something will happen, right?

A.    I had received a resignation letter from a nurse that she had submitted to Axiom.  And it was by request that we get the documents without getting a copy of that.  In that letter, she was very concerned that Michael is misrepresenting himself as Dr. DeLitta to clients.

Q.    Didn't ask you that.

A.    And that was a concern to me.

Q.    I did not ask you that.  I'm asking you, what your testimony is, is that you're fearful that some injury might have occurred to the company?  Is that what you fear?

A.    I think the fear is already there in that the

# Janus University

From Wikipedia, the free encyclopedia

**Janus University**, formerly known as, **Newport University** is a private, <u>distance education</u> institution located in <u>Newport Beach, California</u>.[1][2] It was founded in 1976 and was licensed by the former State of <u>California Bureau of Private Postsecondary and Vocational Education</u>. In 2011, according to its website, Newport University changed its name and stopped offering degree programs.

Newport University was an approved school by the <u>California Bureau for Private Postsecondary Education</u>. Newport University was not accredited by any higher education accreditation organization recognized by the <u>United States Department of Education</u> or the<u>Council for Higher Education Accreditation</u>. The successor institution, Janus University, is approved by the BPPE <u>(School Detail)</u>

Defendant's
Exhibit ___21___ DC
Date_____

| | |
|---|---|
| **From:** | Axiom - Mike DeLitta |
| **To:** | Axiom - Nancy Schaefer |
| **Subject:** | RE: Title |
| **Date:** | Thursday, November 18, 2010 7:40:00 AM |

Not to dwell on this, but you asked me to bounce this off of Dara or Jordan – neither of which I am going to do for obvious reasons. However, James has always been a great resource to you. Ask him. I would suggest that you be clear with the following points:

- When you introduce me to the nurses at the airport you say, "This is Mike DeLitta, the President of Axiom."
- My next interaction with them is when you bring them into my office to have me talk about how we met and the philosophy of Axiom. I give them by business card that reads,
  Michael J. DeLitta, Ph.D., PA-C
  President & CEO

You indicated that it wasn't until much later that they didn't realize I was not an MD. Since they do not get any e-mails from me (which is the only time I was listing "Dr." in from of my name, at this point in my relationship with them what has given them the perception that I am a MD – unless it was something you were saying?

My e-mails are signed as follows:

---

Mike

Dr. Michael J. DeLitta, Ph.D., PA-C
Axiom Medical Consulting, LLC
(281) 419-7063 ext. 206 (office)
(281) 363-9906 (fax)
Mike.DeLitta@AxiomLLC.com
www.AxiomLLC.com
Caring is the Best Medicine®

---

**From:** Axiom - Mike DeLitta
**Sent:** Wednesday, November 17, 2010 5:19 PM
**To:** Axiom - Nancy Schaefer
**Subject:** RE: Title

Nancy,

I do feel strongly, but it's not what I think. It's your perception. Whether you are the only one that feels this way or not that is all that matters.

Since I never introduce myself as Dr. DeLitta to the nurses, nor do you...ever...and I give them my card the moment you bring them into my office – as well as it saying Ph.D., PA-C after my name on my card and on my e-mail, I sure don't understand why we would have "several" nurses who didn't realize I wasn't an MD until "much later." In fact, it doesn't even say "Dr." on my card. Why do you think they feel that way? It can't be anything I am saying to them. Is it actually the Dr. Michael J. DeLitta, Ph.D., PA-C that they read as Dr. Michael J. DeLitta, MD?

It's okay....I'll keep it off. If there is anything that I am giving off that is giving the nurses this perception them please let me know. Maybe I should also remove the title of Medical Director as

EXHIBIT
21

well. I guess that can be misleading – although that was my title at ARCO.

Mike

---

Mike,

If you believe strongly then talk with other people and go with what you feel is right. I might be the only one who thinks what I think. I know that several nurses thought you were an MD and it wasn't until much later that they realized you were Ph.D.

Ask Dara for her honest feed back. I know it irritates her when James Thatcher introduces himself as Dr. James Thatcher (Ph.D.)

Ask Jordan, he'll give you an honest opinion.

Ask some of the nurses if you feel comfortable enough to ask them.

I know you are not happy with Brian at this moment but ask him how he feels about it. Speaking of Brian, did you ever address the situation that Crissy and Andrea brought to you when I was in your office a couple of weeks back? I know you were not looking forward to it. I know there is a lot of dissension with
Brian and the office staff so have an honest conversation with him and let him know the issues that everyone is having with him. Find out if this is something that can be resolved or we need to look for another MD.

I could be wrong.

Nancy

---

Nancy,

Although I believe strongly that I am not misrepresenting myself and that I worked very hard for what I have achieved I have changed my e-mail signature.

Mike

Michael J. DeLitta, Ph.D., PA-C
Axiom Medical Consulting, LLC
(281) 419-7063 ext. 206 (office)
(281) 363-9906 (fax)
Mike.DeLitta@AxiomLLC.com
www.AxiomLLC.com
Caring is the Best Medicine®

This message is for the named recipient's use only. It may contain confidential proprietary information. No confidentiality is

waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.

 **CHASE** 

P.O. BOX 15123
WILMINGTON, DE
19850-5123

AUTOPAY IS ON
See Your Account
Messages below
for details.

| Payment Due Date: | 07/10/14 |
|---|---|
| New Balance: | $643.00 |
| Minimum Payment: | $25.00 |

Account number:REDACTED ACCT INFO

$_____ Amount Enclosed

AUTOPAY IS ON

  

88601 BEX 9 16414 C
MICHAEL J DELITTA MD
25511 BUDDE RD STE 801
SPRING TX 77380-2081

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

**Plaintiff's Exhibit ___4___ DC Date 4/15/15**

## REDACTED ACCT INFO

**Mileage**Plus
**UNITED**

Manage your account online:
www.chase.com/united

Customer Service:
1-888-795-0576

Mobile: Visit chase.com
on your mobile browser

### ACCOUNT SUMMARY

Account Number: REDACTED ACCT INFO

| | |
|---|---|
| Previous Balance | $150.00 |
| Payment, Credits | -$150.00 |
| Purchases | +$643.00 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| New Balance | $643.00 |
| Opening/Closing Date | 05/14/14 - 06/13/14 |
| Credit Limit | $25,000 |
| Available Credit | $24,357 |
| Cash Access Line | $5,000 |
| Available for Cash | $5,000 |
| Past Due Amount | $0.00 |
| Balance over the Credit Limit | $0.00 |

### PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $643.00 |
| Payment Due Date | 07/10/14 |
| Minimum Payment Due | $25.00 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APR's will be subject to increase to a maximum Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example.

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 3 years | $761 |

If you would like information about credit counseling services, call 1-866-797-2885.

### YOUR ACCOUNT MESSAGES

Your next AutoPayment for $643.00 will be deducted from your account and credited on your due date (previous day if your due date falls on a Saturday or Holiday). If you make a payment prior to your due date, that amount will be deducted from the AutoPayment amount identified above.

### UNITED MILEAGEPLUS AWARD MILES SUMMARY

| | |
|---|---|
| + Miles earned on all purchases | 643 |
| + Additional miles earned on United purchases | 37 |
| + Additional miles earned on hotel purchases | 0 |
| + Additional miles at car rental agencies | 0 |
| Total miles transferred to United | 680 |

Log onto united.com for more information about your MileagePlus account and program benefits or to book travel.

Thank you for using your United MileagePlus Presidential Plus Card. Use your card for all purchases to earn MileagePlus Award Miles that can be redeemed for travel on United Airlines. You'll earn 1 mile per $1 spent on all purchases. and an additional mile on purchases made directly with United. You'll also earn an additional mile on hotel accomodations - when purchased directly with the hotel, and on purchases at car rental agencies.

### ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| **PAYMENTS AND OTHER CREDITS** | | |
| 06/10 | AUTOMATIC PAYMENT - THANK YOU | -150.00 |
| **PURCHASES** | | |
| 05/29 | REDACTED ACCT INFO | 586.00 |
| 06/02 | REDACTED ACCT INFO | 20.00 |
| 06/05 | REDACTED ACCT INFO | 37.00 |
| | 060614 1 ED       IAH      MCO | |

**EXHIBIT 7**

Address Change Request

Please provide information below only if the address information on front is incorrect.

Street Address: _____

City: _____

State: _____ Zip: _____ _____

*Home Phone: _____ _____ _____ *Work Phone: _____ _____ _____

E-mail Address: _____

*When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us and companies working on our behalf to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. Message and data rates may apply. You may contact us anytime to change these preferences.

## To contact us regarding your account:

**By Telephone:**
In U.S. 1-888-795-0576
Español 1-888-446-3308
TTY 1-800-955-8060
Pay by phone 1-800-436-7958
Outside U.S. call collect
1-614-248-2161

**Send Inquiries to:**
P.O. Box 15298
Wilmington, DE 19850-5298

**Mail Payments to:**
P.O. Box 94014
Palatine, IL 60094-4014

**Visit Our Website:**
www.chase.com/unitied

Information About Your Account

Crediting of Payments: You may make payments by any of the options listed below. The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution. You can pay down balances faster by paying more than the minimum payment or the total unpaid balance on your account.

You may make payments by regular U.S. mail. Send your payment to the Payments address shown on this statement. Your payments by mail must comply with the instructions on this statement. Do not send cash. Write your Account number on your check or money order. Payments must be accompanied by the payment coupon in the envelope provided with our address visible through the envelope window, the envelope cannot contain more than one payment or coupon, and there can be no staples, paper clips, tape or correspondence included with your payment. If your payment is in accordance with our payment instructions and is made available to us on any day by 5:00 p.m. local time at our Payments address on this statement, we will credit the payment to your Account as of that day. If your payment is in accordance with our payment instructions, but is made available to us after 5:00 p.m. local time at the Payments address on this statement, we will credit it to your Account as of the next calendar day.

You may make payments electronically through our website shown on this statement. If we receive your completed request on our website by 8 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 8 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

For all other payments, or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

Account Information Reported to Credit Bureaus: We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, you may write to us at the Inquiries address shown on this statement.

Notice About Electronic Check Conversion: When you pay by check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. Call the Customer Service number on this statement if you have questions about electronic check collection or do not want your payments collected electronically.

Conditional Payments: Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15369, Wilmington, DE 19850-5045 (We reserve all our rights regarding these payments (e.g. if it is determined there is no valid dispute or if any such check is received at any other address we may accept the check and you will still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

Annual Renewal Notice: If your Account Agreement has an annual membership fee and/or similar charge for issuance or availability of your account, it will be billed each year or in monthly or quarterly installments. This fee and/or charge are owed whether or not you use your Account, and you agree to pay them when billed. The annual fee and charge are non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual fee or charge is billed and at the same time, you pay your outstanding balance in full. If you do this for a charge billed more often than annually such as a monthly service charge, you will not owe the next billed charge, however, prior billed charges are non-refundable and must be paid as part of paying your outstanding balance in full. Your payment of the annual fee or charge does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, we will continue to impose the annual fee and/or charge until you pay your outstanding balance in full and terminate your Account relationship.

Calculation of Balance Subject to Interest Rate: To figure your periodic interest charges for each billing cycle when a daily periodic rate(s) applies, we use the daily balance method (including new transactions). To figure your periodic interest charges for each billing cycle when a monthly periodic rate(s) applies, we use the average daily balance method (including new transactions). For an explanation of either method, or questions about a particular interest charge calculation on your statement, please call us at the toll free customer service phone number listed above.

We calculate periodic interest charges separately for each feature (for example, purchases, balance transfers, cash advances or overdraft advances). These calculations may combine different categories with the same periodic rates. Variable rates will vary with the market based on the Prime Rate or such index described in your Account Agreement. There is a transaction fee for each balance transfer, cash advance, or check transaction in the amount stated in your Account Agreement. There is a foreign transaction fee of 3% of the U.S. dollar amount of any foreign transaction for some accounts. Please see your Account Agreement for information about these fees.

We add transactions and fees to your daily balance no earlier than:

1) the date of the transaction – for new purchases, balance transfers, overdraft advances or cash advances;

2) the date the payee deposits the check – for new cash advance checks or balance transfer checks;

3) the date of a related transaction, the date they are posted to your account, or the last day of the billing cycle whichever we may choose – for fees

How to Avoid Paying Interest on Purchases: Your due date will be a minimum of 21 days after the close of each billing cycle. If you pay your account in full each billing period by the date and time due as referred is charged on new purchases month to month. Also, we will not impose interest charges on any portion of a purchase balance you repay while that balance is subject to an interest free period. Subject to any interest-free period for new purchases, we will begin charging interest from the date a transaction (including any balance transfer, cash advance or overdraft advance), fee or interest charge is added to your daily balance until your amount is paid in full. Because we apply payments in excess of your minimum payment first to higher rate balances, you may not be able to avoid interest charges on new purchases if you have another balance at a higher interest rate unless you pay your balance in full each month.

What To Do If You Think You Find A Mistake On Your Statement

If you think there is an error on your statement, write to us on a separate sheet at Customer Service, P.O. Box 15299 Wilmington, DE 19850-5299. You may also contact us on the web at chase.com.

In your letter, give us the following information:

• Account information: Your name and Account number.

• Dollar amount: The dollar amount of the suspected error.

• Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors in writing or on the web at chase.com. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:

• We cannot try to collect the amount in question or report you as delinquent on that amount.

• The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.

• While you do not have to pay the amount in question, you are responsible for the remainder of your balance.

• We can apply any unpaid amount against your credit limit.

Your Rights If You Are Dissatisfied With Your Credit Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you or if we own the company that sold you the goods or services.)

2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card Account do not qualify.

3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at Customer Service, P.O. Box 15299 Wilmington DE 19850-5299 or on the web at chase.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.





 Manage your account online:
www.chase.com/united

 Customer Service:
1-888-795-0576

 Mobile: Visit chase.com
on your mobile browser

| 2014 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2014 | $375.00 |
| Total interest charged in 2014 | $0.00 |

Year-to-date totals do not reflect any fee or interest refunds
you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|
| **PURCHASES** | | | |
| Purchases | 13.24% (v) | -0- | -0- |
| **CASH ADVANCES** | | | |
| Cash Advances | 19.24% (v) | -0- | -0- |
| **BALANCE TRANSFERS** | | | |
| Balance Transfer | 13.24% (v) | -0- | -0- |

(v) = Variable Rate                    **31 Days in Billing Period**

Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.





Plaintiff's

Exhibit __2__ DC

Date __4/15/15__

# Injury Management Overview

## Axiom Medical Consulting, LLC

*Caring is the Best Medicine*®

25511 Budde Rd., Suite 801, The Woodlands, TX 77380

(281) 419-7063    www.AxiomLLC.com

© Axiom Medical Consulting, LLC.  All rights reserved.

# *Mission Statement*

We are committed to providing the highest quality and cost-effective medical management services available to promote a safe and healthful environment for your employees

- Dr. Michael J. DeLitta

President & CEO

© Axiom Medical Consulting, LLC. All rights reserved.

# *Service*

The high road to service is traveled with integrity, compassion and understanding. People don't care how much we know until they know how much we care.

© Axiom Medical Consulting, LLC. All rights reserved.

# *Partial Client List*

Air Liquide

Baker Hughes, Inc.

BJ Services

BP

Cactus Drilling

Chevron

ConocoPhillips

Cudd Energy

Encana

Exterran

Flint Energy

FMC

GDF Suez Energy NA

Grey Wolf

Precision Drilling

Halliburton

Honeywell

Key Energy

Marathon Oil

Mirant Services, LLC

PHI

Schlumberger

TEPPCO

Team Industrial Services, Inc.

Universal Ensco, Inc.

Weatherford

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Case Management*
## *Topics*

Who Are We

Injury Management Process

Two Case Examples

Stats on Immediate Intervention

Closing

© Axiom Medical Consulting, LLC. All rights reserved.

# *Who We Are*

Full Service Medical Department

Physicals – OSHA, DOT

Drug Testing - DOT, non-DOT

Wellness

*Case Management*

© Axiom Medical Consulting, LLC. All rights reserved.

# *Axiom Different From a TPA*

We are NOT a Third Party Administrator (TPA)

We do not process Workers' Comp claims

We do not negotiate or pay work comp bills

Case Managers, not Case Trackers

© Axiom Medical Consulting, LLC. All rights reserved.

# *How TPA Different From Axiom*

We are 24/7 - We don't close at 5

We understand OSHA and its importance to our clients

All Case Managers (CM) are medically licensed (minimum of RNs)

Our CMs carry a case load of less than 15 – 20 cases (compared to 100 – 200)

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Staff*

Our staff consists of:

- Board Certified Physicians (MD)
  - Occupational and Environmental Medicine
  - Internal Medicine
  - Family Practice
  - Medical Review Officers (MRO)
  - Qualified Medical Examiners (QME)
  - Masters in Public Health (MPH)
- Board Certified Physician Assistants (PA-C)

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Staff*

## Continued . . .

- Psychologists (Ph.D.)
- Registered Nurses (RN) with Bachelor or Masters of Science - Nursing (BSN / MS)
- Certified Case Managers (CCM)
- Certified Disability Management Specialists (CDMS)

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Staff*

Continued . . .

- Certified Occupational Health Nurses (COHN)
- Certified Occupational Health Nurses-Specialist (COHN-S)
- Certified Occupational Health Nurses-Specialist/Case Manager (COHN-S/CM)

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

If the injury is critical or life threatening call 911 and then contact Axiom

Never delay treatment in the event of an emergency

If the injury is not an emergency contact Axiom *before* you transport the employee to a medical facility – this is important and will be explained

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

Call comes into Call Center and received by our Intake Specialists

Basic info taken and case is assigned to Case Manager (CM)

CM calls injured employee within 5 – 10 minutes

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

- CM discusses incident and injury with employee
- CM gather critical medical info
- Supervisor is removed from treatment decisions
- Determines if employee requires evaluation at medical facility

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

If a medical facility is indicated, CM directs employee to *appropriate* medical facility and provides initial info on case to health care provider

Speak with medical facility before employee leaves

Assist in getting post-accident drug and alcohol test –per company policy

© Axiom Medical Consulting, LLC.  All rights reserved.

# *Injury Management Process*

If a medical facility is not indicated, CM will provide 1st aid recommendations and monitor employee's condition

50% of cases never require clinic visit

CMs do NOT diagnose, nor do they need to in order to provide 1st aid measures

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

Employee and person calling in case (i.e., HSE, supervisor) must be in agreement with CM's 1st aid recommendations)

If not, employee will be sent to medical facility for evaluation

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

CM provides a direct number to employee and supervisor to call with any questions, problems or changes

First e-mail goes out within 2 hours after treatment is completed

First follow-up call is usually made within first 4 hours; then 24 hours

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

- This may mean calls in the evenings or weekends
- Keep mgmt and HSE updated via phone and e-mail during entire process
- Follow employee until able to perform regular duties or until adjuster assigned – depends on client's preference

© Axiom Medical Consulting, LLC. All rights reserved.

# *Injury Management Process*

Ongoing dialog with employee, supervisor and treating doctor

Transitional duties (light duty)

Will assist with return to work exam, FCE, etc. if indicated

Important to determine if employee can safely perform <u>all</u> aspects of their job

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Case Management*
## *Case #1*

Tuesday

3:30 PM - Employee (EE) holding a bolt and was struck in the hand by a sledge hammer by co-worker

4:00 PM - EE taken to local hospital

4:30 PM - Axiom called to intervene
Called ER and spoke with charge nurse
EE in x-ray

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Case Management*
## *Case #1*

Tuesday

5:45 PM - Spoke with ER doc

- X-rays negative
- Diagnosis - hematoma
- Plan to give prescription if infection occurs
- Told doc we would follow case & look for infection. Prescription not written
- Return to work (RTW) - full duty

© Axiom Medical Consulting, LLC.  All rights reserved.

# *Medical Case Management*
## *Case #1*

Wednesday

8:45 AM - Spoke with Supervisor (Supv) and EE. EE doing well. Regular duties. Reviewed importance of OTC NSAIDs and ice

Friday

Spoke with EE and Supv. EE still doing well. No sign of infection. Case closed

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Case Management*
## *Case #2*

Friday

- Had Spanish-speaking Case Manager speak with EE
- Determined injury was soft tissue only
- After getting thorough medical history EE was instructed on ice, heat, NSAIDs
- Gave direct number to EE

© Axiom Medical Consulting, LLC. All rights reserved.

# *Medical Case Management*
## *Case #2*

Saturday

EE off work, but called him at home

Reviewed treatment plan and discussed starting heat on Sunday

Spoke with EE on Monday at work

Significant improvement. Told to continue treatment plan

Closed case on Tuesday

© Axiom Medical Consulting, LLC. All rights reserved.

# *Outcomes of Injuries*

| Without Case Mgmt | | With Case Mgmt | |
|---|---|---|---|
| • Non-Work Related | 0 | • Non-Work Related | 16 |
| • First-Aid | 44 | • First-Aid | 85 |
| • Recordable | 33 | • Recordable | 16 |
| • Restricted | 42 | • Restricted | 29 |
| • Lost Time | 33 | • Lost Time | 6 |
| • TOTAL | 152 | • TOTAL | 152 |

© Axiom Medical Consulting, LLC. All rights reserved.

# *Immediate Intervention*

75% of cases - notified same day

14% of cases - the following day

11% of cases - notified 2 days or greater

- 40% of these were over 1 week
- 80% of those were placed on OSHA 300
  - All 6 lost times fell into this category

© Axiom Medical Consulting, LLC. All rights reserved.

# *Immediate Intervention*

- If case received within 24 hrs of injury the average time to close was 7 days

- If case received within 2 days of injury the average time to close was 14 days

- If case received on 3rd day or greater following the injury the average time to close was 32 days

© Axiom Medical Consulting, LLC. All rights reserved.

# Benefits To Employees

Immediate access to Medical Professional 24/7 for injuries

Employee can call CM at any time should medical condition change or if question comes up

Axiom Case Manager is not a "Company Doctor"

© Axiom Medical Consulting, LLC. All rights reserved.

# *Benefits To Employer*

- Immediate access to Medical Professional 24/7 for injuries
- Supervisor removed from treatment / medical decisions
- Communication
- Lower Claims Frequency/Severity
- Reduction in Incident Rate, Reduction in Costs, Reduction in Modifier

© Axiom Medical Consulting, LLC. All rights reserved.

# *Closing*

It's important to report injuries immediately – no matter how minor

A delay of reporting and treating injury by 1 day increases recordability by 60%

24 / 7 /365 coverage - (this is crucial)

Have only one number to call
- (877) 502-9466  (877-50-AXIOM)

© Axiom Medical Consulting, LLC.  All rights reserved.

# About Us

Plaintiff's

Exhibit ___3___ DC

Date_____

Axiom Medical Consulting, LLC is a privately owned company established in 1999 by its CEO Dr. Michael J. DeLitta. Recognizing the need for a "one stop shop", our philosophy has been to provide the utmost care and quality in every medical service we offer.

We believe that caring is the best medicine. This ideal is woven thoughout every aspect of our company. We are not your typical medical services provider, trying to make every client fit into the same structure and business model. Axiom recognizes that even in the same industries, every client is different and can have vastly different needs. Whether you have 10 employees in one location, or 10,000 employees spread all over North America, we work with every one of our clients to meet their indivdual medical needs all while consistently providing the highest quality service and care.

Occupational Medicine has remained virtually the same over the years - which means the services you recieve and those providing it have remained the same along with it. It's impossible to expect great results when all of your choices are the same. You and your employees deserve better.

We're here to change that.

**Transforming Occupational Medicine, *one client at a time.***

**Mission Statement**

Axiom's purpose is to transform Occupational Medicine by providing the highest quality, most cost-effective comprehensive medical management services, maximizing the benefits to all parties involved:
- Clients and their Employees
- Axiom's Professionals



Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine®*

25511 Budde Rd.
Suite 801
The Woodlands, TX 77380
281-419-7063 | fax 281-363-9906
www.axiomllc.com

**EXHIBIT 1**

©Axiom Medical Consulting, LLC
All Rights Reserved

# Axiom Medical Consulting Services:

## 24/7 Nationwide Injury Management:

### Occupational Injury Case Management

### Short-term Disability & FMLA Case Management

### Personal Injury/Illness Case Management

### Medical Case Review

## Medical Programs Management:

### Physical Exam Programs

### OSHA Compliance Exam Programs

### Drug & Alcohol Testing

## Additional Services:

Customized Client-Specific Programs
Consolidated 3rd Party Billing
Can Accommodate over 140 languages
Jones Act/Martime Expertise
On-site Medical Consulting
Educational/Compliance Programs

Transforming Occupational Medicine,
*one client at a time.*      www.axiomllc.com   281-419-7063      ©Axiom Medical Consulting, LLC
All Rights Reserved

# Occupational Injury Telephonic Case Management

When an employee incident occurs, immediate access to an occupational medical specialist ensures an optimal outcome for both the injured worker and employment organization. Axiom Medical Consulting recognizes an employee's health and safety are cornerstones to the success of your business. As OSHA regulatory and occupational case management experts, our licensed professionals are available 24/7 to assist with any need which may arise.

While others promote case tracking, the benefits of Axiom's immediate intervention approach include:



- **Access to a licensed medical professional within minutes following the injury**

- **Development of an agreed treatment plan**

- **Telephonic follow up care through treatment and recovery**

Of the thousands of cases handled each month, over half of injury occurrences are internally managed with first aid measures, eliminating the need of formal medical attention. This alone saves a tremendous amount of money for clients by way of lower claims frequency and severity, reductions in incident rate, modifiers, costs and productivity.

Through customizable reporting structures, dependent on our clients' individual needs, open communication and timely status updates, we invite you to experience "The Axiom Difference".



To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine*™

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Telephonic Case Management Process Flow Chart



**Incident Occurs**

**EMERGENCY?** → **YES** → **CALL 911 FIRST**

**NO**

**Non-Emergency**

Call to Axiom (281) 419-7063, 24/7 Nurse Case Manager (NCM) Assigned - NCM begins Telephonic Assessment. Provides guidance and recommendations

**First Aid Treatment**

NCM provides first aid recommendations and over the counter (OTC) medications

**Clinic/ER Treatment**

NCM directs to appropriate and preferred Clinic or ER. Communicates with treating physician / medical staff and Employee (EE)

NCM initial email report within 3hrs after recommendations or treatment completed. NCM follow up communication to EE via phone and email reports to designated individuals after any status change. Case closure when appropriate

## Don't wait to report! Time is of the Essence!

## Call 24/7 for all injuries- **281-419-7063**

Transforming Occupational Medicine,
*one client at a time.*

©Axiom Medical Consulting, LLC
All Rights Reserved

# Personal, Short Term Disability (STD), Family and Medical Leave Act (FMLA) Telephonic Case Management

While other companies may offer work related case management, Axiom believes you deserve more. As your full service comprehensive medical management provider, we are cognizant of and attentive to the productivity and profitability implications of employee absences.

As our specially trained nurse case managers champion the recovery and return to productive employment, our clients take comfort in knowing Axiom is by their side, every step of the way:

- Ensure adequate evaluation of the employee's disability.

- Proactively and aggressively coordinate, monitor, and manage all aspects of the employee's treatment plan by verifying the effective delivery of recommended modalities and interventions.

- Assist with development of modified duties, alternative work and other programs which minimize short-term indemnity costs and productivity loss.

- Continuously review each case to determine our client's compliance with the Americans' With Disabilities Act (ADA) and Family and Medical Leave Act (FMLA).

Here are just a few of the benefits of utilizing this valuable service:

- Lower medical claims costs.
- Minimize productivity loss.
- Lower short-term disability costs.
- Provide a quick and safe return to work.

To learn more, please contact our Business Development Department:



Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



Axiom
Medical Consulting, LLC
Your Specialists in Medical Management
Caring is the Best Medicine™

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Medical Programs Management

Quality and Consistency – two critical aspects of service that are important on their own, but when combined provide the ultimate in compliance and services levels for our clients. Axiom is able to implement and manage any type of medical exam and drug & alcohol programs you need for your employees. By utilizing this valuable service, here are a few of the benefits you will receive:

- Dedicated Project Managers, Medical Directors and support staff

- Customized protocols, authorization forms and notifications

- Consistent and accurate exam clearances

- National network of medical facilities

- Consolidated Billing of 3rd Party Invoices

Of the thousands of exams facilitated at local clinics each year, over 25% have inappropriate clearances - such as issuing of DOT medical certificates when the applicant did not meet the DOT standards, or employees who were unable to perform the essential functions of the job. This is a major problem which not only increases your risk, but also leads to increasing work related injuries and workers comp claims.

From a baseline pre-employment exam to annual OSHA and DOT compliance exams, let us take the guess work out of the equation for you. Our Project Managers will diligently manage those local clinics on your behalf, ensuring the work is done right the first time. By having Axiom manage your medical programs you can rest assured that your employees will always be healthy and fit to work.



To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



Axiom
Medical Consulting, LLC
Your Specialists in Medical Management
Caring is the Best Medicine™

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

© Axiom Medical Consulting, LLC
All Rights Reserved

# Medical Programs Management Process

## Notifications

Depending on the type of program, Axiom will be notified in two ways:
- Pre-Employment / Pre-Placement - Client notifies Axiom of the need for exam
- Ongoing Compliance - Axiom will notify client when employees are due for exam

## Clinic Setup / Scheduling

Much of our Project Manager's time and effort is spent managing the local medical facilities for our clients. During initial set up, Axiom works individually with each client to determine the best local medical facilities capable of performing the required exams, and supplies all specific exam protocols and authorization forms to each facility. Once notifed of the need for an exam, Axiom will provide all appropriate for contact info for the employee to schedule their exams.

## Results Aquisition

Our Project Managers diligently work with the medical facility to aquire complete an accurate results. Should there be incomplete results. or issues with the exams you can rest assured that the Project Manager catches these errors and takes appropriate actions immediately.

## Axiom Review

Axiom's Project Managers first enter all reults in our systems, while simultaneously reviewing for completion and accuracy. Our Medical Directors then review all exam results and formulate their opinions based upon the exam results, job descriptions, regulatory information and any pertinent information from the client.

## Clearance / Communication of Results

After review, our Medical Directors draft Physicians Written Opinion letters (PWOs) that state the findings of the exam - pass, pass with restrictions or medical hold. A copy goes to the designated company representative, and a copy goes to the employee that also lists any personal medical information. This personal information may not hinder their job, but includes our advice on seeking appropiate follow up with their personal physician.

## Data Tracking / Compliance

When entering exam results into our systems, our Project Managers mark when the employee is due again for any recertification exam (DOT, annual Audiogram, etc). Extensive reporting and statistics can also be generated for our clients' review.

## Invoice Management

Managing the local medical facilities and paying their invoices on our clients' behalf is an often overlooked benefit. Every clinic is different, works in different ways and charges different amounts too. Axiom helps you stay compliant with consistent results, nationwide.

Transforming Occupational Medicine,
*one client at a time.* www.axiomllc.com 281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Hearing Conservation Program

The work your company does is not easy, nor is it quiet. Exposure to high levels of noise in the workplace can cause hearing loss, sometimes permanently. OSHA requires a Hearing Conservation Program for those employees subjected to noise at a time weighted average of 85dBA over an 8 hour shift. This means your employees need to wear proper hearing protection, and receive annual hearing tests called Audiograms to detect any shifts in their hearing. Axiom can implement and manage this program providing:

- A Project Manager that tracks your employee population, and sends designated company represenatives notifications when an employee's annual **Audiogram** is due.

- Set up and coordination of testing at a pre-determined local medical facility

- Medical Director review and clearances

- Immediate response and action to any Standard Threshold Shift (STS) in the hearing indicating potential issues

- Management of the local medical facilities, including invoicing



Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine*

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Respiratory Fit & Protection Program

Air - you can't see it, or really taste it, but it surrounds us and is vital to our survival. Sometimes your employees work in environments where the air has been compromised by dust, smoke, fumes, vapors, or in places where chemicals required for work are harmful to breathe. OSHA regulations require you to protect your employees by placing them into a Respiratory Protection Program - ensuring annual questionnaires are performed, and providing proper and well fitting respirators that help them breathe clean air and continue to work. Axiom can help by managing this program offering a Project Manager that provides:



- Coordination of respirator mask fit-testing at a pre-determined local medical facilities

- Customized program protocols including Pulmonary Function Tests (PFTs)

- Sends designated company represenatives notifications when an employee's annual Questionnaire is due, and provides electronic and / or hard copy of the form and helps coordinate PFT if required

- Medical Director review and clearances of Questionnaires and exams

- Immediate response and action to any potential issues

- Management of the local medical facilities, including invoicing

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com

Transforming Occupational Medicine,
one client at a time.


### Axiom
Medical Consulting, LLC
Your Specialists in Medical Management
Caring is the Best Medicine

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Physical Exam Programs



Taking care of your employee population can be a challenging puzzle to solve. No one likes to get sick. We work for a reason, and when health issues prevent us from working, no one wins. It's a fact - a healthy employee whose physical abilities are matched to their job is safer, more productive and overall less of a risk to their company. Arranging physical exams for your employee population is an important and often overlooked piece of the puzzle. Axiom not only will facilitate that medical piece, but can help you solve the puzzle in many different ways:

- **DOT Physical Exams,** cleared by Axiom Medical Directors on the National Panel of DOT Certified Physicians
- **Pre-Employment / Pre-Placement Exams** based on your specifc protocols
- **Functional Capacity Exams / Fit-for-Duty ,** based on job descriptions, essential job functions and physical demand analysis
- **HAZWOPER (HAZardous Waste OPerator Emergency Response) Exams**
- **Customized Exam Programs,** tailored to suit individual and specific needs



All Exam Programs are managed by our Project Managers, who oversee the entire process from local clinic set up, tracking results, notifications, medical clearances, and invoicing. They are your expert you can rely on to help provide solutions and keep your employees healthy and on the job.

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



## Axiom
### Medical Consulting, LLC

Your Specialists in Medical Management
*Caring is the Best Medicine*

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Drug & Alcohol Testing

As an employer, you not only care about your employees' health, you also do everything in your power to help limit risk and ensure the work you do meets all regulations, including anything related to Drug & Alcohol testing. Understanding and implementing a Drug & Alcohol program can be a challenging road to navigate. There are many twists and turns, and you need a partner to help you determine the best route to take. Axiom is an expert in Drug & Alcohol testing- a proven and valuable co-pliot providing to our clients:

- Pre-Employment testing
- DOT and Non-DOT Random testing
- Post Incident, Reasonable Suspicion
- Policy Administration including written plans and supervisor training

As with all Medical Program Management services, you'd also recieve the following benefits:

- Project Managers and Medical Directors to help track, oversee, provide clearance and expert advice and manage the entire process
- Compliance to DOT regulations, and set up and implementation of a Company specific Non-DOT program
- All necessary forms including Chain of Custody/Control
- Nationwide network of collection facilities including mobile collectors
- Consolidated billing of 3rd party collection fees

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine™*

www.axiomllc.com   281-419-7063

© Axiom Medical Consulting, LLC
All Rights Reserved

**Plaintiff's**
Exhibit ____5____ DC
Date____4/15/15



# AXIOM
### MEDICAL CONSULTING, LLC

## Dr. Michael J. DeLitta
Founder, President & CEO

Office: 281 465 7100
Fax: 281 363 9906

Mike.DeLitta@AxiomLLC.com
www.AxiomLLC.com

4340 West Panther Creek Drive, Suite 106 · The Woodlands, TX 77381

Plaintiff's

Exhibit ___7___ DC

Date _____



# Medical Case Management

*Case #2*

Friday

Had Spanish-speaking Case Manager speak with EE

Determined injury was soft tissue only

After getting thorough medical history EE was instructed on ice, heat, NSAIDs

Gave direct number to EE

© Axiom Medical Consulting, LLC. All rights reserved.

# Medical Case Management
*Case #2*

Saturday

EE off work, but called him at home

Reviewed treatment plan and discussed starting heat on Sunday

Spoke with EE on Monday at work

Significant improvement. Told to continue treatment plan

Closed case on Tuesday

© Axiom Medical Consulting, LLC. All rights reserved.

# Outcomes of Injuries

## Without Case Mgmt

- Non-Work Related . . . . . . 0
- First-Aid . . . . 44
- Recordable . . 33
- Restricted . . . 42
- Lost Time . . . 33
- TOTAL . . . . 152

## With Case Mgmt

- Non-Work Related . . . . . 16
- First-Aid . . . . . . 85
- Recordable . . . 16
- Restricted . . . . 29
- Lost Time . . . . 6
- TOTAL . . . . 152

© Axiom Medical Consulting, LLC. All rights reserved.

# Immediate Intervention

75% of cases - notified same day

14% of cases - the following day

11% of cases - notified 2 days or greater

- 40% of these were over 1 week

- 80% of those were placed on OSHA 300

  – All 6 lost times fell into this category

© Axiom Medical Consulting, LLC. All rights reserved.

# *Immediate Intervention*

If case received within 24 hrs of injury the average time to close was 7 days

If case received within 2 days of injury the average time to close was 14 days

If case received on 3rd day or greater following the injury the average time to close was 32 days

© Axiom Medical Consulting, LLC. All rights reserved.

# Benefits To Employees

Immediate access to Medical Professional 24/7 for injuries

Employee can call CM at any time should medical condition change or if question comes up

Axiom Case Manager is not a "Company Doctor"

© Axiom Medical Consulting, LLC. All rights reserved.

# *Benefits To Em*

Immediate access

Professional 24/7

Supervisor remov

medical decisions

Communication

Lower Claims Fre

Reduction in Inci

in Costs, Reducti

© Axiom Medical Consulting, LLC. All rights reser

*ployer*

s to Medical
7 for injuries
ved from treatment /
s

equency/Severity
dent Rate, Reduction
on in Modifier

ved.

# Closing

It's important to report injuries immediately – no matter how minor

A delay of reporting and treating injury by 1 day increases recordability by 60%

24 / 7 /365 coverage – (this is crucial)

Have only one number to call

- (877) 502-9466 (877-50-AXIOM)

© Axiom Medical Consulting, LLC. All rights reserved.

Filed in The District Court
of Travis County, Texas

ES OCT 09 2013

At ___10:30 A.M.

Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. _____

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| and DELCOM PROPERTIES, LLC, | § | |
| | § | |
| | § | 201st |
| Defendants. | § | 201 JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW, NANCY SCHAEFER,** in the above-captioned and numbered cause, and files this its Plaintiff's Original Petition and Verified Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction complaining of **MICHAEL J. DELITTA, AXIOM MEDICAL CONSULTING, LLC, AXIOM PROFESSIONALS, LLC, AXIOM PROPERTIES, LLC, and DELCOM PROPERTIES, LLC,** and for cause of action would respectfully show unto the Court the following:

I.

### DISCOVERY CONTROL PLAN

1. Pursuant to Rule 190 of the Texas Rules of Civil Procedure, discovery in this case is intended to be conducted under Level 3.

21. Federal tax documents and governing documents prepared by Axiom's accountants and attorneys reflected and continue to reflect that Plaintiff was, is and remains the 50% owner of the member interest of Axiom Medical (including 50% ownership of the affiliated entities, Axiom Properties and Professionals).

22. On or about December 31, 2011, DeLitta and Plaintiff executed the Written Consent and Operating Agreement memorializing DeLitta's promise and oral agreement that Plaintiff and DeLitta had each been 50% owners in Axiom Medical and as such were each issued 5,000 units of membership interests in Axiom Medical.

**B. DeLitta's Self-Dealing and Unilateral Acts to Usurp Plaintiff's 50% Interest**

23. Throughout 2012 and 2013, DeLitta and Plaintiff discussed finding new office space for Axiom. Plaintiff and DeLitta disagreed about whether Axiom needed to purchase a building as opposed to leasing larger space and if a purchase was made, which building would be purchased. DeLitta wanted to purchase a building located at 4840 West Panther Creek Drive, The Woodlands, Texas ("Panther Creek Building"). Plaintiff suggested leasing a building located at 110 Cypress Station Drive, Houston, Texas 77090 ("Cypress Court"). After much discussion, DeLitta decided to purchase the Panther Creek Building himself through a solely owned company that he would form for the single purpose of purchasing the Panther Creek Building ("DeLCom Properties"). Plaintiff and DeLitta agreed that if DeLCom Properties purchased the building, Axiom would lease space from it in the Panther Creek Building.

24. On or about August 8, 2013, without Plaintiff's consent and before forming DeLCom Properties and closing on the Panther Creek Building, DeLitta executed a lease on behalf of both DeLCom Properties and Axiom Medical with terms that were very favorable to DeLCom

Properties (DeLitta's solely owned company) acting as the landlord and very unfavorable to Axiom Medical, the purported tenant (the "Panther Creek Lease").

25.     A few days later, DeLitta formed DeLCom Properties on or about August 13, 2013.

26.     On or about August 26, 2013, DeLCom executed a promissory note to Wells Fargo, N.A. for the principal sum of $4,720,000.00 for the purchase of the Panther Creek Building. Axiom Medical, Axiom Properties, DeLitta and Plaintiff executed guaranties.  In an effort to fund the down payment for the purchase of the Panther Creek Building, Plaintiff and DeLitta each agreed to take a $590,000.00 distribution.   Plaintiff then agreed to lend her $590,000.00 to DeLCom Properties and DeLCom Properties agreed to pay it back through a second note guaranteed by DeLitta.  A true and correct copy of the Wells Fargo promissory note, the settlement statement, the guaranties, and the second note and guaranty are attached as **Exhibits "B-1 through B-7"** respectively, and are incorporated by reference.

27.     On or about September 23, 2013, Plaintiff received correspondence from Nicole Beck, HR Specialist for Axiom Medical regarding maintenance items to address due to Plaintiff's leaving Axiom Medical's employment ("Exit Letter").  This was the first time Plaintiff had heard anything about her "leaving" Axiom Medical.  A true and correct of the Exit Letter is attached as **Exhibit "C-1"** and incorporated by reference.

28.     Shortly after Plaintiff received the Exit Letter, DeLitta sent an email to all Axiom employees that purported to terminate Plaintiff as Executive Vice President and misrepresented or sought to usurp (or both) Plaintiff's role or participation in the continued operation and control of Axiom ("Termination Email").  A true and correct of the Termination Email is attached as **Exhibit "C-2"** and incorporated by reference.  More specifically, Mr. DeLitta stated as follows:

As President & CEO, I have a responsibility to make sure that Axiom remains a viable company and that all of its employees are happy. In order to do this, some changes will need to be made.

Effectively immediately, Nancy Schaefer is no longer Executive Vice President. She will still be co-owner but will have no input or involvement with the day-to-day activities with nursing or Axiom as a whole. Processes are in place to acquire Nancy's share of the company as we move forward.

Some of you may receive calls from her while others may want to reach out to her. There is to be no communication with Nancy from a business perspective. If she calls you or you call her, you may talk about anything other than Axiom. If she requests information or documentation from you, you are to refer her to Nicole Beck in HR. Any disregard of this will result in disciplinary action.

29. DeLitta's actions have created an atmosphere of fear and distrust between the two members and undermined Plaintiff's longstanding and cherished business relationship with the Nursing Staff. The damage to the relationship between Plaintiff and Axiom's employees – and hence, her ability to protect her investment and interest in Axiom – is immediate and irreparable and is incapable of being accurately measured or legally compensated. The damage to Plaintiff's business relationship with the Nursing Staff is continued and ongoing.

30. DeLitta has improperly attempted to engineer a hostile take-over of Axiom through his unilateral and oppressive attempt to deprive Plaintiff of all rights of management or control of Axiom, including those rights vested in Plaintiff under the Operating Agreement. The Operating Agreement contains no provisions that would permit DeLitta to deprive Plaintiff of her role as a manager without her input or consent, much less unilaterally. Both the fact that DeLitta has usurped or attempted to usurp all of Plaintiff's control of Axiom, and the manner and means by which he has endeavored to do so, has caused and continues to cause Plaintiff harm.

31. In addition, DeLitta has deposited, or caused to be deposited, checks payable to Axiom into his own personal account on more than one occasion.

CAUSE NO. D-1-GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| DELCOM PROPERTIES, LLC, | § | |
| | § | |
| Defendants. | § | 201st JUDICIAL DISTRICT |
| | § | |
| --------------------------------------- | § | |
| | § | |
| MICHAEL J. DELITTA, NANCY | § | |
| SCHAEFER | § | |
| | § | |
| | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| DANIELLE M. SEGER, AS TRUSTEE | § | |
| OF THE MICHAEL J. DELITTA AND | § | |
| PAMELA L. DELITTA FAMILY | § | |
| IRREVOCABLE TRUST | § | |
| | § | |
| Third-Party Defendant | § | |

**PLAINTIFF'S VERIFIED APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION TO ENJOIN MICHAEL J. DELITTA FROM MISREPRESENTING HIMSELF AS A MEDICAL DOCTOR**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Nancy Schaefer asks this Court to enter a Temporary Injunction against Defendant Michael J. DeLitta ("DeLitta"), enjoining him from holding himself out as a medical doctor, using the title "Dr.," and otherwise misleading others as to his qualifications. DeLitta's conduct is against the law, is causing irreparable harm to Axiom Medical Consulting LLC's reputation, and

subjects Axiom to third-party liability, thereby diminishing its value. Michael DeLitta is not a medical doctor and does not even have a Ph.D. from an accredited university. He is passing himself off as a medical doctor by pretending that his Ph.D. degree from a discredited "diploma mill" entitles him to call himself "Dr." DeLitta. This is a sham, a fraud on the public, a violation of Mr. DeLitta's obligations under the Physician's Assistant Licensing Act, and a violation of a specific criminal statute.

## I.   FACTS AND ARGUMENT

1.     Axiom Medical Consulting, LLC ("Axiom") provides medical consulting services. It advertises that it "employs Doctors, Physician Assistants, Registered Nurses, and a specially trained support staff to provide a full suite of medical management services, ranging from work-related injury case management to a multitude of customizable exam programs." *See* http://www.axiomllc.com/about/company. Defendant DeLitta is one of the founders of Axiom and is the current CEO and presumably a licensed Physician's Assistant. *See Exhibit 1*, Axiom brochure. The first sentence of the company's online brochure refers to DeLitta as *"Dr. Michael J. DeLitta." Id.* (emphasis added). This is a sham.

### A.     *"Dr." DeLitta's Fake Ph.D.*

2.     DeLitta is not a medical doctor and has never attended medical school. Yet DeLitta routinely refers to himself as a "doctor" and uses the titles "Doctor" and/or "Dr." in the course of his work for Axiom. *Exhibit 2*, Affidavit of Andrea Ruffen. Because Axiom is a medical consulting company and provides medical advice, there is an substantial likelihood that DeLitta's use of the "Dr." title could mislead others into believing that he is a medical doctor. In fact, as shown below, that is exactly what is happening.

3.      DeLitta purportedly has a "Ph.D." in psychology from "Newport University."[1] However, Newport University is not accredited by any accreditation agency recognized by the U.S. Department of Education.  *See* http://ope.ed.gov/accreditation/Search.aspx.  Furthermore, the Texas Higher Education Coordinating Board lists Newport University as an institution that issues "fraudulent or substandard degrees."  *See* http://www.thecb.state.tx.us/index.cfm?objectid= EF4C3C3B-EB44-4381-6673F760B3946FBB, attached hereto as *Exhibit 4*.  The misuse of this fraudulent degree is more than just an exhibition of DeLitta's vanity or insecurity.  Texas makes it a <u>crime</u> for DeLitta to use his claimed Ph.D. (*i.e.*, to refer to himself as a "doctor") to promote a business or to obtain employment, compensation or other benefit in employment or in the practice of a trade.  TEX. PENAL CODE §32.52.  DeLitta's Ph.D. "degree" in psychology is not even what it purports to be, much less a proper basis for him to pass himself off as a medical doctor.  On these grounds alone, DeLitta should be enjoined from using the title "Doctor" or "Dr." in any form while employed by Axiom.  His actions are hurting the company and subject it to liability and a diminished reputation.

### B.      Stretching the Truth Even Further – "Paging Dr. DeLitta"

4.      DeLitta is a Texas-licensed physician's assistant ("PA").  As such, he is governed by the Texas Physician Assistant Board and Chapter 204 of the Texas Occupations Code.  His license imposes a specific obligation for him to avoid confusion over this training.  In Texas, a PA that commits any of the following acts can face civil and criminal liability:

> - *falsely represents that the person is a physician;*
>
> - *acts in an unprofessional or dishonorable manner that is likely to deceive, defraud, or injure the public;*

---

[1] DeLitta also claims to have a "masters degree" in Psychology from Newport University.  Newport University appears on numerous lists of institutions known informally as "diploma mills."  *See* http://www.geteducated.com/fake-diplomas/250-non-accredited-college-newport-international-university-forced-to-close, attached hereto as *Exhibit 3*.

Plaintiff's Application for Temporary and Permanent Injunction to Enjoin Michael J. DeLitta - Page 3

...

*- unlawfully advertises in a false, misleading, or deceptive manner, as described by Section 101.201.*

TEX. OCC. CODE §§ 204.302(3), 302(4), and 302(8) ("Conduct Related to Fraud or Misrepresentation").

Section 101.201 of the Texas Occupations Code is also applicable to PAs and provides in pertinent part:

*Sec. 101.201. FALSE, MISLEADING, OR DECEPTIVE ADVERTISING.*

*(a) A person may not use advertising that is false, misleading, deceptive, or not readily subject to verification.*

*(b) False, misleading, or deceptive advertising or advertising not readily subject to verification includes advertising that:*

> *(1) makes a material misrepresentation of fact or omits a fact necessary to make the statement as a whole not materially misleading;*
>
> ...
>
> *(5) causes confusion or misunderstanding as to the credentials, education, or licensing of a health care professional;*
>
> ...
>
> *or*
>
> ...
>
> *(9) represents in the use of a professional name a title or professional identification that is expressly or commonly reserved to or used by another profession or professional.*

These statutes were clearly designed to prevent the type of confusion that DeLitta is causing by calling himself a "doctor" (based on a phony Ph.D. in psychology) while he is engaged in a medical consulting business where he allegedly supervises nurses.

5.      At least three former Axiom employees have sounded warnings about DeLitta's misleading conduct. Ashley Santoro, a registered nurse who was employed by Axiom for over two years, expressed concern about this issue in her resignation letter:

> *"I am also <u>concerned over the fact we also are told to lie to our clients about Dr. Mike Delitta. Although, he has a doctorate degree - it is not in medicine. He is not a medical</u>*

*physician but a Physician's Assistant. I was told to never tell this to our clients and we are always to say "Dr. DeLitta" when speaking about him to keep up the image. Axiom does not want anyone to know he [is] not a medical physician as he solicits himself to our clients as.*

*Exhibit 5,* Santoro resignation letter. Former Axiom employee Andrea Ruffen, who worked closely with DeLitta for seven years, testified by affidavit that she thought DeLitta was a medical doctor during the entire time she was employed at Axiom. *Exhibit 2,* Affidavit of Andrea Ruffen, ¶ 4. Ruffen further testified that:

a. DeLitta uses the title "Doctor" and/or "Dr.", both orally and in writing, including in e-mails and letters to Axiom employees and Axiom customers and that relate to medical advice or medical issues;

b. DeLitta introduces himself as "Doctor Delitta" or "Dr. Delitta", particularly in medical contexts where the only reasonable impression is that he is a medical doctor;

c. DeLitta answers and responds to the title "Doctor" when the circumstances make it obvious that the person addressing him believes that he is a medical doctor, and that DeLitta never corrects or clarifies the misunderstanding;

d. DeLitta provides medical advice to Axiom employees;

e. DeLitta has discussed his experience in "medical school";

f. DeLitta portrays himself as a "doctor" who supervises the nurses that Axiom employs; and

g. that the majority of people that DeLitta interacts with and to whom DeLitta has presented himself as a "doctor" are misled into believing that he is a medical doctor.

*Exhibit 2,* at ¶ 5. Finally, former Axiom employee Shane Enochs, who is also a registered nurse, testified that he witnessed similar conduct from DeLitta. *Exhibit 6,* Affidavit of Shane Enochs.

6.    Having gotten away with this charade for so long, DeLitta is self-delusional. Since 2008, he has been using a vanity license plate for his vehicle that reads "OCC DOC," which refers to being an Occupational Doctor. He is clearly misleading the public by presenting himself as a

medical doctor. He has apparently even taken out credit cards using the account name "Michael J. DeLitta, M.D.":



*Exhibit 7*, DeLitta's Chase Credit card statement.

### C.    *The Fraud Must Be Corrected*

7.    All of this conduct violates the above-referenced subsections of the Texas Occupations Code and criminal statutes, with serious potential consequences to Axiom. The consequences range from revocation of DeLitta's physician's assistant license, to civil penalties, enforcement actions by the Texas Attorney General, and remedies under Chapter 17 of the Texas Deceptive Trade Practices Act. Given DeLitta's role as CEO and co-founder of Axiom, his conduct causes immediate and irreparable damage to Axiom's reputation, not only with its customers and employees but also within the medical industry, and makes it a party to false advertising and complicit in DeLitta's crime. Plaintiff's request to enjoin DeLitta from holding himself out as a medical doctor is absolutely necessary to ensure that Axiom does not continue to violate the Texas statutes enacted to protect the safety and welfare of the public, whose injury is also immediate and irreparable because it cannot be quantified.

***D.   Defendant Must be Removed as President, CEO and Medical Director***

8.      If Defendant is allowed to continue to serve as the Chief Executive Officer, President and Medical Director of Axiom, Axiom will suffer irreparable harm to its reputation and client base. Defendant's fraudulent conduct goes to the very core of Axiom's reputation, competence and standing in the occupational medical field.  Mr. DeLitta therefore should be removed and replaced by a person with bonafide credentials.

## III.    REQUEST FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

9.      Plaintiff hereby incorporates by reference paragraphs 1 through 7 the same as if set forth herein verbatim.

10.    Plaintiff has no adequate remedy at law, or otherwise, for the harm or damage which will occur to the operation of Axiom, unless DeLitta is restrained from continuing to utilize the business to perpetuate a fraud on the public.  Axiom's relationship with its clients will suffer harm that cannot be easily measured in damages.

11.    The issuance of requested relief will return the parties to the status quo prior to Plaintiff's ouster.  Prior to the lawsuit being filed, Plaintiff had counseled Defendant not to use the "Dr." designation.   However, since her ouster, Defendant has obviously disregarded the law and continues to misrepresent himself.

***E.   Irreparable Harm and No Adequate Remedy at Law***

12.    It is essential that DeLitta be restrained and enjoined as prayed for because:

    a.   Such restraint is necessary to maintain the status quo and to protect the rights and interests of Plaintiff in the business and the property of the Axiom Companies;

    b.   Such restraint is necessary to maintain the status quo to prevent any dissipation or diminution of the business and the property of the Axiom Companies; and

    c.   Such restraint is necessary to maintain the status quo to prevent any further irreparable damage to Plaintiff's business relationship with the nursing staff.

d.     Such restraint is necessary to protect the public interest.

13.     All conditions precedent to the filing of Plaintiff's application and the damages herein requested have been performed or have occurred.

## II. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter a Temporary Injunction prohibiting DeLitta from: (1) using the title "Doctor", "Dr.", "M.D." or otherwise misleading people into believing that he is a medical doctor while performing any duties or functions for Axiom; (2) removing any reference to the term "Dr." or "M.D." from Axiom marketing material including its website; (3) advising Axiom employees and staff to refer to him as "Dr."; and (4) prohibiting him from continuing to be listed on Axiom credit cards and bank statements as "Dr."

In addition, Defendant should be removed as President, Chief Executive Officer and Medical Director of Axiom.

Upon final trial, this Court should enter an order permanently enjoining DeLitta a s set forth above.

Respectfully submitted,

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
(512) 473-2257
(512) 478-4409 facsimile

By: _____
      Donald R. Taylor
      State Bar No. 19688800
      dtaylor@taylordunham.com

      Of Counsel Stacey Reese
      State Bar No. 24056188
      stacey@reeselawpractice.com

HOWARD F. CARTER, JR., P.C.
Attorneys & Counselors
Howard F. Carter, Jr.
State Bar No. 03916500
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
Telephone: (972) 455-2001
Facsimile: (972) 455-2015
Email: sam@scarterlawfirm.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served via the Court's electronic system to the following counsel of record on December 12, 2014.

D. Joe Griffin
GRIFFIN & GRIFFIN, PLLC
8505 Technology Forest Drive, Suite 804
The Woodlands, TX 77381

Teresa L. De Ford
DE FORD LAW FIRM, PLLC
4840 W. Panther Creek Drive, Suite 201
The Woodlands, Texas 77381

Douglas R. Drucker
Kirby Hopkins
DRUCKER HOPKINS, LLP
21 Waterway Avenue, Suite 300
The Woodlands, TX 77380

Timothy J. Herman
James Hatchitt
HOWRY, BREEN & HERMAN, LLP
1900 Pearl Street
Austin, Texas 78705

Eric J. Taube
HOHMANN, TAUBE & SUMMERS
100 Congress Avenue, 18th Floor
Austin, Texas 78701

/s/Donald R. Taylor
Donald R. Taylor

## VERIFICATION OF NANCY SCHAEFER

COUNTY OF DALLAS § 
§ 
STATE OF TEXAS §

Before me, the undersigned authority, appeared Nancy Schaefer, who personally appeared before me and upon her oath was deposed and said:

1. My name is Nancy Schaefer. I am competent to make this verification and have personal knowledge of the facts stated herein, which are all true and correct to the best of my knowledge.

2. The factual allegations set forth in Plaintiff's Application for Temporary and Permanent Injunction to Enjoin Michael J. Delitta from Misrepresenting Himself as a Medical Doctor are within my personal knowledge and are true and correct to the best of my knowledge or such facts that are supported by the sworn affidavits of Ashley Santoro, Shane Enochs and Andrea Ruffen attached to this application.

FURTHER AFFIANT SAYETH NOT.

_____
Nancy Schaefer

SUBSCRIBED AND SWORD TO before me on this _____ 12 _____ day of December, 2014.
STAMP:

_____
Notary Public

R RENE MARTIN
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-05-18

Date of Expiration: _1 – 5 –18_

# About Us

Axiom Medical Consulting, LLC is a privately owned company established in 1999 by its CEO Dr. Michael J. DeLitta. Recognizing the need for a "one stop shop", our philosophy has been to provide the utmost care and quality in every medical service we offer.

We believe that caring is the best medicine. This ideal is woven thoughout every aspect of our company. We are not your typical medical services provider, trying to make every client fit into the same structure and business model. Axiom recognizes that even in the same industries, every client is different and can have vastly different needs. Whether you have 10 employees in one location, or 10,000 employees spread all over North America, we work with every one of our clients to meet their indivdual medical needs all while consistently providing the highest quality service and care.

Occupational Medicine has remained virtually the same over the years - which means the services you recieve and those providing it have remained the same along with it. It's impossible to expect great results when all of your choices are the same. You and your employees deserve better.

We're here to change that.

**Transforming Occupational Medicine, *one client at a time.***

**Mission Statement**
Axiom's purpose is to transform Occupational Medicine by providing the highest quality, most cost-effective comprehensive medical management services, maximizing the benefits to all parties involved:
- Clients and their Employees
- Axiom's Professionals



**Medical Consulting, LLC**
Your Specialists in Medical Management
*Caring is the Best Medicine*®

25511 Budde Rd.
Suite 801
The Woodlands, TX 77380
281-419-7063 | fax 281-363-9906
www.axiomllc.com

**EXHIBIT 1**

©Axiom Medical Consulting, LLC
All Rights Reserved

# Axiom Medical Consulting Services:

## 24/7 Nationwide Injury Management:

### Occupational Injury Case Management

### Short-term Disability & FMLA Case Management

### Personal Injury/Illness Case Management

### Medical Case Review

## Medical Programs Management:

### Physical Exam Programs

### OSHA Compliance Exam Programs

### Drug & Alcohol Testing

## Additional Services:

Customized Client-Specific Programs
Consolidated 3rd Party Billing
Can Accommodate over 140 languages
Jones Act/Martime Expertise
On-site Medical Consulting
Educational/Compliance Programs

Transforming Occupational Medicine,
*one client at a time.* www.axiomllc.com 281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Occupational Injury
# Telephonic Case Management

When an employee incident occurs, immediate access to an occupational medical specialist ensures an optimal outcome for both the injured worker and employment organization. Axiom Medical Consulting recognizes an employee's health and safety are cornerstones to the success of your business. As OSHA regulatory and occupational case management experts, our licensed professionals are available 24/7 to assist with any need which may arise.

While others promote case tracking, the benefits of Axiom's immediate intervention approach include:



- Access to a licensed medical professional within minutes following the injury

- Development of an agreed treatment plan

- Telephonic follow up care through treatment and recovery

Of the thousands of cases handled each month, over half of injury occurrences are internally managed with first aid measures, eliminating the need of formal medical attention. This alone saves a tremendous amount of money for clients by way of lower claims frequency and severity, reductions in incident rate, modifiers, costs and productivity.
Through customizable reporting structures, dependent on our clients' individual needs, open communication and timely status updates, we invite you to experience "The Axiom Difference".



To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
Caring is the Best Medicine™

www.axiomllc.com   281-419-7063

Transforming Occupational Medicine,
*one client at a time.*

©Axiom Medical Consulting, LLC
All Rights Reserved.

335

# Telephonic Case Management Process Flow Chart



Incident Occurs

EMERGENCY?

YES

CALL 911 FIRST

NO

Non-Emergency

Call to Axiom (281) 419-7063, 24/7 Nurse Case Manager (NCM) Assigned - NCM begins Telephonic Assessment. Provides guidance and recommendations

First Aid Treatment

Clinic/ER Treatment

NCM provides first aid recommendations and over the counter (OTC) medications

NCM directs to appropriate and preferred Clinic or ER, Communicates with treating physician / medical staff and Employee (EE)

NCM initial email report within 3hrs after recommendations or treatment completed. NCM follow up communication to EE via phone and email reports to designated individuals after any status change. Case closure when appropriate

## Don't wait to report! Time is of the Essence!

## Call 24/7 for all injuries- **281-419-7063**

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved 336

# Personal, Short Term Disability (STD), Family and Medical Leave Act (FMLA) Telephonic Case Management

While other companies may offer work related case management, Axiom believes you deserve more. As your full service comprehensive medical management provider, we are cognizant of and attentive to the productivity and profitability implications of employee absences.

As our specially trained nurse case managers champion the recovery and return to productive employment, our clients take comfort in knowing Axiom is by their side, every step of the way:

- Ensure adequate evaluation of the employee's disability.

- Proactively and aggressively coordinate, monitor, and manage all aspects of the employee's treatment plan by verifying the effective delivery of recommended modalities and interventions.

- Assist with development of modified duties, alternative work and other programs which minimize short-term indemnity costs and productivity loss.

- Continuously review each case to determine our client's compliance with the Americans' With Disabilities Act (ADA) and Family and Medical Leave Act (FMLA).

Here are just a few of the benefits of utilizing this valuable service:

- Lower medical claims costs.
- Minimize productivity loss.
- Lower short-term disability costs.
- Provide a quick and safe return to work.

To learn more, please contact our Business Development Department:

**Anthony Eaton, Business Development Manager**
(281) 465-7505 . anthony.eaton@axiomllc.com

**Patrick Anderson, Account Executive**
(281) 465-7178 . patrick.anderson@axiomllc.com

**Tom Amato, Business Development Specialist**
(281) 419-7063 . tom.amato@axiomllc.com





**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine™*

www.axiomllc.com   281-419-7063

Transforming Occupational Medicine,
*one client at a time.*

©Axiom Medical Consulting, LLC
All Rights Reserved. 337

# Medical Programs Management

Quality and Consistency – two critical aspects of service that are important on their own, but when combined provide the ultimate in compliance and services levels for our clients. Axiom is able to implement and manage any type of medical exam and drug & alcohol programs you need for your employees. By utilizing this valuable service, here are a few of the benefits you will receive:

- Dedicated Project Managers, Medical Directors and support staff

- Customized protocols, authorization forms and notifications

- Consistent and accurate exam clearances

- National network of medical facilities

- Consolidated Billing of 3rd Party Invoices

Of the thousands of exams facilitated at local clinics each year, over 25% have inappropriate clearances - such as issuing of DOT medical certificates when the applicant did not meet the DOT standards, or employees who were unable to perform the essential functions of the job. This is a major problem which not only increases your risk, but also leads to increasing work related injuries and workers comp claims.

From a baseline pre-employment exam to annual OSHA and DOT compliance exams, let us take the guess work out of the equation for you. Our Project Managers will diligently manage those local clinics on your behalf, ensuring the work is done right the first time. By having Axiom manage your medical programs you can rest assured that your employees will always be healthy and fit to work.



To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



**Medical Consulting, LLC**
Your Specialists in Medical Management
*Caring is the Best Medicine™*

Transforming Occupational Medicine,
*one client at a time.*

©Axiom Medical Consulting, LLC
All Rights Reserved

# Medical Programs Management Process

## Notifications

Depending on the type of program, Axiom will be notifed in two ways:
- Pre-Employment / Pre-Placement - client notifies Axiom of the need for exam
- Ongoing Compliance - Axiom will notify client when employees are due for exam

## Clinic Setup / Scheduling

Much of our Project Manager's time and effort is spent managing the local medical facilities for our clients. During initial set up, Axiom works individually with each client to determine the bext local medical facilities capable of performing the required exams, and supplies all specific exam protocols and authorization forms to each facility. Once notifed of the need for an exam, Axiom will provide all appropriate for contact info for the employee to schedule their exams.

## Results Aquisition

Our Project Managers diligently work with the medical facility to aquire complete an accurate results. Should there be incomplete results, or issues with the exams you can rest assured that the Project Manager catches these errors and takes appropriate actions immediately.

## Axiom Review

Axiom's Project Managers first enter all reults in our systems, while simultaneously reviewing for completion and accuracy. Our Medical Directors then review all exam results and formulate their opinions based upon the exam results, job descriptions, regulatory information and any pertinent information from the client.

## Clearance / Communication of Results

After review, our Medical Directors draft Physicians Written Opinion letters (PWOs) that state the findings of the exam - pass, pass with restrictions or medical hold. A copy goes to the designated company representative, and a copy goes to the employee that also lists any personal medical information. This personal information may not hinder their job, but includes our advice on seeking appropiate follow up with their personal physician.

## Data Tracking / Compliance

When entering exam results into our systems, our Project Managers mark when the employee is due again for any recertification exam (DOT, annual Audiogram, etc). Extensive reporting and statistics can also be generated for our clients' review.

## Invoice Management

Managing the local medical facilities and paying their invoices on our clients' behalf is an often overlooked benefit. Every clinic is different, works in different ways and charges different amounts too. Axiom helps you stay compliant with consistent results, nationwide.

Transforming Occupational Medicine,
*one client at a time.*    www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved 339

# Hearing Conservation Program

The work your company does is not easy, nor is it quiet. Exposure to high levels of noise in the workplace can cause hearing loss, sometimes permanently. OSHA requires a Hearing Conservation Program for those employees subjected to noise at a time weighted average of 85dBA over an 8 hour shift. This means your employees need to wear proper hearing protection, and receive annual hearing tests called Audiograms to detect any shifts in their hearing. Axiom can implement and manage this program providing:

- A Project Manager that tracks your employee population, and sends designated company represenatives notifications when an employee's annual Audiogram is due.

- Set up and coordination of testing at a pre-determined local medical facility

- Medical Director review and clearances

- Immediate response and action to any Standard Threshold Shift (STS) in the hearing indicating potential issues

- Management of the local medical facilities, including invoicing



Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

Anthony Eaton, Business Development Manager
(281) 465-7505 . anthony.eaton@axiomllc.com

Patrick Anderson, Account Executive
(281) 465-7178 . patrick.anderson@axiomllc.com

Tom Amato, Business Development Specialist
(281) 419-7063 . tom.amato@axiomllc.com



## Axiom
### Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine™*

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Respiratory Fit & Protection Program



Air – you can't see it, or really taste it, but it surrounds us and is vital to our survival. Sometimes your employees work in environments where the air has been compromised by dust, smoke, fumes, vapors, or in places where chemicals required for work are harmful to breathe. OSHA regulations require you to protect your employees by placing them into a Respiratory Protection Program - ensuring annual questionnaires are performed, and providing proper and well fitting respirators that help them breathe clean air and continue to work. Axiom can help by managing this program offering a Project Manager that provides:

- **Coordination of respirator mask fit-testing at a pre-determined local medical facilities**

- **Customized program protocols including Pulmonary Function Tests (PFTs)**

- **Sends designated company represenatives notifications when an employee's annual Questionnaire is due, and provides electronic and / or hard copy of the form and helps coordinate PFT if required**

- **Medical Director review and clearances of Questionnaires and exams**

- **Immediate response and action to any potential issues**

- **Management of the local medical facilities, including invoicing**

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

**Anthony Eaton, Business Development Manager**
(281) 465-7505 . anthony.eaton@axiomllc.com

**Patrick Anderson, Account Executive**
(281) 465-7178 . patrick.anderson@axiomllc.com

**Tom Amato, Business Development Specialist**
(281) 419-7063 . tom.amato@axiomllc.com

Transforming Occupational Medicine,
*one client at a time.*



Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine™*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Physical Exam Programs



Taking care of your employee population can be a challenging puzzle to solve. No one likes to get sick. We work for a reason, and when health issues prevent us from working, no one wins. It's a fact - a healthy employee whose physical abilities are matched to their job is safer, more productive and overall less of a risk to their company. Arranging physical exams for your employee population is an important and often overlooked piece of the puzzle. Axiom not only will facilitate that medical piece, but can help you solve the puzzle in many different ways:

- **DOT Physical Exams,** cleared by Axiom Medical Directors on the National Panel of DOT Certified Physicians
- **Pre-Employment / Pre-Placement Exams** based on your specifc protocols
- **Functional Capacity Exams / Fit-for-Duty ,** based on job descriptions, essential job functions and physical demand analysis
- **HAZWOPER (HAZardous Waste OPerator Emergency Response) Exams**
- **Customized Exam Programs,** tailored to suit individual and specific needs



All Exam Programs are managed by our Project Managers, who oversee the entire process from local clinic set up, tracking results, notifications, medical clearances, and invoicing. They are your expert you can rely on to help provide solutions and keep your employees healthy and on the job.

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

**To learn more, please contact our Business Development Department:**

**Anthony Eaton, Business Development Manager**
(281) 465-7505 . anthony.eaton@axiomllc.com

**Patrick Anderson, Account Executive**
(281) 465-7178 . patrick.anderson@axiomllc.com

**Tom Amato, Business Development Specialist**
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
Medical Consulting, LLC
Your Specialists in Medical Management
*Caring is the Best Medicine™*

Transforming Occupational Medicine,
*one client at a time.*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

# Drug & Alcohol Testing

As an employer, you not only care about your employees' health, you also do everything in your power to help limit risk and ensure the work you do meets all regulations, including anything related to Drug & Alcohol testing. Understanding and implementing a Drug & Alcohol program can be a challenging road to navigate. There are many twists and turns, and you need a partner to help you determine the best route to take. Axiom is an expert in Drug & Alcohol testing- a proven and valuable co-pliot providing to our clients:

- **Pre-Employment testing**
- **DOT and Non-DOT Random testing**
- **Post Incident, Reasonable Suspicion**
- **Policy Administration including written plans and supervisor training**

As with all Medical Program Management services, you'd also recieve the following benefits:

- **Project Managers and Medical Directors to help track, oversee, provide clearance and expert advice and manage the entire process**
- **Compliance to DOT regulations, and set up and implementation of a Company specific Non-DOT program**
- **All necessary forms including Chain of Custody/Control**
- **Nationwide network of collection facilities including mobile collectors**
- **Consolidated billing of 3rd party collection fees**

Your employees' health and well being is important to you, as is the job at hand. How do you balance ensuring the work gets done, with keeping your employees safe, healthy, and risk free? It's a difficult task to try to accomplish alone. Axiom can help.

To learn more, please contact our Business Development Department:

**Anthony Eaton, Business Development Manager**
(281) 465-7505 . anthony.eaton@axiomllc.com

**Patrick Anderson, Account Executive**
(281) 465-7178 . patrick.anderson@axiomllc.com

**Tom Amato, Business Development Specialist**
(281) 419-7063 . tom.amato@axiomllc.com



**Axiom**
**Medical Consulting, LLC**
Your Specialists in Medical Management
*Caring is the Best Medicine™*

www.axiomllc.com   281-419-7063

©Axiom Medical Consulting, LLC
All Rights Reserved

343

CAUSE NO. GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| DELCOM PROPERTIES, LLC, | § | |
| | § | |
| Defendants. | § | 201st JUDICIAL DISTRICT |
| | § | |
| | § | |
| MICHAEL J. DELITTA, NANCY | § | |
| SCHAEFER | § | |
| | § | |
| | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| DANIELLE M. SEGER, AS TRUSTEE | § | |
| OF THE MICHAEL J. DELITTA AND | § | |
| PAMELA L. DELITTA FAMILY | § | |
| IRREVOCABLE TRUST | § | |
| | § | |
| Third-Party Defendant | § | |

**AFFIDAVIT OF ANDREA RUFFEN**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF MONTGOMERY | § |

Before me, the undersigned notary, on this day personally appeared ANDREA RUFFEN, the Affiant, a person whose identity is known to me. After I administered an oath to Affiant, Affiant testified:

1. "My name is Andrea Ruffen. I am over 18 years of age, of sound mind, and capable of making this Affidavit. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

**EXHIBIT 2**

PAGE 1 OF 3          344

2.      I was an employee of Axiom Medical Consulting, LLC ("Axiom") for approximately seven years.

3.      During the time that I was employed by Axiom, I worked closely with Michael J. Delitta ("Delitta") and interacted with him on an almost daily basis.

4.      Throughout my entire period of employment with Axiom, it was my belief and understanding that Delitta was a medical doctor. This belief was based on Delitta's words and conduct that I observed.

5.      Some of Delitta's words and conduct that caused me to believe that he was a medical doctor included:

    a.  His use of the title "Doctor" and/or "Dr.", both orally and in writing, including in e-mails and letters he sent to Axiom employees and Axiom customers and that related to medical advice or medical issues;
    b.  His introducing himself as "Doctor Delitta" or "Dr. Delitta", particularly in medical contexts where the only reasonable impression was that he was a medical doctor;
    c.  Witnessing him answer to and respond to the title "Doctor" when the circumstances made it obvious that the person addressing him believed that he was a medical doctor, and never witnessing him correct or clarify the misunderstanding;
    d.  His providing medical advice to myself and other Axiom employees;
    e.  His discussing his experience in "medical school" in conversation with me;
    f.  His portrayal of himself as a "doctor" who supervises the nurses that Axiom employs.

closely with Delitta and had the opportunity to observe his interactions with hundreds of other people, including non-Axiom parties and Axiom customers. Based on my observations, I believe that the majority of people that Delitta interacts with and to whom Delitta has presented himself as a "doctor" are misled into believing that he is a medical doctor. The potential for confusion is particularly high because Axiom is in the medical consulting industry, employs nurses, and provides medical advice to its customers.

7.      Further, Affiant sayeth not."

Andrea Ruffen
_____
Andrea Ruffen

346

On this _10th_ day of December, in the year 2014, before me _Alyssa M. Nicotra_, a notary public, personally appeared, ANDREA RUFFEN, proved on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged she executed the same. Witness my hand and official seal.

_____
NOTARY PUBLIC

SEAL

ALYSSA M NICOTRA
My Commission Expires
September 20, 2018

State of
"I can do this."    Online Professional MBA  [Learn More]
Colorado State University
COLLEGE OF BUSINESS

SITE SEARCH

Home | Online Education Articles | About Us | Contact Us | Sign In

**Online Degrees    Compare Degrees    Online College Rankings    Review Online University**

Online Education Jobs    Expert Advice    Financial Aid    Diploma Mill Police    Careers    Forums    Video    Blog

Breaking News

Los Angeles Times    Get Educated helps LATimes Consumer Reporter David Lazarus in "Getting an Education Learning Over the Internet" -- Nov. 10, 2010



Articles    ARTICLES HOME



UMassOnline
University of Massachusetts
Earn your degree from a trusted university, completely online.
umassonline.net
Sponsor

# Non Accredited College - Newport International University - Forced to Close

Diploma Mill Police > Fake Diploma News




School of Business
D'Amore-McKim
Northeastern University

Sponsor

Newport International University, a non accredited college headquartered in Laramie, Wyoming, has ceased operation in that state. This closure follows the failure of Newport to win a lawsuit against the state of Wyoming related to distance learning accreditation and the regulation of degree mills in Wyoming.

In 2006, in an effort to crack down on the number of unaccredited online schools and degree mills that had set up shop in Wyoming, the Wyoming legislature passed a law requiring all private colleges to seek and hold accreditation from a recognized agency or close. Institutions were given five years to gain accreditation from a recognized agency or leave Wyoming.

Newport immediately sued the state of Wyoming claiming the law violated its right to operate by delegating oversight to private accreditors. The Wyoming court decided this spring to unilaterally uphold the state's right to require accreditation for online colleges.

While Newport International University has been closed in Wyoming, it has advised applicants that it will continue operation through Newport University of California. Newport University of Newport Beach, California, is a non accredited college.

Warren National University (once known as Kennedy National University) ceased operation in Wyoming earlier this year after failing to gain regional accreditation. That online school has appealed the Department of Education's ruling that it must close.

State Superintendent of Public Instruction Jim McBride told the Associated Press that the education department approved of the state's progress to date in closing unaccredited online schools. "The Department of Education and the Wyoming legislature have worked towards this goal for the past three years," McBride said. "We will continue these efforts until all private degree-granting institutions are accredited."

### Diploma Mill News:

List of Fake College Degree Accreditation Agencies
Hamilton University Online Cited as Degree Mill in New York Counselor Fraud Case
Diploma Mill or Real Online Degree? 10 Ways to Spot the Fake
Buy a Degree Online: Global Scam Exposed
What is a Diploma or Degree Mill?
Diploma Mill Police (SM)

## Breaking News sidebar

10 Ways to Spot Fake Online Colleges

How to tell between a diploma mill and a real online school

Online Degree Rankings

Get Educated
BEST ONLINE COLLEGES

Best Online Colleges

Online college rankings reveal the best consumer choices for affordability.

Get Educated
BEST STUDENT HAPPINESS

Online College Reviews

## Find a Degree sidebar

Find a Degree

Search our directory of over 3000 accredited online degrees!




By Subject    By Degree Level    By School

Search our Articles:

[            ]
[Search]

Most Popular Articles

How to Find Online Teaching Job Openings: 7 Best Sites for Online Adjunct Faculty Positions

Who Offers the Cheapest Online MBA?

© 2010 GetEducated.com, Get Educated, Inc.

Write a review of your online degree and see which online colleges have the best reviews and happiest online students.



Online University Reviews

Have you heard good - or bad - things about an online college? Share which online universities you feel are the best in a reputation review.



List of Fake College Degree Accreditation Agencies

Guide to Finding Work as an Online College Instructor

Are There Good Online MBA Programs That Require NO GMAT or GRE?

Washington University Enters Top Online Law Degree Market

Computer Information Systems vs Computer Science

5 Ways to Earn College Credit for Career and Life Experience

Do Real Accredited Universities Offer Life Experience Degrees?

Diploma Mill or Real Online Degree? 10 Ways to Spot the Fake

Online Education



Sponsor



Sponsor

Newsletter

Sign-up to receive our free weekly newsletter!



Online Education Jobs and Teaching Online Courses

Positions Available

Teachers Available

Guide to Teaching Online Courses

Home | Online Education Articles | Media Coverage | About Us | News Releases | Privacy | Terms of Use | Team Bios | History and Mission | Newsletter | Contact | Advertising

http://www.geteducated.com/fake-diplomas/250-non-accredited-college-newport-international-university-forced-to-close    348 2/2

**Texas Higher Education Coordinating Board**



Home / Academic Quality and Workforce Division / Higher Education Institutions / Degree-Granting Colleges and Institutions Other Than Texas Public Institutions / Consumer Protection / Institutions Whose Degrees are Illegal to Use in Texas

## Institutions Whose Degrees are Illegal to Use in Texas

Consonant with its responsibilities under Chapter 61 of the Texas Education Code and rules promulgated pursuant thereto, the Texas Higher Education Coordinating Board annually reviews the institutions included on this list.

"Fraudulent or substandard degree" means a degree conferred in Texas in violation of the Texas Education Code; conferred in another state in violation of that state's laws; conferred in another state by an institution that was not accredited by an accreditor recognized by the Coordinating Board and that has not been approved by the Coordinating Board for its degrees to be used in Texas; or conferred outside the United States by an institution that the Coordinating Board determines is not the equivalent of an accredited or authorized degree. (Texas Educational Code, Chapter 61, Section 61.302)

The Texas Penal Code (Section 32.52) prohibits the use of fraudulent or substandard degrees "in a written or oral advertisement or other promotion of a business; or with the intent to: obtain employment; obtain a license or certificate to practice a trade, profession, or occupation; obtain a promotion, a compensation or other benefit, or an increase in compensation or other benefit, in employment or in the practice of a trade, profession, or occupation; obtain admission to an educational program in this state; or gain a position in government with authority over another person, regardless of whether the actor receives compensation for the position." Violation of this law is a Class B misdemeanor.

| Institution | Location | Remarks |
|---|---|---|
| Abba Institute | Uvalde, San Antonio, Texas | No degree-granting authority from the CB & no accreditation from a CB recognized accreditor. In 1998, awarded Doctor of naturopathy degrees. |
| Académie Européene d'Informatisation World Information Distributed University | Belgium | The Belgian government has referred to the entity as a diploma mill and has confirmed that this entity has no authority to issue degrees. It appears to be linked with a similar entity in Russia. |
| Academy for Contemporary Research | | No accreditation from a CB recognized accreditor. |
| Academy of Healing Arts | | No accreditation from a CB recognized accreditor. |
| Academy of Natural Therapies | Hawaii; California; Wyoming; Montana | No accreditation from a CB recognized accreditor. Closed by court order in Hawaii on 3/19/2003. Relocated to CA, then to either WY or MT. |
| Academy of Religious & Spiritual Studies | | No accreditation from a CB recognized accreditor. |
| Adam Smith University | Liberia; Saipan | No degree-granting authority from Liberia or Saipan. |
| Adams and Washington University, King College of Professional Studies | England | No degree-granting authority from the United Kingdom. |
| Addison State University | Ontario | No degree-granting authority from Ontario. Not a state-supported university as |

**EXHIBIT 4**

|  |  | legitimate Midwestern University in Illinois or Midwestern Baptist Theological Seminary in Missouri. |
|---|---|---|
| Miranda International University | Tennessee, Washington, Seborga (Italy) | Fictitious name used by the St. Regis University scam. See St. Regis University. |
| Monterrey Institute of Graduate Studies | San Antonio, Texas | See Degree.com. |
| Monticello University | Kansas; Hawaii | No accreditation from a CB recognized accreditor. Closed in HI by court order. |
| Myers College Online |  | No accreditation from a CB recognized accreditor. Claims to be located in the United States, but its website lists no location. Claims accreditation with the unrecognized International Distance Learning Accrediting Association and the unrecognized The Regional Education Accreditation Commission. Not to be confused with the legitimate Myers University, Cleveland OH. |
| Nation State University |  | Fictitious name used by the St. Regis University scam. See St. Regis University. |
| Nation University | Hawaii | No accreditation from a CB recognized accreditor. Closed by court order. |
| National Christian University | San Antonio, Dallas, Arlington, Garland, Texas | No degree-granting authority from the CB & no accreditation from a CB recognized accreditor. Assessed administrative penalties for violation of TX law. |
| National University of America | Hawaii | No accreditation from a CB recognized accreditor. Closed by HI court on 1/3/2004. |
| New Manhattan University |  | Fictitious name used by the St. Regis University scam. See St. Regis University. |
| Newport Asia Pacific University |  | Renamed Lambert University. See Lambert University. |
| Newport University | Hawaii; Lebanon | No accreditation from a CB recognized accreditor. |
| Newton University | British Columbia; Hawaii | No accreditation from a CB recognized accreditor. Closed by court order. |
| Nobel University | South Korea | No degree-granting authority from South Korea. |
| North United University |  | Fictitious name used by the St. Regis University scam. See St. Regis University. |
| Northern Port University |  | No degree-granting authority from a CB recognized accreditor. |
| Northwestern International | Cyprus; Denmark | No degree-granting authority |

June 21, 2014

This is my resignation letter effective immediately.

I decline to work for a company who is so dishonest to not only its own employees but to the companies it solicits itself to. I have never worked for a company who was so fearful of the nurses it hires speaking with the boards of nursing they are asked to work in if their job duties are consider legal or illegal in nature; even when not stating with whom they work for. As a registered nurse the nurse not only has the right but an obligation and responsibility to make sure she/he is working legally in the state they are asked to practice in by Axiom as a nurse. I have also never worked for a company who is so fearful of anyone knowing what the company policies are in regards to the nurses job duties, expectations, and internal workings in regards to the nurses job. Especially, when the nurse is only trying to see if what she/he is doing is legal in regards to their nursing license.

Axiom solicits itself to companies in states where no nurses are licensed in and accepts client case management in these states by falsely representing Axiom as having nurses licensed in these states. Axiom also instructs the nurse case managers to not reveal to this to their clients, even when the nurse gets a case in a state they are not licensed in and are not legally suppose to be practicing in. Axiom also is forcing, coercing, bullying, and intimidating the nurses into taking these cases by threatening their employment with Axiom by declining to accept cases in states they knowing are not licensed in. The Team Leaders and Supervisors assigning these cases to nurses not licensed in these states also have vicarious liability in assigning these cases by knowing first hand all nurses state licensure status prior to assigning these cases and also support the bullying, threatening, and intimidating behavior by enforcing this on the nurses they supervise.

I have requested a copy of the written legal opinion which we were told was done by Jon Neff, Axiom's Attorney, along with other nurses in regards to the findings of the nurses concerns with taking cases in states in which we are not legally licensed in. I have requested this from Pam Tilly, Director of Nursing, Dara Sievers, Vice-President, Emily Lopez, Compliance Officer, and Nicole Beck, Human Resource, - all who have declined to submit this opinion which I was told was done, but no one is allowed to see it. I was also declined the request to see the current policy which I was assured Axiom had one in place by Dara Sievers, Vice-President, and Nicole Beck, Human Resource, which I felt I could work off of until the new policy came into place. The only thing the nurses have been allowed to see is a new guideline by Axiom in case assignments with no true opinion and a question and answer sheet which had no attorney name attached to it.

In our team meeting this week Emily Lopez, Compliance Officer, Pam Tilly, Director of Nursing, and Mike DeLitta, President, stated Jim Puente, National Council of State Board of Nursing, assisted Axiom's attorneys in the new guidelines. Mike, Emily, and Pam also personally stated and assured the nurses in our meeting that it was okay for the nurses to take cases and act as a practicing nurse in those states in which she/he is not licensed in and was also legally okay. Emily also stated the nurse would be in more legal trouble for refusing a case in which someone could be really hurt in and used the Good Samaritan example and that Jim Puente himself discussed this with her and approved. Emily also told our team members to call him - which I did and he corrected me on this. He not only stated Axiom misrepresented his name, title, and position but also assured he did not assist with Axiom's new guidelines and did not approve that nurses can practice in states they are not legally licensed in. When Axiom's attorney called Jim Puente they declined to release the client name they were representing but wanted to discuss only disciplinary actions. Axiom's attorneys only discussed with Jim Puente if there

00003098

**EXHIBIT 5**

was documentation of nurses being punished for practicing in states in which they were not licensed in. As he told your attorneys (and how convenient for Axiom) that documentation (if any) will not be easily found due the nurses do not go to a court of law but have to stand before the individual nursing board of the state they have violated or their home state nursing board whom disciplines them and strips them of their license. The information would have to come for each individual state's nursing board.

I am also concerned over the fact we also are told to lie to our clients about Dr. Mike DeLitta. Although, he has a doctorate degree - it is not in medicine. He is not a medical physician but a Physician's Assistant. I was told to never tell this to our clients and we are always to say "Dr. DeLitta" when speaking about him to keep up the image. Axiom does not want anyone to know he not a medical physician as he solicits himself to our clients as. Given Mr. Mike DeLitta and Amy Hamilton, Physician Assistant, are not licensed in all these states we are asked to practice in I wonder about the legal liability of both of them also. And, who is the actual acting physician for our company who is signing off and overseeing every Axiom chart/file? Is he/she license in all these states? I seriously doubt it.

For a company who had a survey done at the end of last year which showed the employees felt there was lack of communication, dishonesty, and they did not trust the company I would say I can truly see why. I also feel since Nancy Schaffer's absence this company has taken a very sharp spiral downward and it saddens me I worked so hard for a company who has no disregard for the nurses licenses and livelihood.

I will return your computer, printer, manual, and equipment within the next few days and I obviously do not need an exit interview.

I also request this resignation letter go into my personal and human resource file at Axiom. I also request a copy of this letter go into the following individuals personal and human resource file at Axiom: Mike Delitta, President, Nancy Schaffer, Co-Owner, Dara Sievers, Vice-President, Pam Tilly, Director of Nursing, Nicole Beck, Human Resource, Emily Lopez, Compliance Officer, Shelly Dace, Team Leader, Lisa Hall, Supervisor, and Jen Brady, Supervisor.

Please do not contact me further.

Sincerely,

Ashley Santoro

CAUSE NO. GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| DELCOM PROPERTIES, LLC, | § | |
| | § | |
| Defendants. | § | 201ˢᵗ JUDICIAL DISTRICT |
| | § | |
| | § | |
| MICHAEL J. DELITTA, NANCY | § | |
| SCHAEFER | § | |
| | § | |
| | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| DANIELLE M. SEGER, AS TRUSTEE | § | |
| OF THE MICHAEL J. DELITTA AND | § | |
| PAMELA L. DELITTA FAMILY | § | |
| IRREVOCABLE TRUST | § | |
| | § | |
| Third-Party Defendant | § | |

## AFFIDAVIT OF SHANE ENOCHS

| | |
|---|---|
| STATE OF OKLAHOMA | § |
| | § |
| COUNTY OF CUSTER | § |

I, Christopher Shane Enochs, after having been duly sworn and a citizen of the United States and a Resident of the State of Oklahoma, testify as follows:

1.    The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.    I was an employee of Axiom Medical Consulting, LLC ("Axiom") for approximately 4 years.

**EXHIBIT 6**    353

3. During the time that I was employed by Axiom, I worked closely with Michael J. Delitta ("Delitta") and interacted with him on a regular basis.

4. Throughout approximately the first year of my employment with Axiom, it was my belief and understanding that Delitta was a medical doctor. This belief was based on Delitta's words and conduct that I observed.

5. Some of Delitta's words and conduct that caused me to believe that he was a medical doctor included:

   a. His use of the title "Doctor" and/or "Dr.", both orally and in writing, including in e-mails and letters he sent to Axiom employees and Axiom customers and that related to medical advice or medical issues;

   b. His introducing himself as "Doctor Delitta" or "Dr. Delitta", particularly in medical contexts where the only reasonable impression was that he was a medical doctor;

   c. Witnessing him answer to and respond to the title "Doctor" when the circumstances made it obvious that the person addressing him believed that he was a medical doctor, and never witnessing him correct or clarify the misunderstanding;

   d. His providing medical advice to myself and other Axiom employees;

   e. His portrayal of himself as a "doctor" and the "Medical Director" who supervises the nurses that Axiom employs.

6. During the approximately four years that I was employed by Axiom, I worked with Delitta and had the opportunity to observe his interactions with numerous other people, including non-Axiom parties and Axiom customers. Based on my observations, I believe that the majority of people that Delitta interacts with and to whom Delitta has presented himself as a "doctor" are misled into believing that he is a medical doctor. The potential for confusion is particularly high because Axiom is in the medical consulting industry, employs nurses, and provides medical advice to its customers.

7. I also observed Dara Wheeler, Vice President, provide instructions to other Axiom staff that Delitta should be addressed as "Dr. Delitta".

8. Further, Affiant sayeth not."

Christopher Shane Enochs

354

STATE OF OKLAHOMA                    §
                                     §
COUNTY OF CUSTER                     §

Before me, the undersigned, in and for said county and state, on this ____ day of December 11th, 20 14, personally appeared Christopher Shane Enochs, to me known to be the identical person who executed the within and foregoing Affidavit, and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

_____
Notary Public

My Commission Expires:

10-4-15

 **CHASE** REDACTED ACCT INFO430000000000b

P.O. BOX 15123
WILMINGTON, DE
19850-5123

AUTOPAY IS ON
See Your Account
Messages below
for details.

| Payment Due Date: | 07/10/14 |
| New Balance: | $643.00 |
| Minimum Payment: | $25.00 |

Account number REDACTED ACCT INFO

$_____._____ Amount Enclosed

AUTOPAY IS ON

88691 BEX 9 16414 C

MICHAEL J DELITTA MD
25511 BUDDE RD STE 801
SPRING TX 77380-2081

CARDMEMBER SERVICE
PO BOX 94014
PALATINE IL 60094-4014

## REDACTED ACCT INFO

 MileagePlus UNITED

 Manage your account online:
www.chase.com/united

 Customer Service:
1-888-795-0576

 Mobile: Visit chase.com
on your mobile browser

### ACCOUNT SUMMARY

Account Number: REDACTED ACCT INFO

| | |
|---|---|
| Previous Balance | $150.00 |
| Payment, Credits | -$150.00 |
| Purchases | +$643.00 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| New Balance | $643.00 |
| Opening/Closing Date | 05/14/14 - 06/13/14 |
| Credit Limit | $25,000 |
| Available Credit | $24,357 |
| Cash Access Line | $5,000 |
| Available for Cash | $5,000 |
| Past Due Amount | $0.00 |
| Balance over the Credit Limit | $0.00 |

### PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $643.00 |
| Payment Due Date | 07/10/14 |
| Minimum Payment Due | $25.00 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APR's will be subject to increase to a maximum Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 3 years | $761 |

If you would like information about credit counseling services, call 1-866-797-2885.

### YOUR ACCOUNT MESSAGES

Your next AutoPayment for $643.00 will be deducted from your account and credited on your due date (previous day if your due date falls on a Saturday or Holiday). If you make a payment prior to your due date, that amount will be deducted from the AutoPayment amount identified above.

### UNITED MILEAGEPLUS AWARD MILES SUMMARY

| | |
|---|---|
| + Miles earned on all purchases | 643 |
| + Additional miles earned on United purchases | 37 |
| + Additional miles earned on hotel purchases | 0 |
| + Additional miles at car rental agencies | 0 |
| Total miles transferred to United | 680 |

Log onto united.com for more information about your MileagePlus account and program benefits or to book travel.

Thank you for using your United MileagePlus Presidential Plus Card. Use your card for all purchases to earn MileagePlus Award Miles that can be redeemed for travel on United Airlines. You'll earn 1 mile per $1 spent on all purchases, and an additional mile on purchases made directly with United. You'll also earn an additional mile on hotel accomodations - when purchased directly with the hotel, and on purchases at car rental agencies.

### ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| **PAYMENTS AND OTHER CREDITS** | | |
| 06/10 | AUTOMATIC PAYMENT - THANK YOU | -150.00 |
| **PURCHASES** | | |
| 05/29 | REDACTED ACCT INFO | 586.00 |
| 06/02 | REDACTED ACCT INFO | 20.00 |
| 06/05 | REDACTED ACCT INFO | 37.00 |
| | 060614 1 ED      IAH      MCO | |

**EXHIBIT 7** <span style="color:blue">356</span>

## Address Change Request

Please provide information below only if the address information on front is incorrect.

Street Address: _____

City: _____

State: \_\_\_\_   Zip: _____  \_\_\_\_\_

*Home Phone: \_\_\_ \_\_\_\_ \_\_\_\_    *Work Phone: \_\_\_\_ \_\_\_\_ \_\_\_\_

E-mail Address: _____

> *When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us and companies working on our behalf to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. Message and data rates may apply. You may contact us anytime to change these preferences.

---

## To contact us regarding your account:



**By Telephone:**
In U.S. 1-888-795-0576
Español 1-888-446-3308
TTY 1-800-955-8060
Pay by phone 1-800-436-7958
Outside U.S. call collect
1-614-248-2161



**Send Inquiries to:**
P.O. Box 15298
Wilmington, DE 19850-5298



**Mail Payments to:**
P.O. Box 84014
Palatine, IL 60094-4014



**Visit Our Website:**
www.chase.com/united

---

### Information About Your Account



**Crediting of Payments:** You may make payments by any of the options listed below. The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution. You can pay down balances faster by paying more than the minimum payment or the total unpaid balance on your account.

You may make payments by regular U.S. mail. Send your payment to the Payments address shown on this statement. Your payments by mail must comply with the instructions on this statement. Do not send cash. Write your Account number on your check or money order. Payments must be accompanied by the payment coupon in the envelope provided with our address visible through the envelope window; the envelope cannot contain more than one payment or coupon; and there can be no staples, paper clips, tape or correspondence included with your payment. If your payment is in accordance with our payment instructions and is made available to us on any day by 5:00 p.m. local time at our Payments address on this statement, we will credit the payment to your Account as of that day. If your payment is in accordance with our payment instructions, but is made available to us after 5:00 p.m. local time at the Payments address on this statement, we will credit it to your Account as of the next calendar day.

You may make payments electronically through our website shown on this statement. If we receive your completed request on our website by 8 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 8 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

For all other payments or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

**Account Information Reported to Credit Bureaus:** We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, you may write to us at the Inquiries address shown on this statement.

**Notice About Electronic Check Conversion:** When you pay by check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. Call the Customer Service number on this statement if you have questions about electronic check collection or do not want your payments collected electronically.

**Conditional Payments:** Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15049, Wilmington, DE 19850-5049. We reserve all our rights regarding these payments (e.g., if it is determined there is no valid dispute or if any such check is received at any other address, we may accept the check and you will still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

**Annual Renewal Notice:** If your Account Agreement has an annual membership fee and/or similar charge for issuance or availability of your account, it will be billed each year or in monthly or quarterly installments. This fee and/or charge are owed whether or not you use your Account, and you agree to pay them when billed. The annual fee and charge are non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual fee or charge is billed and at the same time, you pay your outstanding balance in full. If you do this, for a charge billed more often than annually such as a monthly service charge, you will not owe the last billed charge; however, prior billed charges are non-refundable and must be paid as part of paying your outstanding balance in full. Your payment of the annual fee or charge does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, we will continue to impose the annual fee and/or charge until you pay your outstanding balance in full and terminate your Account relationship.

**Calculation of Balance Subject to Interest Rate:** To figure your periodic interest charges for each billing cycle when a daily periodic rate(s) applies, we use the daily balance method (including new transactions). To figure your periodic interest charges for each billing cycle when a monthly periodic rate(s) applies, we use the average daily balance method (including new transactions). For an explanation of either method, or questions about a particular interest charge calculation on your statement, please call us at the toll free customer service phone number listed above.

We calculate periodic interest charges separately for each feature (for example, purchases, balance transfers, cash advances or overdraft advances). These calculations may combine different categories with the same periodic rates. Variable rates will vary with the market based on the Prime Rate or such index described in your Account Agreement. There is a transaction fee for each balance transfer, cash advance, or check transaction in the amount stated in your Account Agreement. There is a foreign transaction fee of 3% of the U.S. dollar amount of any foreign transaction for some accounts. Please see your Account Agreement for information about these fees.

We add transactions and fees to your daily balance no earlier than:

1) the date of the transaction – for new purchases, balance transfers, overdraft advances or cash advances;

2) the date the payee deposits the check – for new cash advance checks or balance transfer checks;

3) the date of a related transaction, the date they are posted to your account, or the last day of the billing cycle, whichever we may choose – for fees.

**How to Avoid Paying Interest on Purchases:** Your due date will be a minimum of 21 days after the close of each billing cycle. If you pay your account in full each billing period by the date and time due, no interest is charged on new purchases month to month. Also, we will not impose interest charges on any portion of a purchase balance you repay while that balance is subject to an interest-free period. Subject to any interest-free period for new purchases, we will begin charging interest from the date a transaction (including any balance transfer, cash advance or overdraft advance), fee or interest charge is added to your daily balance until your account is paid in full. Because we apply payments in excess of your minimum payment first to higher rate balances, you may not be able to avoid interest charges on new purchases if you have another balance at a higher interest rate unless you pay your balance in full each month.

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us on a separate sheet at Customer Service, P.O. Box 15299 Wilmington, DE 19850-5299. You may also contact us on the web at chase.com.

In your letter, give us the following information:

- Account information: Your name and Account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors in writing or on the web at chase.com. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50 (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)

2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card Account do not qualify.

3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at Customer Service, P.O. Box 15299 Wilmington, DE 19850-5299 or on the web at chase.com.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

**MileagePlus**
**UNITED**

 **Manage your account online:**
www.chase.com/united

 **Customer Service:**
1-888-795-0576

 **Mobile:** Visit chase.com
on your mobile browser

| 2014 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2014 | $375.00 |
| Total interest charged in 2014 | $0.00 |

Year-to-date totals do not reflect any fee or interest refunds
you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|
| **PURCHASES** | | | |
| Purchases | 13.24% (v) | -0- | -0- |
| **CASH ADVANCES** | | | |
| Cash Advances | 19.24% (v) | -0- | -0- |
| **BALANCE TRANSFERS** | | | |
| Balance Transfer | 13.24% (v) | -0- | -0- |

(v) = Variable Rate                                          **31 Days in Billing Period**

Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.

358



pursuant to Section 15.062 of the Texas Civil Practice and Remedies Code as the third-party claim brought by DeLitta against the Trustee arises out of the same transaction or occurrence or series of transactions or occurrences and Plaintiff's claims against the Trustee arise out of the same subject matter as Plaintiff's claims against DeLitta.

14.     An unsigned copy of the Operating Agreement was filed originally because an executed copy of the signature page to the Operating Agreement could not be located.   The parties have treated and continue to treat the Operating Agreement as an effective agreement (e.g., Plaintiff filed suit in Travis County; Defendants did not contest venue and thereby waived any venue challenge; and DeLitta made an offer to buy Plaintiff's shares pursuant to the terms in the Operating Agreement). The Operating Agreement is effective because Schaefer and DeLitta consented to the form, terms and provisions of the agreement and approved the agreement in all respects by signing the agreement and the Written Consent and have also sufficiently ratified the Operating Agreement and Written Consent as both has treated them as operative and relied on them in good faith.

## IV.     FACTS

### A.     Creation of Axiom Medical and Establishment of 50/50 Ownership from Inception

15.     In 1999, DeLitta contacted Plaintiff about starting a company that would be owned 50/50 between Plaintiff and DeLitta and provide injury management for work-related and personal injuries for oil and gas companies.  In reliance on DeLitta's agreement that he and Plaintiff would own the new company 50/50 and/or be "equal partners," Plaintiff accepted DeLitta's offer. Over the course of 1999 and 2000, Plaintiff and DeLitta formalized their business plan that included DeLitta handling all the company's operations and Plaintiff managing the nursing staff.  As part of DeLitta's duty to handle the operations of the business, DeLitta formed Axiom Medical in October 1999.

24. On or about August 8, 2013, without Plaintiff's consent and before forming DeLCom Properties and closing on the Panther Creek Building, DeLitta executed a lease on behalf of both DeLCom Properties and Axiom Medical with terms that were very favorable to DeLCom Properties (DeLitta's solely owned company) acting as the landlord and very unfavorable to Axiom Medical, the purported tenant (the "Panther Creek Lease").

25. A few days later, DeLitta formed DeLCom Properties on or about August 13, 2013.

26. On or about August 26, 2013, DeLCom executed a promissory note to Wells Fargo, N.A. for the principal sum of $4,720,000.00 for the purchase of the Panther Creek Building. Axiom Medical, Axiom Properties, DeLitta and Plaintiff executed guaranties. In an effort to fund the down payment for the purchase of the Panther Creek Building, Plaintiff and DeLitta each agreed to take a $590,000.00 distribution. Plaintiff then agreed to lend her $590,000.00 to DeLCom Properties and DeLCom Properties agreed to pay it back through a second note guaranteed by DeLitta. A true and correct copy of the Wells Fargo promissory note, the settlement statement, the guaranties, and the second note and guaranty are attached as **Exhibits "B-1 through B-7"** respectively, and are incorporated by reference.

27. On or about September 23, 2013, Plaintiff received correspondence from Nicole Beck, HR Specialist for Axiom Medical regarding maintenance items to address due to Plaintiff's leaving Axiom Medical's employment ("Exit Letter"). This was the first time Plaintiff had heard anything about her "leaving" Axiom Medical. A true and correct of the Exit Letter is attached as **Exhibit "C-1"** and incorporated by reference.

28. Shortly after Plaintiff received the Exit Letter, DeLitta sent an email to all Axiom employees that purported to terminate Plaintiff as Executive Vice President and misrepresented or sought to usurp (or both) Plaintiff's role or participation in the continued operation and control of Axiom

("Termination Email"). A true and correct of the Termination Email is attached as **Exhibit "C-2"** and incorporated by reference. More specifically, Mr. DeLitta stated as follows:

> As President & CEO, I have a responsibility to make sure that Axiom remains a viable company and that all of its employees are happy. In order to do this, some changes will need to be made.
>
> Effectively immediately, Nancy Schaefer is no longer Executive Vice President. She will still be co-owner but will have no input or involvement with the day-to-day activities with nursing or Axiom as a whole. Processes are in place to acquire Nancy's share of the company as we move forward.
>
> Some of you may receive calls from her while others may want to reach out to her. There is to be no communication with Nancy from a business perspective. If she calls you or you call her, you may talk about anything other than Axiom. If she requests information or documentation from you, you are to refer her to Nicole Beck in HR. Any disregard of this will result in disciplinary action.

29. DeLitta's actions have robbed Plaintiff of her goodwill, created an atmosphere of fear and distrust between the two members, and undermined Plaintiff's longstanding and cherished business relationship with the Nursing Staff. The damage to the relationship between Plaintiff and Axiom's employees – and hence, her ability to protect her investment and interest in Axiom – is immediate and irreparable and is incapable of being accurately measured or legally compensated. The damage to Plaintiff's business relationship with the Nursing Staff is continued and ongoing.

30. DeLitta has improperly attempted to engineer a hostile take-over of Axiom through his unilateral and oppressive attempt to deprive Plaintiff of all rights of management or control of Axiom, including those rights vested in Plaintiff under the Operating Agreement. The Operating Agreement contains no provisions that would permit DeLitta to deprive Plaintiff of her role as a manager without her input or consent, much less unilaterally. Both the fact that DeLitta has usurped or attempted to usurp all of Plaintiff's control of Axiom, and the manner and means by which he has endeavored to do so, has caused and continues to cause Plaintiff harm.

**PLAINTIFF'S FIFTH AMENDED PETITION**
**AND JURY DEMAND– Page 8**

404

31.    DeLitta has deposited, or caused to be deposited, checks payable to Axiom into his own personal account on more than one occasion. Additionally, DeLitta has used company funds to pay for personal litigation expenses.

**C.    Plaintiff Obtains a Temporary Restraining Order and Temporary Injunction**

32.    After learning that DeLitta had executed the Panther Creek Lease without her consent and after receiving both the Exit Letter and Termination Email, on October 9, 2013, Plaintiff filed her original petition and obtained a temporary restraining order enjoining Defendants from interfering with Plaintiff's access to Axiom's offices, books, records, and employees, from transferring company assets, and from interfering with Plaintiff reinstating herself as Executive Vice President, among other things.  A copy of the Temporary Restraining Order is attached as **Exhibit "D"** and incorporated by reference.

33.    Plaintiff and Defendants entered into an Agreed Temporary Injunction dated October 29, 2013 (under similar, additional and revised conditions as those imposed by Temporary Restraining Order), and the Court appointed a Provisional Voting Member to break ties at the Axiom Medical board level.  A copy of the Agreed Temporary Injunction and the Order appointing the Provisional Member is attached as **Exhibit "E-1" through "E-2"**, respectively, and are incorporated by reference. One of the most significant disagreements sought to be resolved at that time was the dispute over DeLitta's pre-litigation execution of the Panther Creek Lease that contained grossly one-sided terms to the benefit of DeLCom Properties and to the detriment of Axiom Medical, the terms and execution of which constitute self-dealing and defective corporate approval.

34.    After the Provisional Member was appointed, Axiom, with DeLitta's approval, retained the Houston law firm of Andrews Kurth, LLP to review the alleged Panther Creek Lease.  That review indicated that the alleged Panther Creek Lease was fraught with egregious terms and conditions for

any percentage of her 50% ownership in Axiom Medical interests to the Trust and or agree to the company valuation recited in the Sale Agreement. A copy of the Sale Agreement is attached as **Exhibit "G"** and is incorporated by reference. Further, upon information and belief, the Trust is a sham – a mere instrument created and/or controlled by DeLitta to deprive Plaintiff of her ownership interests. Through these actions, DeLitta and the Trustee have deprived Plaintiff of her interest in Axiom with and for no payment or consideration to Plaintiff.

43. Amazingly, Defendants have now abandoned that claim and executed a document stipulating that the Trust and Danielle Seger have no interest in Axiom. As result of the stipulation, Plaintiff has dropped her claims against the Trust.

**E.      DeLitta's Continued Self-Dealing and Violations of the Agreed Temporary Injunction Caused the Court to Appoint a Receiver and Disqualify Counsel from Jointly Representing Axiom and DeLitta**

44. DeLitta has used and continues to use corporate assets for his own personal benefit and continues to violate the Agreed Temporary Injunction in the following ways:

- o used company funds to pay rent without authorization;

- o used company credit cards for personal expenses for himself and for his family;

- o caused unauthorized, self-serving, undocumented and fraudulent accounting entries to be made to his benefit;

- o backdated a fraudulent software license;

- o provided inaccurate financial information to Axiom's board;

- o used company funds to pay for personal litigation expenses;

- o made payments for leasehold improvements and design work for DeLCom Properties' office building without authority;

- o granted raises and changes in employee compensation without authority;

- o delayed payments to Plaintiff while timely paying himself;

- o delayed or hindered Plaintiff's access to records;

- o utilized his control over the finances of Axiom by refusing to take certain actions or refusing to pay for certain items when there was a disagreement about an action to be taken by the members; and

- o threatened Mr. Compton if he exercised his duties as the provisional member.

45.     DeLitta's intentional, willful, and repeated self-dealing and violations of the injunction harm both Schaefer and Axiom. DeLitta's conduct has gotten so bad that the Court was forced to appoint a receiver over Axiom's finances and books and disqualify Ms. De Ford and Mr. Drucker's firms from jointly representing Axiom and DeLitta to adequately protect Axiom's interests. In addition, upon information and belief Defendant DeLitta has apparently used the designation of "PhD" which degree was issued by an unaccredited university and as such Mr. DeLitta should be enjoined from using such designation.

## V.     CAUSES OF ACTION

### A.     Count One - Request For Declaratory Judgment

46.     The foregoing allegations are incorporated by reference as if fully set out herein.

47.     A present, justiciable controversy exists, the outcome of which may determine the rights of the parties and the outcome of this litigation. In particular, the ownership of 50% of the member interest in Axiom Medical and the validity of the Panther Creek Lease are in dispute. Pursuant to TEX. CIV. PRAC. & REM. CODE §37.001, *et seq.*, Plaintiff requests a declaratory judgment declaring the rights of the parties under and in connection with, among other things, writings constituting a contract or affected by statute or a contract, whose rights, status or other legal relations are affected thereby. More specifically, Plaintiff seeks a declaration that:

a.   Plaintiff has been the owner of 50% of the member interest of Axiom Medical since its inception or at least prior to June 29, 2005;

b.  the purported transfer of 99% of non-voting membership interests to DeLitta and subsequently to the Trust is invalid, voidable and/or void and/or was procured by fraud and all documents purporting to transfer same are set aside;

c.  the alleged Panther Creek Lease is void and of no further force and effect; and

d.  Axiom Medical (not DeLitta) owns the DeLCom Software and/or DeLCom Program.

e.  In the alternative, if Axiom Medical does not own the DeLCom Software and/or DeLCom Program, it has a perpetual free license to use it.

48.  Pursuant to TEX. CIV. PRAC. & REM. CODE §37.009, Plaintiff is entitled to recover an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

**B.  Count Two - Breach Of Operating Agreement by DeLitta**

49.  The foregoing allegations are incorporated by reference as if fully set out herein.

50.  The Operating Agreement is a valid and enforceable agreement.

51.  DeLitta breached the Operating Agreement.

52.  As a result, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**C.  Count Three – Breach of Oral Agreement by DeLitta**

53.  The foregoing allegations are incorporated by reference as if fully set out herein.

54.  DeLitta promised and orally agreed that Plaintiff was 50% owner of Axiom Medical.

55.  DeLitta breached that oral agreement and as a result, Plaintiff suffered damages.

**D.  Count Four – Common Law Fraud By DeLitta**

56.  The foregoing allegations are incorporated by reference as if fully set out herein.

57.  If Plaintiff is not a 50% owner of all membership interests in Axiom Medical, then DeLitta made false material misrepresentations to Plaintiff when he told her and acted as if she was a 50%

owner in Axiom Medical and treated her as such. DeLitta knew the misrepresentations were false when he made them or he made them recklessly with the intent that Plaintiff would act on them. Plaintiff relied on DeLitta's misrepresentations that she was a 50% owner in all interests to her own detriment and injury.

58. DeLitta also committed fraud when he made false material misrepresentations about the Sale Agreement inducing Plaintiff to sign it by telling Plaintiff that she was merely consenting to the transfer of his 50% of the shares to the Trust when in fact the Sale Agreement and the Purchase Agreement purported to convey 99% of the membership interest in Axiom Medical to the Trust. DeLitta knew the misrepresentations were false when he made them or he made them recklessly with the intent that Plaintiff would act on them. Plaintiff relied on DeLitta's misrepresentations to her own detriment and injury.

59. DeLitta committed fraud by nondisclosure when he concealed from or failed to disclose to Plaintiff the material facts that he had executed the Regulations of Axiom Medical purporting to give himself 100% ownership of Axiom Medical and a Purchase Agreement purporting to sell 99% of his alleged ownership interest (50% of which belonged to Plaintiff) in Axiom Medical to the Trust. DeLitta knew Plaintiff was ignorant of these facts and did not have an equal opportunity to discover them. DeLitta was deliberately silent when he had a duty to speak and by failing to disclose the facts, he intended to induce Plaintiff to sign the Sale Agreement. Plaintiff relied on DeLitta's non-disclosure to her detriment and injury.

60. Because they were procured by fraud, the Axiom Medical Regulations, the Sale Agreement and the Purchase Agreement should be given no force or effect and should be declared void and voidable.

61. DeLitta committed fraud by nondisclosure when he concealed from or failed to disclose to Plaintiff that Axiom Medical did not own the DeLCom Software and/or Program. DeLitta knew Plaintiff was ignorant of these facts and did not have an equal opportunity to discover them. DeLitta was deliberately silent when he had a duty to speak and by failing to disclose the facts, he intended to induce Plaintiff to take some action or refrain from acting. Plaintiff relied on DeLitta's non-disclosure to her detriment and injury.

62. Plaintiff's reliance on DeLitta's misrepresentations, nondisclosures and/or omissions was foreseeable and was the proximate cause of damages to Plaintiff.

**E.      Count Five – Breach of Fiduciary Duties By DeLitta**

63. The foregoing allegations are incorporated by reference as if fully set out herein.

64. DeLitta established a personal fiduciary duty to Plaintiff prior to the formation of Axiom Medical.

65. DeLitta breached his fiduciary duty to Plaintiff by depriving her of her 50% ownership in Axiom Medical and as her rights as a Member and Manager of Axiom. DeLitta's breach resulted in injury to Plaintiff and benefit to DeLitta.

66. DeLitta owes Axiom fiduciary duties including the duty to refrain from self-dealing.

67. DeLitta's unilateral refusal to implement the resolutions of the Board and the Board-approved Panther Creek Proposed Lease, coupled with his unauthorized and unapproved dictate to Axiom that it will return to and pursue the prior Panther Creek Lease, constitutes self dealing and breach of fiduciary duty, such that the alleged Panther Creek Lease should be declared void, voidable, and of no further force and effect.

68. DeLitta's actions misusing Axiom's corporate credit cards for his personal use and for the personal use of his family members and causing entries to be made on Axiom's books creating

payables to himself when such payables were never made in the past and in the absence of an assignment agreement assigning Axiom Medical's rights in the software to DeLitta constitutes a breach of DeLitta's fiduciary duty to refrain from self-dealing.

69.     DeLitta has breached his fiduciary duty by using corporate assets for his own personal benefit when he caused Axiom to pay for personal litigation expenses in this lawsuit.

## F.     Count Six –Negligent Misrepresentation by DeLitta

70.     The foregoing allegations are incorporated by reference as if fully set out herein.

71.     DeLitta made a representation to Plaintiff and provided false information for the guidance of others. DeLitta did not exercise reasonable care or competence in obtaining or communicating the information. Plaintiff justifiably relied on the representation and the representation proximately caused Plaintiff's injuries.

## G.     Count Seven – Conversion By DeLitta

72.     The foregoing allegations are incorporated by reference as if fully set out herein.

73.     Plaintiff owns 50% of the interests in Axiom Medical.  DeLitta attempted to transfer Plaintiff's membership interest to the Trust.  As a result, Plaintiff suffered injury and has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

74.     Axiom Medical owns the DeLCom Software and/or Program.  DeLitta attempt to transfer this asset to himself without consent of Axiom Medical or Plaintiff.  As a result, Plaintiff suffered injury and has been damages in an amount in excess of the minimal jurisdictional limits of this Court.

75.     Plaintiff would further show that the conduct of DeLitta is the type of conduct for which Plaintiff is entitled to punitive and/or exemplary damages. Plaintiff hereby requests the trier of fact

to award Plaintiff punitive and/or exemplary damages in an amount of two times her actual damages.

**I.      Count Eight– Shareholder Oppression by DeLitta**

76.     The foregoing allegations are incorporated by reference as if fully set out herein.

77.     DeLitta has, in his conduct described above, usurped and deprived (or has sought and purported to usurp and deprive) Plaintiff of her rights as a Member and Manager of Axiom including Axiom Medical, and has oppressed her as a Member. DeLitta's conduct was without color of corporate authority, and was also intentional and malicious. Plaintiff seeks recovery of her monetary damages in excess of the minimum jurisdictional limits of this Court, and punitive and exemplary damages as permitted by Texas law.

**J.      Count Nine- Constructive Trust**

78.     The foregoing allegations are incorporated by reference as if fully set out herein.

79.     To the extent the Trust was the recipient or transferee of any of Plaintiff's interest in Axiom Medical, the transfer was intended to hinder, delay and defraud Plaintiff, and was or constituted a transfer in exchange for which there was no consideration or no fair value to Plaintiff. This transaction was, though known to Mr. DeLitta, concealed from Plaintiff and was not known by her until DeLitta filed a motion to implead the Trustee as a necessary party. Plaintiff's interest in Axiom Medical arose prior to any such transfer, and the transfer to the Trust was an insider transaction, and was not made in good faith as to Plaintiff. Pursuant to TEX. BUS. & COMM. CODE § 24.001, *et seq.*, the above transfer, if not void or subject or subservient to the interests of Plaintiff, is avoidable. Plaintiff is entitled to, and hereby prays for, all such remedies, at law or in equity as are provided under Texas law, including TEX. BUS. & COMM. CODE § 24.008, costs and reasonable attorneys fees as are equitable and just under TEX. BUS. & COMM. CODE § 24.013, and the imposition

of an equitable lien or constructive trust on the 50% member interest. In the alternative, Plaintiff prays for damages and such other equitable relief as may be proven at trial.

**J.      Count Ten – Injunctive Relief From All Defendants**

80.      The foregoing allegations are incorporated by reference as if fully set out herein.

81.      Plaintiff incorporates by reference as if fully set out herein Plaintiff's first, second and third verified applications for temporary restraining order, temporary injunction and permanent injunction, Plaintiff's verification filed on Dec. 15, 2014, and Plaintiff's Verified Application for Temporary and Permanent Injunction to Enjoin Michael J. DeLitta from Misrepresenting Himself as a Medical Doctor filed December 12, 2014.

82.      Plaintiff seeks to obtain a permanent injunction in this matter consistent with its claims in this lawsuit and the Agreed Temporary Injunction.

83.      Plaintiff has demonstrated a viable cause of action against Defendants; Plaintiff has demonstrated a probable right to the relief sought; and Plaintiff has demonstrated a probable imminent and irreparable injury in the interim for which there is no adequate remedy at law.

84.      If Defendants' conducts is not permanently enjoined, Plaintiff will continue to suffer an immediate and irreparable injury for which there is no adequate remedy at law to her business relationships with Axiom employees, an immediate and irreparable injury to her ownership interests in Axiom, and an immediate and irreparable injury in her ability to manage Axiom including without limitation her ability to create, implement and review company policies, hire and fire employees, set employee compensation, and train employees.

**K.      Count Eleven – Alternative Request for Corporate Judicial Remedies**

85.      The foregoing allegations are incorporated by reference as if fully set out herein.

86. Plaintiff seeks enforcement of the provisions of the Operating Agreement to appoint a receiver to rehabilitate, sell and/or seek dissolution of Axiom Medical pursuant to section 64.001 of the Texas Civil Practice and Remedies Code and/or sections 11.314, 11.402, 11.403, 11.404, and/or 11.405 of the Texas Business Organizations Code. Notwithstanding the appointment of a Provisional Member and a Receiver, DeLitta continues to refuse to follow the vote by Axiom's Board including the Provisional Member and continues to violate the Agreed Temporary Injunction. Given DeLitta's continual refusal to follow the Board's votes and violations of the Agreed Temporary Injunction, a receiver should be given the power to sell the company and/or dissolve it as a perpetual deadlock among the members is not feasible.

**L.    Count Twelve-Unjust Enrichment**

87. The foregoing allegations are incorporated by reference as if fully set out herein.

88. After receiving the benefit of Plaintiff's goodwill in the industry, DeLitta: (a) ousted Plaintiff from Axiom Medical; (b) sought to deprive her of her membership interests; (c) created an atmosphere of fear and distrust between the two members; and (d) undermined Plaintiff's longstanding and cherished business relationship with the Nursing Staff.

89. DeLitta received the benefit of Plaintiff's goodwill by fraud, duress, or the taking of an undue advantage. DeLitta wrongfully secured or passively received this benefit and it would be unconscionable for him to retain it.

## VI.    CONDITIONS PRECEDENT

90. All conditions precedent necessary for Plaintiff to have and recover in this action have been performed, have occurred or have been waived.

Filed in The District Court
of Travis County, Texas

APR 2 2 2015

At _____ 10

Velva L. Price, District Clerk

## CAUSE NO. D-1-GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| DELCOM PROPERTIES, LLC, | § | |
| | § | |
| Defendants. | § | 201st JUDICIAL DISTRICT |
| | § | |

## <u>TEMPORARY INJUNCTION</u>

On April 15, 2015, this Court considered Plaintiff's Verified Application for Temporary and Permanent Injunction to Enjoin Michael J. DeLitta ("DeLitta") from Misrepresenting Himself as a Medical Doctor.

After having reviewed the pleadings on file, after having heard the arguments of counsel and testimony from witnesses, the Court finds that Plaintiff's verified application for temporary injunction should be granted.

The Court finds that:

1. DeLitta is not a medical doctor.

2. DeLitta serves as President and CEO of Axiom Medical Consulting, LLC ("Axiom").

3. Axiom provides medical consulting services and advertises that it "employs Doctors, Physician Assistants, Registered Nurses, an a specially trained staff to provide a full suite of

Case # D-1-GN-13-003516

003993332

ENTERED

624

medical management services, ranging from work-related injury case management to a multitude of customizable exam programs."

4. DeLitta is a licensed physician assistant.

5. DeLitta has a Ph.D in Psychology from Newport University.

6. Axiom's company brochures and website to refer to DeLitta as "Dr. Michael J. DeLitta."

7. DeLitta has referred to himself as a "doctor" and uses the titles "Doctor" and/or "Dr." in the course of his work for Axiom.

8. DeLitta has a license plate that reads "OCC DOC" which refers to being an Occupational Doctor.

9. DeLitta has had a credit card with the term "M.D." after his name.

10. DeLitta uses the title "Doctor" and/or "Dr.", both orally and in writing, including in e-mails and letters to Axiom employees and Axiom customers.

11. DeLitta answers and responds to the title "Doctor" when the circumstances make it obvious that the person addressing him believes that he is a medical doctor, and that DeLitta never corrects or clarifies the misunderstanding.

12. Because Axiom is a medical consulting company and provides medical advice, there is a substantial likelihood that DeLitta's use of the "Dr." title could mislead others into believing that he is a medical doctor.

13. DeLitta's conduct is causing immediate and irreparable harm to Axiom's reputation and may subject Axiom to civil and criminal liability thereby diminishing its value and causing damages that are not quantifiable.

14. Plaintiff has demonstrated a viable cause of action against DeLitta.

15. Plaintiff has demonstrated a probable right to the relief sought.

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

16. Plaintiff has demonstrated a probable immediate and irreparable injury in the interim that cannot be compensated by money damages for which there is no adequate remedy at law.

17. If DeLitta's conduct is not enjoined, his conduct will cause immediate and irreparable injury to Axiom's reputation, not only with its customers and employees but also within the medical industry, and makes it a party to false advertising and complicit in DeLitta's wrongful conduct.

IT IS THEREFORE, ORDERED, that Defendant MICHAEL J. DELITTA and his officers, agents, servants, employees, representatives, affiliates, subsidiaries, assigns, attorneys and all those in active participation with them, who receive notice of this temporary injunction, shall be enjoined, either directly or indirectly, from:

a) using the title "Doctor," "Dr.," or M.D. or otherwise misleading people into believing that he is a medical doctor in any context;

b) using the title "Doctor", "Dr.", "M.D." or otherwise misleading people into believing that he is a medical doctor while performing any duties or functions for Axiom;

c) removing any reference to the term "Dr." or "M.D." from Axiom marketing material including its website;

d) advising Axiom employees and staff to refer to him as "Dr.";

e) prohibiting him from continuing to be listed on Axiom credit cards and bank statements as "Dr.".

IT IS FURTHER, ORDERED, that a final trial shall be heard on the __6__ day of __May__, 20_15_, at _9.00_ o'clock _a_.m. in the Courtroom of _201_ Judicial Court of Travis County, Texas, and that Defendants shall then and there show cause why, if any, a Permanent Injunction should not be issued as requested by Plaintiff.

IT IS FURTHER, ORDERED, Plaintiff shall post bond in the amount of _$1,000_.

SIGNED this _22_ day of _May_, 2015 at _9.35_ o'clock _A_.m.

By: _____
HONORABLE JUDGE PRESIDING

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

626

627

**AGREED AS TO FORM:**

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
Telephone:  (512) 473-2257
Facsimile:  (512) 478-4409


By:  _____
　　　　　Donald R. Taylor
　　　　　State Bar No. 19688800
　　　　　dtaylor@taylordunham.com

　　　　　Of Counsel Stacey Reese
　　　　　State Bar No. 24056188
　　　　　stacey@reeselawpractice.com

**HOWARD F. CARTER, JR., P.C.**
Attorneys & Counselors
Howard F. Carter, Jr.
State Bar No. 03916500
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
Telephone: (972) 455-2001
Facsimile: (972) 455-2015
Email: sam@scarterlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

628

**DRUCKER HOPKINS, LLP**
Douglas R. Drucker
Kirby Hopkins
21 Waterway Avenue, Suite 300
The Woodlands, TX 77380
Telephone: (281) 362-2863
Facsimile: (855) 558-1745

By: _____
   Douglas R. Drucker
   State Bar No. 24034488
   Kirby Hopkins
   State Bar No. 24034488

**HOWRY BREEN & HERMAN, LLP**
Timothy J. Herman
State Bar No. 09513700
James Hatchitt
State Bar No. 24072478
1900 Pearl Street
Austin, Texas 78705
Telephone: (512) 474-7300
Facsimile: (512) 474-8557

**ATTORNEYS FOR DEFENDANTS**
**MICHAEL J. DELITTA, AXIOM**
**MEDICAL CONSULTING, LLC,**
**AXIOM PROFESSIONAL, LLC,**
**AXIOM PROPERTIES, LLC, AND**
**DELCOM PROPERTIES, LLC**

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor



**ORLINDA NARANJO**
**Judge**
(512) 854-4023

**TAMMY ST. GEORGE**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

## 419TH DISTRICT COURT

HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX: (512) 854-2224

**STEPHANIE WILLIAMS**
Court Clerk
(512) 854-5854

April 22, 2015

*Via Facsimile (512) 478-4409*
Donald R. Taylor
Attorney for Plaintiff
Taylor Dunham and Rodriguez, LLP.
301 Congress Avenue, Suite 1050
Austin, Texas 78701

*Via Facsimile (512) 474-8557*
Douglas R. Drucker
Attorney for Defendants
Drucker Hopkins, LLP
21 Waterway Avenue, Suite 300
The Woodlands, Texas 77380

**Re:** **Cause No. D-1-GN-13-003516; Nancy Schaefer vs. Michael J. Delitta, Axiom Medical Consulting, LLC, Axiom Professionals, LLC, Axiom Properties, LLC, Delcom Properties, LLC; In the 201st. Judicial District Court, Travis County, Texas**

Dear Counsel:

Enclosed is the signed Temporary Injunction in the above-referenced matter. The Order has been stamped and filed with the District Clerk's Office.

If you have any questions regarding this matter, please contact me directly at (512) 854-4023.

Sincerely,

Tammy St. George
Court Operations Officer to Judge Orlinda L. Naranjo
419th District Court, Travis County

Enclosures (1)
xc: Ms. Velva Price, District Clerk

629



# 419TH DISTRICT COURT

### HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**TAMMY ST.GEORGE**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

## FAX COVER SHEET

**Date:**    4/22/15

**To:**    <u>Donald Taylor</u>
<u>Douglas Drucker</u>

**Fax No.:**    *(512) 478-4409*
(512) 474-8557

**From:** Tammy St. George, Court Operations Officer to Judge Orlinda Naranjo

**Fax No.: 512-854-2224**

**Message:**

_____
_____
_____
_____

**Number of Pages:  7  *Including Fax Cover)***

        **If there is a problem with the transmission of this facsimile, please me at 512-854-4023.**

*********** -224 854 512         - ***** -         DC H19TH- ********************************************************

        -419TH DISTRICT COURT-         -

| FILE NO.=374 | | | | | |
|---|---|---|---|---|---|
| STN NO. | COMM. | ONE-TOUCH/ ABBR NO. | STATION NAME/TEL. NO. | PAGES | DURATION |
| 001 | OK | ☎ | 85124748557 | 007/007 | 00:03:01 |

MODE = MEMORY TRANSMISSION          START=APR-22 10:51    END=APR-22 10:58

*********** -COMM. JOURNAL- ****************** DATE APR-22-2015 ***** TIME 10:58 ***********



# 419TH DISTRICT COURT

### HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**TAMMY ST.GEORGE**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

## FAX COVER SHEET

Date:    4/22/15

To:    **Donald Taylor**
        **Douglas Drucker**

Fax No.:    **(512) 478-4409**
           **(512) 474-8557**

From: Tammy St. George, Court Operations Officer to Judge Orlinda Naranjo

Fax No.: **512-854-2224**

Message:

Number of Pages: 7 *Including Fax Cover)*

    If there is a problem with the transmission of this facsimile, please me at 512-854-4023.

********** –512 854 2224–     – ***** –     –419TH DC– ****************************************

      –     –419TH DISTRICT COURT–        –

| NO. STN | COMM. | ONE-TOUCH/ ABBR NO. | STATION NAME/TEL NO. | PAGES | DURATION |
|---|---|---|---|---|---|
| 001 | OK | ☎ | 85124784409 | 007 | 00:01:22 |

FILE NO.=373

MODE = MEMORY TRANSMISSION         START=APR-22 10:49      END=APR-22 10:51

********** –COMM. JOURNAL– ********************** DATE APR-22-2015 ***** TIME 10:51 **********

Filed in The District Court
of Travis County, Texas

**APR 29 2015**

At_____3:45____ ◯M.

Velva L. Price, District Clerk

### CAUSE NO. D-1-GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL J. DELITTA, | § | TRAVIS COUNTY, TEXAS |
| AXIOM MEDICAL CONSULTING, | § | |
| LLC, AXIOM PROFESSIONALS, | § | |
| LLC, AXIOM PROPERTIES, LLC, | § | |
| DELCOM PROPERTIES, LLC, | § | |
| | § | |
| Defendants. | § | 201st JUDICIAL DISTRICT |
| | § | |

## AMENDED TEMPORARY INJUNCTION

On April 15, 2015, this Court considered Plaintiff's Verified Application for Temporary and Permanent Injunction to Enjoin Michael J. DeLitta ("DeLitta") from Misrepresenting Himself as a Medical Doctor.

After having reviewed the pleadings on file, after having heard the arguments of counsel and testimony from witnesses, the Court finds that Plaintiff's verified application for temporary injunction should be granted.

The Court finds that:

1. DeLitta is not a medical doctor.

2. DeLitta serves as President and CEO of Axiom Medical Consulting, LLC ("Axiom").

3. Axiom provides medical consulting services and advertises that it "employs Doctors, Physician Assistants, Registered Nurses, an a specially trained staff to provide a full suite of

1

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor



Case # D-1-GN-13-003516

004006391



632

medical management services, ranging from work-related injury case management to a multitude of customizable exam programs."

4.   DeLitta is a licensed physician assistant.

5.   DeLitta has a Ph.D in Psychology from Newport University.

6.   Axiom's company brochures and website to refer to DeLitta as "Dr. Michael J. DeLitta."

7.   DeLitta has referred to himself as a "doctor" and uses the titles "Doctor" and/or "Dr." in the course of his work for Axiom.

8.   DeLitta has a license plate that reads "OCC DOC" which refers to being an Occupational Doctor.

9.   DeLitta has had a credit card with the term "M.D." after his name.

10.  DeLitta uses the title "Doctor" and/or "Dr.", both orally and in writing, including in e-mails and letters to Axiom employees and Axiom customers.

11.  DeLitta answers and responds to the title "Doctor" when the circumstances make it obvious that the person addressing him believes that he is a medical doctor, and that DeLitta never corrects or clarifies the misunderstanding.

12.  Because Axiom is a medical consulting company and provides medical advice, there is a substantial likelihood that DeLitta's use of the "Dr." title could mislead others into believing that he is a medical doctor.

13.  DeLitta's conduct is causing immediate and irreparable harm to Axiom's reputation and may subject Axiom to civil and criminal liability thereby diminishing its value and causing damages that are not quantifiable.

2

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

634

14.  Plaintiff has demonstrated a viable cause of action against DeLitta.

15.  Plaintiff has demonstrated a probable right to the relief sought.

16.  Plaintiff has demonstrated a probable immediate and irreparable injury in the interim that cannot be compensated by money damages for which there is no adequate remedy at law.

17.  If DeLitta's conduct is not enjoined, his conduct will cause immediate and irreparable injury to Axiom's reputation, not only with its customers and employees but also within the medical industry, and makes it a party to false advertising and complicit in DeLitta's wrongful conduct.

IT IS THEREFORE, ORDERED, that Defendant MICHAEL J. DELITTA and his officers, agents, servants, employees, representatives, affiliates, subsidiaries, assigns, attorneys and all those in active participation with them, who receive notice of this temporary injunction, shall be enjoined, either directly or indirectly, from:

a)  Using the title "Doctor," "Dr.," M.D. or otherwise misleading people into believing that he is a medical doctor or in any context;

b)  using the title "Doctor", "Dr.", "M.D." or otherwise misleading people into believing that he is a medical doctor while performing any duties or functions for Axiom;

c)  advising Axiom employees and staff to refer to him as "Dr.";

3

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

635

In addition, Defendant MICHAEL J. DELITTA shall refrain from:

a) using the term "Dr." or "M.D." in any Axiom marketing material;

b) continuing to be listed on Axiom's credit cards and bank statements as "Dr.".

IT IS FURTHER, ORDERED, that a final trial shall be heard on the 26th day of October, 2015, at 9:00 o'clock a.m. in the Courtroom of 201 Judicial Court of Travis County, Texas, and that Defendants shall then and there show cause why, if any, a Permanent Injunction should not be issued as requested by Plaintiff.

IT IS FURTHER, ORDERED, that Plaintiff's bond in the amount of $1,000.00 posted with the Travis County District Clerk on April 22, 2015, shall serve as sufficient bond for this order.

SIGNED this 29 day of April, 2015 at 342 o'clock p.m.

By: _____
THE HONORABLE ORLINDA NARANJO

**AGREED AS TO FORM ONLY:**

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
Telephone:  (512) 473-2257
Facsimile:  (512) 478-4409


By: _____
           Donald R. Taylor
           State Bar No. 19688800
           dtaylor@taylordunham.com

           Of Counsel Stacey Reese
           State Bar No. 24056188
           stacey@reeselawpractice.com

**HOWARD F. CARTER, JR., P.C.**
Attorneys & Counselors
Howard F. Carter, Jr.
State Bar No. 03916500
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
Telephone: (972) 455-2001
Facsimile: (972) 455-2015
Email: sam@scarterlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

_Approved as to form mj_

**DRUCKER HOPKINS, LLP**
Douglas R. Drucker
Kirby Hopkins
21 Waterway Avenue, Suite 300
The Woodlands, TX 77380
Telephone: (281) 362-2863
Facsimile: (855) 558-1745

By:

Douglas R. Drucker
State Bar No. 24034488
Kirby Hopkins
State Bar No. 24034488

**HOWRY BREEN & HERMAN, LLP**
Timothy J. Herman
State Bar No. 09513700
James Hatchitt
State Bar No. 24072478
1900 Pearl Street
Austin, Texas 78705
Telephone: (512) 474-7300
Facsimile: (512) 474-8557

**ATTORNEYS FOR DEFENDANTS
MICHAEL J. DELITTA, AXIOM
MEDICAL CONSULTING, LLC,
AXIOM PROFESSIONAL, LLC,
AXIOM PROPERTIES, LLC, AND
DELCOM PROPERTIES, LLC**

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

**AGREED AS TO FORM ONLY:**

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
Telephone: (512) 473-2257
Facsimile: (512) 478-4409

By: _____
        Donald R. Taylor
        State Bar No. 19688800
        dtaylor@taylordunham.com

        Of Counsel Stacey Reese
        State Bar No. 24056188
        stacey@reeselawpractice.com

**HOWARD F. CARTER, JR., P.C.**
Attorneys & Counselors
Howard F. Carter, Jr.
State Bar No. 03916500
5600 Tennyson Parkway, Suite 160
Plano, Texas 75024
Telephone: (972) 455-2001
Facsimile: (972) 455-2015
Email: sam@scarterlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

Temporary Injunction Enjoining Michael J. DeLitta
From Misrepresenting Himself as Medical Doctor

CAUSE NO. D-1-GN-13-003516

| | | |
|---|---|---|
| NANCY SCHAEFER | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| MICHAEL J. DELITTA, AXIOM | § | |
| MEDICAL CONSULTING, LLC, | § | |
| AXIOM PROFESSIONALS, LLC, | § | |
| AXIOM PROPERTIES, LLC and | § | |
| DELCOM PROPERTIES, LLC | § | |
| | § | |
| *Defendants* | § | 201ST JUDICIAL DISTRICT |

## NOTICE OF ACCELERATED APPEAL OF APRIL 29, 2015 AMENDED TEMPORARY INJUNCTION

.

Pursuant to Texas Rule of Appellate Procedure 25.1 and 34, Defendant Michael J. DeLitta ("DeLitta") respectfully files this notice of accelerated appeal of the court's April 29, 2015 Amended Temporary Injunction granting Plaintiff's Verified Application for Temporary Injunction to Enjoin Michael J. DeLitta ("DeLitta") from Misrepresenting Himself as a Medical Doctor ("Temporary Injunction").

Further, Defendants respectfully request the appropriate preparing and forwarding of the clerk's record and reporter's record to the appellate court clerk, and submit the following information in support of this notice of accelerated appeal:

| **Trial Court** | 201ˢᵗ Judicial District Court |
| | Travis County, Texas |
| | **Cause No D-1-GN-13-003516** |

**Style** *Nancy Schaefer,* Plaintiff

*Michael J. DeLitta,*
*Axiom Medical Consulting, LLC,*
*Axiom Professionals, LLC,*
*Axiom Properties, LLC, and*
*DeLCom Properties, LLC,* Defendants

**Date of Order:** April 29, 2015 ("Amended Temporary Injunction")

**Parties Desiring Accelerated Appeal:** Defendant Michael J. DeLitta

**Appellate Court:** Accelerated Appeal is taken to the Third Court of Appeals, Austin, Texas

**Name of Parties Filing Notice:** Michael J. DeLitta

**Accelerated Appeal:** This is an accelerated appeal, and is Not a parental termination or child protection case.

**Indigency Statement:** The filing parties are not indigent.

Wherefore, Defendant Michael J. DeLitta respectfully requests that:

a) the trial court clerk send a copy of this notice of accelerated appeal to the appellate court clerk and to the court reporter(s) responsible for preparing the reporter's record;

b) the trial court clerk request that the official reporter(s) prepare and forward to the appellate clerk the reporter's record (including all exhibits proffered, offered, or admitted) for the hearing conducted on April 15, 2015;

c) the trial court clerk prepare and forward to the appellate clerk the clerk's record;

d) the trial court clerk take all other steps to prepare and forward the appellate record to the appellate court clerk.

Respectfully submitted,

Drucker ⦙ Hopkins LLP

*/s/ Douglas R. Drucker*_____
Douglas R. Drucker
Texas Bar No. 06136100
Kirby D. Hopkins
Texas Bar No. 24034488
21 Waterway Avenue. Suite 300
The Woodlands, Texas 77380
281.362.2863 (phone)
855.558.1745 (fax)
drucker@druckerhopkins.com
hopkins@druckerhopkins.com

**Counsel for Defendants**

Timothy J. Herman

State Bar No. 09513700
therman@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
HOWRY BREEN & HERMAN, LLP
1900 Pearl Street
Austin, Texas 78705
512.474.7300 (phone)

**Local Counsel for Defendants**

## CERTIFICATE OF SERVICE

I certify that pursuant to the Texas Rules of Civil Procedure, a true and correct copy of the foregoing was served via (hand delivery ____; CMRRR ____; fax or eFile notification __X__) to the all attorneys of record on the 11th day of May, 2015:

*/s/Douglas R. Drucker*
Douglas R. Drucker